UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x

CITY OF WARREN POLICE AND FIRE :   Civil Action No. 1:20-cv-02031
RETIREMENT SYSTEM, Individually and on :
Behalf of All Others Similarly Situated, :   <u>CLASS ACTION</u>
                                    :
                   Plaintiff, :   COMPLAINT FOR VIOLATIONS OF THE
                                    :   FEDERAL SECURITIES LAWS
      vs. :
                                      :
WORLD WRESTLING ENTERTAINMENT, :
INC., VINCENT K. McMAHON, GEORGE :
A. BARRIOS and MICHELLE D. WILSON, :
                                      :
              Defendants. :

———————————————— x   <u>DEMAND FOR JURY TRIAL</u>

Plaintiff City of Warren Police and Fire Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by World Wrestling Entertainment, Inc. ("WWE" or the "Company"), Company press releases and conference call transcripts, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities fraud class action on behalf of all purchasers of WWE Class A common stock between February 7, 2019 and February 5, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").  These claims are asserted against WWE and certain of its senior executives who made materially false and misleading statements regarding the Company during the Class Period.

2.     In recent years, WWE entered into important strategic relationships with the Kingdom of Saudi Arabia, which the Company viewed as a critical emerging market and key to the Company's growth plans and financial success in the face of flagging domestic fan engagement. These relationships included a multi-year television distribution rights agreement with the Orbit Showcase Network ("OSN"), a Saudi-controlled direct broadcast satellite provider serving the Middle East and North Africa ("MENA") region, and a 10-year partnership with the Saudi General Sports Authority to host live events in Saudi Arabia.

3.     WWE and its management faced blowback from fans and the media for their willingness to work with the Saudis, given the human rights abuses, denial of equal rights to women

- 1 -

and minorities, and autocratic policies imposed during the reign of King Salman bin Abdulaziz Al Saud and his son, Crown Prince Mohammad bin Salman bin Abdulaziz Al Saud ("MBS"). These critical voices reached a crescendo following the October 2, 2018 murder of journalist Jamal Khashoggi, widely believed to be carried out at the direction of the Saudi government.

4.      Controversially, WWE decided to proceed with a scheduled live event in Saudi Arabia, *Crown Jewel*, on November 2, 2018, soon after the killing. Several prominent wrestlers refused to participate, including John Cena and Daniel Bryan. Although WWE decided to go forward with the event, citing contractual commitments, its representatives openly criticized the Saudi government. For example, WWE's Chief Brand Officer Stephanie McMahon stated it was an "incredibly tough decision, given that heinous act."

5.      Unbeknownst to investors, the events in late 2018 fomented simmering tensions between WWE and the Saudi government. In particular, conservative elements of the Saudi government disliked WWE's portrayal of women and what they viewed as the questionable morality reflected in WWE programming and live shows. At the same time, WWE was under immense pressure to justify its decision to continue working with the Saudi government and outwardly claimed that it was trying to push for change from within the country.

6.      By at least early 2019, tensions in the relationship between WWE and the Saudi government had reached a breaking point. The Saudi government had refused to make millions of dollars in payments owed to WWE. Further, OSN was contemplating the early termination of its obligations under its broadcasting agreement (ultimately terminated in March 2019) and had rebuffed WWE's efforts to renew the agreement. These developments threatened WWE's ability to reach a renewed media agreement in 2019, which the Company told investors was critical to its expansion plans in the MENA region and its growth prospects. Moreover, WWE was facing

withering consumer engagement in its traditional markets, heightening the need for the Company to reach an agreement with the Saudis on favorable terms.

7.     Throughout the Class Period, rather than disclose these adverse developments, defendants represented that WWE had continued to bolster its relationship with Saudi Arabia and was making significant progress on the renewal of the critical media agreement and its business initiatives in the country.  For example, defendants stated that WWE's "important partnership with the [Saudi] General Sports Authority" was "expected to continue to constitute a significant percentage of [WWE's] revenues" and that the Company had reached an "agreement in principle" on a renewed media rights deal for the MENA region.  In reality, however, the prospects for a deal continued to worsen throughout the Class Period, as the Saudi government failed to make millions of dollars in additional payments owed to WWE following a June 2019 live event held in the country and the negotiations with OSN floundered.

8.     The behind-the-scenes turmoil began to be revealed in a series of partial disclosures. On April 25, 2019, the Company disclosed disappointing financial results and fiscal guidance, which several analysts connected to potential hiccups in the Company's dealings with the Saudis.  While defendants insisted that negotiations were proceeding smoothly and nearing completion, this illusion was shattered on October 31, 2019.  In connection with the release of the Company's third quarter 2019 financial results, WWE revealed significant underperformance across key metrics and shocked the market by revealing that the vaunted MENA media rights deal had been indefinitely delayed. Around this same time, it was reported that the Saudi government had withheld tens of millions of dollars in payments owed to WWE.  The dispute spiraled out of control, culminating in a decision by WWE to cut a broadcasting feed of a live event held in the country.  In retaliation, the Saudi government temporarily refused to allow several WWE wrestlers to leave the country in what was

later described as akin to a "hostage situation" under the pretense of mechanical airplane issues. Then, on January 30, 2020, WWE revealed that two of its longest serving senior executives – defendants George A. Barrios and Michelle D. Wilson – had been unceremoniously ousted. Shortly thereafter, on February 6, 2020, WWE again disclosed disappointing financial performance due to its failure to secure a favorable broadcasting deal with the Saudis and revealed that the vaunted Saudi media rights deal had been completely excised from the Company's financial forecasting.

