**Exhibit A**

APPEARANCES

LEVI & KORSINSKY

1      MR. HOWLAND:  Well, I'm going to work with the

2   attorneys and oversee the litigation as best I can to represent

3   the shareholders' interests.  And also in the settlement, if

4   there is any, I would evaluate the settlement, decide, accept,

5   or reject, and plan to be as helpful as I can and use my advice

6   and knowledge to help this case.

7      THE COURT:  How did you come to be a plaintiff in this

8   case?

9      MR. HOWLAND:  I purchased quite a bit of stock in WWE.

10      THE COURT:  I know that.

11      MR. HOWLAND:  Oh, and I had more of a loss.  I had the

12   main loss.

13      THE COURT:  No, I understand that too, thank you.

14      But what I meant is how did you come in touch with

15   your lawyers?

16      MR. HOWLAND:  I saw them when I was reading online

17   about all the situation with WWE.  I saw their ad on the Yahoo!

18   Finance page and I contacted them.

19      THE COURT:  At my request, they've sent me the

20   retainer agreement that you signed.  Was that just a form or

21   did you negotiate it?

22      MR. HOWLAND:  We talked about the fees; and I agreed

23   with it and then signed it.

24      THE COURT:  So the fees are 15 percent if they get a

25   settlement right away.

1            MR. HOWLAND:  Right.

2            THE COURT:  25 percent if it's after a motion to

3    dismiss.  And 30 percent after discovery has commenced.

4            Now, those are dollars out of the victims' pockets.

5    Why did you agree to something that high?

6            MR. HOWLAND:  Well, there's a lot of -- I'm sure

7    there's a lot of work involved in a case like this; and there's

8    a lot of expenses in a law firm, representing a lot of people.

9    So they are putting their money on the line first before the

10   plaintiffs.  They have to take care of all the costs up front.

11           THE COURT:  That's true.  But why should you care

12   about that?  That's their position.  That's why they would want

13   a higher percentage.  But from your standpoint, don't you want

14   to get as much money as you can of the money you lost?

15           MR. HOWLAND:  Well, yes.  But these are professional

16   people and they deserve to be paid.  I mean, they have a lot

17   of -- like I say, why am I care about it?  Because they are

18   offering me all this help.  I don't have to pay anything up

19   front.  You know, they are taking on the whole thing on their

20   end and making it easy on me, because I don't have to then put

21   money in to pay them.  If I have to do this on my own, I don't

22   know if I would, you know, to pay for them to do this.

23           It's a risk/reward thing.

24           THE COURT:  Have you ever been involved in any kind of

25   litigation?

1          MR. HOWLAND:  No.

2          THE COURT:  You're a lucky man.

3          MR. HOWLAND:  Other than small claims court.  And

4     there was one a long time ago, but the person died, so it just

5     dropped off.  But that was -- didn't even get hardly anything

6     into it.

7          THE COURT:  All right.

8          So let me turn to counsel for Mr. Howland.

9          There's no doubt that he had the largest loss; and

10    that creates a presumption, but it's a rebuttable presumption.

11         Your retainer agreement -- which, of course, is not

12    binding on the Court, but, nevertheless, is something the Court

13    found of interest -- asks for much higher percentages than is

14    being asked for by counsel for the firefighters.  I want to

15    talk to their representative in a minute, but I know already

16    that he's got an accounting background, so he would have, one

17    might suppose, somewhat greater sophistication in evaluating

18    settlements and the like than everyday folks.  So why shouldn't

19    I prefer the firefighters?

20         MR. APTON:  Your Honor, this is Adam Apton.

21         And as your Honor pointed out, there is a presumption

22    under the PSLRA.  And whether and to what extent the Kansas

23    City Fire can rebut the presumption that is in favor of

24    Mr. Howland, that is simply based on an accounting background

25    or the status as an institutional investor, I would say no.

