**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF WARREN POLICE AND FIRE
RETIREMENT SYSTEM, Individually
and on Behalf of All Others Similarly
Situated,

                       Plaintiff,

vs.

WORLD WRESTLING
ENTERTAINMENT, INC., et al.,

                       Defendants.

Civil Action No. 1:20-cv-02031 (JSR)

ORAL ARGUMENT REQUESTED

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
## <u>DEFENDANTS' MOTION TO DISMISS</u>

**K&L GATES LLP**
Jerry S. McDevitt (*pro hac vice*)
210 Sixth Street
Pittsburgh, PA 15222

Stephen G. Topetzes (*pro hac vice*)
Theodore L. Kornobis
1601 K Street, NW
Washington, DC 20006

Joanna A. Diakos
599 Lexington Avenue
New York, NY 10022

*Counsel for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND .................................................................................................... 2

    I.    WWE's Business Dealings in the MENA Region ................................................. 3

        A.    OSN ................................................................................................................. 3

        B.    Saudi Arabia Live Events ............................................................................. 4

        C.    MENA Media Rights Deal ............................................................................ 4

    II.    Allegedly Misleading Statements During the Class Period ................................. 5

        A.    The Statements .............................................................................................. 5

        B.    The Alleged Omissions and the Purported "Breakdown" in
            Negotiations with Saudi Arabia .................................................................. 7

        C.    PSLRA Cautionary Statements and Risk Disclosures ............................... 8

    III.    The Alleged "Corrective Disclosures" ................................................................ 10

ARGUMENT ............................................................................................................................ 10

    I.    The CAC Does Not Plead Any Actionable Material Misstatements or
        Omissions ............................................................................................................... 11

        A.    Plaintiff Does Not Satisfy the Requirements Under Rule 9(b) and
            the PSLRA to Plead Facts with Particularity that Show *Why* and
            *How* the Company's Disclosures Were Materially Misleading ............... 11

            1.    Plaintiff's Allegations Regarding the Supposedly Omitted
                Information Are All Conclusory and Are Not Supported
                by Particularized Facts ................................................................. 12

            2.    No Particularized Allegations Explain Why Any of
                Defendants' Statements as to the Negotiation Status Were
                False or Misleading ....................................................................... 21

            3.    Plaintiff Does Not Adequately Plead Why Any of WWE's
                Risk Disclosures Was Materially Misleading ............................. 21

        B.    Plaintiff's Allegations of Opinion Statements Do Not Support
            Fraud Claims ................................................................................................. 23

306348626 v8

1.    Plaintiff's Allegations Involve Statements of Opinions. ............ 23

2.    The CAC Does Not Allege Particularized Facts to
Support that Defendants Did Not Honestly Believe the
Opinion Statements ................................................................. 24

3.    The CAC Does Not Plead Any Facts Contrary to
Defendants' Opinions that They Were Required to
Disclose .................................................................................. 24

C.    The Allegedly Misleading Statements Are Covered by the
PSLRA Safe Harbor for Forward-Looking Statements. ...................... 28

1.    Plaintiff's Allegations Concern Forward-Looking
Statements ............................................................................. 28

2.    The Forward-Looking Statements Are Not Actionable
Because They Were Accompanied by Meaningful
Cautionary Language .............................................................. 29

II.    The Scienter Allegations Do Not Satisfy the Heightened PSLRA
Standards. ............................................................................................... 30

A.    Plaintiff Does Not Allege with Particularity a Strong Inference
that Defendants Had Actual Knowledge that Any Statements
Were Misleading. ............................................................................... 30

B.    Plaintiff Does Not Allege Particularized Facts Supporting a
Strong Inference of Recklessness. ..................................................... 33

C.    The More Plausible Inference Is that Defendants Honestly
Believed the Forward-Looking Opinion Statements When Issued .......... 34

D.    The Alleged Stock Sales Do Not Establish Scienter. ............................. 35

1.    Defendant Barrios ................................................................. 36

2.    Defendant McMahon ............................................................. 36

3.    Defendant Wilson ................................................................. 37

E.    No Inference of Scienter from Defendants' Departures from
WWE .................................................................................................. 38

III.    Plaintiff Fails to Plead Loss Causation. ............................................... 39

A.    Updates Regarding the MENA Deal Are Not "Corrective
Disclosures" of Prior Statements Relating to the Negotiation
Status or Opinions. ............................................................................. 39

       B.      No Materialization of Concealed Risk.................................................... 39

IV.    Plaintiff Does Not Establish Section 20(a) Liability as to the Individual
      Defendants. ...................................................................................... 40

CONCLUSION................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accurate Grading Quality Assur., Inc. v. Thorpe*,
No. 12-cv-1343, 2013 WL 1234836 (S.D.N.Y. Mar. 26, 2013).................................................3

*Acito v. Imcera Group, Inc.*,
47 F.3d 47 (2d Cir. 1995) .....................................................................................................37

*Anschutz Corp. v. Merrill Lynch & Co.*,
690 F.3d 98 (2d Cir. 2012).....................................................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...............................................................................................*passim*

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (S.D.N.Y. 2008)....................................................................................35

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ...........................................................................................12

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004).....................................................................................17

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010)......................32

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)...................................................................................................39

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008).....................................................................................38

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
No. 18-cv-10320 (AJN), 2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020)................................30

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
No. 18-cv-7796 (VEC), 2020 WL 248729 (S.D.N.Y. Jan. 15, 2020) ....................................23

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991)......................................................................................................3

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014).......................................................................................29

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)............................................................................27

*In re Express Scripts Holdings Co. Sec. Litig.*,
    773 F. App'x 9 (2d Cir. 2019) .............................................................23, 26, 33, 34

*Finn v. Barney*,
    471 F. App'x 30 (2d Cir. 2012) ......................................................................19

*In re ForceField Energy Inc. Sec. Litig.*,
    No. 15-cv-3020, 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017)...............................24

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd* 779 F. App'x 69 (2d Cir. 2019).......................36

*Gagnon v. Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019) ................................................................36

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009).............................................................36, 37

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................ *passim*

*In re Glenayre Techs., Inc. Sec. Litig.*,
    No. 96-cv-8252, 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998)................................38

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)................................................................29

*Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*,
    No. 04-cv-3318 (LAP), 2005 WL 736217 (S.D.N.Y. Mar. 30, 2005)......................32

*Hou Liu v. Intercept Pharm., Inc.*,
    No. 17-cv-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020)...................22

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007).................................................................27

*In re Adient plc Sec. Litig.*,
    No. 18-cv-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)......................33

*In re Initial Pub. Offering Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005)................................................................40

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................35

*Koplyay v. Cirrus Logic, Inc.*,
   No. 13-cv-790 (CM), 2013 WL 6233908 (S.D.N.Y. Dec. 2, 2013) ................................31, 37

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d. Cir. 2005)......................................................................................39

*Long Miao v. Fanhua, Inc.*,
   No. 18-cv-8183 (PAE), 2020 WL 996602 (S.D.N.Y. Mar. 2, 2020)..........................13

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
   No. 01-cv-4388 (JGK), 2004 WL 376442 (S.D.N.Y. Feb. 27, 2004) ........................32

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)..........................................................................27

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011).....................................................................................................11

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .....................................................................17

*Micholle v. Ophthotech Corp.*,
   No. 17-cv-210 (VSB), 2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019)......................36

*Miller v. Lazard, Ltd.*,
   473 F. Supp. 2d 571 (S.D.N.Y. 2007)........................................................................17

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................13, 28, 31, 33

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
   834 F.3d 481 (3d Cir. 2016)......................................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)..............................................................................................25, 26

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018).....................................................................30, 34

*Paulsen v. Stifel, Nicolaus & Co.*,
   No. 18-cv-9440, 2019 WL 2415213 (S.D.N.Y. June 4, 2019) .................................19

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   No. 18-cv-08049 (RA), 2020 WL 550769 (S.D.N.Y. Feb. 4, 2020) ......................23, 32

*Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*,
   773 F. App'x 630 (2d Cir. 2019) ...............................................................................26

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)..................................................................................31

*Porwal v. Ballard Power Sys., Inc.*,
No. 18-cv-1137 (GBD), 2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019)..........................28, 32

*In re Progress Energy, Inc.*,
371 F. Supp. 2d 548 (S.D.N.Y. 2005)..................................................................................21

*Resnik v. Swartz*,
303 F.3d 147 (2d Cir. 2002)................................................................................................25

*Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)................................................................................................28

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................................................................................11, 12, 28

*S. Cherry St., LLC v. Hessessee Grp., Ltd.*,
573 F.3d 98 (2d Cir. 2009)..................................................................................................34

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816
F.3d 199 (2d Cir. 2016)........................................................................................... *passim*

*In re Seadrill Ltd. Sec. Litig.*,
No. 14-cv-9642, 2016 WL 3461311 (S.D.N.Y. June 20, 2016) ...........................................24

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp.
Ltd.*, 357 F. App'x 393 (2d Cir.) ........................................................................................39

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)............................................................................................26, 29

*Singh v. Schikan*,
106 F. Supp. 3d 439 (S.D.N.Y. 2015)..................................................................................13

*In re Skechers USA, Inc. Sec. Litig.*,
No. 18-cv-8039, 2020 WL 1233759 (S.D.N.Y. Mar. 12, 2020).............................................38

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)....................................................................................29, 30, 32

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)................................................................................................19

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,*
    552 U.S. 148 (2008)...................................................................................10

*Suez Equity Inv., L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001).......................................................................39

*In re Synchrony Fin. Sec. Litig.,*
    No. 3:18-CV-1818 (VAB), 2020 WL 1531297 (D. Conn. Mar. 31, 2020) ...........................26

*In re Take-Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................................39

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
    531 F.3d 190 (2d Cir. 2008)................................................................30, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)...........................................................................34, 37

*Tongue v. Sanofi,*
    816 F.3d 199 (2d Cir. 2016)..........................................................23, 25, 26

*Williams v. Globus Med., Inc.,*
    869 F.3d 235 (3d Cir. 2017)..............................................................22, 33

*In re World Wrestling Entm't, Inc. Sec. Litig.,*
    180 F. Supp. 3d 157 (D. Conn. 2016)......................................................14

## Statutes

15 U.S.C. § 78u-4(b)(2) ....................................................................................30

15 U.S.C. § 78u-4(c)(1) ......................................................................................3

15 U.S.C. § 78u-5 .......................................................................................28, 30

Defendants World Wrestling Entertainment, Inc.  ("WWE" or the "Company"), Vincent K. McMahon, George A. Barrios, and Michelle D. Wilson (collectively "Defendants") respectfully submit this memorandum in support of their Motion to Dismiss the Consolidated Amended Class Action Complaint ("CAC") filed by Lead Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust ("Plaintiff"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This is an impermissible fraud-by-hindsight case focused on WWE's efforts to enter into a business arrangement that ultimately did not come to fruition in the Class Period (*i.e.*, February 7, 2019, to February 5, 2020).  The CAC represents a strained attempt by Plaintiff to assert securities fraud claims based upon rank speculation, innuendo, uninformed and unreliable internet postings, and statements by persons unconnected to Defendants or the subject business dealings.  Plaintiff utterly fails to plead fraud with particularity and the CAC is devoid of any well-pled facts concerning "why" or "how" any statement by Defendants is materially misleading.  Plaintiff identifies statements of opinion or other forward-looking communications safeguarded under the Private Securities Litigation Reform Act ("PSLRA"), all of which made clear that potential events or agreements were not finalized and might not materialize.  Defendants also provided to investors financial projections in the event that a deal would not be finalized, and those projections all proved accurate.  Further, Plaintiff does not plead any particularized facts that raise a strong inference of scienter.  Instead, the allegations support the much more plausible inference that Defendants honestly believed their optimistic opinions (while appropriately cautioning that negotiations might not result in agreements) and updated those opinions as the Class Period progressed.  The claims are defective and should be dismissed in their entirety.

