**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS, and MICHELLE D. WILSON, <br><br> Defendants. | Civil Action No. 1:20-cv-02031-JSR |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

I.    INTRODUCTION ............................................................................................................ 1

II.   RELEVANT FACTS ........................................................................................................ 3

    A.    WWE Expands Into a Key Market – the MENA Region, Partnering
    With the Kingdom of Saudi Arabia to Host Live Events ............................................... 3

    B.    WWE Fails to Inform the Market That The OSN Agreement Had Been
    Terminated Early, Forcing the Company to Find a New Media Rights
    Partner in the MENA Region ............................................................................................ 4

    C.    WWE Announces That the Media-Rights Deal With the Saudis Falls
    Through for 2019, While Reports Emerge That Problems Exist
    Between the Two Parties .................................................................................................... 6

III.  PLAINTIFF HAS ADEQUATELY ALLEGED A 10(b) CLAIM ................................... 7

    A.    Plaintiff Has Adequately Pled Materially False and Misleading
    Statements and Omissions ................................................................................................ 8

        1.    Defendants Misled the Market Concerning the Premature
        Termination of WWE's Media Rights Agreement With OSN ............................ 8

        2.    Defendants' Risk Disclosures Concerning the Failure to Renew
        Key Agreements Are Actionable Misstatements ................................................ 14

        3.    Defendants Misled the Market Concerning a Potential Media-
        Rights Agreement with Saudi Arabia Intended to Replace the
        OSN Agreement .................................................................................................. 15

        4.    Purported Statements of Opinion Are Actionable ............................................. 22

        5.    Purported Forward-Looking Statements Are Actionable; Safe
        Harbor Does Not Apply ...................................................................................... 26

    B.    Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter ......................... 29

        1.    Defendants' Own Sworn Declarations Acknowledge Their
        Scienter With Respect to Certain Categories of Misstatements ........................ 29

        2.    Defendants' Insider Stock Sales Support An Inference of Scienter ................... 32

        3.    The Core Operations Doctrine Supports an Inference of Scienter.......................35

        4.    Confidential Witnesses Support An Inference of Scienter .................................37

        5.    Defendants' Departure Supports Scienter...........................................................38

    C.   Plaintiffs Adequately Plead Loss Causation ...................................................38

IV.    PLAINTIFF HAS ADEQUATELY STATED A SECTION 20(a) CLAIM ......................40

V.    CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
   No. 11-cv-2279, 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)............................................21

*Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.*,
   No. 99-cv-1068 (NT), 2000 WL 815894 (S.D.N.Y. June 23, 2000) ................................ 18-19

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010)................................................................................28-29

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)....................................................................................................11

*In re Avon Sec. Litig.*,
   No. 19-cv-01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).................... 16-17, 23

*In re Barrick Gold Sec. Litig.*,
   No. 13 CIV. 3851 SAS, 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) ...................................40

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)........................................................................................................ 18-19

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)....................................................................................38

*BG Litig. Recovery I, LLC v. Barrick Gold Corp.*,
   180 F. Supp. 3d 316 (S.D.N.Y. 2016)....................................................................................39

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ...............................................................................................8

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017)................................................................................38, 39

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)....................................................................................................39

*Chicago Conservation Ctr. v. Frey*,
   40 F. App'x 251 (7th Cir. 2002) .............................................................................................24

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)............................................................................ *passim*

*City of Providence v. Aeropostale, Inc.*,
    No. 11 Civ. 7132 (CM), 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)............................27, 28

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    No. 18-cv-7796 (VEC), 2020 WL 248729 (S.D.N.Y. Jan 15, 2020) ......................................15

*In re Delcath Sys. Inc. Sec. Litig.*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014)................................................................................28, 40

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................................ 38-39

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)....................................................................................7

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)..................................................................................................29

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)................................................................................22, 33

*In re Express Scripts Holdings Co. Sec. Litig.*,
    773 F. App'x 9 (2d Cir. 2019) ......................................................................................24, 25, 26

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)............................................................................14, 19

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015)...................................................................................24

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................28, 29, 32, 38

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................... 7-8, 35

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) ...................................................................23-24, 27, 28

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)..................................................................................... 12-13, 14

*Garber v. Legg Mason, Inc.*,
    347 F. App'x 665 (2d Cir. 2009) ..........................................................................................11

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)...................................................................................37

*Giunta v. Dingman*,
   893 F.3d 73 (2d Cir. 2018) ..................................................................................7

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................18

*Greenfield v. Heublein, Inc.*,
   742 F.2d 751 (3d Cir. 1984) ...............................................................................19

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12-cv-8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ............... 9, 10, 25, 35-36

*Hou Liu v. Intercept Pharm., Inc.*,
   No. 17-cv-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ..................15

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008) ................................................................40

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................................30

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...........................................................................21

*Long Miao v. Fanhua, Inc.*,
   No. 18-cv-8183 (PAE), 2020 WL 996602 (S.D.N.Y. Mar. 2, 2020) ...................18

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) .............................................................8, 30

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................22

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................................8

*In re Nortel Networks Corp. Sec. Litig.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003) ................................................................27

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ......................................................................... 16-17, 32

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...........................................................................34

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) ..................................................................29

*Omnicare Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................23, 24

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014)..................................................................38

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................34

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)................................................................14

*Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*,
    773 F. App'x 630 (2d Cir. 2019) ...................................................................25-26

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
    No. 17-cv-5753 (JGK), 2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019)....................14

*Plumbers & Pipefitters National Pension Fund v. Orthofix International N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)..................................................................18

*In re Refco Inc. Sec. Litig.*,
    No. 07-MD-1902 (JSR), 2010 WL 11500542 (S.D.N.Y. Oct. 22, 2010).......... 11-12

*In re Salix Pharm., Ltd.*,
    No. 14-cv-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .........27, 28

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)................................................................................32

*In re Shanda Games Ltd. Sec. Litig.*,
    No. 1:18-cv-02463 (ALC), 2019 U.S. Dist. LEXIS 171592 (S.D.N.Y. Sept.
    30, 2019)..........................................................................................................32

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16-cv-6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)...................13

*In re SLM Corp. Securities Litigation*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010)............................................................34, 35

*In re Synchrony Fin. Sec. Litig.*,
    No. 18-cv-1818 (VAB), 2020 WL 1531297 (D. Conn. Mar. 31, 2020) .................25

*Tarapara v. K12 Inc.*,
    No. 16-cv-4069 (PJH), 2017 WL 3727112 (N.D. Cal. Aug. 30, 2017)..................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................................7, 29

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................21

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................8, 11, 39, 40

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ................................................................15

*Wilson v. LSB Indus., Inc.*,
  No. 15-cv-7614 (RA), 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ................................ 27-28

*In re World Wrestling Entm't, Inc. Sec. Litig.*,
  180 F. Supp. 3d 157 (D. Conn. 2016) ................................................................18

Lead Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust ("Plaintiff") hereby submits this opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint.[1] ECF No. 58 ("Motion" or "Mot.").

## I.   INTRODUCTION

WWE is most known for its brand of professional wrestling, but in recent years, the Company has transformed itself into more of a media company, generating significant revenues on licensing deals the Company enters into with international television providers, who buy the exclusive right to air original WWE content. Before the start of the Class Period,[2] Defendants told investors that the Company expected to significantly increase the revenues WWE earns on these media-rights agreements—projecting a growth in revenue on these agreements from $235 million in 2018 to $435 million in 2020. At issue here is the Company's media-rights agreement governing WWE's Middle East and North Africa ("MENA") region, WWE's **second-largest market in terms of monetization**, and a self-described "key" market.

In 2014, WWE signed a media-rights contract with the Orbit Showcase Network ("OSN"), a privately owned pay TV network operating in the Middle East, North Africa, and Asia, governing the MENA region, which was set to expire at the end of 2019. When the Class Period started, on February 7, 2019, Defendants assured investors that the Company was working on "renewing" this agreement (along with other media-rights agreements for other regions of the world). However, unbeknownst to investors, OSN had informed WWE in

---

[1] Defendants are World Wrestling Entertainment, Inc., d/b/a WWE ("WWE"), Vincent K. McMahon, George A. Barrios, and Michelle D. Wilson. McMahon, Barrios, and Wilson are collectively referred to as the "Individual Defendants." The Consolidated Amended Class Action Complaint is referred to herein as the "Complaint," (cited as "¶__"). ECF No. 57. All capitalized terms shall be ascribed the same meaning as in the Complaint. All internal citations omitted and emphasis added unless otherwise noted.

[2] The "Class Period" is February 7, 2019 through February 5, 2020, inclusive.

November 2018 that it intended to terminate this contract early, and the parties entered a settlement in December 2018 that formally terminated the contract, effective March 31, 2019.

Defendants concealed this from investors, but some details began to emerge on April 25, 2019, when the Company issued its 1Q2019 results and announced lower-than-expected guidance for the second-quarter—the first quarter in which the Company would no longer receive any revenues from the OSN agreement. Crucially, just days before the close of the disappointing first-quarter 2019, Defendant Vince McMahon sold 3,204,427 shares of WWE stock for proceeds **of more than $261 million**. He made this sale while in possession of the material, non-public information that (1) WWE would be forced to report disappointing results for 1Q2019, and (2) the OSN deal would not be renewed, which would negatively impact 2Q2019 revenues and market exposure in that important growth market.

It was not until July 25, 2019 that WWE disclosed the OSN agreement had ended. But to blunt the impact of this news, Defendants informed investors that WWE already had reached an "agreement[] in principle" for a new contract with the Kingdom of Saudi Arabia ("KSA"), and that it would announce this new deal "very soon." But this was untrue. In reality, WWE and KSA were, at that point, very far apart in their negotiations—as confirmed by an employee of the media company negotiating on KSA's behalf. The relationship between WWE and the Saudi government was also a tense one—boiling over during a live event in Saudi Arabia on October 31, 2019, after which WWE representatives were held against their will because of a dispute over delayed payments the Saudis owed WWE for prior events. WWE's Chief Accounting Officer has admitted to these late payments, and a former wrestler, who was himself held in Saudi Arabia following the event, confirms media reports detailing the "hostage" situation.

