UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC., et al.,<br><br>    Defendants. | Civil Action No. 1:20-cv-02031 (JSR) |

# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

                   **K&L GATES LLP**
                   Jerry S. McDevitt (*pro hac vice*)
                   210 Sixth Street
                   Pittsburgh, PA 15222

                   Stephen G. Topetzes (*pro hac vice*)
                   Theodore L. Kornobis
                   1601 K Street, NW
                   Washington, DC 20006

                   Joanna A. Diakos
                   599 Lexington Avenue
                   New York, NY 10022

                   *Counsel for Defendants*

## **TABLE OF CONTENTS**

**Page**

I. Plaintiff's Opposition Cannot Avoid Dismissal Through Deception ................................. 1

    A. Plaintiff's Deception Regarding the OSN Agreement ............................................ 1

    B. Plaintiff's Deception Regarding The Negotiations With KSA ............................... 4

II. Plaintiff's Opposition Cannot Avoid Dismissal By Misstating the Law ........................... 9

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp*,
　875 F. Supp. 2d 359 (S.D.N.Y. 2012) ...................................................................................10

*Das v. Rio Tinto PLC*,
　332 F. Supp. 3d 786 (S.D.N.Y. 2018) .....................................................................................10

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
　469 F. Supp. 2d 88 (S.D.N.Y. 2006) .......................................................................................10

*Glaser v. The9, Ltd.*,
　772 F. Supp. 2d 573 (S.D.N.Y. 2011) .....................................................................................10

*In re Hi-Crush Partners L.P. Sec. Litig.*,
　No. 12-cv-8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ........................................9

*Jackson v. Abernathy*,
　960 F.3d 94 (2d Cir. 2020) .....................................................................................................10

*Kiryas Joel All. v. Vill. of Kiryas Joel*,
　No. 11 CIV. 3982, 2011 WL5995057 (S.D.N.Y. Nov. 2011) ............................................3, 10

*Long Miao v. Fanhua, Inc.*,
　No. 18 CIV. 8183, 2020 WL 996602 (S.D.N.Y. Mar. 2, 2020) ................................................5

*In re Millennial Media, Inc. Sec. Litig.*,
　No. 14-cv-7923, 2015 WL 3443918 (S.D.N.Y. May 29, 2015) ...............................................7

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
　575 U.S. 175 (2015) ..................................................................................................................3

*Ret. Ass'n v. comScore, Inc.*,
　268 F. Supp. 3d 526 (S.D.N.Y. 2017) .....................................................................................10

*In re SLM Corp. Sec. Litig.*,
　740 F. Supp. 2d 542 (S.D.N.Y. 2010) .....................................................................................10

*Tyler v. Liz Claiborne, Inc.*,
　814 F. Supp. 2d 323 (S.D.N.Y. 2011) .....................................................................................10

ii

306901861 v1

I.      **Plaintiff's Opposition Cannot Avoid Dismissal Through Deception**

   A.   **Plaintiff's Deception Regarding the OSN Agreement**

Plaintiff's first manufactured argument—that WWE fraudulently concealed termination of the OSN agreement and misrepresented it was working to renew it—is based entirely on deceptive and misleading assertions unsupported (or contradicted by) Plaintiff's own allegations.[1]

*First*, the Opposition attempts to argue that the OSN agreement was material by falsely suggesting that the MENA media rights deal was the second largest media rights deal for WWE. Plaintiff's assertion is flatly contradicted by the very document that Plaintiff cites (CAC ¶ 237)—a statement by Defendant Barrios at a conference where he expressly distinguished between gross monetization (inclusive of live event revenue) and revenue from media rights deals.  As to media rights deals, Barrios made clear that MENA was not even in the top three:

> [QUESTION]: I'd imagine that relative to the U.K. and India markets like China, Latin America they're always are smaller today.  These are earlier gestation markets for you guys, I assume.
>
> BARRIOS: Yes. I think we've been public before that our largest markets in terms of total monetization were the U.S., U.K. and India.  Middle East is now #2 in 2018 after the U.S.  ***And specifically on the rights deals, we've said there was the U.S. and then the U.K., and then they were #2 and #3***, so that's all we've been public with.