9.     As a result of these disclosures, the price of WWE stock plummeted from a Class Period high of more than $100 per share to as low as $40.24 per share on February 6, 2020, representing a stunning *60%* share price decline.  However, the Company's most senior executives – including each of the Individual Defendants (defined below) – took advantage of WWE's inflated stock price to sell millions of dollars' worth of their own WWE shares during the Class Period.  In a single stock sale, WWE's Chief Executive Officer ("CEO"), defendant Vincent K. McMahon, sold more than *3.2 million* WWE shares for *over $261 million* in gross insider trading proceeds.  This sale occurred on March 27, 2019, with only a few days left in the Company's disappointing 2019 first quarter and despite growing behind-the-scenes problems with the Saudis.

10.     Outside investors were not so fortunate, suffering hundreds of millions of dollars in losses and economic damages under the federal securities laws as the price of WWE stock collapsed when the truth finally began to be revealed over time.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

13.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, and WWE Class A common stock trades on the New York Stock Exchange ("NYSE"), which is located in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE.

## PARTIES

15.     Plaintiff City of Warren Police and Fire Retirement System, as set forth in the accompanying certification, which is incorporated herein by reference, purchased WWE Class A common stock during the Class Period and was damaged thereby.

16.     Defendant World Wrestling Entertainment, Inc. is headquartered in Stamford, Connecticut. WWE Class A common stock is listed and trades on the NYSE under the ticker symbol "WWE." The holders of WWE Class A common stock generally have the same rights as holders of WWE Class B common stock, except that holders of Class A common stock are entitled to one vote per share, whereas holders of Class B common stock are entitled to ten votes per share. Defendants admit that because "[a] substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by [defendant] McMahon," "he controls a majority of the voting power of [WWE] common stock and can effectively exercise control over [WWE's] affairs."

17.     Defendant Vincent K. McMahon ("McMahon") is, and was at all relevant times, the Co-Founder and CEO of WWE and Chairman of WWE's Board of Directors.

18.     Defendant George A. Barrios ("Barrios") was a Co-President of WWE, its principle financial officer and a member of its Board of Directors during the Class Period. On January 30, 2020, WWE announced that Barrios had abruptly left the Company "effective immediately."

19.     Defendant Michelle D. Wilson ("Wilson") was a Co-President of WWE and a member of its Board of Directors during the Class Period. On January 30, 2020, WWE announced that Wilson had abruptly left the Company "effective immediately."

20.     Defendants McMahon, Barrios and Wilson are sometimes referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that artificially inflated the price of WWE stock during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of WWE's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

21.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about WWE. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of WWE Class A common stock was a success, as it: (i) deceived the investing public regarding WWE's business and prospects; (ii) artificially inflated

the price of WWE Class A common stock; (iii) permitted certain senior executives of WWE to sell more than $282 million worth of their personally held shares at fraud inflated prices; and (iv) caused plaintiff and other members of the Class (defined below) to purchase WWE Class A common stock at artificially inflated prices.

## BACKGROUND TO THE ACTION

22.     WWE is an integrated media and entertainment company that is primarily known for its scripted professional wrestling shows.  As in other professional wrestling promotions, WWE shows are not legitimate contests, but are entertainment based and feature storyline-driven, scripted, and choreographed matches, though matches often include moves that can put performers at risk of injury, even death, if not performed correctly.  Since the 1980s, WWE has publicly branded its product as sports entertainment, acknowledging the product's roots in competitive sport and dramatic theater.

23.     WWE personnel consist of professional wrestlers, managers, play-by-play and color commentators, ring announcers, interviewers, referees, trainers, producers, script writers, and various other positions.  As of February 2019, WWE had 915 employees, excluding its hundreds of "Superstars" and "NXT" talent, which it considers independent contractors.  Main roster personnel are assigned to one of three primary brands – *Raw*, *SmackDown*, and *NXT* – and primarily appear on Monday Night *Raw*, Friday Night *SmackDown*, or *NXT*, while cruiserweight wrestlers appear on *205 Live* and wrestlers from *NXT UK* appear on their own weekly show.  Personnel can also appear on WWE's other weekly television programming, as well on pay-per-view and untelevised live events.

24.     WWE reports revenues in three segments: Live Events, Media, and Consumer Goods (merchandise).  Live Events provides ongoing content for WWE's media platforms and Live Event segment revenues consist primarily of ticket sales, including primary and secondary distribution, revenues from events for which WWE receives a fixed fee, as well as the sale of travel packages

associated with the Company's global live events.  The Media segment reflects the production and monetization of long-form and short-form media content across various platforms, including WWE Network, pay television, digital and social media, as well as filmed entertainment.  Across these platforms, revenues principally consist of content rights fees, subscriptions to WWE Network, and advertising and sponsorships.  Media net revenues were $683.4 million, $535.6 million, and $476.9 million, representing 73%, 67%, and 65% of WWE's total net revenues in fiscal years 2018, 2017, and 2016, respectively.

25.     The Kingdom of Saudi Arabia is a country in Western Asia constituting the bulk of the Arabian Peninsula.  The state, which is highly dependent on oil, as it has the second-largest proven petroleum reserves and is the largest exporter of petroleum in the world, is an absolute monarchy ruled by the Al Saud royal family.  Beginning in 2014, the Saudi government began hosting several WWE live events in Saudi Arabia.  The events were very lucrative for WWE, and later expanded as part of Saudi Arabia's social and economic reform program, Saudi Vision 2030.

26.     Orbit Showcase Network ("OSN") is a direct-broadcast satellite provider serving the MENA region.  OSN has traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region.  The OSN network is owned and operated by Panther Media Group Limited, a joint venture between a Kuwait-based company and Mawarid Holding, a private Saudi investment company controlled by the Al Saud royal Saudi family.