1      Case law is quite clear with the largest financial

2  interest and otherwise adequate or typical, the presumption

3  vests, so to speak.  And that would be in support of --

4      THE COURT:  That's just not correct, in my view.  And

5  I've written several cases on this subject, and I've appointed

6  sometimes the number two person rather than the number one

7  person.

8      Just to give you one example, although not in this

9  case, but I just want to give it as an example, often you will

10  find that there are plaintiffs that are grouped together so

11  that they create jointly the largest amount of losses, but it's

12  a total artificial contraption put together by counsel.  And I

13  have given that very little weight.  So a presumption is a

14  presumption; and it's entitled to weight, but it's certainly

15  not conclusive.

16      MR. APTON:  Your Honor, Adam Apton again.

17      In that situation, I would agree.  When investor

18  groups are formed, there is something left to be said for

19  adequacy; whether and to what extent that group is

20  lawyer-driven or works effectively and is cohesive of lead

21  plaintiff, that's always in doubt.

22      In this particular situation, your Honor, we have an

23  investor, Mr. Howland, who has a professional background, who

24  is experienced, who is managing employees.  He worked as a

25  department head for the bulk of his career.

1          THE COURT:  He sounds like a fine fellow.  But if I

2     read his papers correctly, he managed six people; it wasn't

3     like he was managing dozens of people.  And in any event,

4     managing a number of employees is not the most relevant kind of

5     experience for managing attorneys in a class action.

6          MR. APTON:  Your Honor, I would submit -- this is Adam

7     Apton again -- that Mr. Howland's background, not just

8     background, but experience with this case, Mr. Howland is an

9     avid fan of WWE, and he's very familiar with the subject

10    matter.

11         So while someone at Kansas City Fire might have an

12    accounting background, given that this is not, on its face, an

13    accounting case per se -- there's no restatement of financials,

14    for instance -- what's important is someone who can help guide

15    the attorneys in terms of the media that's out there that

16    covers the press, the specific facts about the crown jewel

17    event that was held in October of 2019, the deal between the

18    WWE and Saudi Arabia.  I mean, these are all pieces of

19    information that are going to be far more important than how

20    the accounting standards, you know, for revenue recognition are

21    carried out, for instance.

22         And Mr. Howland certainly has strengths there that --

23    I don't know about Ms. Davis's Kansas City Fire -- Ms. Davis's

24    experience with WWE, but I would assume that Mr. Howland is

25    certainly head and shoulders advanced in that regard.

K5CVCITO

1      THE COURT:  So one last question and then we'll turn

2  to the firefighters.

3      One of the reasons I ask for retainer agreements --

4  which I do in not just this case, but every case -- is because

5  it gives some indication up front of the degree to which the

6  individual plaintiff is really going to have a say.  And

7  Mr. Howland said that you talked about these; but just judging

8  from the percentages, it sounds like he pretty much accepted

9  the percentages you suggested, which are considerably higher

10 than the percentages suggested by firefighters' counsel.

11     So why should I not infer from that that the thing

12 that is presumably most important to a plaintiff is how much

13 money they will get, as opposed to how much money their lawyers

14 will get, was something where Mr. Howland did not exercise a

15 great deal of initiative?

16     MR. APTON:  Your Honor, Adam Apton.

17     I think it's unfair to say that Mr. Howland didn't

18 exercise a great deal of initiative.  I mean, there was a

19 discussion about it and there was back-and-forth.  But to

20 compare it to a fee structure between the firm and an

21 institutional client, when there may or may not be a monitoring

22 agreement in place, and other facts that, you know, perhaps

23 even help the percentages, so to speak, I don't think it's

24 quite apples to apples; I think it's apples to oranges.

25     And to get a full understanding of what the agreement

1    between firefighters and the firefighters and Labaton in this

2    particular case, or an institutional investor in any firm that

3    has a monitoring agreement, I think there's more information to

4    be had than just to compare it on the face of a retention

5    agreement, perhaps is not the most clarifying.

6           THE COURT:  All right.

7           So let me turn to firefighters.  And who's their

8    representative on firefighters?