Everything Defendants are alleged to have said regarding the negotiations was accurate. In the first half of the Class Period, WWE stated that it was "working on" media rights agreements

in several markets, including the Middle East.  By July 25, 2019, WWE stated that the agreement

with its prior partner had terminated, that it "believe[d]" it had an agreement-in-principle with the

Kingdom of Saudi Arabia ("KSA"), but that such understanding was "non-binding" and might not

be finalized.  The Company also estimated the likely financial downside if a deal did not occur.

On October 31, 2019, the Company stated that due to a delay in completing the contemplated deal,

it was lowering year-end guidance by the same amount previously estimated, and noted that though

the Company continued to work toward a deal no assurances could be given that one would be

finalized.  By year-end, a deal had not been completed and the financial performance was exactly

in the range of where Defendants predicted it would be.  Plaintiff's conclusory assertions that

Defendants nevertheless omitted material information are inadequately pled and have been

routinely rejected by courts because a company is not required to provide investors with every fact

that may possibly cut against optimistic, but caveated, opinions regarding ongoing negotiations.

## FACTUAL BACKGROUND[1]

WWE is an integrated media organization and recognized leader in global entertainment.

CAC ¶¶ 2, 36.  Defendant Vincent K. McMahon is the CEO and Chairman.  CAC ¶ 37.  Defendants

George A. Barrios and Michelle A. Wilson were Co-Presidents and members of the Board.  CAC

¶¶ 38-39.  The Company produces and distributes live events and media programming under

various brands, including *Raw*, *SmackDown*, and *NXT*.  CAC ¶¶ 2-3, 42, 45, 126, 128.  Its biggest

media distribution market is the United States, which was the primary driver of growth the

---

[1]    The facts are taken from the allegations in the CAC, the documents referenced and deemed to
be incorporated therein (including Company disclosures and earnings calls), and other materials
properly subject to judicial notice.  Copies of such documents are attached as exhibits to the
Declaration of Stephen G. Topetzes, filed herewith (referred to herein as "Ex. __").  The Motion
focuses on the allegations relevant to the Court's analysis regarding the sufficiency of Plaintiff's
claims, and does not address the scores of irrelevant allegations that relate solely to ancillary
matters or events predating the Class Period or that involve observations with respect to alleged
circumstances in Saudi Arabia that have no connection to WWE or the Individual Defendants.

Company predicted to investors in June 2018.  CAC ¶¶ 9, 68.  Other markets include the U.K.,

India, China, Latin America, and the Middle East and North Africa ("MENA") region.

## I.  WWE's Business Dealings in the MENA Region

### A.  OSN

In July 2014, WWE and Orbit Showtime Network ("OSN"), a direct-broadcast satellite

provider, announced a five-year media agreement giving OSN exclusive broadcasting rights for

WWE content on pay-tv in the MENA region.  CAC ¶¶ 4, 72.  OSN is privately-owned, and not

affiliated with KSA.  Ex. 1 (Warkman Decl.) ¶ 9.[2]  In November 2018, OSN informed WWE that

it wished to terminate the agreement early because it was exiting the business of live sports

coverage.  In December 2018, the parties entered a settlement agreement to end the relationship as

of March 31, 2019, which provided for payment-in-full by OSN through the termination date.

CAC ¶¶ 154-56; Ex. 2 (Nohra Decl.) ¶¶ 9-13.  The termination of this media agreement impacted

only pay-tv distribution in the region; WWE also distributed its content in the region through a

free over-the-air partner, MBC (a broadcast company owned by KSA).  CAC ¶ 285.

---

[2]   Throughout the CAC, Plaintiff cites to and explicitly relies upon statements made by WWE personnel.  *See* CAC ¶¶ 11, 154-156, 213-214, 305-307, 314-316.  These statements were not obtained by Plaintiff's counsel in the course of investigating this suit, but instead are from three of six sworn declarations attached to a Rule 11(c) motion served by Defendants prior to the filing of the CAC.  Those declarations provided personal first-hand knowledge that refuted material allegations of this lawsuit, including (1) there was a dispute surrounding past-due payments for prior events during the October 2019 event; (2) WWE cut the broadcast signal to coerce payment, and (3) the KSA Crown Prince ordered retaliation in the form of holding wrestlers "hostage" in the plane chartered to return them to the United States.  Following service of the Rule 11(c) motion, the original plaintiffs voluntarily dismissed their complaints.  Because Plaintiff cited to and explicitly relied upon three of the declarations in drafting the CAC, they are properly considered on a motion to dismiss.  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (a court can consider "documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit"); *Accurate Grading Quality Assur., Inc. v. Thorpe*, No. 12-cv-1343, 2013 WL 1234836, at *6 (S.D.N.Y. Mar. 26, 2013) (considering declarations in plaintiff's possession and that were relied upon in drafting amended complaint).  Upon disposition of this suit, WWE respectfully requests the opportunity to submit the additional declarations to the Court in connection with the procedure set forth in 15 U.S.C. § 78u-4(c)(1).

### B.     Saudi Arabia Live Events

WWE has also worked on live event arrangements directly with KSA.  CAC ¶¶ 5, 73.  In March 2018, WWE and the Saudi General Sports Authority ("GSA") signed a 10-year partnership to hold live wrestling events in the country.  CAC ¶ 5.  Two such live events were held in 2018 (before the Class Period).  CAC ¶ 73, 106.  Two live events also were held in KSA during the Class Period.  The first, *Super ShowDown*, was held on June 7, 2019.  CAC ¶ 200.  During 2019, WWE discussed with KSA the possibility of holding a second event.  CAC ¶ 256.  That event (*Crown Jewel*) was ultimately announced on September 27, and held on October 31, 2019.  CAC ¶ 207.  It included the first-ever women's match in KSA.[3]

### C.     MENA Media Rights Deal

In 2019, WWE also worked on a new MENA distribution deal.  CAC ¶ 14.  The discussions were separate from OSN and occurred directly with the GSA and Saudi General Entertainment Authority ("GEA").  Ex. 2 (Nohra Decl.) ¶ 14.  The CAC notably lacks *any* allegations about the actual status or content of the negotiations (*e.g.*, dates, persons involved, substance of discussions).

According to the Company's public statements, WWE was working on a MENA media rights deal from before the beginning of the Class Period.  CAC ¶ 226.  As of July 25, 2019, WWE stated that it "believe[d]" it had reached an agreement-in-principle with the GSA, although WWE cautioned that it was "nonbinding," that it may not occur, and that if it did not occur Adjusted OIBDA[4] for the year would be $10-$20 million lower than projected.  CAC ¶¶ 256, 262.  CW-1

---

[3]     *See* Farah Otero-Amad, *WWE hosts Saudi Arabia's first women's wrestling match*, NBC NEWS (Oct. 31, 2019), https://www.nbcnews.com/news/world/wwe-hosts-saudi-arabia-s-first-women-s-wrestling-match-n1074896.  A second women's match was held shortly after the Class Period and prior to filing the original complaint.  *Bayley to face Naomi at WWE Super ShowDown in Riyadh*, ARAB NEWS (Feb. 22, 2020), https://www.arabnews.com/node/1631616/sport.

[4]     OIBDA refers to operating income before depreciation and amortization.

claims that by the time he joined MBC in the "fall of 2019," MBC was "essentially" negotiating for the GSA, and Plaintiff contends the parties were "worlds apart" in terms of projected subscribers.  CAC ¶¶ 191, 193.  By October 31, 2019, the Company explained that it was continuing to work toward completion of a MENA agreement and discussions were ongoing, but that no assurances could be given regarding a deal, and the Company lowered its Adjusted OIBDA guidance by $10-$20 million due to the delay in getting the MENA deal completed.  CAC ¶¶ 267, 271.  Defendant Barrios further explained to analysts the evolving opinions about the prospects for a deal: "[I]t's like any other discussion you're having with a partner, you're trying to find a common ground that works for you.  [Three] months ago, we expected that deal to be finalized.  As I characterized it now is discussions are ongoing."  CAC ¶ 271.  Through the rest of FY19, the Company stated that discussions were continuing with GEA.  CAC ¶ 279.  By the end of the Class Period, a MENA deal still had not been completed, and the Company announced earnings in line with the adjusted guidance (*i.e.*, exactly what WWE had forecast to investors).  CAC ¶ 292.

## II.    Allegedly Misleading Statements During the Class Period

### A.    The Statements

The CAC recites a series of statements by Defendants during the Class Period, including in SEC filings, press releases, earnings calls, and other presentations.  CAC ¶¶ 224-291.  Plaintiff claims the statements were misleading because they allegedly omitted certain information.

The vast majority of the statements at issue involve forward-looking statements or expressions of opinion as to:

- the Defendants' attention to and desire to complete a MENA media rights deal (CAC ¶¶ 229, 230, 237, 253);

- whether or when a new MENA media rights deal might be completed (CAC ¶¶ 226-28, 237, 257, 260, 272), including statements to the effect that WWE reached an agreement-in-principle on the broad terms around July 2019 (CAC ¶¶ 256, 260);

- forecasted revenue and Adjusted OIBDA based on the assumption that international deals would be completed (CAC ¶¶ 224, 231, 238, 243, 247, 255-56, 260, 262); and

- overall optimism and plans to invest in international markets (CAC ¶¶ 224, 226).