Defendants' Motion is a scattershot effort to offer their own alternative version of

numerous alleged facts, which is not appropriate at this stage of the case. In fact, even before Plaintiff filed the Complaint, Defendants threatened Plaintiff's counsel with sanctions, arguing that the initial complaints on file (none of which were filed by Plaintiff or its counsel) included allegations that conflicted with what Defendants contend actually happened.[3] Defendants frequently take the same approach in the Motion, which should be denied in its entirety.

Many of Defendants' legal challenges are stock, defense-side arguments that are untethered to the alleged facts. For example, Defendants reflexively argue that the Complaint includes forward-looking and opinion statements, but leave Plaintiff guessing which specific statements they are referring to. Defendants then go through the motions when challenging scienter, ignoring the implication of key facts (including their own admission that, before the Class Period, OSN terminated its contract prematurely, and McMahon's massive stock sale), and blindly citing any securities cases they could find in which courts found scienter lacking, regardless of whether those cases are relevant here. Defendants' loss causation argument is similarly perfunctory, proposing a pleading standard on the issue that Courts do not require.

## II.   RELEVANT FACTS

### A.   WWE Expands Into a Key Market – the MENA Region, Partnering With the Kingdom of Saudi Arabia to Host Live Events

WWE is a sports-entertainment company, primarily known for its brand of professional wrestling. ¶¶41-42. The Company has in recent years transitioned into more of a media company, with its Media segment accounting for the vast majority of its overall revenue—specifically reflecting 67%, 73%, and 77% of total net revenues in 2017, 2018, and 2019,

---

[3] Plaintiff relies on sworn declarations Defendants included with their threatened Rule 11(c) motion. That Defendants did not actually file this motion after the Complaint was filed reveals that the supposed "sanctionable" conduct was nothing more than Plaintiff alleging facts that Defendants did not like—something that is, of course, not grounds for Rule 11 sanctions.

respectively. ¶¶43-45. The Company's growth and transformation into a media company has been fueled by WWE's expansion internationally over the past number of years. ¶¶61-69, including through increasing the revenues earned on licensing deals the Company enters into with international television providers, who buy the exclusive right to air original WWE content.

An important part of the Company's international expansion involved extending WWE's reach into countries within the MENA region. ¶70. The Company took a significant step towards boosting WWE's popularity in the region in 2014, when it entered into a five-year exclusive media-rights agreement with OSN, pursuant to which OSN agreed to pay fees for the right to air WWE's original content on OSN, including *Raw* and *Smackdown Live*. ¶¶72, 130-31.

A few years later, in March 2018, the Company made further headway in the MENA region when it announced that it had signed a 10-year exclusive partnership with the Saudi General Sports Authority to hold large wrestling events in the Kingdom of Saudi Arabia. ¶¶73-74. The partnership proved lucrative—estimated by analysts to be worth approximately $500 million to WWE. ¶75. The Company held two events pursuant to the partnership in 2018—the *Greatest Royal Rumble* on April 28, 2018 and the *Crown Jewel* on November 2, 2018—both of which generated significant controversy (¶¶87-95, 108-11) and substantial revenue. ¶119.

**B.      WWE Fails to Inform the Market That The OSN Agreement Had Been Terminated Early, Forcing the Company to Find a New Media Rights Partner in the MENA Region**

Heading into the start of the Class Period, investor attention was focused on the Saudi partnership—but also on a number of international media-rights agreements that were nearing expiration and which the Company had been assuring investors, in months prior, would be renewed on even more favorable terms. ¶¶149-50. In fact, Defendants told investors in June 2018, that the Company expected revenue from existing and new content agreements to grow more than 85%, from $235 million in 2018 to $435 million in 2020. ¶140. One such agreement

4

was the OSN deal, which was set to expire at the end of 2019 and which was estimated by analysts to generate an average annual value of between $15 million and $20 million for the Company (with an estimated $25 million to $30 million revenue contribution in the agreement's final 12 months), and which supported market growth of WWE in that region. ¶¶16-27, 136. At the start of the Class Period, on February 7, 2019, the Company told investors that it was targeting Adjusted OIBDA[4] of at least $200 million. ¶149. These results were dependent on WWE's ability to renew a number of its media-rights agreements in key markets, including the OSN agreement, *id.*, and Defendants had been telling investors for months that it was working on renewing those agreements. ¶¶150-52.

But, in reality, as Defendants have now admitted, through statements of current WWE employees, OSN actually informed WWE in November 2018 that it would not renew the agreement, and WWE and OSN entered into an agreement on December 18, 2018, formally ending the contract ***early***, effective March 31, 2019. ¶¶154-56. Defendants did not inform the market of this significant development for more than six months—instead telling investors that the Company was working on ***renewing*** the OSN agreement and that they would not otherwise comment on the status of the "renewal" negotiations. ¶158. When the Company finally announced its 1Q19 results on April 25, 2019, WWE issued lower-than-expected second-quarter 2019 guidance, reflecting the still-unknown news that the Company would no longer be receiving revenues associated with the OSN agreement that expired on March 31, 2019. ¶371.

It was not until July 25, 2019 that WWE finally informed the market that the OSN deal had been terminated (though no specifics were given)—but Defendants shielded the impact of this material news by simultaneously (but falsely) announcing that that WWE had an agreement

---

[4] "OIBDA" means Operating Income Before Depreciation and Amortization.

"in principle" with the Saudi government for a media-rights agreement for the MENA region that would be complete "very soon." ¶¶165-68. But a former employee of the Middle East Broadcasting Company ("MBC")—which is controlled by the Saudi government—explained that, by Fall 2019, at least several months later, WWE and the Saudi government still were worlds apart in their negotiations of a new media-rights deal and could not agree on key terms, such as the size of the potential market of WWE subscribers in the MENA region. ¶¶188-95.

### C.   WWE Announces That the Media-Rights Deal With the Saudis Falls Through for 2019, While Reports Emerge That Problems Exist Between the Two Parties

Even though Defendants informed the market in July 2019 that a new media-rights agreement for MENA would be completed "very soon" as an "agreement[] in principle" had been reached, Defendants shocked investors just months later, on October 31, 2019, when they announced, in connection with WWE's third-quarter 2019 results, a "delay in completing a previously contemplated agreement in the MENA region." ¶174.

Just hours after the October 31, 2019 earnings call, WWE held its fourth live event[5] pursuant to the Saudi partnership, billed the *Crown Jewel* 2019. ¶207. Following the event, reports emerged revealing that the relationship between WWE and Saudi government was in trouble. Specifically, it was reported that numerous WWE wrestlers and representatives were being detained in Saudi Arabia—their flight not allowed to take off from the airport. ¶¶208-11. It was also reported that Defendant McMahon cut the live feed to the October 31, 2019 *Crown Jewel* event in response to delayed payments by the Saudi government in connection with prior events—and that the Crown Prince retaliated by refusing to let WWE representatives leave the country, holding them for as long as six hours. *Id.*

---

[5] The third live event pursuant to the Saudi partnership (and the first in 2019) was held on June 7, 2019—billed as the *Super ShowDown*—i.e., during WWE's second-quarter 2019. ¶200.

As detailed below, these reports are corroborated by a former wrestler for WWE, who participated in the October 31, 2019 *Crown Jewel* event and who was held in Saudi Arabia afterwards. ¶216. WWE's Chief Accounting Officer also confirms that the Saudi government was delayed in making a $60 million payment to WWE in connection with the June 7, 2019 *Super ShowDown* event—a payment that was received **after** the close of the third-quarter 2019 (on September 30, 2019), even though Defendants had told investors in July 2019 that this payment would be received **during** the third-quarter. ¶214.

Additional details of Defendants' fraud were revealed on January 30, 2020, when WWE issued a press release announcing that two of its most senior and longest-serving executives, Defendants Barrios and Wilson, had abruptly left the Company. ¶181. But Defendants did not reveal the full truth until February 6, 2020, when WWE confirmed that WWE had achieved just $180 million in adjusted OIBDA for 2019 due to the failure to complete the MENA distribution agreement with the Saudis. ¶182. WWE also announced that its guidance for 2020 did not include any revenues related to a MENA media-rights deal—meaning Defendants acknowledged that a deal with the Saudi government would not even be completed in 2020—if at all. *Id.*

## III.   PLAINTIFF HAS ADEQUATELY ALLEGED A 10(b) CLAIM

"To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants . . . made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 462 (S.D.N.Y. 2017). In reviewing the Motion, the Court must "accept all factual allegations . . . as true," *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and draw "all reasonable inferences in the [Plaintiff's] favor," *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). The complaint "need only allege 'enough factual matter (taken as true)' to suggest that a violation occurred." *Freudenberg v. E*Trade Fin.*

*Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010).

### A.     Plaintiff Has Adequately Pled Materially False and Misleading Statements and Omissions

To support a finding of liability, Rule 10b–5 expressly requires an actual statement, one

that is either "untrue" outright or "misleading" by virtue of what it omits to state, i.e., "half-

truths." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) ("half-truths"—true

statements that create a materially misleading impression—support claims for securities fraud).

In addition, pure omissions (i.e., "a complete failure to make statement") can also be

actionable when a corporation has a duty to disclose the omitted facts. *Id.* And "once a company

speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no

existing independent duty to disclose [such] information." *Meyer v. Jinkosolar Holdings Co.,*

*Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[T]here is a duty to tell the whole truth."); *In re Marsh*

*& Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("When a

corporation does make a disclosure . . . there is a duty to make it complete and accurate.").[6]

### 1.     Defendants Misled the Market Concerning the Premature Termination of WWE's Media Rights Agreement With OSN

Defendants' Class Period statements concerning (a) the status of "renewal" negotiations

regarding the MENA region media-rights agreement (i.e., the OSN agreement), ¶¶226-29, 237-

38, 246-47, 251, 253 and (b) the issuance and affirmance (though July 25, 2019) of WWE's 2019

---

[6] Defendants argument that the Complaint's structure and use of "block quotations" is improper should be rejected. Mot. at 12 n.10. The Complaint clearly identifies the false and misleading statements in bold and italics and alleges the facts that support why those statements are false or misleading. *E.g.*, ¶223, 230, 234. In the case Defendants cite—*Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012)—unlike here, the "280-page complaint consist[ed] in large part of large block quotations" and "frequently cross-referenced" a single paragraph that alleged in a blanket fashion that preceding paragraphs were false and misleading. This argument is also inconsistent with the rest of Defendants' Motion, because they appear to have had no trouble identifying the alleged false and misleading statements and arguing that they are not actionable. *See, e.g.*, Mot. at 5, 7.

full-year financial guidance, which depended on renewing key media rights agreements (including the OSN agreement), ¶¶224, 243, 245, were materially false and misleading, because, unbeknownst to investors, the OSN agreement was terminated early pursuant to a settlement agreement entered into nearly two months before the start of the Class Period.