Ex. 36 at 4.[2]  Barrios made this point even clearer at a conference the prior month, where he said: "[A]s of today, ***our largest media deals are obviously in the U.S., U.K. and India***. In addition to those markets, Latin America, China, Middle East, other." Ex. 37 at 4 (quoted in CAC ¶ 152).

---

[1] The OSN-related allegations in this case have mutated over time after the allegations in the original complaints were shown to be false.  The original complaints falsely alleged that OSN was owned and controlled by KSA and that the termination of the OSN agreement was the first indication of a deteriorating relationship between WWE and KSA.  After WWE provided Plaintiff with sworn declarations demonstrating that OSN was not owned and controlled by KSA, Plaintiff abandoned that baseless claim in favor of the equally baseless claim in the CAC.

[2] Referenced exhibits in support of Defendant's Motion are attached to the Declarations of Stephen G. Topetzes filed herewith (Exs. 36-37) and with Defendant's Motion (ECF No. 60) (Exs. 1-35).

1

The OSN deal, which covered only pay-tv in the MENA region, was not material and Plaintiff offers only rank speculation to the contrary. Plaintiff does not allege WWE's annual revenue from the OSN deal, instead offering divergent estimates from two analysts, which range from 0.968 percent to 2.15 percent of the Company's $930.2 million in total revenue. CAC ¶¶ 8, 176, 276.[3] Nor does Plaintiff allege that any analyst sounded alarms or raised concerns about the end of the OSN deal.[4] In fact, Plaintiff alleges the opposite: the market "reacted positively," was "encouraged" that WWE was negotiating with KSA, and the stock price *rose*. CAC ¶¶ 263, 265.

Plaintiff also attempts to manufacture materiality by describing anticipated revenue from all media deals *globally* or alleging that international deals *generally* were important to investors. Opp. 1, 9. The CAC makes clear that the U.S. market was by far the largest and, of the total $514 million in revenue projected for all media deals in 2020, only $79 million was up for negotiation (which included not only MENA but also U.K. and India). CAC ¶¶ 139, 144.

***Second***, the Opposition falsely claims that Defendants "concealed" the termination of the OSN agreement from investors. Plaintiff completely ignores that WWE disclosed in its 2018 10-K (Feb. 7, 2019) that various deals, including in the MENA region, were "nearing the end of their terms"—an accurate statement given that the OSN agreement was terminating on March 31, 2019. And WWE expressly disclosed that the agreement had terminated on July 25, 2019.

***Third***, the Opposition falsely claims that WWE misled investors by stating that it was working to renew its agreement with OSN. The CAC does not identify any such statement because

---

[3] Plaintiff tries to argue that the termination of the OSN deal impacted the Company's adjusted OIBDA guidance for Q2, asserting that it was lower than what the analysts' consensus allegedly "expected" it would be. Opp. 13; CAC ¶ 241. But Plaintiff offers no factual allegations that tie this to OSN, nor does the CAC support this given the alleged size of the OSN deal. To the contrary, Plaintiff alleges that analysts tied it to a delay in the KSA live events, not the media deal. *Id.* ¶ 242.

[4] Plaintiff argues that an analyst did write about this (Opp. 12 n.10), but the report Plaintiff cites was issued months later and merely noted the fact of the termination.

2

none exists.  And the Opposition does not dispute that:

- The cited statements by WWE plainly address renewals in various <u>markets</u> – not renewals <u>with OSN</u> or with specific entities.

- WWE and analysts discussed "renewals" in terms of markets, including that WWE "renewed" with a <u>brand new</u> partner in the U.K. and "renewed" its U.S. media rights deal by splitting content between an existing and a <u>brand new</u> partner; and,

- The CAC acknowledges that ***analysts continued to discuss the MENA media rights deal as a "renewal," <u>even after</u> it was clear WWE was negotiating with KSA*** (CAC ¶ 283).

Plaintiff completely ignores the context in which the statements were made and the materials properly before the Court that demonstrate what the market understood WWE's statements to mean.[5]  Indeed, it is Plaintiff's repeated attempts to substitute "OSN" for the term "market" in WWE's statements—not WWE's statements themselves—that are materially misleading.