27.     On July 21, 2014, WWE and OSN announced a five-year exclusive media agreement, stating that "WWE's flagship television program Monday Night Raw [would] air live on OSN, WWE's exclusive pay TV partner in the Middle East and North Africa through 2019."  According to

a press release WWE and OSN put out that day, "[u]nder this new agreement, fans [could] now

enjoy all of WWE's programming, including Raw, SmackDown®, NXT™ and Main Event™, as

well as WWE pay-per-view events including WrestleMania® and SummerSlam®, in one place on

OSN Sports 2 HD."  The release further stated in pertinent part as follows:

> "OSN and WWE have a long standing relationship and we are very excited to
> be taking that to the next level," said Andy Warkman, OSN's VP of Sport &
> Production.  "For the first time in the region, all core WWE programming will be
> available in one place, making OSN the home of WWE, reaching an audience across
> more than 20 countries.  This deal furthers our commitment to bringing our
> customers the best content."
>
> "WWE is very excited to be extending and expanding its deal with OSN in
> the Middle East," said Carlo Nohra, General Manager of WWE Middle East.  "OSN
> hosts some of the very best international entertainment and sports programming and
> is the perfect home for WWE programming.  Together with OSN, we will continue
> to grow our TV, pay-per-view, live event and consumer products businesses across
> the Middle East."

28.     On February 15, 2015, WWE and OSN jointly issued a release stating they were

adding WWE Network to the five-year agreement as part of an expanded partnership.

29.     In the years that followed, expansion into the MENA region became an increasingly

important part of WWE's business plans and growth initiatives, as the Middle East grew to become

the Company's second largest market by monetization.  Key to this expansion was the Company's

desire to deepen its relationship with the Saudi government, which it planned to leverage into

increased penetration and monetization of the entire MENA region.

30.     Towards this end, in March 2018, the Saudi Press Agency announced that WWE and

the Saudi General Sports Authority had signed a 10-year multi-platform partnership with WWE to

hold wrestling events in the country.  Analysts estimated the partnership was worth about $500

million to WWE.  A press release issued by WWE and the Saudi General Sports Authority described

the deal as follows:

The Saudi General Sports Authority in partnership with WWE will present the *Greatest Royal Rumble* event at the King Abdullah Sports City in Jeddah, Saudi Arabia on Friday, April 27.  For the first time ever, the *Royal Rumble* match will feature 50 WWE Superstars.  As part of this historic event, fans will see WWE Superstars John Cena™, Triple H™, Roman Reigns™, AJ Styles™, Braun Strowman™, The New Day™, Randy Orton™, Bray Wyatt™ and Shinsuke Nakamura™, among others.

\*      \*      \*

Ticket and broadcast information will be available in the coming weeks.  ***This event is part of a 10-year strategic multiplatform partnership in support of Vision 2030, Saudi Arabia's social and economic reform program***.

"*The Greatest Royal Rumble* will be a spectacle of historic proportions," said Vince McMahon, WWE Chairman & CEO.  "***Our partnership with the Saudi General Sports Authority reflects a long-term commitment to present WWE's world-class entertainment to a global audience on a grander scale than ever before***."[1]

31.     The first event held under the Saudi partnership was the *Greatest Royal Rumble*, which took place on April 27, 2018 at the King Abdullah International Stadium in Jeddah, Saudi Arabia.  WWE hailed the event as the largest "outside the U.S. in the past 16 years" and a major contributor to the Company's "record" second quarter 2018 results.  Speaking during an earnings call with investors, defendant Wilson stated that, "[a]s added proof of the compelling nature of our content, last Friday, we held one of our largest events ever outside the United States, with a sold-out crowd at the Greatest Royal Rumble event in Jeddah, Saudi Arabia."  She continued, stating that "[t]he April 27th event marked the successful beginning of a 10-year partnership with the Kingdom of Saudi Arabia."

32.     Although WWE was criticized for holding the event without female wrestlers in accord with Saudi government policies, female fans were allowed to attend if accompanied by a male guardian.  During the show, a WWE commercial was aired that included female wrestlers in

---

[1]     Emphasis has been added throughout unless otherwise noted.

their ordinary regalia, inciting the Saudi General Sports Commission to issue an apology to Saudi citizens for the "indecent material."  WWE also sought to tamp down allegations that the partnership gave legitimacy and cover to an oppressive regime.  For example, Paul Michael Levesque (known by his stage name, "Triple H"), WWE's Executive Vice President of Talent, Live Events and Creative, responded to the criticism:  "'I understand that people are questioning it, but you have to understand that every culture is different and just because you don't agree with a certain aspect of it, it doesn't mean it's not a relevant culture. . . .  You can't dictate to a country or a religion about how they handle things but, having said that, WWE is at the forefront of a women's evolution in the world and what you can't do is effect change anywhere by staying away from it.'"  He continued:  "'While, right now, women are not competing in the event, we have had discussions about that and we believe and hope that, in the next few years they will be.'"

33.     Despite the criticism, WWE continued to view business dealings with the Saudi government as a lucrative entrance point into the MENA region and a key pillar of its business plans.  For example, in discussing the Company's "record" second quarter 2018 results, defendant McMahon stated, "'We're pleased with our continued success in increasing the monetization of WWE content globally.'"  He claimed this "'success is evidenced by . . . the development of a 10-year strategic partnership with the Saudi General Sports Authority,'" which he listed as among the Company's most important international initiatives.