9           MS. DAVIS:  Your Honor, I am.  I'm Barbara Davis.  I'm

10   the executive officer for the firefighters' pension system.

11          THE COURT:  So suggestion was just made by

12   Mr. Howland's counsel that you may have accounting expertise --

13   and unquestionably you do -- but you don't know much about the

14   WWE.  Is that correct?

15          MS. DAVIS:  I have watched the WWE, but I do not have,

16   right, probably as much expertise.  I'm not a huge fan that

17   watches.  And I really don't -- except for the information

18   regarding the lawsuit and the research that I've done, I'm

19   really not that familiar although, of course, everyone is -- I

20   believe most people are familiar with them because they've been

21   around for so long.

22          THE COURT:  So how would you go about monitoring

23   counsel if you were appointed lead plaintiff?

24          MS. DAVIS:  Well, not only would I be monitoring the

25   counsel, so with my board of trustees, which are the board of

1    nine members and their counsel, and we will be evaluating every

2    step of the way.  So we will be reading their motions.  And all

3    their reports are cleared through the board and reviewed by the

4    board.  So it's not just myself, it's also the board's

5    personal -- or their attorney and the trustees of that board.

6              THE COURT:  Your retainer agreement has a fee

7    schedule.  And, of course, none of this is binding on the

8    Court; I'll determine the fee at the end of the case if there

9    is a plaintiffs' fee to be paid, but it's still of interest to

10   the Court at this point.

11             Were those figures negotiated?  Had this counsel

12   represented you -- represented the firefighters in the past?

13   Can you give me any insight into any of that?

14             MS. DAVIS:  Sure.

15             Absolutely they were negotiated.  We discussed what

16   would be fair at different levels of, you know, how the case

17   progressed.  And we have had securities -- they are one of four

18   securities law trained firms that the board has hired.  And we

19   have not served as lead plaintiff with this firm with that

20   system.

21             But I have seen other retainer agreements.  I have

22   signed other retainer agreements with another firm where we

23   were petitioning to serve as lead plaintiff.  And this is

24   actually a lower fee schedule than that.

25             THE COURT:  All right.

1        Let me turn to firefighters' counsel.

2        The biggest hurdle you obviously face is that

3   Mr. Howland's loss was considerably more than the firefighters'

4   loss, giving him a very strong motive to be very hands-on when

5   he has so much money personally riding on this case, so to

6   speak.  So why should I overcome presumption?

7        MR. McCONVILLE:  Sure.  Thank you, your Honor.

8        Frank McConville from Labaton Sucharow.

9        So I think there's a little bit of a tension between

10  the financial interest and then also the satisfaction of the

11  Rule 23 factors at the lead plaintiff stage.  And it is my

12  understanding -- and certainly the recent cases dealing with

13  these issues have indicated that -- in order to trigger that

14  presumption as the most adequate plaintiff, not only do you

15  have to have the largest financial interest -- and we don't

16  dispute the fact that Mr. Howland does, in fact, have the

17  largest financial interest -- but in order to trigger the

18  presumption, you also have to make a *prima facie* showing of

19  typicality and adequacy.

20        And the string of cases that I am referring to are

21  very recent, two of which are in the Southern District of New

22  York from Judge Buchwald and Judge Preska.  And I'll get to the

23  cites in a little bit.  But the overriding principle is that in

24  order to trigger the presumption, you need to show that you

25  have the capacity to manage the lawyers throughout the

1    litigation; that you have the experience serving as a

2    fiduciary; and that you have the wherewithal, as the litigation

3    goes forward, to always be overseeing the lawyers and

4    protecting the interest of the class.

5            And in all three of the cases that recently have been

6    decided, the court looked at the individual movant who really

7    made no showing at the initial motion stage that they

8    satisfactorily can oversee the lawyers and keep the class's

9    interest in -- you know, the front of their motives as they're

10   litigating the case.  And as a result, the court never

11   triggered the presumption for the most adequate plaintiff; and,

12   as a result, the institution in all three situations, the

13   institution that had a lower loss was preferred to serve as the

14   lead plaintiff.