Plaintiff also challenges certain statements that describe the current status of negotiations or the pending nature of a possible MENA media rights deal (CAC ¶¶ 226, 237, 245-247, 251, 253, 260, 267, 271, 279, 283, 285), and claims that the Company's risk disclosures, in which it warned investors that a number of international media rights deals were going to be terminated and about the potential risks associated with new media rights deals not being completed, were misleading because the OSN agreement was terminated early.  CAC ¶¶ 232, 244.[5]

***None*** of these statements expresses certainty or makes promises regarding the prospects of a new MENA media rights deal.  To the contrary, they describe the status of the discussions as "*ongoing*" or something the Company is "*still working on*," and identify "*targets*" or "*estimates*." *E.g.*, CAC ¶¶ 158, 237, 241, 255.  Throughout the Class Period, WWE made clear that achieving the targeted financial projections "assumes substantial revenue."  CAC ¶ 224.  Similarly, when WWE stated in July 2019 that it "believe[d]" it reached "agreements in principle" with the GSA on both a second live event and a MENA media rights deal, the Company <u>simultaneously</u> cautioned: "however, this understanding is nonbinding.  It is possible that either or both of these business developments do not occur on expected terms."  CAC ¶ 256.  WWE also explained at that time that its Adjusted OIBDA projections assumed completion of the deals and that otherwise the Company "currently believes that the most likely downside to its Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook."  CAC ¶¶ 255-56, 262.  By

---

[5]   Plaintiff also marks other statements in bold and italics seemingly to assert they were false or misleading, but does not explain how that is the case.  They are objectively true.  For example, Plaintiff marks as false a statement that WWE staged an event in Saudi Arabia (¶ 259), but does not dispute such event occurred (it undeniably did).  Plaintiff similarly marks some financial or cash flow figures (*e.g.*, CAC ¶¶ 255, 273), but does not (and cannot) assert such items were false.

the next quarter, on October 31, 2019, the Company lowered its Adjusted OIBDA guidance by $10-$20 million because of delay in completing the MENA deal.  CAC ¶¶ 267, 271.  By the end of 2019, the final Adjusted OIBDA was exactly in line with that projected range.  CAC ¶ 292.

### B.    The Alleged Omissions and the Purported "Breakdown" in Negotiations with Saudi Arabia

The central allegation in the CAC appears to be that the above-described statements were misleading because Defendants did not disclose that WWE's relationship with KSA allegedly was "deteriorating" and experienced "growing tensions."  In particular, the CAC alleges that the above-identified statements were misleading because they "failed to disclose":

- That OSN informed WWE in November 2018 that it would not renew its media rights agreement and the parties entered into a settlement in December 2018 that terminated the contract effective March 31, 2019.  Plaintiff argues that this put into serious jeopardy the Company's ability to finalize a media rights agreement for the MENA region by the end of 2019.  CAC ¶¶ 234(a), 249;

- Plaintiff's subjective characterizations of WWE's relationship with the Saudi government, including that:

  o  It was "under stress" from February 2019 to July 2019 due to controversy WWE faced for holding events in the country in 2018, and because the Saudi government allegedly failed to make timely payments.  CAC ¶¶ 234(b), 249, 264(b);

  o  It was "embroiled in conflict" by October 2019 because KSA at one point owed $60 million to WWE plus an additional $2 million for reimbursable costs, CAC ¶ 275(b), 281(b) and that such purported "conflict" became "more severe" after the *Crown Jewel* event, CAC ¶ 281(c); and,

- Plaintiff's conclusion that, "given how far apart the parties [allegedly] were," by July 2019 no reasonable person could believe that a MENA media rights agreement would be completed in 2019 (and by October 2019 it was allegedly unreasonable to think a deal could be completed at any point in 2020).  CAC ¶¶ 264(a), 275(a), 281(a).

Plaintiff also alleges that the risk disclosures were insufficient and materially false or misleading because the risk had already materialized in that OSN terminated its agreement.  CAC ¶¶ 235, 250.

As explained below, the CAC is virtually devoid of reference to <u>any</u> source to support these speculative and conclusory assertions.  There is not a single internal document, meeting, or

confidential witness who had any interaction with the Defendants or who was involved in negotiation discussions between WWE and KSA.  The only sources cited in the CAC are two confidential witnesses (neither of whom interacted with the Individual Defendants, participated in negotiations over the MENA rights deal, or worked at WWE's corporate offices), declarations provided by Defendants prior to filing the CAC, and a series of "news reports" that consist almost exclusively of unsupported content cherry-picked from wrestling websites founded on multiple layers of hearsay and unverified statements from Twitter.[6]

### C.   PSLRA Cautionary Statements and Risk Disclosures

In addition to the specific cautionary language used by WWE in the July 25, 2019 and October 31, 2019 statements described in the CAC, all of WWE's public statements that included an allegedly misleading statement contained language that specifically cautioned investors regarding the risks associated with forward-looking statements and notified them that the PSLRA provides a "safe harbor" for such statements.[7]  The format and wording differed slightly, but the substance remained substantially the same.  In particular, WWE told investors that its statements:

> relate to our future plans, objectives, expectations and intentions and are not historical facts and accordingly involve known and unknown risks and uncertainties and other factors that may cause the actual results or the performance by us to be materially different from future results or performance expressed or implied by such forward-looking statements.

Ex. 3 (WWE 2018 10-K) at 39.  Each PSLRA safe-harbor statement also identified specific risks for investors to consider when evaluating forward-looking statements.  In each case, the *first* risk

---

[6]   Plaintiff also makes post-Class Period allegations about the Saudi government purportedly backing a pirate television service.  CAC ¶¶ 184-187.  Even assuming, for the sake of argument, that there are facts to support this allegation, the allegations are irrelevant because there is nothing to indicate that such information was known to Defendants.

[7]   The statement indicated that forward-looking statements included, but were not limited to, "the words 'may,' 'will,' 'could,' 'anticipate,' 'plan,' 'continue,' 'project,' 'intend,' 'estimate,' 'believe,' 'expect' and similar expressions."  Ex. 3 (WWE 2018 10-K) at 39.

identified related to those associated with entering or renewing content distribution agreements,

and others related to international markets and accounts receivable.  For example, WWE disclosed:

> The following factors, among others, could cause actual results to differ materially from those contained in forward-looking statements made in this Form 10-K and our other SEC filings, in press releases, earnings calls and other statements made by our authorized officers: (i) **risks relating to entering, maintaining and renewing major distribution agreements**; […] (ix) **uncertainties associated with international markets** including possible disruptions and reputational risks; […] (xii) **risks relating to the complexity of our rights agreements across distribution mechanisms and geographical areas**; […] (xx) **risks relating to our accounts receivable**; […]  Forward-looking statements made by the Company speak only as of the date made, are subject to change without any obligation on the part of the Company to update or revise them, and undue reliance should not be placed on these statements.

Ex. 3 (WWE 2018 10-K) at 39-40.  Similar language is found in the quarterly statements, earnings

press releases, and slides shown in earnings calls.[8]  Indeed, the presentation at every earnings call

began with a reminder of the PSLRA cautionary language disclosure.[9]

Further, each 2019 quarterly earnings release also included endnotes highlighting certain

specific risks for investors to consider, including a statement that addressed the uncertainties

associated with renewing key agreements.  CAC ¶¶ 182, 377, 380.  For example:

> "The Company's business model and expected results (including our outlook for the second quarter and rest of 2019) will continue to be subject to significant execution and other risks, <u>including risks relating to entering into, maintaining and/ or renewing key agreements, uncertainties associated with international markets and risks inherent in large live events</u>, and the other risks outlined in the Company's Form 10-K filing with the SEC."

---

[8]    *See* Ex. 4 (4Q18 Release) at 11; Ex. 5 (4Q18 Call Tr.) at 1; Ex. 6 (4Q18 Slides) at 1; Ex. 7 (1Q19 Release) at 9; Ex. 8 (1Q19 Call Tr.) at 2; Ex. 9 (1Q19 Slides) at 1; Ex. 10 (2Q19 Release) at 10; Ex. 11 (2Q19 Call Tr.) at 1; Ex. 12 (2Q19 Slides) at 1; Ex. 13 (3Q19 Release) at 9; Ex. 14 (3Q19 Call Tr.) at 1; Ex. 15 (3Q19 Slides) at 1; Ex. 16 (4Q19 Release) at 11; Ex. 17 (4Q19 Call Tr.) at 1; Ex. 18 (4Q19 Slides) at 1.

[9]    *See, e.g.*, Ex. 8 (1Q19 Call Tr.) at 1 ("Today's discussion will include forward-looking statements.  These forward-looking statements reflect our current views, are based on various assumptions and are subject to risks and uncertainties disclosed in our SEC filings.  Actual results may differ materially and undue reliance should not be placed on them").

Ex. 7 (1Q19 Release) at 7 (emphasis added).  The Company expanded on these risk disclosures in its annual report on Form 10-K (to which the earnings releases directed readers).  The first risk factor disclosed in the report states that the Company's "failure to maintain or renew key agreements could adversely affect our ability to distribute our media content."  Ex. 3 (WWE 2018 10-K) at 8.  It further states: "We face uncertainties associated with international markets, which could adversely affect our operating results and impair our business strategy.  We are consistently negotiating and entering into new agreements and renewals and extensions of existing agreements for our products and services in international markets."  *Id.* at 12.

### III.   The Alleged "Corrective Disclosures"

The CAC essentially claims that every event or statement during the Class Period that was followed by a drop in the Company's stock price was a corrective statement—even if the disclosures had nothing to do with any of the MENA media rights negotiations.  These include the 1Q19 results, CAC ¶¶ 241-42, 248; the 3Q19 results, CAC ¶¶ 267-268, 270, 274; the announcement of the departures of Defendants Barrios and Wilson, CAC ¶ 288; preannounced 4Q19 results, CAC ¶ 289; and the final 4Q19 results, CAC ¶¶ 292-294, 296-298.

## ARGUMENT

To establish a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, Plaintiff must plead (and ultimately prove): "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  A claim for control person liability under Section 20(a) of the Exchange Act requires that Plaintiff establish: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant,

and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

The CAC does not state a claim for relief because it (I) does not adequately plead any actionable statements or omissions, (II) does not plead Defendants' scienter sufficiently to meet the heightened pleading standards applicable to the claims, (III) does not demonstrate loss causation; and (IV) does not establish control person liability.