Specifically, as alleged in the Complaint, Carlo Nohra, the VP and General Manager of WWE – Middle East—who was the self-described principal point of contact with OSN regarding the applicable media-rights agreements—admits that OSN informed WWE in November 2018, via a settlement proposal from OSN's general counsel, that it intended to exit the sports content business. ¶155. Nohra further explains that OSN and WWE entered into a formal settlement proposal on December 18, 2018 pursuant to which OSN and WWE agreed to the *early termination* of their media-rights agreements effective March 31, 2019, *id.* (which was scheduled to terminate at the end of 2019, ¶162).

Courts are clear that a company has "a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557 (CM), 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013). Here, the status of the Company's media-rights renewal discussions (including with its partner in the Middle East, OSN) were material to investors, considering that Defendants were asked about them frequently (¶¶229, 238), the Company told investors it expected to increase the revenues on these deals significantly between 2018 and 2020 (¶¶139-40, 144-45), and the Company otherwise touted the importance of renewing these agreements before and during the Class Period. (*E.g.*, ¶¶150-52, 237). Defendants therefore had a duty to tell investors when discussing its international media-rights renewals that one of these key

agreements—the OSN agreement—*for its second-largest market in terms of monetization* (¶325), had been terminated *early* and could not possibly be renewed with OSN. *See Hi-Crush*, 2013 WL 6233561, at * 15-16 (defendant had a duty to disclose that a contract with one of its largest customers had been effectively terminated, in part because the defendant touted the importance of the relationship and that it had a long-term contract with the customer); *Tarapara v. K12 Inc.*, No. 16-cv-4069 (PJH), 2017 WL 3727112, at *27 (N.D. Cal. Aug. 30, 2017) (finding plaintiffs had sufficiently stated a claim where defendants had "fail[ed] to disclose the non-renewal of [a] contract).

As a result, Defendants' affirmative statements about working on the renewal of its international media-rights agreements, which included the MENA agreement (¶¶226, 227, 229, 238, 247, 253), and Defendants' unwillingness to comment on the negotiations' status after being asked by analysts (¶¶246, 251), were materially false and misleading, because Defendants knew, but failed to disclose, that the OSN deal was terminated prematurely. It was similarly misleading for Defendants to tell investors that a renewed agreement would be "completed substantively by the middle of the year," (¶228) and that those negotiations were "ongoing" (¶237).[7] At the very least, Defendants were obligated to disclose that the Company's efforts to renew (or find a new partner for) a media-rights agreement for the MENA region would be significantly complicated

---

[7] Defendants argue that Plaintiff "does not actually allege that the [following] statements are misleading," Mot. at 21: ¶¶226, 237, 245-47, 251, 253. This is not true. Plaintiffs clearly allege that these statements were "half-truths" that were misleading for what they failed to disclose, namely that the OSN agreement had been prematurely terminated. With respect to allegedly misleading statements at ¶¶260, 267, 271, 279, 283, 285, these statements are also adequately alleged to be misleading for the reasons detailed at ¶¶234, 239, 249, 252, 254, 264, 275, 281, 284, 287, and discussed herein at Section III.A.3. Defendants also argue that certain statements are objectively true, Mot. at 6 n.5, and suggest that the statement at ¶255 is not alleged to be false. But this statement is alleged to be materially false and misleading by omission (¶264), for the reasons detailed herein at Section III.A.3. Plaintiff acknowledges, however, that the statements at ¶¶258, 259, and 273 were not intended to be alleged as false and misleading, and instead are included in the Complaint for context.

by the fact that its current partner in the region had prematurely terminated its contract. For similar reasons, certain of Defendants' statements about renewing the MENA region deal were "untrue outright." *Vivendi*, 838 F.3d at 239. It was plainly false for Defendant Barrios to state, for example, on February 7, 2019 (the start of the Class Period) that the Company was "working on" the "rights ***renewal*** process" in "key markets," including "the Middle East." ¶226 (emphasis added), considering that the media-rights agreement had already been ***terminated***, and so there was no agreement to "***renew[]***."

Defendants argue that their affirmative statements that WWE was working on "renewing" its media-rights agreement, including the Middle East deal, were not false, because—they preposterously claim—the word "renewal" means something different in this context. Mot. at 18-20.[8] As Defendants tell it, the word "renew" is a "term[] of art in the broadcasting industry" that was used "to refer to distribution rights in a particular ***market***, not with any particular counterparty."[9] *Id.* at 19. But whether the term "renewal" in the broadcast context means something other than its ordinary meaning is a question of fact that is not appropriate at the motion-to-dismiss stage, and in any event it must be resolved in Plaintiff's favor. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("[T]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."); *see also In re Refco Inc. Sec. Litig.*,

---

[8] Merriam Webster's definition of "renew" includes "to grant or obtain an extension of or on." https://www.merriam-webster.com/dictionary/renew.

[9] Defendants' argument on this point (and others throughout the Motion) depends heavily on asking the Court to accept the truth of the matters asserted in documents Defendants attached to their Motion but that are not included in the Complaint. Plaintiff does not dispute that a court can take judicial notice of documents "for the purpose of establishing that the information [therein] was publicly available," Mot. at 19 n.19, but Defendants take it too far when they attempt to use this information to suggest the truth of the matters asserted therein, *see, e.g.*, Mot. at 20 n.21, which is not appropriate. *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009).

No. 07-MD-1902 (JSR), 2010 WL 11500542, at *8 (S.D.N.Y. Oct. 22, 2010) (meaning of the term "prime broker" is a factual dispute that cannot be resolved on a motion to dismiss).

And even assuming, *arguendo*, that Defendants are correct about the alternate definition of the word "renew" (which Plaintiff does not concede), Defendants' statements are still materially misleading. First, as detailed above, affirmative statements about renewing key agreements (regardless of what "renewal" means) were misleading for what they failed to disclose—i.e., that the OSN agreement had been terminated prematurely. Second, and relatedly, Defendants' argument ignores that the OSN agreement was terminated *months early*: it was set to expire "at the end of 2019" (¶138), but was terminated in March 2019 (pursuant to the December 18, 2018 agreement). As a result, when Defendants made affirmative statements beginning in February 2019 that the Company was working to "renew" a media-rights deal for the MENA region, Defendants actually knew that the then-current MENA region agreement was just weeks from expiration—whereas the market believed that it was many months away from expiration. This means that investors were led to believe, at the start of the Class Period, that the Company had many months to finalize a new media-rights agreement for the MENA region before the current one expired—when, in reality, the Company would be working to find a new partner for a new media-rights agreement in a key growth market without the benefit of having an existing agreement in place through the end of 2019.

Defendants argue that the termination of the OSN agreement was not material. Mot. at 19-20.[10] But it *was* material to investors' understanding of the ongoing contract negotiations for

---

[10] Defendants are also wrong that not "a single analyst wrote about" the fact that the OSN deal was terminated. Mot. at 19 n.18. Analysts did discuss it. *See* ¶176. Moreover, the Complaint alleges that WWE's stock price rose on July 25, 2019 because Defendants shielded the disclosure of the OSN termination with news that they had an "agreement[] in principle" with the Saudis on a new deal that would be announced "very soon." ¶¶166-67.

a few reasons, including that (a) it weakened WWE's bargaining position because the Company had to find a new partner on a faster timeline than investors appreciated, (b) it meant that at least one potential counterparty—and WWE's *current* counterparty for the past five years—was no longer an option as a new partner,[11] (c) it meant that the Company would be left without any media-rights deal revenues at all as of April 1, 2019, unless it found a new partner before then, and (d) and because WWE would not have a media-rights agreement in the MENA region, it would miss out on the opportunity further expand into this important growth market. ¶253.

Further supporting materiality is that these lost revenues had an immediate impact on WWE's stock price, considering that the Company provided lower-than-expected guidance on April 25, 2019 for the second-quarter 2019, reflecting the materialization of the still-unknown risk that WWE would not receive in that quarter the revenues associated with the OSN agreement. ¶¶371-72; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (stock drop on release of previously concealed information supports materiality).[12] And finally, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of

---

[11] Defendants' argument that it was widely known that OSN exited the sports-programming business in March 2019 (Mot. at 20-21), is beside the point—because it was reasonable to believe that OSN would nonetheless complete its contractual obligations and not terminate its contract early. Additionally, WWE's brand of wrestling blurs the lines between sports and entertainment, ¶49—and so it was not necessarily obvious that OSN's decision to exit sports programming meant it would stop covering WWE wrestling programs. Moreover, clearly this was not obvious to seasoned analysts following WWE, none of whom picked up on the fact that OSN's departure from the sport programming space in March 2019 could affect WWE's media rights deal in Saudi Arabia. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific."). Demonstrating this further is that analysts covering WWE were confused about when the OSN agreement actually ended, with at least one believing it ended in the Summer 2019. ¶176.

[12] *See also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (statements responding to analyst questions supports materiality).

their importance." *Ganino*, 228 F.3d at 162. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378

(S.D.N.Y. 2015) (materiality is "rarely a basis for dismissal on the pleadings").