*Fourth*, with respect to alleged falsity in WWE's risk disclosures, the Opposition injects a new argument that WWE failed to disclose the materialization of a risk that the OSN termination impacted WWE's business (whereas the CAC alleged that the materialized risk was simply that the OSN deal terminated, CAC ¶ 235).  Plaintiff's attempt to add a new allegation via an Opposition brief is improper.[6]  Moreover, Plaintiff's allegations that the OSN termination left WWE "scrambling" (CAC ¶ 163), "weakened [its] bargaining position" (Opp. 13), or "significantly complicated" the ability to enter into a deal (Opp. 10-11) are pure speculation.  And OSN only impacted pay-tv in the MENA region; WWE still had an existing agreement with MBC to distribute content over non-pay-tv.  CAC ¶¶ 261, 285.  Plaintiff's argument thus essentially

---

[5] *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (investors take into account context, other language, and industry customs and practices).

[6] *See Kiryas Joel All. v. Vill. of Kiryas Joel*, No. 11 CIV. 3982, 2011 WL 5995075, at *5 (S.D.N.Y. Nov. 29, 2011) (Rakoff, J.) ("[T]he Court cannot consider allegations that the plaintiffs raise for the first time in their brief opposing the motion to dismiss because 'it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'" (citation omitted)).

3

imposes a requirement for WWE to disclose every deal termination, even if undeniably immaterial. See Mot. 22-23; *see also supra* n.3.

B.  **Plaintiff's Deception Regarding The Negotiations With KSA**

Plaintiff's second manufactured argument—that WWE committed securities fraud because it could not possibly believe that it had an agreement in principle on broad terms with KSA in July 2019 and knew it could not complete a deal with KSA because of their allegedly deteriorating relationship—is also entirely premised on deceptive claims rather than particularized facts.

*First*, the Opposition completely ignores the *actual statements* made by WWE regarding its negotiations with KSA in its July 2019 earnings release.  Plaintiff argues that Defendants' announcement of an "agreement in principle" must have been fraudulent because those words necessarily conveyed that the parties had virtually concluded negotiations and were about to sign a deal.  But Plaintiff disregards WWE's actual words:

> The Company ***believes*** it has agreements in principle with the Saudi General Sports Authority ***on the broad terms*** for the latter two items; ***however, this understanding is nonbinding***. ***It is possible that either or both of these business developments do not occur on expected terms*** and/or that engagement does not improve as assumed. ***The Company has evaluated these potential outcomes*** and currently believes that the ***most likely downside*** to its Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook.

CAC ¶ 256 (emphasis added).  No reasonable investor could conclude that the Company's belief in an explicitly "non-binding" "agreement in principle" on "broad terms," which the Company said might not be finalized, and as to which the Company provided (ultimately accurate) operating income estimates for a no-deal possibility, misleadingly conveyed that the deal was a sure bet.

*Second*, the Opposition misleadingly attempts to rely on CW-1—a low-level employee at MBC who was not even hired until the *fall of 2019*—to argue that WWE's statement that it believed it had a "non-binding" "agreement in principle" with GSA months earlier *in July 2019* was false.  This is an improper fraud-by-hindsight argument—and an incredibly weak one given

4

CW-1's limited role and knowledge.[7]  Critically, Plaintiff does not dispute that CW-1 (a) had *no* interaction with anyone at WWE; (b) had *no* interaction with any GSA representative involved in negotiations with WWE; (c) was not involved *at all* in those negotiations; and (d) offers *no* allegations about the content of those negotiations.  *See Long Miao v. Fanhua, Inc.*, No. 18 CIV. 8183, 2020 WL 996602, at *17 & nn.18-22 (S.D.N.Y. Mar. 2, 2020) (collecting cases disregarding statements from lower level employees who lacked contact with any individual defendant). Moreover, CW-1 confirms that Defendants' statements that negotiations were "ongoing" and the parties were "continuing to work" toward an agreement were correct, and his brief employment at MBC beginning in the fall of 2019 coincided with when WWE *lowered* its guidance and told the market that "no assurances can be given" that a MENA deal would be completed.[8]