34.     On October 2, 2018, the world was shocked to learn of the murder of journalist Jamal Khoshoggi, in which the Saudi government was implicated.  It was rumored that the next anticipated WWE live event scheduled to take place in Saudi Arabia, *Crown Jewel,* might be cancelled.  But the event went forward, with WWE stating on October 25, 2018, in connection with its third quarter 2018 results, that, "[s]imilar to other U.S.-based companies who plan to continue operations in Saudi

Arabia, the Company has decided to uphold its contractual obligations to the General Sports Authority." However, the incident placed added strain on the relationship between WWE and the Saudi government, which had begun to break down by at least the start of 2019. The Saudis withheld millions of dollars in money owed to WWE under the parties' agreements and decided to prematurely pull WWE programming on OSN as the parties entered a critical bargaining period, with the MENA media rights agreement coming up for renewal during the year.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

35.     The Class Period begins on February 7, 2019. On that date, WWE issued a press release announcing its fourth quarter and fiscal 2018 ("4Q18" and "FY18") financial results for the period ended December 31, 2018 and providing fiscal year 2019 ("FY19") financial guidance. The release stated that during FY18, WWE had successfully "[p]roduced new, large-scale international events (*Greatest Royal Rumble*, *Crown Jewel* and *Super Show-Down*) and compelling content across platforms." Discussing the Company's then-present business metrics and financial prospects, the release highlighted the Company's monetization of international markets, including Saudi Arabia. It stated in pertinent part as follows:

> "*In 2018, WWE generated the highest level of revenue and earnings in the Company's history by leveraging our brand strength to increase the monetization of our content worldwide*," stated Vince McMahon, Chairman and Chief Executive Officer. "*Our long-term growth strategy will continue to focus* on content creation, digitization and *international development*."

> George Barrios, WWE Co-President, added "We increased revenue by nearly $130 million, and achieved a record level of Adjusted OIBDA and network subscribers. *We expect to balance 2019 revenue growth with investment in strategic areas that extend the moat around our business, enabling us to continue our business transformation and maximize shareholder value*."[2]

---

[2]     "OIBDA" refers to operating income before depreciation and amortization.

36.     The press release also stated that WWE expected to achieve "Adjusted OIBDA of at

least $200 million" for the year, stating in pertinent part:

**Financial Outlook 2019**

>         *In 2019, WWE management expects the Company to achieve another year*
> *of* record revenue of approximately $1.0 billion and, as previously communicated, is
> targeting Adjusted *OIBDA of at least $200 million*, which would also be *an all-time*
> *record* (up at least 12% from Adjusted OIBDA of $178.9 million in 2018).

>         Management believes that increasing fan engagement over the next few years
> can enhance WWE's brand value and strengthen the Company's ability to optimize
> the value of its content over the long-term.  *Given the potential magnitude of this*
> *opportunity and its importance to long-term growth, the Company plans to*
> *continue to invest in* content, digitization and *international development*.

>                         *       *       *

>         Achieving the targeted range of full year results assumes substantial revenue,
> which supports Adjusted *OIBDA of at least $100 million* in the fourth quarter.

(Footnote omitted.)

37.     During the earnings call to discuss WWE's 4Q18 results, defendant McMahon stated

in his prepared remarks:  "Our international revenue surpassed $300 million for the first time in

history . . . [as] we performed large-scale record-breaking events, [including] *Greatest Royal*

*Rumble* . . . ."

38.     Similarly, defendant Barrios stated:  "[I]n 2018, we effectively executed our strategy,

leveraged our brand to increase the monetization of our content worldwide and across multiple

platforms . . . with international markets surpassing $300 million for the first time in our history."

He also tied the $200 million adjusted OIBDA projection to the Company's continued success and

efforts in the Middle East region.  He stated in pertinent part:

>         So if we're moving revenue at a faster clip than we anticipate, we may put some
> additional investments in the fourth quarter but *all geared towards hitting that $200*
> *million in OIBDA for the year*.  And as we talked about in the prepared remarks, *it*
> *really is on those areas of continuing to drive content, especially the localization of*
> *our current content and potentially local content in some of our key international*

- 13 -

*markets. **We just think that's a big addition to the flywheel that we've built***. We'll continue to invest in digital products and digitization kind of writ large, the network being kind of one of the largest manifestations of that. **And we'll continue to put more people, more kind of functional roles in our key markets**, in India, **in the Middle East**, in China, in Latin America. So that's what we're going to do. As we said again in the prepared remarks, **we think there's a long tail for us in the monetization of content, both in the U.S. and outside the U.S. and we think the opportunity is one we want to make sure we take advantage of. In terms of the rights renewal process outside the U.S., obviously, there's a lot of key markets that we're still working on**, U.K., India, China, Latin America, **the Middle East**. We'll announce those as the deals get done or shortly thereafter.

39.     On February 7, 2019, WWE also filed its FY18 Annual Report on Form 10-K with the SEC ("FY18 10-K"), which was signed by defendants McMahon, Barrios and Wilson. Defendants McMahon and Barrios also certified the accuracy of the report pursuant to the Sarbanes Oxley Act of 2002. The FY18 10-K emphasized the continuing importance of the Company's Saudi business dealings, stating in pertinent part as follows:

**Customers**

Our customers include content distributors of our media content through their networks and platforms, fans who purchase tickets to our live events, purchase our merchandise at venues or online through our eCommerce platforms and subscribers to WWE Network, advertisers and sponsors, consumer product licensees, and film distributors/buyers. ***As noted elsewhere, we have several important partners, including*** NBCU who carries the domestic television distribution of *Raw* and, until October 2019, *SmackDown Live*, the Fox Network which beginning October 2019 will begin distributing *SmackDown Live*, and ***the General Sports Authority of the Kingdom of Saudi Arabia who, among other things, hosts our live events in the Middle East***.

40.     In addition, the FY18 10-K emphasized the importance of the Saudi relationship, stating that, "[i]n 2018, WWE embarked on an important long-term partnership with the General Sports Authority of the Kingdom of Saudi Arabia for, among other things, a series of live events in that region." It also stated that WWE had "an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia" that was then "expected to continue to constitute a significant percentage of [WWE's] revenues."