15           So the cases I'm talking about, the first one is

16   called *Perez v. HEXO*, 2020 Westlaw 905753 -- again, it's Judge

17   Buchwald -- in which the Court said:  "The movant's failure to

18   provide any information regarding his experience in this

19   preliminary motion, the Court questions the movant's ability to

20   meaningfully oversee counsel and control the prosecution of

21   litigation."

22           And again, the Court looked to the second movant who

23   had made that showing and appointed them as lead plaintiff.

24           The second case is *Karp v. Diebold*, 2019 Westlaw

25   5587148 -- again, Judge Preska -- in which an individual,

1    again, failed to show that they can meaningfully oversee

2    counsel, and had the wherewithal and experience and

3    sophistication to keep the class's interest protected.  And

4    Judge Preska appointed an institutional investor -- I believe

5    it was a fund out of Indiana -- which had that experience

6    serving as a fiduciary, and appointed them as lead plaintiff.

7         All of that notwithstanding the fact that the

8    individuals in those cases had the largest financial interest;

9    but because they failed to make this preliminary showing of

10   adequacy and typicality, the court never triggered the lead

11   plaintiff's presumption.

12        So one point I wanted to raise, because counsel for

13   Mr. Howland indicated that it's not an apples-to-apples

14   situation with regard to the retention agreement, I would

15   respectfully disagree.  The retention agreement that our client

16   negotiated was for this case in particular.  And as our client

17   indicated, we do monitor for the fund, along with four other

18   law firms that monitor their portfolios and bring to their

19   attention when there's potentially meritorious securities

20   claims.

21        But pursuant to that monitoring agreement, if the fund

22   decides to retain us to pursue an individual action or a class

23   action, a separate retainer agreement is negotiated for that

24   particular litigation, which is precisely what happened here,

25   and is precisely how we got to the fee schedule that we

1    ultimately landed on and we sent to the Court earlier today.

2            So I just wanted to make that clear.

3            THE COURT:  Okay.  So I think there are good arguments

4    on both sides, and I want to think about this.

5            But here's what I think makes sense in terms of a

6    schedule:

7            First, if either counsel wants to put in further

8    written submissions -- for example, Mr. Howland's counsel may

9    want to look at those cases -- I haven't looked at them yet --

10   and comment on them in writing -- that's fine, provided that

11   any written submissions be limited to 15 double-spaced pages

12   and be submitted no later than one week from today.

13           And then I will make my decision no later than two

14   weeks from today.  So, let's see, today is the 12th.  So that

15   means your submissions -- and you're not required to submit

16   anything further, but if you want to, each of you can on May

17   19th, and then I will make my decision on May 26.

18           Whoever is chosen, I assume likely will want to file

19   an amended consolidated complaint.  And that's why that would

20   have to be done no later than two weeks from my decision.  So,

21   let's see, that would be June 8th.

22           Then I assume defense counsel would probably want to

23   make a motion to dismiss.  So that would need to be filed two

24   weeks thereafter, so that would be June 22nd.

25           Answering papers, two weeks after that, which would be

K5CVCITO

1    July 6.

2            Reply papers, July 13.

3            And we'll have oral argument on the motion to dismiss

4    on July 20th.

5            Linda, are you on the phone?

6            THE DEPUTY CLERK:  Yes, I am.

7            THE COURT:  Four o'clock on July 20th?

8            THE DEPUTY CLERK:  Very good.

9            THE COURT:  Okay.  And counsel, I'm hopeful by that

10   time that you'll be able to come to court, but I will let you

11   know at least a week beforehand whether it's going to be oral

12   argument in the courthouse or oral argument by telephone.

13            Okay.  Anything else we need to take up today?

14            Very good.  Thanks very much.  Bye-bye.

15                          *    *    *

16

17

18

19

20

21

22

23

24

25