## I.     The CAC Does Not Plead Any Actionable Material Misstatements or Omissions.

Plaintiff has not met its burden to plead the existence of false or misleading statements. The CAC is premised on alleged omissions, which are actionable only when disclosure is necessary to make the statements made, in light of the circumstances under which they were made and the overall context, not misleading to a reasonable investor. *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 527 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."). The CAC fails to satisfy the heightened pleading requirements under Rule 9(b) and the PSLRA because it does not explain <u>why</u> and <u>how</u> the statements at issue (which consist of opinions covered by the PSLRA safe harbor) are allegedly misleading.

### A.     Plaintiff Does Not Satisfy the Requirements Under Rule 9(b) and the PSLRA to Plead Facts with Particularity that Show *Why* and *How* the Company's Disclosures Were Materially Misleading.

Securities fraud claims are subject to the heightened pleading standards of Rule 9(b) and the PSLRA, which require plaintiffs to "do more than say that the statements [at issue] were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Similarly, Rule 9(b) requires that a plaintiff plead particularized facts and "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain <u>why</u> <u>the statements were fraudulent</u>." *ATSI*, 493 F.3d at 99 (emphasis added); *see also Rombach*, 355 F.3d at 170. Plaintiff does not come close to meeting that burden. Nowhere in the CAC does Plaintiff plead particularized facts demonstrating <u>why</u> or <u>how</u> any of the allegedly omitted information caused the subject statements (as to the negotiations, prospects, timing, and forecasts associated with a new MENA media rights deal) to be materially false or misleading.

### 1. Plaintiff's Allegations Regarding the Supposedly Omitted Information Are All Conclusory and Are Not Supported by Particularized Facts.

Plaintiff asserts in conclusory fashion that the statements were misleading for failing to disclose certain information, namely, (a) Plaintiff's hindsight speculation that the parties must have been too far apart; (b) Plaintiff's subjective characterization that the Company's relationship with KSA was "under stress" or "embroiled in conflict" due to supposed controversy that WWE faced for holding events in 2018, the Saudi government's alleged failure to make timely payments, and alleged tensions related to the *Crown Jewel* event; and (c) that OSN had terminated the prior pay-tv deal. CAC ¶¶ 234, 249, 264, 275, 281. None of this is alleged with any particularity to establish <u>why</u> or <u>how</u> the Defendants' statements were false or misleading.[10]

#### (a) Purported "Distance" Between WWE and Saudi Arabia.

Although the CAC's central allegations relate to omissions regarding the supposed breakdown in negotiations between WWE and KSA, the CAC does not contain <u>any</u> detail as to those negotiations (*e.g.,* when they occurred, who was involved, what the status of the negotiations

---

[10]  Further, the CAC's structure—block quotation paragraphs of supposed misstatements followed by a paragraph that broadly identifies supposedly omitted material information in those quotations—is improper. As the Second Circuit has explained, this "basically leav[es] the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012).

was at the time of any of the shareholder disclosures, and what the Individual Defendants or others at WWE supposedly knew about the negotiations). Instead, Plaintiff's assertions regarding the supposed "distance" between the parties appears to be grounded on nothing other than innuendo and assertions by CW-1, a former employee at MBC who was not directly involved in the negotiations and offers nothing as to what Defendants knew or whether Defendants honestly believed their forward-looking statements.

Plaintiff's bald and speculative assertions that there was "growing tension[]," a "deteriorating relationship," and that "negotiations . . . went nowhere," CAC ¶¶ 29, 304, 377, are insufficient and should be disregarded. *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (plaintiff must "set forth the facts on which a belief that a statement is misleading was formed"); *ATSI*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). Moreover, "the law is clear that companies need not depict facts in a negative or pejorative light or draw negative inferences to have made adequate disclosures." *Singh v. Schikan*, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015).[11]

As to CW-1, Plaintiff's allegations establish that he had a minimal role with respect to any negotiations with WWE. Confidential witnesses must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *see also Long Miao v. Fanhua, Inc.*, No. 18-cv-8183 (PAE), 2020 WL 996602, at *19 (S.D.N.Y. Mar. 2, 2020) (dismissing, in part, because "the witnesses' positions and job responsibilities are not described at a sufficient level of particularity to indicate a high likelihood

---

[11] *See also OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 504 (3d Cir. 2016) (company "was under no obligation to use any adjective, let alone a pejorative one, to describe the state of [a pending] deal," rejecting criticism of not describing deal as "imperiled" or "in danger").

that they actually knew facts underlying their allegations").[12]  CW-1 does not claim to have been directly involved in any negotiations with WWE, to have exchanged a single message with WWE, or to have been present for a single meeting or telephone call with anyone at WWE.  He had a very short stint at MBC: he joined in the fall of 2019—months after the start of the Class Period—and he left at some unknown point less than a year later.[13]  He therefore cannot support any allegations as to the July 2019 agreements-in-principle.[14]  The allegations also reveal that, even for the short period when he was at MBC, he had a limited and apparently junior role with respect to WWE, focused only on an internal-to-MBC study used to estimate the potential deal value for MBC.  CAC ¶ 192.  All of his assertions as to the actual discussions with WWE are based on second- or third-hand information he purportedly heard from unidentified persons (some of whom he does not even recall).  CAC ¶¶ 193-195.  *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (confidential witness account was "particularly uninformative" where he "got his information through intermediaries, thus undermining the likelihood that he has personal knowledge of his allegations").  Otherwise he offers his personal opinions about what he viewed as "optimistic" or whether he "thinks" negotiations are still ongoing as of June 2020.  CAC ¶¶ 194-195.  *Glaser*, 772 F. Supp. 2d at 590-91 (confidential witnesses cannot merely recite conclusory allegations).

---

[12]   It is thus wholly improper for Plaintiff to try to reserve for itself the ability to provide additional details as to CW-1 *in camera*.  CAC ¶ 16 n.3.  Plaintiff has the burden to plead particularized facts to support why the Court should credit confidential witnesses, and Defendants must be able to explain how those allegations are lacking.  Plaintiff's invocation of "retaliatory concerns" lacks any foundation, as CW-1 is not employed by WWE and is a *former* employee of MBC.

[13]   Further, the only thing supporting that MBC is even relevant to the allegations is CW-1's statement.  All of WWE's public statements discuss negotiations with GEA or GSA.

[14]   *See, e.g.*, *In re World Wrestling Entm't, Inc. Sec. Litig.*, 180 F. Supp. 3d 157, 184 (D. Conn. 2016) (rejecting confidential witness allegations regarding the status of media rights negotiations when the witness was not employed by the company in the period covered by the allegations).

###### (b) Plaintiff's Subjective Characterizations of the Relationship as "Under Stress."

Plaintiff asserts that the relationship between WWE and KSA was "under stress" such that it was misleading for Defendants not to have disclosed certain indicia of what Plaintiff terms a "deteriorating" relationship. Plaintiff first points to WWE's events in KSA in 2018, but on that topic Plaintiff only references a series of (irrelevant) allegations about some reactions within the United States; there are no allegations—let alone particularized ones—that Saudi Arabia had any negative reaction that reflected "deterioration" of the relationship. To the contrary, the allegations and public information support the opposite, as WWE held the first-ever women's match in KSA in October 2019, *see* n. 3, *supra*, and WWE and KSA expanded their live event relationship during the Class Period in November 2019. CAC ¶ 279.

Plaintiff next argues that supposed "late" payments by KSA caused stress on the relationship so as to jeopardize the ability of WWE to reach a new media rights deal for the region. Again, no particularized allegations support this conclusory and subjective assertion by Plaintiff. Critically, the CAC is devoid of any allegations that amounts were paid after a deadline, that KSA breached the payment terms of a contract, or that any payment was withheld or deferred due to a problem KSA expressed to WWE. The entirety of the allegations centers on innuendo that any payment made after an event occurs or after WWE estimated it would be paid must be indicative of a relationship that has become so deteriorated that no reasonable person could expect any continued business or future deals. Such allegations are specious and defective.

In fact, Plaintiff's own allegations and documents cited in the CAC undercut its unfounded conclusions. As noted above, while all of this alleged "stress" and "deterioration" existed, WWE and KSA agreed to expand their relationship by holding a second live event each year. CAC ¶¶ 207, 279. Further, the CAC makes clear that having some amounts outstanding after the event

was not an unusual circumstance.  CAC ¶¶ 213, 316.  Plaintiff relies upon statements in a declaration by the WWE Senior Vice President for Finance, which reflects that all fees due for the 2018 events were paid in 2018, all fees for the *Super ShowDown* 2019 event were paid prior to the *Crown Jewel* 2019 event, and all fees for the *Crown Jewel* 2019 event have been paid.  Ex. 19 (Kowal Decl.) ¶¶ 6-8.  Certain <u>reimbursable costs</u> were outstanding after each of the events, which have all since been paid (but for approximately $2.4 million not yet paid for *Crown Jewel* 2019).  *Id.*  Plaintiff tries to emphasize the significance of $60 million that was owed for the June 7, 2019 event, but Plaintiff's only criticism is that the payment was made within 30 days after Defendants said that they <u>expected</u> it would be.  CAC ¶ 212.  Defendants never guaranteed the date of payment and Plaintiff does not allege that the payment missed a contractual deadline.

Plaintiff's other allegations about "tens of millions of dollars" allegedly paid "late" lack any foundation or particularity.  CAC ¶¶ 210, 212-15, 313.  The allegations are all based on "speculation" from "news reports," such as "a wrestling-focused website" that itself is based on statements by a "WWE Spanish commentator" (who is not employed by WWE and who based his own story on another unnamed party).  CAC ¶¶ 211-12.[15]  In addition to comprising multiple layers of uncorroborated hearsay with unidentified sources, the website undercuts its own source's reliability, admitting that the quoted figures ($300 to $500 million) were "insanely high" and unrealistic given the money WWE generated per event.  CAC ¶ 211.  The so-called "media reports" also include other unidentified "wrestling-focused websites" that cite to "an individual" who was supposedly "in contact with sources in the WWE" that stated "the [Saudis] come up short" by a couple million dollars every show (*i.e.*, the three done so far).  CAC ¶ 215.  Those

---

[15]  Plaintiff claims that CW-2 "confirms the substance of these media reports," CAC ¶¶ 216, 218, but the allegations as to him lack any detail about payments allegedly owed and, as discussed below, contain their own multiple levels of hearsay.

quotes in the CAC are from the Twitter page of a self-proclaimed wrestling journalist.  Ex. 20.