> **2.     Defendants' Risk Disclosures Concerning the Failure to Renew Key Agreements Are Actionable Misstatements**

Plaintiff alleges that Defendants issued materially false and misleading risk disclosures

(¶¶232, 244) because they warned of a risk that already had materialized, namely that the OSN

agreement—one of the Company's key agreements—had already been terminated prematurely.[13]

Defendants included a risk disclosure in WWE's 2018 Form 10-K, issued on February 7,

2019, warning of the risk that the "failure to maintain or renew key agreements could adversely

affect our ability to distribute our media content," and stating further: "Because a large portion of

our revenues are generated, directly and indirectly, from this distribution, any failure to maintain

(such as due to a breach or alleged breach by either party) or renew arrangements with

distributors and platforms . . . could adversely affect our financial outlook, liquidity, business

and operating results." *Id.* This was materially misleading because, as of December 18, 2018,

Defendants ***already knew*** that the OSN agreement had been terminated.  ¶234(a).

Defendants push back, arguing that the warned-of risk was not that key agreements could

be terminated, but that key agreements could be terminated ***and also*** that this would impact the

Company's financial results. Mot. at 22. But the alleged risk-disclosure language is plainly

broader than that—it warns of the risk that "any failure to maintain . . . or renew arrangements

with distributors . . . could adversely affect our ***financial outlook***, liquidity, ***business*** and

---

[13] *See Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17-cv-5753
(JGK), 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) (finding plaintiffs sufficiently alleging
material misrepresentations of fact when the company disclosed the risk of adverse effects on
revenues from declining sales while the sales had already declined); *In re Facebook, Inc. IPO
Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have
held that a company's purported risk disclosures are misleading where the company warns only
that a risk may impact its business when that risk has already materialized.").

operating results." ¶232. The premature termination of the OSN agreement certainly impacted

WWE's "business" at the time this risk disclosure was issued (on February 7, 2019), because the

Company was forced to find a new partner for an agreement in a key market that was supposed

to generate increased revenue through the end of 2019. And in any case, it did impact WWE's

"financial outlook" at the time of this risk disclosure—because the cancelled OSN deal was no

longer generating expected revenue throughout the end of 2019.[14]

Defendants do not even advance this same argument for the other risk disclosure Plaintiff

alleges was materially false and misleading (i.e., ¶244), which is actionable for the same reason:

Defendants warned of a risk that had already materialized.

### 3. Defendants Misled the Market Concerning a Potential Media-Rights Agreement with Saudi Arabia Intended to Replace the OSN Agreement

Defendants not only failed to disclose that the OSN agreement was prematurely

terminated until July 25, 2019, but they also blunted the impact of this surprising news by

simultaneously disclosing that WWE was then in negotiations with the Saudi government for a

media-rights agreement for the MENA region, and that the deal would be completed "very soon"

because the parties had reached an "agreement[] in principle." ¶¶166-68. In reality, Defendants

had no reasonable basis to believe that the new MENA deal with the Saudi government would be

completed at all—because the parties were far apart on basic assumptions about the deal,

---

[14] For these same reasons, the cases Defendants cite on this point (Mot. at 22) are plainly distinguishable. In *Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017) the risk language at issued warned exclusively of the impact lost customers could have on *sales*—and because plaintiffs had not alleged an impact on sales, the statement was not actionable. Here, the risk language warned of the impact that the failure to renew key agreements could have on the company's *business*, and Plaintiff alleges that this risk had already materialized. The same goes for *Hou Liu v. Intercept Pharm., Inc.*, No. 17-cv-7371 (LAK), 2020 WL 1489831, at*12 (S.D.N.Y. Mar. 26, 2020), where the risk disclosed of was an impact on *earnings*—again, here the risk is broader than that. In addition, Defendants are doing more than just alleging an "increase" in the disclose risk, and so *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, No. 18-cv-7796 (VEC), 2020 WL 248729, at *12 (S.D.N.Y. Jan 15, 2020) is irrelevant.

including the size of the market—and, as a result, Defendants' Class Period statements about completing a media-rights agreement with the Saudi government (and statements regarding WWE's full-year guidance, which depended on this deal being completed) were materially false and misleading. ¶¶255, 256, 257, 260, 261-62, 267, 269, 271-72, 279, 283, 285.

**(a)    A Basic Failure to Agree on Terms Supports the Material Falsity of Defendants' Statements**

CW-1, who joined MBC in Fall 2019, describes how when he worked on a feasibility study regarding the possibility of a broadcast partnership between MBC and WWE, the parties were very far apart in terms of projected WWE subscribers, as well as annual licensing fees. ¶¶192-93. CW-1 recalled that WWE had wildly unreasonable expectations of the revenue it expected from a potential broadcast partner, proposing an $80 million annual licensing fee for its projection of **_100 million-plus over-the-top ("OTT") WWE subscribers_**, which was based on the large number of OSN subscribers who watched WWE. ¶193.[15] According to CW-1, MBC projected far fewer viewers of WWE content. CW-1 confirmed that, according to his research and analysis, **_MBC projected just 6.5 million WWE subscribers, at most_**. ¶194. CW-1 explained that WWE rejected this low subscriber figure, so MBC raised it somewhat—first to 10 million to be cooperative, and then finally to 15 million. *Id.* WWE then reduced its licensing fee ask to $50 million. *Id.* However, MBC felt it could not go above $14.5 million. *Id.*

Defendants ask this Court to discount CW-1's allegations because "CW-1 does not claim to have been directly involved in any negotiations with WWE, to have exchanged a single message with WWE, or to have been present for a single meeting or telephone call with anyone at WWE." Mot. at 14. But this is not the standard. Courts in this Circuit are clear that for CW statements to be credited on a motion to dismiss, "confidential sources must be 'described in the

---

[15] OTT is a media service which streams content to viewers via the Internet. ¶178.

16

complaint with sufficient particularity to support the probability *that a person in the position*

*occupied by the source would possess the information alleged*.'" *In re Avon Sec. Litig.*, No. 19-

cv-01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) (citing *Novak v. Kasaks*,

216 F.3d 300, 314 (2d Cir. 2000)). The relevant inquiry is not whether the CW was "directly

involved in any negotiation with WWE" or exchanged messages with WWE representatives or

Defendants, but instead whether the individual "was in position to possess information about"

the facts attributed to the CW—in this case, the projected subscriber numbers and annual

licensing fee that WWE proposed as part of its negotiation with MBC. *See Avon*, 2019 WL

6115349, at *21 (no requirement that a CW have direct contact with a defendant).

Here, CW-1 was positioned to, and did in fact, possess this information because he

worked on a feasibility study assessing the possibility of a broadcast partnership with WWE and

MBC, and was tasked with estimating the "value of a partnership" between the two companies.

¶192. This description of CW-1's responsibilities at MBC "support the probability that [he]

would possess the information alleged." *Novak*, 216 F.3d at 314.[16] Defendants argue that CW-1's

"assertions as to the actual discussions with WWE are based on second- or third-hand

information he purportedly heard from unidentified persons," Mot. at 14, but, in reality, the

thrust of CW-1's allegations are that, while personally working on a feasibility study to assess

the value of a partnership between WWE and MBC, CW-1 learned that the parties were far apart

in their discussions with regard to projected subscriber numbers and the appropriate licensing

---

[16] Plaintiff removed certain identifying details about CW-1 due to potential safety and retaliatory concerns. This individual is a current (not a former) employee of a company that is backed by the Saudi government—and so it takes little effort to understand why CW-1's expressed concerns are legitimate. Plaintiffs are willing to provide this information to the Court *in camera*. Defendants are not prejudiced because this information is not necessary to assess whether CW-1 was in a position to possess the information attributed to him.

fees.[17] ¶¶193-94. This is the type of information that a person performing this particular role would have access to. CW-1's statements should therefore be credited. *See Plumbers & Pipefitters National Pension Fund v. Orthofix International N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015) (crediting CW's statement because it was "highly probable" that a person in his position would possess the information alleged).[18]

CW-1's allegations make clear that there could not have been an agreement in principle in July 2019 because the parties were still so far apart in their negotiations months later in Fall 2019. ¶¶256-57.[19] Indeed, the significant gap between the parties on projected subscriber numbers and proposed licensing fees in Fall 2019 means that the parties could not have had an agreement on the "price and the structure of the transaction" in July 2019, which is how courts routinely define "agreement in principle." *Basic Inc. v. Levinson*, 485 U.S. 224, 225 (1988); *see also Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.*, No. 99-cv-1068 (NT), 2000 WL 815894, at *9 (S.D.N.Y. June 23, 2000) ("[W]hen business people use [the term] 'agreement in principle,' it means that the parties have reached a meeting of the minds with only details left

---

[17] Defendants' cite to *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) is thus irrelevant, because CW-1 does have personal knowledge of the information ascribed to him.

[18] Defendants cite *Long Miao v. Fanhua, Inc.*, No. 18-cv-8183 (PAE), 2020 WL 996602, at *19 (S.D.N.Y. Mar. 2, 2020), Mot. at 13-14, but that case is distinguishable. There, plaintiffs failed to describe "the sources of [the CWs'] knowledge," *Fanhua*, 2020 WL 996602, at *19, whereas here, Plaintiff explains that CW-1 knew the attributed information as a result of performing a feasibility study and estimating the value of the partnership. ¶192. Moreover, the Court in *Fanhua* found as it did because the CW allegations were "entirely unmoored in time" and did not indicate whether they applied to past or current practices at the defendant-company. *Fanhua*, 2020 WL 996602, at *20.

[19] Defendants cite *In re World Wrestling Entm't, Inc. Sec. Litig.*, 180 F. Supp. 3d 157, 184 (D. Conn. 2016) to argue that CW-1's allegations say nothing about whether Defendants' July 25, 2019 statements were false, because those allegations relate to the Fall 2019 time frame. But in that *WWE* decision, the confidential witness left the company **before** the alleged misstatements and therefore could not attest to what occurred **after** he left, given the type of information he provided, *id.* at 184. Here, by contrast, CW-1 provides information indicating that Defendants were worlds apart in their discussions in Fall 2019. ¶¶191-95. Thus, it is reasonable to infer (based on how negotiations work) that they were not any closer in reaching an agreement three months **earlier** and clearly had not reached an "agreement in principle" at that time. ¶260.

to be resolved."); *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756 (3d Cir. 1984), *abrogated by Basic*, 485 U.S. at 225 ("agreement in principle" is an agreement "on the price and structure").[20]

Further, as of October 31, 2019—when Defendants informed the market that the media-rights deal would not be completed in 2019—and through the remainder of the Class Period, Defendants continued to assure the market that "discussions [were] ongoing," ¶271, and that the parties "continue[d] to work" towards completing the agreement. ¶279; *see also* ¶¶283, 285. These statements were also materially false and misleading because Defendants did not disclose that they had no reasonable basis to believe the deal would be completed ***in 2020***—given how far apart they were in terms of the deal—as Defendants ultimately disclosed just months later, when they announced on February 6, 2020 that the Company's full-year 2020 guidance would not include any assumptions related to a prospective MENA deal. ¶293.