CW-1's opinion that WWE had unreasonable expectations and that WWE and MBC were far apart on an audience engagement metric, *months after* Defendants' July 2019 statement regarding a "non-binding" "agreement in principle" with GSA does not render the statement misleading.  In the end, Plaintiff offers nothing but the unsupported proclamation that, "based on the way negotiations work," if MBC and WWE were far apart in the fall, there is no way WWE could have believed they were close to a deal in the summer with GSA, a different entity (*i.e.*, in Plaintiff's opinion, negotiations can only move in a straight line). That is not a viable fraud claim.

***Third,*** the Opposition argues that, as of *October 31, 2019*, it was fraudulent for Defendants not to have told investors that it was impossible to reasonably believe that a MENA media rights

---

[7] As noted, WWE's agreement-in-principle statement in July 2019 regarded discussion *with GSA*. CW-1's purported statements regarding MBC's studies in the fall of 2019 are not helpful to evaluating whether WWE's earlier statement regarding discussions with GSA was false.

[8] The CAC clearly states that CW-1 is a former employee of MBC (CAC ¶ 178), yet the Opposition confusingly indicates that CW-1 is a current employee of "a company that is backed by the Saudi government."  Opp. 17 n.16.  It is unclear if Plaintiff means a different company, or if Plaintiff is contradicting its own allegations (indicating a lack of knowledge of its own CW).

deal would be completed *at any point in 2020* (*i.e.*, that no deal could be done 14 months into the future). Opp. 19. The Opposition tries to support this clairvoyant contention by pointing to the fact that WWE's guidance for 2020 (issued in February 2020, *i.e.*, over three months after Defendants' allegedly misleading statements) did not include revenue from a possible MENA media rights deal in its 2020 guidance issued in February 2020. Opp. 19. This argument does not even fit with the facts as alleged by Plaintiff: on October 31, 2019, Defendants *lowered* the WWE year-end projections based on the fact that no assurances could be made that a MENA deal would be completed. Further, in February 2020 WWE made clear that it was still working on a MENA deal, and never stated that it would not be completed in 2020 (only that the Company's projected OIBDA guidance did not reflect revenue from that potential deal).

***Fourth***, the Opposition does not dispute that the fictional narrative regarding a supposedly deteriorating relationship between KSA and WWE is based on speculation and innuendo from Internet gossip sites and social media accounts, which are demonstrably incorrect and implausible as shown by a sworn declaration on which Plaintiff expressly relies. That declaration proves that there was no dispute over allegedly late payments from KSA in October 31, 2019: KSA paid the full $60 million fee for the prior event *before* the *Crown Jewel* event, and WWE publicly disclosed that payment on an earnings call earlier that day. See Mot. at 16, 18. Indeed, the Opposition does not reflect or support how *any* payments from KSA were "late"—it does not identify any payment made after a deadline or in breach of any contract, nor does it identify any guarantee by a Defendant as to any payment date. And even assuming such payments were "late," the Opposition does not explain how the payments rendered the relationship between WWE and KSA so deteriorated that Defendants should have told the markets that any ability to ever reach any media rights agreement with KSA was irreversibly doomed.

6

The Opposition falsely claims that CW-2 and his multiple-levels-of-hearsay allegations "corroborate" Plaintiff's allegations of tension in the relationship between WWE and KSA as of October 31, 2019. *See* Mot. at 17-18. Plaintiff does not and cannot allege that CW-2 has any personal knowledge of any conversations between Defendant McMahon and the Crown Prince, or any of the actions supposedly taken by KSA related to the *Crown Jewel* event or travel.[9] Plaintiff also nowhere alleges that either CW knows he is being cited in the CAC, reviewed the allegations attributed to him and affirmed them, or that any lawyer at Plaintiff's law firm has ever spoken to the CWs.[10]

*Fifth*, Plaintiff's own allegations demonstrate that WWE's relationship with KSA actually *expanded*—not deteriorated—during the Class Period. Plaintiff acknowledges:

- WWE and KSA finalized the agreement-in-principle to hold a ***second live event in 2019***. On July 25, 2019, WWE announced its "belief" as to two "non-binding" agreements-in-principle on "broad terms"—one for the MENA media rights deal and one to hold a second live event in 2019. Plaintiff argues this was a lie because Defendants must have known that no media rights deal could have been completed given how far apart the

---

[9] Although Plaintiff claims that Defendants "threatened" a Rule 11 motion, Opp. 3 & n.3, Defendants merely sought to provide Plaintiff (and the plaintiffs who filed the original complaints) with the facts concerning the demonstrably false allegations in the original complaints, which the two law firms that filed them withdrew rather than face sanctions. It is Plaintiff, not Defendants, that has brought in (a selective sampling of) the Rule 11 sworn declarations (while continuing to ignore three others that directly contradict the allegations relating to the October 31, 2019 event). As Defendants noted (Mot. at 3 n.2), the PSLRA requires a Rule 11 analysis and Defendants will be happy to provide those declarations to the Court at the appropriate time or upon request.

[10] *Cf. In re Millennial Media, Inc. Sec. Litig.*, No. 14-cv-7923, 2015 WL 3443918 (S.D.N.Y. May 29, 2015) (criticizing practice of "attributing statements in a complaint to persons identified there as CWs, without ever (1) confirming with the CW the accuracy of the statements attributed to him or her, or (2) notifying the CW that counsel intended to quote him or her as such," noting that counsel had not spoken to 10 of the 11 CWs, four of whom reported material inaccuracies in statements attributed to them).

parties allegedly were and purported tension in the parties' relationship. CAC ¶ 264. But, one of those two July 2019 "non-binding" agreements in principle (for the second live event) was in fact completed and announced in September.

- <u>**WWE and KSA agreed on November 4, 2019, to expand their partnership to include a second annual event through 2027**</u>. The context and timing of this announcement is key: Plaintiff asserts that WWE's relationship with KSA at this time was "embroiled in conflict" (CAC ¶ 275) and only *five days* earlier the "tension became even more severe" (CAC ¶ 281) and was "boiling over" (Opp. 2) amid Plaintiff's speculation regarding the supposed "cut feed" at the October 31, 2019 event and wrestlers being "held hostage." Yet, *two business days* after these (invented) allegations, WWE and KSA finalized and announced a deal to expand their relationship *over the next eight years*.[11]

These facts (admitted by Plaintiff in the CAC) render implausible any allegations of a relationship with KSA that was so deteriorated and "boiling over" that it was unreasonable for the Company to express caveated optimism for a deal. In fact, Plaintiff's allegations depend upon the irreconcilable conclusion that, *in the span of two business days*, WWE and KSA went from a "hostage crisis" that arose out of an alleged (and temporary) cut broadcasting feed because of a late payment (that indisputably had already been paid), to an agreement to *expand* the parties' relationship over eight years. The CAC thus does not even meet the plausibility standard under *Twombly* and *Iqbal*, much less the heightened standard demanded by the PSLRA to plead facts with particularity and support a strong inference of scienter.

---

[11] Plaintiff tries to diminish this announcement by claiming it merely "formalized" an existing relationship, being that two events occurred in 2018 and 2019. Opp. 22. Plaintiff ignores its own allegations that the existence of a second event in 2019 was far from certain, analysts acknowledged the previous arrangement was for one annual event, and "investors closely watched for news" and paid attention to a second event announcement. *See* CAC ¶¶ 171-72, 202-204.

306901861 v1

## II. Plaintiff's Opposition Cannot Avoid Dismissal By Misstating the Law

***First***, the Opposition's attempts to distinguish authorities cited by Defendants (*see* Mot. 25-27) or to avoid cases addressing opinion statements fail.[12] Plaintiff's reliance on *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013), also is misplaced. There, the Court's holding was expressly premised on the fact that, *at the same time* of a dispute with a top four customer that terminated a contract, the company publicly touted its relationship ***with the specific counterparty***. Moreover, the counterparty represented over 18 percent of the company's total revenue, the company publicly discussed the importance of that counterparty, and revelation of the termination led to a one-day 26 percent drop in the stock price. No such allegations exist here. WWE's statements in the Class Period discussed efforts to renew in key *markets*, the allegations do not support that the OSN deal (for only pay-tv in this region) was material to WWE, and WWE's stock price *rose* when the OSN termination was announced. Similarly, in trying to downplay Defendants' cautionary language disclosures—which directly and prominently addressed the risk of not entering into key deals, the risks associated with uncertain international markets, and the non-binding nature of agreements in principle—Plaintiff cites cases that involved markedly more generic warnings. *See* Opp. 27-28.