- 14 -

41.     Also on February 7, 2019, WWE issued a press release "announc[ing] that the Company's Board of Directors ha[d] authorized a stock repurchase program of up to $500 million of the Company's common stock."  The release quoted defendant Barrios (who would ultimately sell over $3.3 million worth of his WWE stock that same month) as stating in pertinent part as follows:

> "The authorization of a stock repurchase program underscores our commitment to the Company's shareholders. ***The decision is supported by WWE's strong financial performance and demonstrates our confidence in the Company's future***.  We believe we can continue to invest for future growth, maintain financial flexibility and return excess capital to shareholders, all of which should keep us on the path toward building long-term value."

42.     On February 26, 2019, defendant Barrios presented to investors at the Morgan Stanley Technology, Media & Telecom Conference.  He stated that the negotiations on the MENA distribution rights deal were "ongoing," with a target to "get that locked down by the middle of the year."  He also stated that the "Middle East is now #2 in 2018 after the U.S." in terms of gross monetization and "important for us strategically because our distribution partners for the core content is a key part of the value creation for the business, important for us financially."

43.     The statements referenced above in ¶¶35-42 were materially false and misleading when made because they failed to disclose the following adverse facts that were known to defendants or recklessly disregarded by them:

        (a)     that WWE was experiencing rising tension with the Saudi government and a breakdown in negotiations over a renewed broadcasting distribution deal;

        (b)     that the Saudi government and its affiliates had failed to make millions of dollars in payments owed to WWE pursuant to existing contractual commitments between the parties;

(c)     that OSN had terminated the broadcast of WWE programming in the first quarter of 2019 despite a contractual obligation to continue such broadcasts and that this cancellation was symptomatic of a deterioration in the business relationship between the parties;

(d)     that OSN had rebuffed efforts to renew a distribution rights agreement on terms acceptable to WWE, and such renewal was unlikely to occur in 2019, if ever;

(e)     that WWE did not have the ability to expand its operations in the Middle East or within Saudi Arabia as had been represented to investors; and

(f)     that as a result of the foregoing, defendants' positive statements about the Company's business metrics and financial prospects during the Class Period were materially false and misleading and/or lacked a reasonable basis.

44.     On April 25, 2019, WWE reported disappointing first quarter 2019 ("1Q19") financial results, revealing that revenues had fallen year over year on notable declines in the live events and consumer products segments.  In addition, WWE announced lower than expected guidance for its second quarter of 2019 ("2Q19"), but maintained full-year guidance of "at least $200 million" in adjusted OIBDA.  The Company also revealed a $24 million uptick in accounts receivables, but claimed that this reflected the ordinary timing of different events.  WWE blamed the absence of certain "Super Stars" for the poor performance, but several analysts tied the disappointing results and guidance to potential delays in scheduling a live Saudi event.

45.     The price of WWE Class A common stock fell on this news, declining more than $13 per share, or 13%, to close at $85.38 per share on April 25, 2019, on unusually high volume of more than 10 million shares traded.  However, by continuing to conceal the true status of the deterioration in WWE's relationship with the Saudis and reaffirming the Company's fiscal 2019 ("FY19")

financial guidance, defendants maintained the artificial inflation in the price of WWE Class A common stock.

46.     In addition, defendants continued to provide false and misleading statements to the market.  For example, although the 1Q19 press release stated that 2Q19 OIBDA would be reduced due to "the timing of strategic investments," it failed to disclose the breakdown of the critical Saudi relationship that had occurred behind the scenes and that threatened the Company's business and prospects.  The press release stated in pertinent part as follows:

> **Second Quarter 2019 Business Outlook**
>
> For the second quarter 2019, the Company estimates Adjusted OIBDA of $19 million to $24 million.  This range of results represents a year-over-year decline in Adjusted OIBDA driven by increases in fixed costs, ***including the timing of strategic investments***.
>
> **Financial Outlook 2019**
>
> In 2019, WWE management is targeting another year of record revenue of ***approximately $1.0 billion and, as previously communicated, Adjusted OIBDA of at least $200 million, which would also be an all-time record*** (up at least 12% from Adjusted OIBDA of $178.9 million in 2018).
>
> ***Achieving the targeted range of full year results assumes substantial revenue, which supports Adjusted OIBDA of at least $100 million in the fourth quarter***.

(Footnote omitted.)

47.     On July 25, 2019, WWE reported its financial results for 2Q19, ended June 30, 2019.  The release stated that, "[d]uring the quarter, WWE continued to demonstrate success in staging large-scale, action packed events for its fans, including . . . *Super ShowDown* in Jeddah, Saudi Arabia."  The *Super ShowDown* event had occurred on June 7, 2019, and the release touted the event as a major driver of WWE's results and portrayed the Company's successful operations in Saudi Arabia as a pillar of its FY19 financial guidance.  The press release stated in pertinent part as follows:

George Barrios, Co-President, added "In the quarter, our earnings exceeded guidance, however we anticipate a portion of this to reverse and we continue to target full-year Adjusted OIBDA of at least $200 million. *The guidance presupposes the staging of a second large scale international event and the completion of a media rights deal in the MENA region*. As we optimize near-term results, we will continue to focus on content creation, localization and digitization, including the evolution of our direct-to-consumer network, to drive long-term growth."

## Second-Quarter Consolidated Results

\*      \*      \*

**Adjusted OIBD**A (which excludes stock compensation) was $34.6 million as compared to $43.5 million and the Company's Adjusted OIBDA margin was 13% as compared to 15% in the prior year quarter, respectively. *The current period results exceeded guidance primarily due to enhanced revenue recognized in conjunction with the Company's recent event in Saudi Arabia, which is expected to reverse in connection with an anticipated fourth quarter event in that country*.

\*      \*      \*

**Cash flows used in operating activities** were $7.6 million as compared to $74.2 million of cash generated in the prior year quarter driven by unfavorable changes in working capital, *which was primarily related to the timing of the Saudi event in June as the prior year event was held in April*, as well as lower operating performance.