Even if these websites and Twitter cites could be deemed "news sources," none of these unverified,

non-particularized hearsay allegations supports that any payments breached a contract or indicates

a relationship so tattered that no deal could be done.[16]

Finally, Plaintiff's allegation that the WWE-Saudi Arabia relationship was strained by the

activities surrounding the 2019 *Crown Jewel* event (*i.e.*, the supposed "cut feed" and alleged

incidents related to travel back to the United States) are also conclusory and do not establish any

falsity or scienter.  As Plaintiff acknowledges (CAC ¶ 208), WWE and the charter airline company

released statements explaining the mechanical issues with the plane.  Ex. 21 (Forbes, 11/01/19).

In contrast, Plaintiff relies on the same speculative so-called "news outlets" and Twitter accounts

described above, as well as a former wrestler (CW-2).  CAC ¶¶ 210-212.  The CAC also cites an

article that acknowledges WWE's description of the mechanical issues, while also citing a radio

commentator who (without any explanation or sources) offered his own contrary opinion on his

radio show and Twitter.  CAC ¶ 209.  As to CW-2, most of the allegations he raises are innocuous

or completely irrelevant to issues of falsity or scienter, such as CW-2's observation that persons

boarding an airplane "appear[ed] to be 'in a hurry,'" a flight attendant made a colloquial statement

about not taking off, CW-2's opinion that the pilot's voice sounded "distressed," and CW-2's

observation regarding the presence of armed security at an airport.  CAC ¶¶ 216-17.[17]

---

[16]  *Cf. In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004) ("[C]onclusory allegations and opinions 'taken from a newspaper reporter's notebook' cannot satisfy the strictures of Rule 9(b) or the PSLRA and cannot be a predicate for fraud under § 10(b) and Rule 10b-5." (citations omitted)); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007) (news articles "still must indicate particularized facts"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.").

[17]  Plaintiff also bizarrely cites CW-2's memory about what other people posted on social media, including wrestlers' wives posting concerns or being grateful when their spouses landed, and

The most specific item CW-2 provides—the hearsay that a WWE Senior Director of Talent Relations informed him that Defendant McMahon cut the live feed and got into an argument with the Crown Prince as to late payments—is directly contradicted by Plaintiff's own allegations and items Plaintiff relied upon.  KSA made the $60 million payment <u>before</u> the *Crown Jewel* event began, as was publicly disclosed earlier that day on the earnings call.  CAC ¶ 212; Ex. 19 (Kowal Decl.) ¶¶ 5(g), (i), 8.  It thus does not make sense, logically, that this payment (even accepting the conclusory allegation that it was "late") would have prompted Defendant McMahon to temporarily "cut" and then shortly thereafter resume a live broadcast feed.

Further, none of the allegations related to *Crown Jewel* creates a plausible inference that any of the Defendants committed securities fraud.  By the time of this event (October 31, 2019), WWE had already lowered its year-end guidance to assume a MENA media rights deal would <u>not</u> be completed, explaining that although "the Company continues to work toward the completion of a MENA agreement, no assurances can be given in this regard."  CAC ¶ 267.  The ultimate year-end financials were consistent with that adjusted guidance.  CAC ¶ 292.  And, days after the event, WWE announced that it <u>expanded</u> its partnership with GEA to include a second live event every year through 2027.  CAC ¶ 279.  Thus, even were the Court to credit Plaintiff's third-hand allegations from CW-2, they do not support that anything related to the *Crown Jewel* event rendered any of the Company's forward-looking opinion statements false or misleading.

### (c)    The Early Termination of the OSN Agreement

Plaintiff's final allegation to support falsity relates to WWE not disclosing OSN's March 2019 termination of its prior deal with WWE until July 2019 (although the Company did disclose

---

wrestlers being upset they were not able to take the earlier flight.  CAC ¶¶ 221-222.  It is not clear how any of this supports any element of Plaintiff's claims.

in February 2019 that it had several relationships "nearing the end of their terms, including in…
the Middle East," CAC ¶ 232).   Plaintiff contends that by using the word "renew" Defendants
misleadingly conveyed that WWE was negotiating exclusively with OSN.  CAC ¶¶ 150, 157-161.
Plaintiff's entire argument hinges on a single word ("renew") that Plaintiff takes out of context.
Defendants never discussed renewing a deal *with OSN*.  In fact, Plaintiff does not identify any
statement by Defendants that mentions, let alone ties a MENA media rights deal to, OSN.  Instead,
statements regarding "renewal" or "negotiations" refer to the "*markets*" up for renewal.  *See, e.g.*,
CAC ¶ 226 ("In terms of the rights renewal process outside the U.S., obvious there's a lot of key
markets that we're still working on . . . the Middle East."); *see also* CAC ¶¶ 150, 158, 160.[18]
Defendants also discussed the overall "distribution plan . . . in several international markets."  CAC
¶ 247; *see also* CAC ¶ 251 ("we are in discussions in multiple markets around the world").

Further, the Company's practice relative to discussion of "renewing" media rights or
distribution arrangements, utilizing terms of art in the broadcasting industry that the analysts and
investors following it knew well, reveal the faults in Plaintiff's superficial arguments.[19]
Defendants (and analysts) used the term "renewal" to refer to distribution rights in a particular
*market*, not with any particular counterparty.   As Defendant Barrios explained at an analyst
meeting predating the Class Period, in discussing the "last renewal cycle" for its top-seven markets
(United States, U.K., India, Latin America, Middle East, and Canada): "**We renewed, sometimes**

---

[18]   The CAC allegations and materials cited by Plaintiff reveal that investors did not care about
OSN as the counterparty and the money in the existing OSN deal was immaterial.  After WWE
stated in July 2019 that OSN had terminated its relationship, Plaintiff does not allege that a single
analyst wrote about it, and in fact the Company's stock price went up the next day.  CAC ¶ 263.

[19]   A court can properly take judicial notice of documents "for the purpose of establishing that the
information [therein] was publicly available."  *Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012);
*see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Similarly, a
court may properly take judicial notice of publicly-filed documents.  *See, e.g.*, *Paulsen v. Stifel,
Nicolaus & Co.*, No. 18-cv-9440, 2019 WL 2415213, at *3 (S.D.N.Y. June 4, 2019).

**with the current distributors, in some cases, we switched distributors** . . . ."  Ex. 22 (UBS 12/04/17 Conf. Tr.) at 3 (emphasis added).[20]   In another meeting, Defendant Barrios explicitly noted that the "renewal" terminology refers to distribution strategy in a market:

> [B]ased [on] the way these agreements are structured and on our experience, we put the dates out that we think the announcement will be made -- whether they're a current new partner or a different distribution strategy, right. Because it's not just renewal, it's really the distribution strategy.

Ex. 23 (Morgan Stanley 02/28/18 Conf. Tr.) at 6.

Similarly, analysts <u>continued to use the word "renew" when referring to the MENA media rights deal</u>, even after it became clear that WWE was negotiating with KSA (a new partner).  *See* CAC ¶ 170 (analyst report discusses "TV renewal"); CAC ¶ 266 (analyst report noting outstanding "renewal for the TV rights in the MENA region" and that discussions are with GSA); Ex.14 (3Q19 Call Tr.) at 21 (question regarding "international renewals"); Ex. 24 (UBS 12/09/19 Conf. Tr.) at 8 (Analyst: "Any updates on international renewals, India, Middle East?").  When WWE changed distribution partners in other markets (including within or just before the Class Period), the Company and analysts also referred to the new arrangements as "renewals."[21]

Nor do Plaintiff's allegations support that omission of the early OSN termination made any statements by Defendants *materially* misleading.  That OSN exited the business of providing sports programming in March 2019 was known to the market and covered in the broadcasting trade

---

[20]   *See also* Ex. 23 (Morgan Stanley 02/28/18 Conf. Tr.) at 5 (Analyst: "when you think about the U.S. renewal, how important is it for you to keep the same partner, NBCU, do you think that there could be other parties that could be interested.").

[21]   For example, a few months before the Class Period, WWE announced "renewal" of its U.S. distribution rights, which included a brand new partner (Fox) to distribute *Smackdown*, and the Company and analysts routinely referred to it as a "renewal."  *E.g.*, Ex. 25 (UBS 12/03/18 Conf. Tr.) at 5 (Barrios: "We recently completed the renewal of our distribution agreements in the U.S."); Ex. 26 (2Q18 Call Tr.) at 4 (Analyst: "With the U.S. renewal done…."). Similarly, from 2018-2019 WWE discussed renewing its media deal in the U.K., which had been for years with Sky Sports.  Ex. 5 (4Q18 Call Tr.) at 5.  In 2Q19, WWE entered a deal with a new partner (BT Sports).

press.[22]  Plaintiff also offers nothing but conclusory speculation to support its allegation that early termination by OSN (an entity unrelated to KSA) jeopardized the ability of WWE to get a MENA media rights deal done, or that Defendants were "scrambling to find a replacement partner for the OSN agreement," CAC ¶ 163.  In fact, Plaintiff acknowledges that WWE had other relationships in the region (including its partnership with MBC) and was in direct negotiations with KSA.

### 2.   No Particularized Allegations Explain Why Any of Defendants' Statements as to the Negotiation Status Were False or Misleading.

Plaintiff marks as misleading various statements that describe discussions or negotiations involving MENA media rights as "ongoing" or something the Company was "working on."  CAC ¶¶ 226, 237, 245-247, 251, 253, 260, 267, 271, 279, 283, 285.  However, the CAC does not contain any allegations to undercut the veracity of these statements.  In fact, other than marking them in bold and italics, Plaintiff does not actually allege that the statements were misleading.  And there is not a single witness, document, or other source cited in the CAC to support that negotiations and discussions were not occurring during the Class Period (in fact, CW-1 supports that discussions were ongoing when he joined in the fall of 2019, CAC ¶ 194).  All Plaintiff offers are the same allegedly omitted "facts" that it contends should have been disclosed, which for the reasons expressed above, are unavailing.  Such rank speculation does not state a claim for securities fraud.

### 3.   Plaintiff Does Not Adequately Plead Why Any of WWE's Risk Disclosures Was Materially Misleading.

Plaintiff alleges that WWE's risk disclosures were false because "WWE was warning of a risk that had already materialized" (*i.e.*, the OSN agreement had been terminated).  CAC ¶¶ 235, 250.  But, in fact, Plaintiff's allegations do not identify any falsity in the risk disclosures.

---

[22]  *See OSN to Focus on Cricket*, BROADBAND TV NEWS (Feb. 13, 2019) (attached as Ex. 27); *OSN Slashes Sports Coverage for MENA Region*, INSIDE SATELLITE TV (Feb. 12, 2019) (attached as Ex. 28).  The securities laws do not require disclosure of publicly-known information.  *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552–53 (S.D.N.Y. 2005).