Defendants argue that these statements are not actionable because they made no promises regarding the prospects of a new MENA media-rights deal. Mot. at 6. They argue, for example, that the "agreement[] in principle" statements, ¶¶256, 260, were qualified by the acknowledgment that it was "possible" the deal would not get done. Mot. at 6. But this, like a company's risk disclosures, are ineffective when they warn of a risk that "may impact its business when that risk has already materialized." *Facebook*, 986 F. Supp. 2d at 516. Defendants are effectively arguing that investors should not have relied on the concrete statement that an "agreement[] in principle" had been reached simply because they simultaneously warned that it was possible the deal would not happen. This does not fly.

---

[20] Defendants' other statements on July 25, 2019 were also false and misleading for these same reasons—including the affirmance of WWE's full-year 2019 guidance, which depended on the "completion of a media rights deal in the MENA region," ¶255; *see also* ¶¶260, 262.

#### (b)   Growing Conflict Between WWE and Saudis Supports the Material Falsity of Defendants' Statements

Defendants' statements about negotiations with the Saudi government for a new media-rights agreement (and that the deal was near completion and agreed upon in principle (¶¶256-57)) were also misleading because Defendants failed to disclose that WWE's relationship with the Saudi government was deteriorating as a result of controversy WWE faced for holding events in the country, as well as because the Saudi government had failed to make timely payments to the Company owed in connection with those events, ¶¶264(b), 275(b), 281(b), 284, 287. WWE's Chief Accounting Officer admitted that the Saudi government was late in making certain payments to WWE in connection with live events held in Saudi Arabia in 2018 and 2019, including a $60 million payment in connection with the June 7, 2019 event. ¶¶313-16. CW-2, a former wrestler who performed for WWE from 2012 to April 2020 and who participated in the October 31, 2019 *Crown Jewel* event, confirmed that he was informed by a high-level WWE employee that the reported dispute between Defendant McMahon and the Saudi Crown Prince following the October 31, 2019 event was the result of late payments the Saudis owed in connection with the June 7, 2019 event. ¶¶216, 218.

Defendants attempt to discredit these allegations by proposing their own alternative version of facts. For example, Defendants do not dispute that the $60 million payment in connection with the June 7, 2019 event was paid late, but suggest that it was no big deal, and had no impact on WWE's relationship with the Saudis. Mot. at 15-16. They also ask the Court to ignore the media reports that tied these late payments to a dispute between Defendant McMahon and the Saudi Crown Prince after the October 31, 2019 *Crown Jewel* event (even though CW-2 corroborates this)—because, in their view, the reports are not real news sources, *id.* at 16-17; and they suggest that the real reason for the flight delay and reported "hostage" situation was a

"mechanical issue."[21] Mot. at 17.

These transparent attempts to introduce competing facts are not appropriate at this stage.[22] Moreover, while it may be true that "Defendants never guaranteed a date of payment" with regard to $60 million owed in connection with June 7, 2019 event and that it was paid before the *Crown Jewel* 2019 event (Mot. at 16), the fact is, the payment was indisputably paid late: Defendant Barrios affirmatively told investors on a July 25, 2019 earnings call that the Company expected this payment in the third-quarter (¶212), but, as WWE' Chief Accounting Officer admits, it was paid *after* the close of the quarter. ¶214. And Plaintiff does not merely speculate that this caused a dispute between the parties—it was reported in various media outlets. ¶¶209-12. Plaintiff also verified this information as part of its investigation, and included statements of CW-2, who confirms that he spoke to WWE's Senior Director of Talent Relations, Mark Carrano, and was told that Crown Prince Mohammed bin Salman and McMahon had gotten into an argument over these late payments.[23] ¶218. These allegations are therefore more

---

[21] Perfectly demonstrating Defendants' effort to introduce competing facts is that they cite a Forbes article to argue that the flight delay was mechanical, Mot. at 17 (citing Ex. 21, ECF No. 60-21), despite that the article itself acknowledges that others speculated the issue "may not have been strictly mechanical." *Id.*

[22] *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013) ("Defendants' efforts amount to an appeal to the referee to call a foul while the opposing team is still announcing its lineup and taking the field" and are "fact-based disputes that the Court will not credit on a motion to dismiss."); *In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11-cv-2279, 2012 WL 3758085, at *9 (S.D.N.Y. Aug. 29, 2012) ("Defendants' motion to dismiss rests primarily on their assertion that the things they said were true: that the SEC documents are accurate, and that the Shenzhen acquisition was totally benign, rather than being an undisclosed related-party transaction. But this is not an appropriate argument to make on a motion to dismiss).

[23] Defendants argue that this is hearsay and should not be credited. But "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016). Defendants also suggest that CW-2's statements are "innocuous" and "irrelevant to issues of falsity and scienter," Mot. at 17—but these CW allegations personally corroborate the very media reports that Defendants simultaneously argue are uncorroborated.

than mere "innuendo,"[24] Mot at 15, and Defendants' preferred narrative that the late payments were unimportant should not be credited at this stage—that is instead for discovery to root out. *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 98 (S.D.N.Y. 2006) (defendants disputed allegations as a matter of fact, which is not appropriate on a motion to dismiss).

Defendants also argue that the relationship between WWE and the Saudi government could not have been under stress considering that "WWE and KSA expanded their live event relationship during the Class Period in November 2019." Mot. at 15. But all the November 2019 announcement did was formalize that the 10-year partnership would "include a second annual large-scale event," ¶279, and did not actually "expand" anything, because in both 2018 and 2019—the first two years of the partnership—the parties already held two large-scale events in each of those years. ¶¶87, 117, 200, 207.

### 4.    Purported Statements of Opinion Are Actionable

The statements Defendants appear to challenge as opinions are actionable.[25] As an initial matter, many of the statements in the Complaint are not opinions at all. For example, Defendant Barrios's February 7, 2019 statement that the Company was "working on" the "rights renewal process" in "key markets," including "the Middle East," ¶226, is not an expression of opinion—

---

[24]  The two in-Circuit cases cited by Defendants to support that news sources should be disregarded  are wholly inapplicable, given that neither plaintiff in either of those cases alleged witness testimony in support of the news sources and a viable theory of fraud, as Plaintiff does here. *Id.* at 17 n.16 (*citing In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007)). Defendants' out-of-Circuit case, *In re McKesson HBOC, Inc. Sec. Litig.*, actually cuts in Plaintiffs' favor. 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (a newspaper article which corroborates plaintiff's own investigation can be a reasonable source of information and belief allegations). In addition, Defendants cannot have it both ways, arguing on the one hand that the news sources cited in the Complaint should be disregarded, but that the news sources they inappropriately include with their Motion should be considered. *E.g.*, Mot. at 19-21.

[25] Defendants claim that "[t]he vast majority of the statements at issue involve forward-looking statements or expressions of opinion." Mot. at 5, but they do not specifically identify which such statements they are referring to.

it is a statement of fact. The same is true of Defendant Barrios's February 26, 2019 statement

that negotiations on the MENA distribution rights deal were "ongoing." ¶237; *see also* ¶228

("it's fair to say that all the agreements will be completed substantively by the middle of the

year."); ¶257 ("we are going to be close to announcing those deals very soon."); *Omnicare Inc. v.*

*Laborers Dist. Counsel Constr. Indus. Pension Fund,*, 575 U.S. 175, 183 (2015) (a "fact is 'a

thing done or existing' or '[a]n actual happening'").

    Second, even those statements that arguably contain opinions are actionable as

Defendants either: (i) did not genuinely hold the expressed opinions, or (ii) omitted material facts

about the basis for the opinion, which rendered the statements misleading in context. *Omnicare,*

575 U.S. at 192-93, 185-95. In fact, "that [Defendants] may have believed [their statements] to

be accurate is irrelevant, even when read as an opinion statement. The core inquiry when

determining whether an omission renders an opinion misleading is whether the omitted facts

"conflict with what a reasonable investor would take from the statement itself." *Avon*, 2019 WL

6115349, at *17 (citing *Omnicare,* 575. U.S. at 188-90).

    Thus, when Defendant Barrios told investors on February 7, 2019 that "[w]e do want to

get the international renewals completed," ¶229, this statement is actionable even if he genuinely

held this belief, because (as detailed above) the failure to disclose that Defendants knew, or

recklessly disregarded that, the OSN agreement had been already terminated prematurely renders

this statement misleading. *See supra* at 8-14. The same goes for Barrios's statement that same

day, referring to WWE's media-rights distribution strategy in various international markets: "we

expect to complete this work and provide additional perspective on our plants towards the . . .

end of the first half of 2019." ¶227; *see also* ¶237 (WWE will get the MENA media-rights deal

"locked down by the middle of the year"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d

282, 303 (S.D.N.Y. 2018) (finding opinion statements actionable where defendants omitted information making the statement misleading). Likewise, even if the Company "fe[lt] really good about" finalizing the "really important" media-rights deal in the Middle East at the time of this June 26, 2019 statement, Defendants still failed to disclose that the OSN deal had by that point ended, and that the Company was attempting to secure a new agreement without one in place. This was material to investors and had to be disclosed. *See supra* at 10-13.