***Second***, the cases cited by Plaintiff do not support any inference of scienter—much less a strong one. Plaintiff admits that the CAC does not identify a ***single*** document, conversation, meeting, or other fact tying knowledge of Plaintiff's speculative allegations to any Defendant. Nor does Plaintiff dispute that it has not pled ***any*** facts regarding the content or substance of any negotiations. Plaintiff argues that it is not required to establish scienter solely through these means,

---

[12] For example, Plaintiff quotes a statement that "it's fair to say that all the agreements will be completed substantively by the middle of the year," but omits that the sentence began with the phrase "I think" and was surrounded by context about uncertainty regarding predictions. Ex. 8.

9

citing *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, but that case involved detailed allegations from six CWs who worked at the defendant company and offered facts about what the individual defendants knew based on personal conversations, direct interactions with defendants, and meetings in the relevant division. 875 F. Supp. 2d 359, 369-71 (S.D.N.Y. 2012). The Court's decision turned on these direct allegations tying knowledge to the individual defendants, including direct interaction with CWs. *Id.* CW-1 and CW-2 offer no such allegations.

***Third,*** the CAC's allegations as to stock sales are insufficient to plead scienter (Mot. 36-38), and Plaintiff's cases are easily distinguishable.[13] Plaintiff also admits in the Opposition that it did not plead net profits, and its attempt to add these allegations in the Opposition is improper.[14]

***Fourth***, as to the "core operations" doctrine, it remains unresolved in the Second Circuit whether this doctrine survived the PSLRA and, to the extent it has, courts have indicated it "at most constitutes 'supplemental support' for alleging scienter but does not independently establish scienter."[15] Moreover, "courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on the 'core operations doctrine.'"[16] Plaintiff does not (and cannot) make such an allegation as to the MENA media rights deal.

---

[13] *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) (involving sales of 92, 83, and 68 percent of defendants' holdings, plus publicly admitted misconduct); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (defendant sold 97% of holdings); *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 91, 101 (S.D.N.Y. 2006) (defendant sold over 80% of holdings, plus internal CWs and "scathing" government investigation report).

[14] *See Kiryas Joel All.*, 2011 WL5995057, at *5.

[15] *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (citation omitted); *see also Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020) (allegations of core operations insufficient on their own); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 596 (S.D.N.Y. 2011) (scienter not pled from "mere fact that the WoW Contract was at the core of defendants' business").

[16] *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (noting that "the thrust of the case law indicates continued movement away from the doctrine").

10

| | |
|---|---|
| Dated: July 21, 2020 | Respectfully submitted, |
| | |
| | */s/  Jerry S. McDevitt* |
| Stephen G. Topetzes (*pro hac vice*) | **K&L GATES LLP** |
| Theodore L. Kornobis | Jerry S. McDevitt (*pro hac vice*) |
| **K&L GATES LLP** | 210 Sixth Street |
| 1601 K Street, NW | Pittsburgh, PA 15222 |
| Washington, DC  20006 | Phone:   (412) 355-6500 |
| Phone:   (202) 778-9000 | Fax:       (412) 355-6501 |
| Fax:       (202) 778-9100 | jerry.mcdevitt@klgates.com |
| stephen.topetzes@klgates.com | |
| ted.kornobis@klgates.com | |
| | Joanna A. Diakos |
| | **K&L GATES LLP** |
| | 599 Lexington Avenue |
| | New York, NY 10022 |
| | Phone:   (212) 536-4807 |
| | Fax:       (212) 536-3901 |
| | joanna.diakos@klgates.com |

*Attorneys for Defendants World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios, and Michelle D. Wilson*