48.    The release also stated that WWE had reached non-binding "***agreements in principle*** with the Saudi General Sports Authority on the broad terms" for a second large scale live event and a media rights deal for the MENA region. It stated in pertinent part:

## Financial Outlook 2019

*The Company reiterated its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million. This guidance assumes continued improvement in WWE's engagement metrics, a second large scale event in the MENA region, and the completion of a media rights deal in the MENA region. The Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items*; however, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or that engagement does not improve as assumed. The Company has evaluated these potential outcomes and currently believes that the most likely downside to its Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook.

The Company's full year guidance reflects strong fourth quarter results with substantial revenue growth from both the Company's new content distribution agreements in the U.S., which become effective in that period, **and the aforementioned media rights deal in the MENA region**.

(Footnote omitted.)

49.     That same day, defendants held an earnings call to discuss WWE's 2Q19 results in which defendants McMahon, Wilson, and Barrios participated.  During his prepared remarks, defendant McMahon stated:  "Obviously, there's India and MENA to do, and *we are going to be close to announcing those deals very soon*."

50.     Similarly, defendant Barrios stated that, "[d]uring the quarter, we achieved adjusted OIBDA of $34.6 million, which exceeded our guidance, primarily due to enhanced revenue recognized in conjunction with our recent event in Saudi Arabia.  That enhanced revenue is expected to reverse in connection with an anticipated fourth quarter event in that country."

51.     During her prepared remarks, defendant Wilson stated: "During the quarter, we continue[d] to successfully stage large-scale events for our fans, including . . . *Super ShowDown* in Jeddah, Saudi Arabia."

52.     Later in the call, defendant Barrios provided more color on the Company's guidance and the positive impact of the Saudi relationship, stating in pertinent part as follows:

> *For the full year, we continue to target record revenue of approximately $1 billion and adjusted OIBDA of at least $200 million.  This guidance assumes* continued improvement in our engagement metrics, *a second large-scale event in the MENA region and the completion of a media rights deal in the MENA region.  We believe we have agreements in principles with the Saudi – in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items*.  However, this understanding is nonbinding.  It is possible that either or both of these business developments do not occur on expected terms and/or the engagement does not improve as assumed.  We valued these potential outcomes and currently believe that [the] most likely downside to our adjusted OIBDA would be approximately $10 million to $20 million below our current outlook.  *Our full year guidance reflects strong fourth quarter results, substantial revenue growth from* both our new content distribution agreements in the U.S. which become effective in that period, *and the aforementioned media rights deal in the MENA region*.

53.     The statements referenced above in ¶¶44-52 were materially false and misleading when made because they failed to disclose the following adverse facts that were known to defendants or recklessly disregarded by them:

(a)     that WWE's relationship with the Saudi government had continued to deteriorate;

(b)     that the Saudi government and its affiliates had failed to make millions of dollars in payments owed to WWE pursuant to existing contractual commitments between the parties, including at least $60 million owed in connection with the June 2019 *Super ShowDown* event;

(c)     that OSN had refused to restart the broadcast of WWE programming despite a contractual obligation to continue such broadcasts and that this refusal was symptomatic of a deterioration in the business relationship between the parties;

(d)     that OSN had rebuffed efforts to renew a distribution rights agreement on terms acceptable to WWE and such renewal was unlikely to occur in 2019, if ever;

(e)     that WWE did not have the ability to expand its operations in the Middle East or within Saudi Arabia as had been represented to investors; and

(f)     that, as a result of the foregoing, defendants' positive statements about the Company's business metrics and financial prospects during the Class Period were materially false and misleading and/or lacked a reasonable basis.

54.     On October 31, 2019, WWE issued a press release providing the Company's third quarter 2019 ("3Q19") financial results.  The press release stated that the Company's revenues and operating income had continued to decline year over year to $186.3 million and $6.4 million, respectively.  The Company also announced that it was lowering its FY19 adjusted OIBDA guidance

to a range of $180 million to $190 million due in large part to WWE's failure to complete a MENA distribution agreement with the Saudis. On a conference call to discuss the results, defendant Barrios stated that "no assurances" could be given that the deal would ever be completed.

55. That same day, WWE held the *Crown Jewel* live event in Riyadh, Saudi Arabia. After the event ended, shocking news reports surfaced claiming that the Saudi government was effectively holding a number of WWE wrestlers "hostage" in retaliation for defendant McMahon's decision to delay a live broadcast of *Crown Jewel* until the Saudis made tens of millions of dollars in past due payments. Estimates for the amount outstanding ranged from $60 million to as much as $500 million. Several wrestlers detailed their experience during the ordeal on social media platforms.

56. Reports based on discussions with Company insiders claimed that this blowup was just the latest iteration of a long-standing Saudi pattern and practice of failing to make necessary payments. For example, professional wrestling journalist Brad Shepard stated that he had spoken to a source within WWE who had stated "that every show [the Saudis] come up short on money owed by about a couple of million, and they provide the excuse of it being a 'departmental issue' and they promise to send the money within a short time frame later – but never do." He continued: "So, there's a belief within WWE that they are either getting screwed on the deal with Saudi Arabia or something else is going on – which I won't speculate. I once again asked if women's wrestling had anything to do with this and was once again told yes, partly."

57. As reported by *The Wall Street Journal* that evening, Benchmark analyst Mike Hickey stated that "by lowering its outlook now rather than missing fourth-quarter expectations, ***the company is signaling that it doesn't have a lot of confidence a deal will get done***."

- 21 -

58.     On this news, the price of WWE stock declined more than $10 per share, or 15%, to close at $56.04 per share on October 31, 2019, on unusually high volume of more than 7.5 million shares traded.

59.     On January 30, 2020, WWE announced that two of its most senior and longest serving executives, defendants Barrios and Wilson, had abruptly left the Company.  Analysts and market commentators reacted with shock at the sudden loss of two key figures who had long been part of the public face of the Company.  For example, *Forbes* described the departures as a "bloodbath" that had caused "[p]anic and uncertainty" throughout WWE's corporate offices.