WWE disclosed that the "failure to maintain or renew key agreements could adversely affect our ability to distribute our media content . . . which could adversely affect our operating results." CAC ¶ 232 (quoting WWE 2018 10-K). The risk being disclosed relates to the potential effect on the Company's ability to distribute its media content and the potential resulting adverse effect on operating results. Plaintiff does not allege that, at the time of this disclosure, OSN's termination had a material effect on WWE's ability to distribute its media content or resulted in any adverse effect on its financial statements. Therefore, no undisclosed "risk" had materialized.

In a similar context, the Third Circuit affirmed dismissal of a securities fraud case, rejecting a similar argument that a disclosed risk had materialized. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017). There, the company warned: "If we are unable to maintain and expand our network of direct sales representatives and independent distributors, we may not be able to generate anticipated sales" and "if any such independent distributor were to cease to distribute our products, our sales could be adversely affected." *Id.* at 238. As the Third Circuit explained, that a key distributor already left did not mean the risk had materialized because "[t]he risk actually warned of is the risk of adverse effects on sales—not simply the loss of independent distributors generally. Accordingly, the risk at issue only materialized—triggering [a] duty to disclose—if sales were adversely affected at the time the risk disclosures were made." *Id.* at 242-43.[23]

Even if the OSN termination made it more likely that WWE might have difficulty entering into a new MENA distribution deal with a different party (which the CAC allegations do not support), the Company's statement is not misleading. "An increase in a risk does not mean the

---

[23]   *See also Hou Liu v. Intercept Pharm., Inc.*, No. 17-cv-7371 (LAK), 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) (risk disclosure that use of company product in a setting that "may result in . . . misuse that may negatively affect the commercial prospects" was not actionable because even if misuse had occurred, the statement "was made in the context that these events were ones that could affect [defendant's] income," which was not alleged to have occurred).

risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading." *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, No. 18-cv-7796 (VEC), 2020 WL 248729, at *12 (S.D.N.Y. Jan. 15, 2020).

## B.   Plaintiff's Allegations of Opinion Statements Do Not Support Fraud Claims.

The central charge in the CAC relates to forward-looking and opinion statements regarding the prospects, timing, and revenue associated with a MENA media rights deal, and Plaintiff does not allege anything to support that such statements were misleading.  Statements of opinion are rarely the subject of a securities fraud claim.  "As the Second Circuit has firmly rejected [the] 'fraud by hindsight' approach it is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events."  *In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18-cv-08049 (RA), 2020 WL 550769, at *13 (S.D.N.Y. Feb. 4, 2020) (citation and internal marks omitted).  Opinion statements are only actionable if the opinion is not "sincerely held" or "if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  The CAC does not support either of these theories.

### 1.   Plaintiff's Allegations Involve Statements of Opinions.

The statements identified in the CAC as to Defendants' desire to complete a MENA media rights deal, projections regarding timing, forecasted OIBDA, and overall optimism and plans for international markets (*see* p. 5-6, *supra*) comprise statements of opinion.  *See In re Sanofi*, 87 F. Supp. 3d at 531 (expressions of "expectations for the future rather than presently existing, objective facts" are opinions, citing cases); *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13 (2d Cir. 2019) (statements characterizing counterparty relationship "are expressions of puffery and optimism . . . [that] do not give rise to securities violations" (citation omitted)).

None of the statements identifies any guarantee or states that an agreement had or definitely will be reached.  Indeed, all of the statements indicate that negotiations and discussions were "ongoing," that WWE was "still working on" the deal, and expressed targets for when the Company would like to have it "locked down."  CAC ¶¶ 158, 237, 241, 255.  Even when WWE announced in July 2019 that it "believe[d] it has agreements in principle with the Saudi [GSA] on the broad terms for [a Saudi live event and a MENA media rights deal]," the Company noted that its "understanding is nonbinding" and that it was "possible that either or both of these business developments do not occur."  CAC ¶¶ 256, 260.  WWE also noted that if these deals do not occur, the Company "currently believes that the most likely downside to its Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook."  CAC ¶¶ 255-56, 262.  *Cf. In re ForceField Energy Inc. Sec. Litig.,* No. 15-cv-3020, 2017 WL 1319802, at *15 (S.D.N.Y. Mar. 29, 2017) (statement that company was "poised for significant growth" and "represents an excellent opportunity for investors" was opinion); *In re Seadrill Ltd. Sec. Litig.*, No. 14-cv-9642, 2016 WL 3461311, at *11 (S.D.N.Y. June 20, 2016) (statements that defendants "feel increasingly comfortable" and "expect" to support dividend level in "foreseeable future" were opinions).

### 2. The CAC Does Not Allege Particularized Facts to Support that Defendants Did Not Honestly Believe the Opinion Statements

As explained in Section II.A, *infra*, regarding Plaintiff's failure to plead scienter, the CAC does not identify any facts (let alone particularized ones) that indicate the Defendants did not in fact believe the opinions allegedly contained in the identified statements.

### 3. The CAC Does Not Plead Any Facts Contrary to Defendants' Opinions that They Were Required to Disclose

An opinion statement does not become actionable merely because a plaintiff, in hindsight, would have wanted to know an omitted fact related to the same subject matter.  Instead, a plaintiff "must identify particular (and material) facts going to the basis of the issuer's opinion—facts about

the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  The omitted facts must "conflict with what a reasonable investor would take from the statement itself."  *Id.* at 189.  The Supreme Court warned against "an overly expansive reading of this standard," and noted that "reasonable investors understand that opinions sometimes rest on a weighing of competing facts," and "do[] not expect that *every* fact known to an issuer supports its opinion statement."  *Sanofi*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 189).  An opinion statement is not misleading merely because "an issuer knows, but fails to disclose, some fact cutting the other way."  *Id.* (quoting *Omnicare*, 575 U.S. at 189).  Allegations rooted in a failure to provide information "that would have potentially undermined Defendants' optimistic projections" or that "ran counter to an opinion expressed" are not sufficient.  *Id.* at 212; *see also Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.").

Here, even assuming that Plaintiff adequately pled the allegedly omitted information—and it has not (*see* Section I.A., *supra*)—no particularized factual allegations support how any of it made Defendants' statements materially misleading.  Courts repeatedly find that statements of optimism about completing deals or other favorable occurrences do not become misleading simply because the company does not provide every piece of contrary information along the way.  For example, the Second Circuit recently affirmed dismissal of a securities fraud suit based on statements expressing optimism regarding negotiations with a counterparty, while at the same time the counterparty "rejected or failed to respond to" proposals, threatened to breach, and "refused on a number of occasions to meet with" defendant.  *In re Express Scripts*, 773 F. App'x at 11, 13.

25

The court explained: "[plaintiff] essentially argues that Defendants should have anticipated the outcome of the negotiations sooner or that the negotiations would deteriorate, but in the circumstances here, where the discussions were ongoing, Defendants did not have a duty to disclose more about the uncertain state of the negotiations." *Id.* at 14;[24] *see also Sanofi*, 816 F.3d at 211-12 (the existence of ongoing discussions "d[oes] not prevent Defendants from expressing optimism" and plaintiffs are "not entitled to so much information as might have been desired to make their own determination about the likelihood of [a favorable outcome] by a particular date")

The "context and manner of presentation" of the statement must also be considered when evaluating whether any omitted information would have "<u>significantly</u> altered the <u>total mix</u> of information" for a "<u>reasonable investor</u>." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citations omitted) (emphasis added); *see Omnicare*, 575 U.S. at 190 (must read a statement "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information" as well as "the customers and practices of the relevant industry"). Here, a reasonable investor would have understood that an ongoing deal negotiation is subject to considerable uncertainty as to if and when the deal may be completed—particularly in light of the Company's direct statements to this effect. *See In re Express Scripts*, 773 F. App'x at 14. In particular:

- The Company made clear that it would <u>not</u> comment on the status or details of ongoing negotiations. *See* Ex. 8 (1Q19 Call Tr.) at 4 (Barrios: "Given that we're in the middle of

---

[24]   *See also In re Synchrony Fin. Sec. Litig.*, No. 3:18-CV-1818 (VAB), 2020 WL 1531297, at *23 (D. Conn. Mar. 31, 2020) ("Defendants' statements expressing confidence in partnership renewals, even [a key partner's] renewal, are not materially misleading, especially because Defendants warned about the increased competition for renewals."), *appeal docketed* (Apr. 24, 2020); *cf. Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630, 633 (2d Cir. 2019) (no reasonable investor could have found "vague" statements regarding status of company's negotiation with counterparty to be misleading, particularly where company made clear it "would not comment on renewal negotiations . . . while such negotiations were underway").

these discussions, we're going to stay away on commenting on them in any way, shape or form."); Ex. 14 (3Q19 Call Tr.) at 5 (Barrios: "I don't want to characterize the discussions we're having.").  CAC ¶¶ 245, 246.

- None of the statements involved guarantees of a deal being completed or promised a specific revenue or OIBDA amount.  To the contrary, each of the allegedly misleading statements was described in terms of projections or expectations (*see* Section I.B.1, *supra*) and explicitly noted the risks associated with the Company's media rights deals, including that a deal may not be completed.  *See* pgs. 8-9, *supra*.  "[M]eaningful cautionary language can render omissions or misrepresentations immaterial."  *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (citation and quotation marks omitted).

- The Company's history and regular practice with respect to media content deals and negotiations reveals that delays, uncertainty, and changing partners is not unusual.  For example, WWE expressed its expectation to finalize a U.K. media rights deal by the end of 2018 and an India deal in 1Q19, Ex. 29 (3Q18 Release) at 7, but the U.K. deal closed in 2Q19 and the India deal was completed after the Class Period.

Moreover, courts have long recognized that corporate "puffery" or statements expressing optimism about the future of the business "are too general to cause a reasonable investor to rely upon them."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014) ("'[R]osy predictions,' or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  "[C]orporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."  *Novak,* 216 F.3d at 309.

27

### C.     The Allegedly Misleading Statements Are Covered by the PSLRA Safe Harbor for Forward-Looking Statements.

The PSLRA provides a safe harbor for statements that are "forward-looking" when either (a) they are accompanied by meaningful cautionary statements, or (b) plaintiff has failed to prove the person making the statement (or executive approving the statement) had <u>actual knowledge</u> it was misleading.  15 U.S.C. § 78u-5; *Porwal v. Ballard Power Sys., Inc.*, No. 18-cv-1137 (GBD), 2019 WL 1510707, at *6 (S.D.N.Y. Mar. 21, 2019).[25]  Because all of the allegedly misleading opinion statements described above were forward-looking statements accompanied by meaningful cautionary language (and Plaintiff has not pled actual knowledge, *see* Section II.A, *infra*), they are all entitled to the safe harbor provision in the PSLRA.