Moreover, Defendant Barrios's statement on July 25, 2019 that "[w]e believe we have agreements in principle" with the Saudi government on "the completion of a media rights deal in the MENA region," ¶260; ¶256 (same statement in press release), is misleading (as detailed above, *see supra* at 15-22) notwithstanding that he used the words "[w]e believe." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) ("[T]he use of the word 'believed' does not transform defendants' representation . . . into a statement of opinion"); *see also Omnicare*, 575. U.S. at 193 ("But those magic words ['we believe' or 'we think'] can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors.").[26] Defendant Barrios also could not have genuinely held this opinion: as further detailed below, he knew that there was no agreement in principle at the time, because the parties were far apart in their negotiations. *See* Section III.B.

Defendants' incorrect argument that a certain category of unidentified misstatements are inactionable opinions relies heavily on *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, *13 (2d Cir. 2019). To begin with, Defendants' pre-July 25, 2019 statements about renewing its media-rights agreement for the MENA region, ¶¶226-29, 237-38, 246-47, 251, 253,

---

[26] *Chicago Conservation Ctr. v. Frey*, 40 F. App'x 251, 257 (7th Cir. 2002) ("It is true that merely prefacing a statement with phrases such as 'I think' or 'I believe' will not transform an otherwise factual assertion into a nonactionable opinion.").

are alleged to be false and misleading because they failed to disclose that OSN and WWE entered into a settlement dated December 18, 2018, formally terminating their contract effective March 31, 2019. ¶¶234(a), 239, 249, 252, 254. *Express Scripts* is plainly inapplicable to this category of alleged misstatements because, unlike here, that case involved a situation in which during the class period the actual contractual negotiations were ongoing and no termination right was exercised. Here, Defendants' duty to disclose the termination of the OSN agreement "ripened" once it became clear that the contract had been terminated, *Hi-Crush*, 2013 WL 6233561, at *13-16—which, here, was December 18, 2018, **before** the Class Period even began.

As for Defendants' statements beginning on July 25, 2019, about the Company's negotiations with the Saudi government for a new media-rights deal, Defendants' argument and reliance on *Express Scripts* is also misplaced. In *Express Scripts*, the plaintiffs challenged statements that defendant's relationship with its partner was "great . . . very, very solid"; that it "really enjoys" its relationship, which is "business as usual" and a "two-way street"; that it was "excited to continue productive discussions" with the partner; and that it was "actively engaged in good faith discussions with" the partner. 773 F. App'x at *13. Here, Defendants' statements were far more concrete—including that the parties had an "agreement[] in principle" and that WWE would be announcing the deal "very soon." As discussed above, an "agreement[] in principle" means an agreement on the "price and the structure of the transaction," *see supra* at 18-19, which is a concrete false statement, unlike the softer statements deemed puffery in *Express Scripts*. 773 F. App'x at *13.[27]

---

[27] The other cases Defendants cite are similarly distinguishable. *In re Synchrony Fin. Sec. Litig.*, No. 18-cv-1818 (VAB), 2020 WL 1531297, at *23 (D. Conn. Mar. 31, 2020) (soft "statements expressing confidence in partnership renewals . . . are not materially misleading, especially because Defendants warned about the increased competition for renewals"); *Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630, 633-34 (2d Cir. 2019)

*(continued … )*

Second, *Express Scripts* held the defendant need not have "anticipated the outcome of the negotiations sooner or that the negotiations would deteriorate," *id.* at *14. Here, Plaintiff alleges something different—not that the outcome of negotiations needed to be disclosed but rather the outcome ***had been*** falsely disclosed. Defendants claimed an "agreement[] in principle" was reached—but in reality, the parties had not even agreed on basic terms, ¶¶188-95.

Finally, Defendants argue that "each of the allegedly misleading statements was described in terms of projections or expectations," Mot. at 27—which is plainly false. For example, as noted numerous times above, Defendant McMahon told investors on July 25, 2019, that "we are going to be close to announcing those deals very soon" (referring to the media-rights agreement in principle with the Saudis), ¶257. This is not an "expectation" but is instead a statement of ***present*** fact—McMahon did not say "we hope" to be close to announcing a deal very soon; he said "we are going" to be.[28]

### 5. Purported Forward-Looking Statements Are Actionable; Safe Harbor Does Not Apply

As with statements Defendants challenge as inactionable opinions, Defendants argue that a certain unidentified category of statements are forward-looking statements that are inactionable because they protected by the statutory safe harbor. Mot. at 28-30. As an initial matter, many of the alleged statements are not actually forward looking at all, ¶¶226, 228, 229, 237, 246, 251,

---

*( ... continued)*
(statements regarding the non-renewal of one agreement were "not sufficiently concrete, specific or material to impose a duty to update" as to deteriorating prospects of another agreement— distinguishable from the concrete, agreement "in principle" statements here).

[28] Defendants argue that "delays, uncertainty, and changing partners" is not unusual based on "the Company's history and regular practice" regarding media rights deals, and that this somehow renders their Class Period statements not misleading. Mot. at 27. But these facts are inconsistent with Defendants' own statements that an agreement in principle had been reached. Defendants also squeeze in a boilerplate paragraph about what "puffery" means in the Second Circuit, without tethering it at all to the allegations or describing what statements it claims are puffery. Mot. at 27. This argument should also be disregarded.

253, 256, 257, 260, 267, 272, 279, 283, 285, because they are based on representations of

historical and/or current facts (and therefore are not protected by the statutory safe harbor). *See*

*Galestan*, 348 F. Supp. 3d at 304 (finding that "many of [Defendants'] statements are not

protected by the safe harbor provision because they were statements of present fact"); *In re Salix*

*Pharm., Ltd.*, No. 14-cv-8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016)

(same). Here, Defendants did more than offer mere "rosy predictions," and instead made

affirmative statements, such as that "all the agreements ***will be*** completed substantively by the

middle of the year," ¶228—these statements are "neither themselves forward-looking nor

provided a basis for forward-looking projections that could be disclaimed" with the cautionary

language Defendants provided here. *Lockheed Martin.*, 875 F. Supp. 2d at 366.[29]

　　　　With respect to those statements that are arguably forward-looking, these statements—

including those regarding WWE's 2019 full-year guidance—are misleading for what they fail to

disclose. *See supra* at 8-14, 15-22. It is well settled that "the safe harbor does not apply to

material omission," even where the omission makes misleading forward looking projections.

*City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM)(THK), 2013 WL 1197755, at

*12 (S.D.N.Y. Mar. 25, 2013); *see also Salix*, 2016 WL 1629341, at *9 (statements that "were

made misleading by material omissions" are not protected by the statutory safe harbor); *Wilson*

*v. LSB Indus., Inc.*, No. 15-cv-7614 (RA), 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017)

("Court's in this circuit have consistently held that neither the PSLRA safe harbor, nor the

---

[29] The safe-harbor also does not apply to statements that include representations of existing fact. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (explaining that the safe harbor does not apply when "allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact").

bespeaks-caution doctrine protects material omissions.").[30]

But even putting that aside, the safe harbor also does not apply because Defendants' boilerplate cautionary language (Mot. at 8-9, 29) was not sufficiently meaningful. *See Galestan*, 348 F. Supp. 3d at 304 ("[T]his boilerplate language likely does not rise to the level of 'meaningful' cautionary language."). Defendants highlight generic cautionary language that every company includes with their public disclosures, such as boilerplate statements in 10-Ks and other releases, and "reminders" on earnings calls. Mot. at 8-9. Courts routinely hold that these are too generic to be meaningful. *Lockheed Martin*, 875 F. Supp. 2d at 365 ("generalized boilerplate" disclaimers not sufficiently meaningful); *Salix*, 2016 WL 1629341, at *11 (same).

Defendants seek cover in certain of the Company's disclosures regarding the risk of entering into, maintaining, and/or renewing key agreements. Mot. at 29 (citing 1Q19 Release). But these risk disclosures were "not 'meaningful' or 'sufficiently specific' because [Defendants] did not disclose that the risk factors were not merely hypothetical (i.e., they "could" happen), but were in fact happening." *Aeropostale*, 2013 WL 1197755, at *12; *see also In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating

---

[30] Defendants also argue that they never "expresse[d] certainty or ma[de] promises regarding" the prospects of a new MENA region media-rights deal and that they made clear their financial projections (i.e., guidance statements) were merely "targets." Mot. at 6. But as the court explained in *Aeropostale*, "Plaintiff does not need to rely on the falsity of [Defendant's] financial projections in order to show that they fail[ed] to disclose facts that impacted the reliability of those statements"—and "[t]he safe harbor and bespeaks caution doctrines do not apply to these omissions." 2013 WL 1197755, at *13; *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) (safe harbor "inapplicable" to quantitative revenue projections allegedly "based on a false premise: nonexistent revenue"). Moreover, Defendants cite *In re Delcath Sys. Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 327, 333-34 (S.D.N.Y. 2014), which involved statements about the likelihood of FDA approval for a certain product. Mot. at 29. But the court held that no "reasonable investor could have believed that there was no risk" that the product wouldn't be approved, *id.* at 334—which is not analogous to Defendants telling investors they had an "agreement[] in principle" that would be announced "very soon."

the magnitude of the risks described.").

**B.      Plaintiffs Plead Facts Giving Rise to a Strong Inference of Scienter**

In assessing scienter, the courts must determine "whether ***all*** of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. The inference of scienter

must be "at least as compelling as any opposing inference one could draw from the facts alleged"

but "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of

competing inferences." *Id.* at 323-24. If the inference is at least as compelling as any nonculpable

explanation, "the tie . . . goes to the plaintiff." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark*

*Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019)."Scienter may be inferred from (i) facts

showing that a defendant had 'both motive and opportunity to commit the fraud,' or (ii) facts that

constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *comScore,*

*Inc.*, 268 F. Supp. 3d at 550; *see also Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d

297, 306 (2d Cir. 2015).

**1.      Defendants' Own Sworn Declarations Acknowledge Their Scienter**
**With Respect to Certain Categories of Misstatements**

Defendants have admitted they knew that certain categories of the alleged misstatements

were materially false and misleading. As detailed herein, *see supra* at 9, WWE representatives

confirm that OSN informed WWE in November 2018 that it would not renew its agreement

(scheduled to end in late 2019)—and that, on December 18, 2018, the parties entered into a

settlement agreement formally terminating the agreement, effective March 31, 2019. ¶¶154-56.