60.     On this news, the price of WWE stock declined more than $13 per share, or nearly 22%, to close at $48.88 per share on January 31, 2020, on unusually high volume of more than 19.4 million shares traded.

61.     Then, just a few days later, on February 6, 2020, WWE again announced disappointing financial results and guidance.  The earnings release issued by the Company revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that the Company had achieved just $180 million in adjusted OBIDA for the year due to the failure to complete the MENA distribution agreement with the Saudis.  On an earnings call to discuss the results, WWE's CFO, Frank Riddick, confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal.

62.     On this news, the price of WWE stock declined another $4.50 per share, or 9%, to close at $44.50 per share on February 6, 2020, on unusually high volume of more than 15.5 million shares traded.

63.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased WWE Class A common stock at artificially inflated prices, suffering significant losses and were damaged thereby.

## ADDITIONAL SCIENTER ALLEGATIONS

64.     As alleged herein, WWE and the Individual Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding WWE, their control over, and/or receipt and/or modification of WWE's allegedly materially misleading statements and/or their associations with the Company that made them privy to confidential proprietary information concerning WWE, participated in the fraudulent scheme alleged herein.  The Individual Defendants personally oversaw the Company's negotiations with the Saudis and held themselves out to investors as the Company representatives most familiar with the relationship.   In particular, defendant McMahon was personally involved as the relationship deteriorated, giving the ultimate order to cut the live broadcast feed for the 2019 *Crown Jewel* event until the Saudis fulfilled their payment obligations for past events.

65.     The Individual Defendants also had the motive and opportunity to commit fraud. With the price of WWE Class A common stock artificially inflated on their false but positive statements, several of WWE's senior executives cashed in, selling millions of dollars of their personally held shares at fraud-inflated prices as follows:

| Filer Name | Transaction Date | Direct Indirect | Price | Shares Sold | Proceeds |
|---|---|---|---|---|---|
| Barrios (George A.) | 2/27/2019 | D | $83.73 | 37,100 | $3,106,383 |
| | 2/27/2019 | D | $84.63 | 2,900 | $245,427 |
| | 7/22/2019 | D | $69.98 | 63,758 | $4,461,785 |
| | 7/22/2019 | D | $70.54 | 10,920 | $770,297 |
| | | | | **114,678** | **$8,583,892** |
| Dunn (Kevin) | 8/1/2019 | D | $73.40 | 14,000 | $1,027,600 |
| | | | | **14,000** | **$1,027,600** |
| Gottesman (Patricia A) | 7/30/2019 | D | $72.92 | 4,112 | $299,847 |
| | 8/9/2019 | D | $67.02 | 4,123 | $276,323 |
| | | | | **8,235** | **$576,171** |
| McMahon (Vincent K) | 3/27/2019 | D | $81.45 | 3,204,427 | $261,000,579 |
| | | | | **3,204,427** | **$261,000,579** |
| Wilson (Michelle D) | 8/8/2019 | D | $69.30 | 158,134 | $10,958,686 |
| | | | | **158,134** | **$10,958,686** |
| **Grand Total** | | | | **3,499,474** | **$282,146,928** |

## LOSS CAUSATION AND ECONOMIC LOSS

66.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of WWE Class A common stock and operated as a fraud or deceit on purchasers of WWE Class A common stock.  As detailed above, when the truth about WWE's misconduct was revealed, the value of WWE Class A common stock declined precipitously as the prior artificial inflation no longer propped up the stock's prices.  The declines in the price of WWE shares were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of WWE Class A common stock and the subsequent

- 24 -

significant decline in the value of WWE Class A common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

67.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of WWE's business, operations and financial results as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of WWE Class A common stock to be artificially inflated.  Plaintiff and other Class members purchased WWE Class A common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE

68.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

69.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for WWE Class A common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     WWE Class A common stock met the requirements for listing and was listed and actively traded on NYSE, a highly efficient market;

(b)     WWE regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national

- 25 -

circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     WWE was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

70.     As a result of the foregoing, the market for WWE Class A common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all those who transacted in WWE Class A common stock during the Class Period suffered similar injury through their transactions in the stock at artificially inflated prices and a presumption of reliance applies.

71.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased WWE Class A common stock between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for WWE stock, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action on behalf of all purchasers of WWE Class A common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.

73.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, WWE Class A common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class, located geographically throughout the country.  Joinder would be highly impracticable.  Record owners and other members of the Class may be identified from records maintained by WWE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal securities laws complained of herein.

75.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)    whether the price of WWE Class A common stock during the Class Period was artificially inflated because of defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

78.     Plaintiff incorporates ¶¶1-77 by reference.

79.     During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of WWE Class A common stock during the Class Period.

81.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for WWE Class A common stock.  Plaintiff and the Class would not have purchased WWE Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

82.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of WWE Class A common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

83.     Plaintiff incorporates ¶¶1-82 by reference.

84.     During the Class Period, defendants acted as controlling persons of WWE within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about WWE, the Individual Defendants had the power and ability to control the actions of WWE and its employees.  WWE controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  March 6, 2020                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         MARY K. BLASY


                                         _____
                                                SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         BRIAN E. COCHRAN
                                         200 South Wacker Drive, 31st Floor
                                         Chicago, IL 60606
                                         Telephone:  312/674-4674
                                         312/674-4676 (fax)
                                         bcochran@rgrdlaw.com

                                         VANOVERBEKE, MICHAUD &
                                          TIMMONY, P.C.
                                         THOMAS C. MICHAUD
                                         79 Alfred Street
                                         Detroit, MI  48201
                                         Telephone:  313/578-1200
                                         313/578-1201 (fax)
                                         tmichaud@vmtlaw.com

                                         Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*None.*

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*City of Warren Police and Fire Retirement System v. Prudential Financial, Inc.*, No. 2:19-cv-20839 (D.N.J.)