### 1.     Plaintiff's Allegations Concern Forward-Looking Statements

Forward-looking statements include those that contain financial projections, objectives for future operations, plans, and any statements of assumptions underlying these items.  *See* 15 U.S.C. § 78u-5(i); *In re Sanofi*, 87 F. Supp. 3d at 535 (statements expressing optimism for FDA approval are "classically forward-looking—they address what Defendants expected to occur in the future"); *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010) ("A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow....").  The above statements are forward-looking because they relate to target and anticipated financial metrics, expectation and timing of a potential deal, and overall confidence and optimism in the future.  CAC ¶¶ 224, 226-32.

---

[25]   Similarly, the "bespeaks caution" doctrine provides that alleged misrepresentations "are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  *Rombach*, 355 F.3d at 173 (citation omitted).

### 2.   The Forward-Looking Statements Are Not Actionable Because They Were Accompanied by Meaningful Cautionary Language

The statements were all accompanied by meaningful cautionary language.  Such language is "meaningful" when it "convey[s] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 771 (2d Cir. 2010) (internal citation omitted); *see also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 397-98 (S.D.N.Y. 2018) (courts evaluate cautionary language "to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist" (internal citation omitted)), *aff'd*, 757 F. App'x 35 (2d Cir.).

In each of the allegedly misleading statements, WWE prominently and meaningfully disclosed relevant risks.  *See* pgs. 8-9, *supra*.  A detailed PSLRA risk disclosure was contained in each 10-K, 10-Q, earnings release, and analyst conference call presentation, and each FY19 earnings release highlighted "risks relating to entering into, maintaining and/or renewing key agreements, uncertainties associated with international markets and risks inherent in large live events."  *See, e.g.*, Ex. 7 (1Q19 Release) at 7.

These statements are similar to those found sufficient in numerous cases dismissing fraud claims under the PSLRA.  For example, a company's optimistic statements about FDA approval were found nonactionable when the company also consistently gave warnings that the FDA might not approve the product and did not express certainty, and thus no reasonable investor would have thought that there was no risk in the product's approval.  *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 327, 333-34 (S.D.N.Y. 2014); *see also Singh*, 918 F.3d at 64 (statements "framed by acknowledgements of the complexity and numerosity of applicable regulations . . . suggests caution (rather than confidence) regarding the extent of [company's] compliance"); *City of Omaha*

*Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, No. 18-cv-10320 (AJN), 2020 WL 1529371, at *7-9 (S.D.N.Y. Mar. 30, 2020) (statements specific to company's ability to maintain staffing of sales force provided meaningful cautionary language).

## II.   The Scienter Allegations Do Not Satisfy the Heightened PSLRA Standards.

The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind," *i.e.* scienter.  15 U.S.C. § 78u-4(b)(2).  A plaintiff may establish the required "strong inference" by either pleading "motive and opportunity" or "strong circumstantial evidence" of the defendant's mental state embracing "conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99; *see also Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 227 (S.D.N.Y. 2018).[26]  Allegations involving forward-looking statements require actual knowledge—recklessness will not suffice.  *See* 15 U.S.C. § 78u-5; *Slayton*, 604 F.3d at 773, 776 n.9.

Plaintiff's allegations do not come close to meeting the high standard imposed by the PSLRA.  The allegations rely upon the above-described conclusory and unsupported allegations and innuendo regarding the purported status of the WWE-Saudi Arabia relationship and negotiations, and lack any ties to the Defendants and what they allegedly knew.  Instead, the allegations support the more plausible inference that Defendants honestly believed their statements regarding a MENA media rights deal.

### A.   Plaintiff Does Not Allege with Particularity a Strong Inference that Defendants Had Actual Knowledge that Any Statements Were Misleading.

In addition to the fact that none of the allegedly omitted information made any of the statements misleading (*see* Section I, *supra*), the CAC also contains no particularized allegations

---

[26]   For corporate defendants, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

that the Defendants knew and did not disclose any material information with an intent to mislead. A plaintiff "*must specifically identify* the reports or statements that are contradictory to the statements made," to "provide specific instances in which defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (internal quotation marks omitted); *see also Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

Notably absent from the CAC are references to <u>any</u> internal reports or documents, <u>any</u> WWE insider accounts, <u>any</u> communications involving Defendants, or a description of <u>any</u> meeting at which any of these supposedly omitted "adverse facts" allegedly was discussed with Defendants (or anyone else within the Company).  This does not satisfy the stringent requirements imposed by the PSLRA and Rule 9(b), and alone warrants dismissal.  *See Dynex*, 531 F.3d at 196 (holding that plaintiffs did not raise an inference of scienter because they did not specifically identify the reports or statements containing the information); *Koplyay v. Cirrus Logic, Inc.*, No. 13-cv-790 (CM), 2013 WL 6233908, at *7 (S.D.N.Y. Dec. 2, 2013) (dismissing complaint that "never makes reference to any internal reports, statements by confidential witnesses, or other specific facts" that showed defendants' knowledge of information contrary to statements made in public disclosures).[27]  Moreover, neither confidential witness is alleged to have interacted with any Defendant regarding the matters at issue in the CAC, and thus no reasonable inference of scienter

---

[27]  *Cf. In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01-cv-4388 (JGK), 2004 WL 376442, at *11 (S.D.N.Y. Feb. 27, 2004) ("Because the plaintiffs have not alleged with sufficient particularity the nature, the content, the reliability, or the availability of the allegedly contradictory internal reports, the allegations concerning this information do not provide sufficient circumstantial evidence to raise a strong inference of the defendants' fraudulent intent.").

can be drawn from those allegations.  *See Glaser*, 772 F. Supp. 2d at 590-91; *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

Instead, the allegations of knowledge are based entirely on Defendants' "positions with the Company" and the argument that they therefore must have known about the allegedly omitted "facts."  CAC ¶ 40.  This is insufficient.  *See, e.g.*, *In re Philip Morris*, 2020 WL 550769, at *20 ("boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient" (citation omitted)); *Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04-cv-3318 (LAP), 2005 WL 736217, at *4 (S.D.N.Y. Mar. 30, 2005) ("Vague and conclusory allegations that a defendant allegedly had access to non-public information . . . do not suffice."), *aff'd*, 159 F. App'x 317 (2d Cir.).  Moreover, even if Plaintiff had adequately pled that Defendants knew the allegedly omitted information, the CAC does not support that this rendered any statements misleading (let alone that Defendants were consciously aware of this) (*see* Section I.A., *supra*),.  *See Porwal*, 2019 WL 1510707, at *6 (plaintiff failed to plead that defendants "*actually knew* that they had no reasonable basis for [their asserted] belief" (citation and internal quotation marks omitted)); *see Slayton*, 604 F.3d at 775-76 (plaintiffs failed to "state[] with particularity facts giving rise to a strong inference that the defendants made … [a] statement with actual knowledge that it was false or misleading").

Further, when alleged misstatements comprise opinion, a plaintiff must allege facts indicating that the defendants did not honestly hold the opinion because "'a material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief.'"  *In re Sanofi*, 87 F. Supp. 3d at 534 (citation omitted).  Because the CAC does not point to any information reported to Defendants that was contrary to their articulated beliefs, Plaintiff cannot establish scienter as to the opinion statements.  *See In re Adient plc Sec. Litig.*, No.

18-cv-9116 (RA), 2020 WL 1644018, at *16 (S.D.N.Y. Apr. 2, 2020) (plaintiffs failed to allege any specific material facts that rendered the defendants' opinion statements as false or misleading).

The entire premise of Plaintiff's scienter allegations appears to be a fraud-by-hindsight theory (*i.e.*, because a MENA deal did not occur and Defendants later changed their forecasts, their prior opinions must have been lies), which is utterly insufficient to state a claim. *See In re Express Scripts*, 773 F. App'x at 14 ("Allegations . . . 'that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.'" (citation omitted)); *In re Adient*, 2020 WL 1644018, at *12 (a "statement believed to be true when made, but later shown to be false, is insufficient" to establish securities fraud); *Globus Med.*, 869 F.3d at 244 ("[I]nstead of citing contemporaneous sources to show [defendant] knowingly incorporated [inappropriate] revenue into [its] projections, plaintiffs rely on conjecture based on subsequent events.  This is insufficient.").

### B.   Plaintiff Does Not Allege Particularized Facts Supporting a Strong Inference of Recklessness.

Plaintiff has not pled any particularized facts that Defendants acted with recklessness when making the at-issue statements.  Recklessness amounts to "a state of mind approximating actual intent, and not merely a heightened form of negligence," and requires "defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308, 312; *see also Ong*, 294 F. Supp. 3d at 227.  The standard requires that conduct be "highly unreasonable" and represent "extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendants or so obvious that the defendants must have been aware of it*." *S. Cherry St., LLC v. Hessessee Grp., Ltd.*, 573 F.3d 98, 109 (2d Cir. 2009) (citation omitted).

Plaintiff's allegations completely lack specificity and contain no asserted facts as to what Defendants supposedly knew or recklessly disregarded when making their statements.  *See In re*

*Express Scripts,* 773 F. App'x at 15 (finding no evidence of recklessness because the defendant's statements were consistent with the facts at the time they were made); *S. Cherry St.,* 573 F.3d at 112 (holding that the complaint did not allege recklessness because plaintiffs did not present evidence that defendants did not believe their various representations to be accurate).

### C. The More Plausible Inference Is that Defendants Honestly Believed the Forward-Looking Opinion Statements When Issued.

Plaintiff fails to plead particularized facts giving rise to a strong inference of scienter that a reasonable person would deem "cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *ATSI*, 493 F.3d at 99; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Here, the more plausible inference is that Defendants originally believed that the MENA deal would be completed in 2019, they updated their opinions as time progressed (including to indicate that the deal might not be done by year-end), and the delays were part of normal contract negotiations with a major counterparty (as happened on several occasions including for other deals within the Class Period). *See Glaser*, 772 F. Supp. 2d at 589, 589-99 (finding that the "plaintiffs' inference that defendants knew their statements were false when made is far less compelling than the inference that Defendants believed that they would be successful in renewing the [subject] contract"). Indeed, this is what Defendant Barrios explained to analysts during the Class Period, when the Company lowered its year-end guidance due to the delay in completing the MENA deal: "[I]t's like any other discussion you're having with a partner, you're trying to find a common ground that works for you. [Three] months ago, we expected that deal to be finalized. As I characterized it now is discussions are ongoing." CAC ¶ 271.