Defendants either knew this, or were deliberately reckless in not knowing it, considering

that (a) Defendants told investors in 2018 that WWE expected to grow revenue on key media-

rights agreements (including for the MENA region) during 2019 and 2020 (¶¶139-40, 144-45);

(b) in the months leading up to the start of the Class Period, Defendants spoke frequently about finalizing/renewing its media-rights agreements for its key markets, including the MENA region, (¶¶150-52); (c) the Company's full-year 2019 guidance was dependent on finalizing/renewing these agreements (¶¶158-59, 226); and (d) just weeks into the Class Period, on February 26, 2019, Defendant Barrios described finalizing/renewing these agreements as "important for us strategically" and "financially." ¶237.

Renewing the OSN agreement was therefore highly important to the Company (according to Defendants), and so it is implausible that Defendants were not aware of the status of that negotiation—and they therefore knew that the OSN agreement **had been terminated early**. And to the extent Defendants did not **know** that the OSN agreement was terminated early, pursuant to a settlement dated December 18, 2018 and correspondence between the parties in November 2018 (months before the start of the Class Period), Defendants were deliberately reckless in not seeking out this crucial information. There are few things less reckless than Defendants telling the market they were working on renewing a key agreement that had already been terminated.[31]

Defendants' scienter argument completely ignores WWE's own admission that OSN informed the Company in November 2018 that it would not renew its media-rights agreement. Defendants make no mention of it in their scienter discussion, and instead confusingly claim that Plaintiffs "allegations of knowledge are based entirely on Defendants' 'positions with the Company,'" Mot. at 32, and that the "entire premise of Plaintiff's scienter allegations appears to

---

[31] Moreover, Carlo Nohra's knowledge of this contract termination can be attributed to WWE under the doctrine of corporate scienter. *In re Marsh & Mclennan Companies., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("[C]ourts have readily attributed the scienter of management-level employees to corporate defendants."). Nohra serves as VP and General Manager of WWE (¶154), and this level of seniority suffices for corporate scienter. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (attributing the knowledge of a vice chairman, vice president, and managing director to the corporate defendant).

be a fraud-by-hindsight theory," *id.* at 33—which is plainly false. Defendants' argument that the more plausible inference is that they honestly believed their purported opinion statements (Mot. at 34-35) fails to account for the allegation that Defendants have admitted the OSN agreement was terminated prematurely. Further, as is a theme in the Motion, Defendants' "more plausible inference" argument attempts to introduce competing facts (i.e., that WWE and the Saudis actually had a good relationship (*id.* at 35)), which is not appropriate, *see supra* at 21, and in any event, competing inferences must be drawn in Plaintiff's favor. *See supra* at 11, 29.

Defendants also insist that scienter is not present here because Plaintiff has not identified "internal reports or documents" or provided a "description of any meeting at which" the allegedly omitted facts were discussed with anyone within the Company. Mot. at 31. But Defendants ignore that VP Nohra describes documentary evidence—including that in September 2018 WWE sent OSN a "Notice of Material Breach" based on delinquent payments. ¶154. OSN's general counsel responded with a letter in November 2018 informing WWE that it intended to exit its sports content business in early 2019. ¶155. This led to OSN sending an unsolicited settlement proposal to WWE. *Id.* Negotiations followed, and, according to Nohra, the WWE and OSN entered into a settlement agreement dated December 18, 2018. *Id.* In addition, in confirming that certain specific payments by the Saudi government were late, WWE's Chief Accounting Officer must have been referring to internal WWE accounting records. ¶¶314-16. These are all references to documentary evidence cited in the Complaint that Defendants either knew about, or were reckless in not knowing about, because they clearly had access to them.

Even so, there is no requirement that a Plaintiff ***must*** specifically identify documents, or communications, or specific meetings containing information contradicting public statements in order to adequately allege scienter. *Lockheed Martin*, 875 F. Supp. 2d at 370-71 (scienter

adequately alleged despite defendants' argument that plaintiffs did not allege what defendants "were told" and did not "identify any specific information [defendants] had regarding the allegations"). Requiring Plaintiffs to prove scienter only through allegations such as reports and meetings would also effectively deem meaningless allegations relating to corporate scienter, the core operations doctrine, and motive and opportunity, the latter of which courts have deemed to be alone sufficient to establish scienter. *See In re Shanda Games Ltd. Sec. Litig.*, No. 1:18-cv-02463 (ALC), 2019 U.S. Dist. LEXIS 171592, *21-22 (S.D.N.Y. Sept. 30, 2019).

### 2.    Defendants' Insider Stock Sales Support An Inference of Scienter

In this Circuit, scienter can also be established by demonstrating motive and opportunity. *Novak*, 216 F.3d at 308. "The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001).

"Unusual" insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." *Id.*; *comScore, Inc.*, 268 F. Supp. 3d at 555 ("sheer magnitude of [stock] sales . . . combined with the circumstances surrounding the sales, including [defendant's] admission of misconduct, strongly supports an inference of scienter."). Each of the Defendants' insider sales support an inference of scienter.

***Defendant McMahon*** sold 3,204,427 shares of WWE stock during the Class Period for proceeds of more than ***$261 million***. ¶337. Through this transaction, McMahon disposed of approximately ***10.1%*** of his total shares that were available for sale during the Class Period. *Id.* This huge sale was inconsistent with prior trading practices, because McMahon sold approximately 10 times as many shares during the Class Period as compared to the number of WWE shares he sold during the Control Period, resulting in proceeds of sales that ***increased by more than 1000% during the Class Period***, as compared to the Control Period. ¶343.

Defendant McMahon's March 27, 2019 sale was also suspiciously timed. Most notably, he sold more than 3.2 million WWE shares for over $261 million in gross insider trading proceeds only a few days before the end of the 2019 first quarter, which failed to meet revenue guidance, and while Defendant McMahon knew, or was deliberately reckless in not knowing, that OSN had prematurely terminated its media-rights agreement. ¶346. This worked out well for McMahon, because when the Company finally announced its disappointing results for 1Q2019 on April 25, 2019 and WWE provided lower-than-expected guidance for the second-quarter 2019—which reflected the still-unknown news that the Company would no longer be receiving revenues associated with the OSN agreement that expired on March 31, 2019—WWE's stock price fell  $13.12 per share, or 13.31%, to close at $85.38 per share on April 25, 2019. ¶371-72.

Defendants argue that the more "plausible competing inference" is that this outsized stock sale, executed while McMahon was in possession of material nonpublic information about the early termination of the OSN deal and disappointing 1Q2019 results, is somehow immunized because WWE disclosed in a Form 8-K that the $261 million in proceeds of McMahon's inside sale would primarily be used to fund other "investment opportunities," including launching a professional football league in early 2020, at least 10 months later. But what is relevant is that McMahon made this trade while in possession of material non-public information, and it is "for a jury to decide" whether the proposed innocent explanation was McMahon's true motivating factor for making the sale, *see EVCI Colleges Holding*, 469 F. Supp. 2d at 100 ("an innocent explanation for the timing of [defendant's] sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations")—and with respect to competing inferences,

a "tie . . . goes to the plaintiff." *Lockheed Martin*, 875 F. Supp. 2d at 372.[32] Defendants also argue that this enormous sale represented only a small percentage of McMahon's overall holdings. Mot. at 36. But courts are clear that stock sales of this magnitude, even if representing a small percentage of overall holdings, are sufficiently suspicious. *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("The $78 million profit from sales by the Individual Defendants during the Class Period is . . . massive by any measure"); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) ("[W]here, as here, stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings.").[33]

   ***Defendant Wilson*** sold 158,134 shares of WWE stock during the Class Period for proceeds of approximately ***$11 million, disposing of 100% of the total shares***, including vested stock units, she had available for sale during the Class Period. ¶338. These sales were inconsistent with Wilson's prior trading practices, because Wilson sold approximately 13% more WWE shares in the Class Period as compared to the Control Period. ¶344. Wilson's sales also were suspiciously timed, because the August 8, 2019 sale was made after Defendants falsely represented, on July 25, 2019, that WWE had an agreement in principle with the Saudi government on a new media-rights deal, ¶260, which artificially inflated or maintained WWE's share price, ¶263, but before the next partial revelation on October 31, 2019. ¶¶374-82.

---

[32] *See also In re SLM Corp. Securities Litigation*, 740 F. Supp. 2d 542, 555 n.5 (S.D.N.Y. 2010) (proposed innocent explanations for stock sales are facts that are in dispute and not appropriate for determination on a motion to dismiss).

[33] Defendants' argument that Plaintiff did not allege net profits is misplaced. Mot. at 37. McMahon, the founder of WWE, obtained the more than 3 million shares he sold by converting Class B shares (which are convertible on a one-for-one basis at any time) into Class A shares, and which he obtained in connection with WWE's 1999 IPO, pursuant to which Class A shares were offered at $17 per share. *See* Declaration of Carol C. Villegas, Exhibit A, at 12, 56, F-16. McMahon sold the Class B shares (after converting them into Class A shares) while the stock was trading near all-time highs.