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*City of Warren Police and Fire Retirement System v. Zebra Technologies*, No. 2:17-cv-4412 (E.D.N.Y.)
*City of Warren Police and Fire Retirement System v. TransDigm Group*, No. 1:17-cv-01677 (N.D. Ohio)
*City of Warren Police and Fire Retirement System v. Foot Locker, Inc.*, No. 1:18-cv-01492 (E.D.N.Y.)
*City of Warren Police and Fire Retirement System v. Hasbro, Inc.*, No. 1:18-cv-00543 (D.R.I.)
*City of Warren Police and Fire Retirement System v. DXC Technology*, No. 1:18-cv-01599 (E.D. Va.)
*Atansio v. Tenaris S.A., et al.*, No. 1:18-cv-07059 (E.D.N.Y.)
*In re PG&E Corporation Sec. Litig.*, No. 5:18-cv-03509 (N.D. Cal.)

WWE

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of March , 2020.

CITY OF WARREN POLICE AND FIRE
RETIREMENT SYSTEM

By: _Scott D. Salyer_____

Its: _Chairman_____

- 2 -

WWE

SCHEDULE A

SECURITIES TRANSACTIONS

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 04/25/2019 | 255 | $89.55 |
| 05/31/2019 | 3 | $72.31 |
| 05/31/2019 | 4 | $72.28 |
| 05/31/2019 | 32 | $72.73 |
| 05/31/2019 | 67 | $72.62 |
| 06/03/2019 | 29 | $73.25 |
| 06/03/2019 | 45 | $73.59 |
| 06/03/2019 | 74 | $73.56 |
| 06/03/2019 | 166 | $73.42 |
| 06/03/2019 | 196 | $73.20 |
| 06/11/2019 | 1 | $72.70 |
| 06/11/2019 | 5 | $72.69 |
| 06/11/2019 | 20 | $72.94 |
| 06/11/2019 | 129 | $72.87 |
| 06/12/2019 | 74 | $73.17 |
| 06/12/2019 | 147 | $73.01 |
| 06/13/2019 | 10 | $73.59 |
| 06/14/2019 | 25 | $74.56 |
| 06/14/2019 | 29 | $74.54 |
| 06/14/2019 | 39 | $74.54 |
| 06/17/2019 | 14 | $75.55 |
| 06/17/2019 | 48 | $75.53 |
| 06/17/2019 | 90 | $75.48 |
| 06/18/2019 | 4 | $76.70 |
| 06/18/2019 | 9 | $76.88 |
| 06/18/2019 | 30 | $76.82 |
| 06/18/2019 | 67 | $77.01 |
| 06/18/2019 | 113 | $77.27 |
| 06/19/2019 | 14 | $76.47 |
| 06/19/2019 | 30 | $76.05 |
| 06/19/2019 | 44 | $76.61 |
| 06/19/2019 | 44 | $76.97 |
| 06/19/2019 | 49 | $77.05 |
| 06/20/2019 | 18 | $76.61 |
| 06/20/2019 | 79 | $75.86 |
| 06/24/2019 | 14 | $73.15 |
| 06/24/2019 | 573 | $72.43 |
| 06/25/2019 | 3 | $72.36 |
| 06/25/2019 | 9 | $72.43 |
| 06/25/2019 | 67 | $72.52 |
| 06/25/2019 | 103 | $72.37 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 03/14/2019 | 7 | $90.63 |
| 05/14/2019 | 13 | $79.99 |
| 07/11/2019 | 15 | $73.36 |
| 07/11/2019 | 24 | $73.11 |
| 07/11/2019 | 31 | $73.09 |
| 07/11/2019 | 47 | $73.14 |
| 07/11/2019 | 59 | $73.05 |
| 07/12/2019 | 21 | $73.48 |
| 07/12/2019 | 30 | $73.21 |
| 07/12/2019 | 32 | $73.12 |
| 07/12/2019 | 37 | $73.46 |
| 07/12/2019 | 54 | $73.13 |
| 07/12/2019 | 95 | $73.16 |
| 07/15/2019 | 37 | $73.09 |
| 07/15/2019 | 114 | $73.18 |
| 07/16/2019 | 15 | $73.01 |
| 07/16/2019 | 44 | $72.66 |
| 07/16/2019 | 110 | $72.79 |
| 07/17/2019 | 44 | $72.35 |
| 07/17/2019 | 269 | $72.27 |
| 07/18/2019 | 8 | $70.16 |
| 07/18/2019 | 48 | $70.27 |
| 07/18/2019 | 211 | $70.47 |
| 07/18/2019 | 223 | $70.39 |
| 07/19/2019 | 127 | $70.68 |
| 07/19/2019 | 241 | $70.93 |
| 07/22/2019 | 33 | $70.00 |
| 07/22/2019 | 72 | $70.01 |
| 07/22/2019 | 234 | $69.93 |
| 07/23/2019 | 62 | $67.93 |
| 07/23/2019 | 183 | $70.11 |
| 07/23/2019 | 228 | $68.05 |
| 07/24/2019 | 141 | $68.67 |
| 07/24/2019 | 181 | $68.68 |
| 07/24/2019 | 196 | $68.70 |
| 07/30/2019 | 1 | $72.92 |
| 07/30/2019 | 28 | $72.79 |
| 07/30/2019 | 30 | $72.84 |
| 07/30/2019 | 32 | $72.83 |
| 07/30/2019 | 48 | $72.85 |
| 07/30/2019 | 59 | $72.65 |
| 07/30/2019 | 72 | $72.84 |
| 07/30/2019 | 158 | $72.82 |

Prices listed are rounded to two decimal places.

*Opening position of 942 shares.