Defendants' actions also undercut any allegation that they did not believe the opinion statements. At the same time that WWE was working on the MENA media rights deal, it also continued to work on developing a second annual event in KSA (both for 2019 and future years).

In July 2019, WWE announced that it believed it reached agreements-in-principle with the GSA for both a media rights deal and a second event.  CAC ¶ 256.  These discussions ultimately led to an agreement to hold a second event in 2019 (announced in September 2019) and an expansion of the relationship to hold a second live event in KSA every year through 2027 (announced in November 2019).  CAC ¶¶ 179, 207, 279.  This shows that the relationship with KSA had not "deteriorated" such that no deal could be made and that statements of optimism regarding a deal being completed were not materially misleading.  *Cf. In re Sanofi*, 87 F. Supp. 3d at 532 (noting that "Defendants' business decisions strongly indicate" they believed their opinions).

### D.    The Alleged Stock Sales Do Not Establish Scienter.

Plaintiff's allegations regarding Defendants' stock sales also do not support scienter.[28] Pleading insider stock sales alone is not enough to establish scienter—Plaintiff bears the burden to show that the sales are "unusual" or suspicious.  *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 344 (S.D.N.Y. 2008).  Relevant considerations include:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

*Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 772–73 (S.D.N.Y. 2019) (citation omitted). Plaintiff has not met its burden to plead facts supporting that any of the alleged insider sales was "unusual" or "suspicious."[29]

---

[28]  When a plaintiff does not adequately plead motive, "the strength of the circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).

[29]  Plaintiff's stock sale allegations fail as to all three Defendants.  Even if Plaintiff had sufficiently pled insider sales by a single defendant—even significant sales—that is insufficient to give rise to a strong inference of scienter.  *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336

### 1.    Defendant Barrios

Defendant Barrios' sales were made pursuant to a 10b5-1 plan entered before the Class Period. Ex. 30 (Barrios Forms 4).[30]  Therefore, his sales are conclusively not indicative of fraud. *See Glaser*, 772 F. Supp. 2d at 592; *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009).  Moreover, his sales in the Class Period were one-third the size of his sales in Plaintiff's Control Period.  CAC ¶ 335.

### 2.    Defendant McMahon

Plaintiff's allegations do not establish that Defendant McMahon's stock sale was "unusual" or "suspicious" in light of the CAC allegations.  Although this was a larger sale than in prior periods, it was contemporaneously disclosed to investors as being made specifically so that Defendant McMahon could fund the creation of the XFL sports league, a significant expenditure. *See* Ex. 31 (WWE 8-K (Mar. 27, 2019)).  This presents a more plausible competing inference.  *See Tellabs*, 551 U.S. at 314.[31]  Plaintiff's arguments regarding the timing of the sale (*i.e.*, around the time of the OSN termination) are also meritless for the reasons outlined above.

Further, this stock sale represented only a relatively small percentage (approximately 11%) of Defendant McMahon's overall holdings, and he continues to be WWE's largest stockholder with a significant stake in the Company.  *See* Ex. 31 (WWE 8-K (Mar. 27, 2019)) (showing that his holdings represented "approximately 80.1% of the Company's total voting power and

---

F. Supp. 3d 196, 218 (S.D.N.Y. 2018) ("[A] significant stock sale by just one corporate insider is insufficient to support such an inference." (citation and quotation marks omitted)), *aff'd* 779 F. App'x 69 (2d Cir. 2019).

[30]  Courts regularly consider SEC filings when evaluating insider sales.  *Michelle v. Ophthotech Corp.*, No. 17-cv-210 (VSB), 2019 WL 4464802, at *14 (S.D.N.Y. Sept. 17, 2019).

[31]  The CAC tries to use this one large sale to skew the collective totals and impugn the other Defendants' sales by aggregating all the sales together to argue that the Defendants collectively increased their sales "five-fold."  CAC ¶¶ 341-42.  This is patently misleading.

approximately 36.8% of the Company's total outstanding shares of common stock"). Sales of a relatively low percentage of stock holdings, where the defendant continues to own a substantial financial interest in the company, count *against* an inference of scienter. *See Acito v. Imcera Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (sale of less than 11% of holdings was not indicative of scienter); *Koplyay*, 2013 WL 6233908, at *5 (sales of 10-14% of holdings represented "only a small fraction of [defendants'] total beneficial ownership"); *In re Gildan Activewear*, 636 F. Supp. 2d at 271 (sale of 22.5% was not indicative of scienter). *Cf. Glaser*, 772 F. Supp. 2d at 593 ("It defies reason that an entity looking to profit on a fraudulently inflated stock price would hold close to ninety percent of its shares as share prices fell, while knowing that the information illuminating the fraud was seeping into the market.").

Finally, as with all Defendants, although Plaintiff recites the total proceeds of the sale, the CAC does not contain information as to the net profits realized. *See Glaser*, 772 F. Supp. 2d at 592 (identifying gross proceeds without profits is insufficient).

### 3. Defendant Wilson

Plaintiff's allegations as to Defendant Wilson also do not support that her sales were unusual or suspicious. Indeed, the allegations and materials of which the Court may take judicial notice demonstrate otherwise. First, the timing of the sales—two weeks after the last significant set of alleged misstatements (2Q19 results), nearly three months before the 3Q19 results (which were largely alleged corrective disclosures), and six months before the end of the Class Period— is not indicative of scienter. *Cf. In re Skechers USA, Inc. Sec. Litig.*, No. 18-cv-8039, 2020 WL 1233759 (S.D.N.Y. Mar. 12, 2020) (various sales not indicative of scienter, including sales the day after an alleged misstatement and six weeks before the alleged first corrective disclosure, and sales of 65 percent of holdings in the middle of alleged misstatements, five months before alleged corrective disclosure, and seven months before the end of the class period); *City of Brockton Ret.*

*Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("[Defendant] did not sell his stock at the end of the putative class period, when insiders would have 'rushed to cash out' before the financial statements were restated.").

Second, Plaintiff's allegations do not indicate that her single sale was unusual or out of the ordinary as compared to her prior trading activity.  To the contrary, the sale (158,000 shares in August 2019 with total proceeds of $10.9 million) is in line with previous sales she made in the years leading up to the Class Period.  For example, in the year immediately preceding the Class Period, she made a near-identical sale with total proceeds of over $11.2 million (comprising 39 percent of her holdings) in the same month.[32]  This one class period sale is thus not indicative of scienter.  *See In re Glenayre Techs., Inc. Sec. Litig.,* No. 96-cv-8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) ("Insider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices [and] at times calculated to maximize personal benefit from undisclosed inside information." (citation and internal quotation marks omitted)), *aff'd sub nom. Kwalbrun v. Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999).

### E.     No Inference of Scienter from Defendants' Departures from WWE

The mere fact that executives departed a company does not contribute to an inference of scienter, absent any factual allegations linking the departures to the alleged fraud.  *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir.).  Plaintiff offers no such particularized fact allegations linking the departures of Defendants Barrios and Wilson to anything relating to the MENA rights deal, and thus these allegations do not support scienter.

---

[32]   *See* Ex. 32 (Form 4 (08/01/18)); *see also See, e.g.*, Ex. 33 (Form 4 (08/07/15)) (sold 27% of shares); Ex. 34 (Forms 4 (08/19/16) & (08/22/16)) (sold 11.7% of shares); Ex. 35 (Form 4 (08/03/17)) (sold 11.2% of shares, total proceeds over $1.168 million).

### III.   Plaintiff Fails to Plead Loss Causation.

Loss causation requires that "the subject of the fraudulent statement or omission [be] the cause of the actual loss suffered." *Suez Equity Inv., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).  A plaintiff can plead loss causation by alleging either that the market reacted negatively to corrective disclosure or the loss was foreseeable and caused by materialization of risk concealed by the fraudulent statement.  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).  Neither circumstance is established by the CAC.

### A.   Updates Regarding the MENA Deal Are Not "Corrective Disclosures" of Prior Statements Relating to the Negotiation Status or Opinions.

The alleged "corrective disclosures" amount to updates as time progressed of the status of negotiations, previous expectations, and financial projections offered by the Company.  Thus, none "reveals to the market that a defendant's prior statements were not entirely true or accurate." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008); *see also Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 175 n.4 (2d. Cir. 2005) ("[A]llegations do not amount to corrective disclosures [if] they do not reveal to the market the falsity of the prior [statements].");  *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect.").

### B.   No Materialization of Concealed Risk.

The Company prominently and repeatedly disclosed the risks associated with not being able to enter into, extend, or renew media rights deals, and the uncertainties associated with international markets.  These risks were adequately disclosed in meaningful cautionary statements, and the allegedly omitted information did not render the statements materially misleading or amount to concealed risks.  Plaintiff also stretches to include every downward movement of the Company's stock as based on the alleged fraud.  For example, the 1Q19 results and slight

adjustment in guidance for 2Q19 are not alleged to have anything to do with the MENA media rights deal.  Plaintiff argues that "several analysts subsequently" tied the results and guidance to a delayed KSA event, CAC ¶ 242, but Plaintiff does not identify who these analysts are or when they made these statements sufficient to attribute this to any alleged fraud.

## IV.  Plaintiff Does Not Establish Section 20(a) Liability as to the Individual Defendants.

Plaintiff's Section 20(a) claims fail because, for the reasons explained above, there is no primary violation and none of the individual Defendants acted with scienter so as to be a "culpable participant."  *ATSI*, 493 F.3d at 108.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the CAC be dismissed in its entirety, with prejudice, because it does not plead any actionable misstatements or omissions, establish a compelling inference of scienter, or plead loss causation.

Dated: June 26, 2020

Respectfully submitted,

*/s/  Jerry S. McDevitt*

Stephen G. Topetzes (*pro hac vice*)
Theodore L. Kornobis
**K&L GATES LLP**
1601 K Street, NW
Washington, DC  20006
Phone:   (202) 778-9000
Fax:       (202) 778-9100
stephen.topetzes@klgates.com
ted.kornobis@klgates.com

**K&L GATES LLP**
Jerry S. McDevitt (*pro hac vice*)
210 Sixth Street
Pittsburgh, PA 15222
Phone:   (412) 355-6500
Fax:       (412) 355-6501
jerry.mcdevitt@klgates.com

Joanna A. Diakos
**K&L GATES LLP**
599 Lexington Avenue
New York, NY 10022
Phone:   (212) 536-4807
Fax:       (212) 536-3901
joanna.diakos@klgates.com

*Attorneys   for   Defendants   World   Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios, and Michelle D. Wilson*

40