**Defendant Barrios** sold 114,678 shares of WWE stock during the Class Period for proceeds of more than $8.5 million. ¶339. Through these transactions, Barrios disposed of approximately 74.1% of the total shares, including vested stock units, he had available for sale during the Class Period. *Id.* Barrios sold the 114,678 shares on two dates during the Class Period—February 27, 2019 and July 22, 2019. The February 2019 sales occurred after Barrios learned, or recklessly disregarded, that the OSN agreement was being terminated early, on March 31, 2019. ¶347. And the July 22, 2019 sales occurred only three days before Defendant Barrios himself disclosed to the market on July 25, 2019, that the OSN contract had been terminated and falsely represented that the Company had reached an "agreement[] in principle" with KSA for a new media rights deal. ¶260-61.[34]

### 3. The Core Operations Doctrine Supports an Inference of Scienter

To demonstrate scienter, "a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *Hi-Crush*, 2013 WL 6233561, at *26; *Lockheed Martin*, 875 F. Supp. 2d at 371 (Second Circuit has "endorsed the idea behind the core

---

[34] That these sales were made pursuant to a 10b5-1 trading plan is irrelevant at this stage because "the existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 171, 200-01 (S.D.N.Y. 2010). In addition, Defendants (tacitly conceding that McMahon's astronomical sales are unusual) argue that unusual insider trading activity by a single defendant is insufficient to give rise to a strong inference of scienter if other defendants did not sell shares (Mot. at 25 n.29) citing *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 218 (S.D.N.Y. 2018). But *Frankfurt* included five individual defendants, and only one was alleged to have engaged in unusual trading activity. *Id.* at 218. The better approach is the one highlighted in *In re SLM Corp. Securities Litigation*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010), in which the court distinguished cases in which "only one of **several** individual defendants engaged in unusual trading activity," and found that where there are only two individual defendants, one who engaged in unusual trading activity and one who did not, the latter's lack of sales does not exculpate the selling defendant or the company. *Id.* at 558. Thus, should the Court determine that only, say, McMahon's sales were unusual, the arguable lack of suspicious sales by Wilson and/or Barrios should have no impact on whether the Complaint raises a strong inference of scienter as to McMahon or WWE.

operations doctrine as enhancing, if not independently supporting, an inference of scienter, albeit in dicta in a non-precedential opinion").

      Here, numerous facts support that the renewal of the OSN agreement—and the need to ultimately replace it with a new media rights agreement for the MENA region—were so important to the Company that Defendants must have had  knowledge of the information concerning these negotiations. *First*, Defendants told investors in 2018 that the Company would significantly grow the revenues derived from its media-rights agreements, including the OSN agreement, over the next two years (2018-2020), which caught the attention of analysts. ¶¶139-40, 144-45. *Second*, in the months leading up to the start of the Class Period, Defendants spoke frequently about finalizing its media-rights agreements for its key markets, including the MENA region. ¶¶150-52. *Third*, by the start of the Class Period, the Company announced that the MENA region grew to become the Company's second-largest market by monetization. ¶325. *Fourth*, at the start of the Class Period, the Company provided a full-year 2019 guidance that was dependent on finalizing these agreements, ¶¶158-59, 226, and just weeks into the Class Period, on February 26, 2019, Defendant Barrios described finalizing these agreements as "important for us strategically" and "financially," because it would provide "visibility over the next several years for a pretty significant portion of our revenue, so really important." ¶237. *Fifth*, by July 25, 2019, the Defendants specifically tied the Company's ability to achieve its full-year 2019 guidance to the "completion of a media rights deal in the MENA region." ¶255. *Sixth*, WWE's pre-existing 10-year partnership with the Saudi government proved extremely lucrative for the Company in 2018, ¶¶118-20—meaning Defendants paid close attention to WWE's relationship with the Saudi government. Defendants also repeatedly singled-out the importance of the Saudi relationship, ¶231, and thus had to have been knowledgeable about it.

For all these reasons, Defendants knew (or were deliberately reckless in not knowing) that the OSN deal had been terminated in December 2018 and were knowledgeable about the WWE's negotiations with the Saudi government for a new media-rights agreement for the region. Indeed, "it would be absurd" to suggest that Defendants did not have this knowledge, given the importance of the MENA region media-rights agreement and WWE's relationship with the Saudis. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012). In addition, that Defendants made specific statements about the supposed agreement with the Saudis—including that the parties had an agreement "in principle" that would be announced "very soon"—provides "strong circumstantial evidence that [they] were receiving some form of specific information." *Lockheed Martin*, 875 F. Supp. 2d at 372.

### 4. Confidential Witnesses Support An Inference of Scienter

The Complaint includes statements from two confidential witnesses, both of which support an inference of scienter.

*CW-2*. CW-2, a former WWE wrestler, corroborates reports that the conflict between Defendant McMahon and the Saudi Crown Prince was caused by delayed Saudi payments to WWE (also supporting that McMahon was directly involved in deals the MENA region and that he knew about late payments). ¶320. Defendants had to have been aware of these late payments, considering their sheer size, and also because Defendants regularly touted the importance of WWE's relationship with the Saudi government, ¶¶118-23, 231—and therefore had to have been aware of significant issues affecting that relationship.

*CW-1*. As already detailed herein, CW-1 provides information describing that WWE and the Saudi government were far apart in their negotiations for a new media-rights deal. Numerous facts support that Defendants knew, or were deliberately reckless in not knowing, the details of the Company's negotiations with the Saudi government for a new media-rights agreement (and

that, as CW-1 explains, the negotiations went nowhere), including that Defendants repeatedly discussed the importance of finalizing the media-rights deal in the region, ¶¶139-40, 144-45, 150-52, 237, tied its full-year guidance to the completion of the deal, ¶¶158-59, 226, and touted the importance of WWE's relationship with the Saudi government more generally. ¶¶118-23, 231. These facts, viewed collectively and holistically,, support Defendants' knowledge.

### 5.   Defendants' Departure Supports Scienter

It is well settled that "[t]he timing and circumstances surrounding [executive] resignations . . .  contribute to the inference of scienter with respect to those defendants." *comScore, Inc.*, 268 F. Supp. 3d at 553 (high-level departures support an inference of scienter). Defendant Barrios and Wilson were terminated just days before the Company announced disappointing full-year 2019 results, including the issuance of 2020 full-year guidance that did not include any revenues related to a media-rights deal in the MENA region. ¶380. This supports an inference of scienter. ¶¶354-56. *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (collecting cases) ("it [can] suggest[] a higher level of wrongdoing approaching recklessness or even conscious malfeasance.").

### C.   Plaintiffs Adequately Plead Loss Causation

To plead loss causation, a plaintiff must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 765 (S.D.N.Y. 2017). "[P]leading of loss causation under Section 10(b) is governed by Rule 8 notice pleading standards," rather than the heightened pleading standard of Rule 9. *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 488 (S.D.N.Y. 2011). Thus, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind," and a complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be." *see also*

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).[35] Plaintiff alleges in detail how the truth about Defendants' false and misleading statements was revealed to the market through a series of partial revelations. ¶¶368-82. Defendants do not challenge this in any detail, but instead vaguely claim that the alleged dates on which the truth was partially revealed amount to nothing more than updates on negotiations, expectations, and financial projections. Mot. at 39.

But this is false. Plaintiff alleges, for example, that the lower-than-expected 2Q19 guidance the Company provided on April 25, 2019 (the only date Defendants discuss, Mot. at 39-40) reflected a partial materialization of the unknown risk that WWE would not receive in that quarter (2Q19) the revenues associated with the cancelled OSN agreement, which had been terminated effective March 31, 2019 (i.e., the last day of 1Q19).[36] ¶¶371-73; *see, e.g.*, *BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 326-27 (S.D.N.Y. 2016) (loss causation sufficiently pled through disclosure which resulted in a materialization of previously concealed risks); *see also Vivendi*, 838 F.3d at 260-61 (endorsing the "materialization of the risk" theory). Plaintiff further alleges that details about the failed media-rights deal for the MENA region were revealed on October 31, 2019 (¶¶374-76), January 30, 2020 (¶¶377-79), and February 6, 2020, causing the stock price to decline. ¶¶380-82. This is sufficient to plead loss causation at this stage. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 231 (2d Cir. 2014) (a plaintiff's loss causation allegations need only be "plausible").

Defendants suggest that the alleged downward stock movements are not necessarily based on the alleged fraud and do not reveal that defendants' prior statements were false, Mot. at

---

[35] Even under Rule 9, the Complaint adequately pleads loss causation because it alleges that the subject of the fraudulent statement was the cause of the actual loss suffered, which is what courts in this Circuit require. *See Braskem*, 246 F. Supp. 3d at 765-66.

[36] Defendants argue that "Plaintiff does not identify" which analysts tied the results issued that day to the delayed Saudi event, Mot. at 40, which is not accurate—this is clearly alleged in the Complaint. ¶199.

39—but a plaintiff need not show that a "specific corrective disclosure . . . exposed the precise extent of [the] alleged fraud," so long as the plaintiff's "theory of loss causation nevertheless rest[s] on the revelation of the truth," *Vivendi*, 838 F.3d at 262, and "there is no requirement that the disclosure take a particular form or be of a particular quality." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008). Further, Defendants' argument that there was no materialization of a ***concealed*** risk because they disclosed the risk (Mot. at 39) is misguided—Defendants' misstatements meant that investors "could not accurately weigh that risk," and "[t]he risk that caused the loss . . . was within the 'zone of risk concealed by the misrepresentations." *In re Barrick Gold Sec. Litig.*, No. 13 CIV. 3851 SAS, 2015 WL 1514597, at *13 (S.D.N.Y. Apr. 1, 2015) (rejecting this precise argument).

## IV.   PLAINTIFF HAS ADEQUATELY STATED A SECTION 20(a) CLAIM

The Complaint alleges that the Individual Defendants are control persons (¶40) and participated in the drafting, preparation, and dissemination of the false and misleading statements. ¶357-67. Defendants' sole argument regarding Section 20(a) is that Plaintiff fails to sufficiently plead a primary securities fraud claim. Mot. at 40. But because Plaintiff adequately pleads a primary violation and alleges the Individual Defendants' culpability in the primary violation, the Motion to dismiss should be denied. *See Delcath*, 36 F. Supp. 3d at 336.

## V.   CONCLUSION

For the reasons detailed herein, Defendants' Motion should be denied in its entirety.[37]

---

[37] Plaintiff respectfully requests that any dismissal be without prejudice and Plaintiff be given an opportunity to amend.

Dated: July 14, 2020

LABATON SUCHAROW LLP

*/s/ Carol C. Villegas*
Carol C. Villegas
Christine M. Fox
Domenico Minerva
Ross M. Kamhi
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
Email: cvillegas@labaton.com
      cfox@labaton.com
      dminerva@labaton.com
      rkamhi@labaton.com


*Counsel for Lead Plaintiff Firefighters'
Pension System of the City of Kansas City,
Missouri Trust and the Proposed Class*