UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
CITY OF WARREN POLICE & FIRE
RETIREMENT SYSTEM,
individually and on behalf of
all others similarly
situated,

          Plaintiff,

          -against-

WORLD WRESTLING ENTERTAINMENT
INC. et al,

          Defendants.
```

20-cv-2031 (JSR)

ORDER

JED S. RAKOFF, U.S.D.J.

Lead Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust brings a putative class action against defendants World Wrestling Entertainment, Inc. ("WWE"), its CEO Vincent K. McMahon, and its former Co-Presidents George A. Barrios and Michelle D. Wilson for alleged securities fraud based on defendants' purported misrepresentations about its media contracts in the Middle East and North Africa. Defendants have now moved to dismiss plaintiff's consolidated amended complaint ("CAC" or "the complaint") for failure to state a claim under Rule 12(b)(6). Ultimately, however, none of defendants' numerous arguments succeeds. Basically, this is because the complaint, while not a model of clarity, adequately

1

alleges an overall claim of securities fraud that is not only plausible, but also complies with the relevant heightened pleading requirements applicable to this kind of action.

I.   The Complaint's Allegations

WWE is an international sports entertainment and media organization, CAC ¶¶ 41-45, the growth of which has been partly fueled in recent years by expansion into international markets, id. ¶¶ 67-69. The complaint's allegations surround WWE's recent expansion into the region comprising the Middle East and North Africa ("MENA"), id. ¶¶ 70-85, and, particularly, its representations surrounding the status of its media rights agreements in the MENA region during the class period of February 7, 2019 to February 5, 2020. The complaint alleges that prior to the class period, in 2014, WWE signed a five-year media rights contract (the "OSN Agreement") with the Orbit Showcase Network ("OSN"), a TV provider operating in the MENA region. Id. ¶ 72. In March 2018, WWE announced that it had separately signed a 10-year partnership with the Saudi General Sports Authority to hold large wrestling events in the Kingdom of Saudi Arabia ("Saudi Arabia") that it intended to broadcast. Id. ¶ 73-75. Plaintiff alleges that although this latter partnership was somewhat controversial, id. ¶¶ 91-99, 106-17, it proved highly lucrative for WWE, id. ¶ 101-05, 118-20, and was emblematic of

WWE's increasing dependence on its international media rights agreements as a source of growth. Id. ¶¶ 139-43.

As a consequence, the complaint alleges, investor attention in early 2019 was focused on a number of international media rights agreements that were nearing expiration, id. ¶ 9, and that WWE assured investors would be renewed on favorable terms, id. ¶¶ 149-50. One such agreement was the OSN Agreement, which was originally set to expire at the end of 2019. Id. ¶ 151. Unbeknownst to investors, however, OSN informed WWE in November 2018 that it would not renew the agreement, and WWE and OSN entered into a termination agreement on December 18, 2018, formally ending the contract nine months early, effective March 31, 2019. Id. ¶¶ 154-56. Plaintiff alleges that the defendants not only did not inform the market of these developments until late July of 2019, but, instead, falsely told investors that WWE was working on "renewing" its MENA region media rights agreement. Id. ¶ 158.

Furthermore, according to the complaint, when WWE finally disclosed on July 25, 2019, the previously undisclosed early termination of the OSN Agreement, WWE sought to blunt the impact of this news by simultaneously announcing that it had reached an agreement "in principle" with the Saudi government for a media rights agreement for the MENA region that would be finalized "very soon." Id. ¶¶ 165-68. Plaintiff alleges that this

announcement was likewise false, and that strong circumstantial evidence shows that the parties were at the time actually far apart in their negotiations and had failed to agree to key terms. Id. ¶¶ 188-95.

The complaint further alleges that WWE's difficulties securing a media rights agreement in the MENA region led not only to disappointing earnings figures in October 2019, but also the abrupt departure of defendants Barrios and Wilson from the leadership of WWE in January 2020. It was not until February 6, 2020, however, that WWE announced that its disappointing performance in 2019 resulted from its failure to complete a media agreement with Saudi Arabia. Id. ¶ 182. WWE then also revealed its anticipation that it would not complete such an agreement in 2020 either. Id.

Finally, the complaint alleges that the defendants' misrepresentations and omissions relating to its MENA agreements during the class period amounted to a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Moreover, plaintiff alleges that the involvement of the three individual defendants (described in more detail below) amounted to a violation of Section 20(a) of the Exchange Act.

Defendants now move to dismiss the amended complaint in its entirety for failure to state a claim under Rule 12(b)(6).

4

II.  Legal Standard

In general, for a claim to survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). After discarding allegations that amount to nothing more than legal conclusions, see Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), the court should "accept as true" what remains and "draw all reasonable inferences in plaintiff's favor." Beazley Ins. Co., Inc. v. Ace American Ins. Co., 150 F. Supp. 3d 345, 354 (S.D.N.Y. 2015) (citing In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) (per curiam)). The net result must be "enough to raise a right to relief above the speculative level" for the claim to survive. Twombly, 550 U.S. at 555.

In addition, a complaint alleging securities fraud must satisfy the heightened pleading requirements of both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). The former requires the complaint to state "with particularity the circumstances constituting fraud," Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted), while the latter extends the heightened pleading requirement to the requirement of pleading allegations that strongly imply fraudulent intent.

5

III. <u>Alleged Violation of Rule 10b-5</u>

SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Thus, to avoid dismissal under Rule 10b-5 a complaint must allege: "(1) a material misrepresentation or [actionable] omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Stoneridge Inv. Partners, LLC v. Sci.-Atlanta</u>, 552 U.S. 148, 157 (2008). Defendants move to dismiss plaintiff's Rule 10b-5 claim on the ground that the CAC (A) does not adequately plead any actionable misrepresentations or omissions, (B) does not plead Defendants' scienter sufficiently to meet the heightened pleading standards applicable to the claims, and (C) does not demonstrate loss causation. The Court considers each in turn.

A. <u>Misrepresentations and Omissions</u>

Defendants first move to dismiss plaintiff's Rule 10b-5 claim on the ground that the CAC fails to allege any actionable misrepresentations or omissions. As mentioned, Rule 10b-5 makes

it unlawful both to "make any untrue statement of a material fact," and to "omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b). Thus, the CAC may state a claim either by alleging a false statement or by alleging a "half-truth," that is, a "literally true statement[] that create[s] a materially misleading impression" by omitting certain information. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 240 (2d Cir. 2016). Although the CAC alleges numerous purported misrepresentations, they can be grouped into two broad categories: misrepresentations related to the status of the OSN Agreement; and misrepresentations related to the status of a replacement media rights agreement with Saudi Arabia. While each group might support a separate 10b-5 claim, the CAC alleges that they are connected in that they both served to disguise the material difficulties WWE was experiencing in providing media outlets for its MENA events and prospective MENA audience.

## 1. Particularity of the Allegations

Defendants first argue that the CAC does not plead any misrepresentation whatsoever with the particularity required by Rule 9(b) and the PSLRA, because it does not state with particularity "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), in terms of the relevant audience "reasonable investor[s]." Kleinman v. Elan Corp., PLC,

706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). The Court
finds, however, that the CAC does provide the requisite
particularity as to both groups of alleged misrepresentation.

2. Misrepresentations Regarding the OSN Agreement

For purposes of this motion, it is undisputed that
defendants did not disclose until July 2019 that the OSN
Agreement, due to expire at the end of 2019, had been formally
terminated as of March 31, 2019 as a result of a termination
agreement signed in December 2018. The question then is what
statements made by defendants in the interim were rendered
misleading by this nondisclosure. The complaint primarily
focuses in this regard on the numerous statements made by
defendant Barrios, then Co-President of WWE, in a February 2019
earnings call in which he explained that WWE was "working on"
the "rights renewal process outside the U.S." in "key markets"
including "the Middle East." CAC ¶ 226; see also id. ¶ 229 ("We
do want to get the international renewals completed."). The CAC
also points to statements by the WWE and individual defendants
in a February 2019 press release, an April 2019 earnings
conference, and a public presentations in May and June 2019
where they suggested that MENA media rights negotiations were
ongoing. Id. ¶¶ 237, 246, 251, 253. The CAC alleges that these
statements were misleading because at the time they were made,
OSN had already informed WWE "that it would not renew its media

8

rights agreement and the parties had entered into a settlement .
. . meaning that renewal of that particular media agreement . .
. was impossible." Id. ¶ 234(a). Plaintiff alleges that the
suggestion that WWE was working on "renewals" in the MENA region
and that such negotiations were "ongoing" is inconsistent with
defendants' knowledge of such early termination and the
unlikelihood of any replacement agreement with OSN or anyone
else in the immediate future.

　　As mentioned, defendants do not dispute that they had
agreed to early termination of the OSN Agreement and were aware
by late 2018 that it would not be renewed; but they offer the
rather extraordinary argument that their statements that they
were working on "renewals" was not misleading because the word
"renewal" is supposedly a "term[] of art in the broadcasting
industry" that was used "to refer to distribution rights in a
particular market, not with any particular counterparty." Mem.
of Law in Support of Defendants' Motion to Dismiss ("Deft.
Mem.") at 19, ECF No. 59. Defendants argue that plaintiff and
other investors would have known this special meaning based on
other prior statements by defendants, and thus that plaintiff
could not have reasonably believed that defendants were
negotiating with or planning to renew an agreement with OSN, id.
at 20, even though that was the only previously-existing

agreement and therefore the only one that could be "renewed" in ordinary English.

Quite aside from its facial implausibility, this argument exemplifies a gross misunderstanding of the applicable heightened pleading requirements that pervades defendants' briefing. While Rule 9(b) and the PSLRA require a plaintiff to allege fraud with particularity, they in no way dispose of the traditional rule that, at the motion to dismiss stage, the Court accepts as true the complaint's well-pleaded allegations of fact and draws all reasonable inferences in plaintiff's favor, and is prohibited from engaging in any fact finding of its own. See Palin v. New York Times Co., 940 F.3d 804, 810-11 (2d Cir. 2019). Thus, rather than resolve the factual dispute over whether plaintiff should have understood the word "renewal" to carry a special meaning in this context, the Court must assume, as the complaint asserts, that it carries its ordinary meaning. Under this assumption, a reasonable investor could have interpreted defendants' discussions of "renewal" in the MENA region to indicate WWE was working with OSN to renew its preexisting distribution agreement since there was no other agreement to renew. Given WWE could not have been engaged in such renewal negotiations at the time because OSN had already terminated the agreement, the complaint has adequately explained

with particularity why defendants' "renewal" and "ongoing"
negotiation statements were false and misleading.

Independently, the complaint alleges, as part of the first
group of misrepresentations, that a risk disclosure included in
WWE's 2018 Form 10-K, issued on February 7, 2019, was
misleading. The disclosure warned of the risk that "failure to
maintain or renew key agreements could adversely affect our
ability to distribute our media content," and that "failure to
maintain (such as due to a breach or alleged breach by either
party) or renew arrangements with distributors and platforms . .
. could adversely affect our financial outlook, liquidity,
business and operating results." CAC ¶ 232. Plaintiff alleges
this was misleading because defendants already knew that one of
its "key" agreements, the OSN Agreement, had been terminated in
February 2019 and thus that this risk had already materialized.
Id. ¶¶ 234(a), 235.

Defendants argue that the disclosure was not misleading
because the disclosure "related to the potential effect on the
Company's ability to distribute its media content and the
potential resulting adverse effect on operating results" of the
termination of an agreement (a risk that had not occurred), not
the risk of the failure to maintain an agreement itself (a risk
that had occurred). Deft. Mem. at 22. Defendants rely for this
proposition on a Third Circuit case regarding a risk disclosure

11

that stated "if any of our independent distributors were to cease to do business with us, our sales could be adversely affected." Williams v. Globus Med., Inc., 869 F.3d 235, 242 (3d Cir. 2017). The Third Circuit held that this statement warned investors of "the risk of adverse effects on sales -- not simply the loss of independent distributors general." Id.

Even if this precedent were binding on this Court (which it is not), it does not, in any case, support defendants' argument. This is because the allegations of the CAC are far more particularized than the broad statement at issue in Williams. Specifically, the CAC alleges that the defendants' failure to reveal the termination of the OSN Agreement not only "adversely affect[ed] [WWE's] financial outlook, liquidity, business and operating results," CAC ¶ 232, but more particularly left WWE "scrambling to find a replacement partner," id. ¶ 163, and "put in serious jeopardy the ability to finalize a media rights agreement for the MENA region by the end of 2019," id. ¶ 234(a). Given the alleged importance of a MENA agreement to WWE's financial projections, e.g., id. ¶¶ 149, 226, plaintiff has thus adequately alleged with particularity not only that WWE failed to disclose its inability to renew a key agreement, but also that this failure had adversely affected WWE's "financial outlook" by February 2019. Plaintiff has thus alleged with

particularity why the February 2019 risk disclosure statement was misleading.

With respect to all the foregoing misrepresentations about the status of the OSN Agreement, defendants finally argue that plaintiff has not demonstrated that any alleged OSN-related misrepresentation was material. Defendants assert that early termination of the OSN Agreement was not material to investors because WWE had other relationships in the MENA region and that, moreover, the MENA agreements did not comprise as substantial a portion of revenue as plaintiff alleges. Deft. Mem. at 20-21; Deft. Reply at 1-2. At the Rule 12(b)(6) stage, however, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted). Given the complaint's repeated and particularized allegations of the importance of media rights agreements in the MENA region to WWE's financial outlook, e.g., CAC ¶¶ 149, 226 -- allegations that the Court again must accept as true at this stage -- the status of the OSN Agreement specifically is not so "obviously unimportant" as to justify dismissal on grounds of lack of materiality.

3. Misrepresentations Regarding Saudi Arabia Agreement

The CAC also alleges that numerous statements defendants made in 2019 indicating that a media rights agreement with Saudi Arabia was underway and soon to be completed were misleading. See CAC ¶¶ 255, 256, 257, 260, 261-62, 267, 269, 271-72, 279, 283, 285. The primary statements plaintiff relies on are from July 25, 2019, when WWE released its financial results report for the second quarter of 2019 and held a conference call for analysts, media representatives and investors in which defendants McMahon, Wilson and Barrios participated. Id. ¶¶ 255-57. In the report, WWE stated that it "believe[d] it ha[d] agreements in principle with the Saudi General Sports Authority on the broad terms for" "a media rights deal in the MENA region." CAC ¶ 256. On the conference call thereafter, plaintiff alleges that McMahon stated "we are going to be close to announcing [the] deal very soon," id. ¶ 257. Plaintiff alleges that these statements could not have been true given "how far apart the parties were at this point during their negotiations," id. ¶ 264(a), and the extent to which WWE's "relationship with the Saudi government was under stress," id. ¶ 264(b). Plaintiff further alleges that the motive for these false statements was to blunt the impact of the simultaneous belated disclosure of the termination of the OSN Agreement, id. ¶ 14, thus connecting the two groups of false statements in one overall fraudulent scheme. In effect, according to the complaint, WWE was telling

14

investors not to worry about the termination of the OSN Agreement because it was about to be replaced by a comparable agreement with Saudi Arabia.

Plaintiff first supports its claim that defendants' statements about the imminence of a media rights agreement with Saudi Arabia were misleading by providing testimony from a confidential witness ("CW-1") regarding the distance between the parties during their negotiations. Plaintiff alleges that CW-1 is a former employee of MBC, a media company partially owned by Saudi Arabia that was charged with negotiating on Saudi Arabia's behalf the proposed media agreement with WWE. Id. ¶¶ 189-91. Plaintiff alleges that when CW-1 joined MBC in the fall of 2019, he worked on a feasibility study related to a possible broadcast partnership between WWE and MBC, estimating the "value of the partnership" between the companies. Id. ¶ 192. According to the CAC, CW-1 reported that in Fall 2019, MBC and WWE "were still worlds apart in terms of projected WWE subscribers as well as the annual licensing fees" by tens of millions of subscribers and dollars. Id. ¶ 193-94. Plaintiff alleges that this testimony indicates that in July 2019 WWE could not, contrary to its representation, have "believe[d] it ha[d] an agreement[] in principle with the Saudi General Sports Authority on the broad terms for" "a media rights deal in the MENA region" and likewise

had no basis to believe any such deal would be completed in 2019.

As an initial matter, and contrary to defendants' claim, the Court may properly take account of the alleged testimony of CW-1, even though some of his testimony is based on hearsay and indirect knowledge. For a complaint to rely on information provided by confidential sources, such a source need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000). This liberal standard make sense; the heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible. Here, the CAC alleges that CW-1 worked for the company negotiating on Saudi Arabia's behalf, worked specifically on analysis related to the contemplated media rights agreement, and talked to others at MBC about developments in the deal during his time at MBC. CAC ¶¶ 192-95. It is thus probable that CW-1 would have had access to information about the prior status of the MBC deal.[1] The Court may thus take account of on CW-1's testimony.

_____

[1] The cases defendants cite to try to contradict this point, aside from not being binding on this Court, are easily

When credited, CW-1's testimony supports the notion that WWE's stated belief that it had an "agreement in principle" for the MENA region in July 2019 was false and misleading. Drawing all reasonable inferences in plaintiff's favor, the fact that the parties had not agreed on fundamental terms of a contract by the Fall 2019 strongly supports the inference that the defendants could not have had a near-final agreement a few months earlier.

Defendants counter that no reasonable investor could have been misled in light of WWE's concurrent warning that the "understanding [wa]s nonbinding," that it was "possible" that the "businesses development[] [would] not occur on expected terms," and that there would be a financial downside if this occurred. Reply Mem. of Law in Support of Defendants' Motion to Dismiss ("Deft. Reply") at 4, ECF No. 66. While these words of caution warn that the announced "agreement in principle" might not come to fruition in its precise form, however, they do not

---

distinguishable. In <u>Long Miao v. Fanhua, Inc.</u>, No. 18-cv-8183 (PAE), 2020 WL 996602, at *19 (S.D.N.Y. Mar. 2, 2020), the Court there held that confidential witnesses were not described with enough particularity because the description of their role could have fit almost any person at the company, the complaint provided no description of the source of their knowledge, and the reported statements were "entirely unmoored in time" -- all unlike the statements here. In <u>Glaser v. The9, Ltd.</u>, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011), the Court there did not credit a confidential witness's testimony because it appeared to rely solely and exclusively on second-hand information, again unlike the testimony of CW-1.

warn of the misrepresentation that plaintiff complains of: that there was never an agreement in principle between the parties to begin with. Accordingly, CW-1's testimony supports with particularity the claim that WWE's statements about the status of a replacement media rights agreement were misleading.

Plaintiff's allegations that there was an undisclosed deteriorating relationship between Saudi Arabia and WWE also support its claim that defendants' statements about the imminence of a replacement media rights agreement were misleading. Plaintiff alleges that tension between the parties began when the Saudi government failed to make a timely payment of about $60 million to WWE for a June 2019 event WWE held in Saudi Arabia. CAC ¶¶ 214, 264(b), 275(b), 281(b). This tension escalated in October 2019, when WWE held an event entitled "Crown Jewel" in Saudi Arabia. Id. ¶ 281(c). Plaintiff claims that in retaliation for the late payments, defendant McMahon cut the live feed for the Crown Jewel event, which angered the Crown Prince of Saudi Arabia. Id. ¶ 218. As a result, according to plaintiff, the Crown Prince refused to let certain wrestlers leave the country, holding them "hostage" for some hours in an airplane before letting them take off. Id. at ¶¶ 215-22. The CAC relies for these latter allegations on the testimony of an unnamed former wrestler for WWE ("CW-2") who was allegedly on

the flight delayed by the Crown Prince. The CAC also relies on news sources reporting the incident. Id. ¶¶ 209-12, 216-21.

Defendants dedicate much of their briefing to disputing the truth of these allegations, suggesting that the relationship between Saudi Arabia was amicable throughout the class period. Deft. Mem. at 15-18. As previously explained, however, the Court must accept as true the complaint's well-pleaded allegations, without regard to defendants' competing accounts. For the same reason, the Court is unmoved by defendants' protestations that plaintiff's allegations are based on hearsay and unreliable news sources. Id. at 16-18. While the quality of supporting evidence may impact plausibility of a plaintiff's claim, a plaintiff need not offer admissible proof of its allegations for the Court accept them as true at this stage. Once appropriately accepted as true, plaintiff's allegations about the deteriorating relationship between WWE and Saudi Arabia plausibly support plaintiff's claims that WWE's statements were misleading. Parties with a relationship as unworkably tense as plaintiff describes are unlikely to have reached an "agreement in principle" at any point. Taken together with plaintiff's allegations that the parties had not even agreed to basic terms of a contract by Fall 2019, this second allegation supports with particularity plaintiff's claims that the defendants' statements about the status of a replacement MENA deal were misleading.

19

4. <u>Statements of Opinion</u>

Defendants next argue that many of the alleged misrepresentations are nonetheless inactionable because they "involve statements of opinion." Deft. Mem. at 23. A plaintiff may base its fraud allegations on a defendant's statement of opinion only where it "contain[s] one or more embedded factual statements that can be proven false" or "implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted." <u>Abramson v. Newlink Genetics Corp.</u>, No. 19-642-CV, 2020 WL 3956263, at *5 (2d Cir. July 13, 2020). But this standard is here met with regard to both groups of misrepresentations, as the following examples illustrate.

First, with regard to the OSN Agreement, defendants' statement that WWE was "working on" the "rights renewal process outside the U.S." in "key markets" including "the Middle East" is actionable, even to the extent it is an opinion. CAC ¶ 226. Defendants appear to suggest that the words "working on" render anything that follows a statement of opinion. Deft. Mem. at 24. But even if this were the case (which is doubtful), it is clear that what plaintiff challenges about this statement is an "embedded factual statement[] that can be proven false." <u>Abramson</u>, 2020 WL 3956263, at *5. As described above, plaintiff challenges as demonstrably false defendants' suggestion that any

20

"renewal" process was ongoing because OSN had already told WWE that it would not renew the media rights agreement. Thus, this statement is actionable, even if it is an opinion. Further, WWE's inadequate risk disclosure statement, warning that "failure to maintain . . . or renew arrangements with distributors and platforms . . . could adversely affect our financial outlook, liquidity, business and operating results" but not revealing that the OSN Agreement had already been cancelled, id. ¶ 232, is not an opinion statement, nor do defendants provide any explanation for how it supposedly might be.

Second, with regard to the status of the Saudi Arabia replacement agreement, defendants' statement that WWE "believe[d] it ha[d] agreements in principle with the Saudi General Sports Authority on the broad terms for" "a media rights deal in the MENA region," is actionable. CAC ¶ 256. It is true that the use of the word "believe" renders the statement an opinion. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 183 (2015). However, such an opinion can still form the basis of plaintiff's claim if plaintiff "can identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." Id. at 194. Here, as described

21

above, plaintiff provides the testimony of CW-1 as well as
allegations about the state of the relationship between WWE and
Saudi Arabia that, if taken as true, lead to the plausible
inference that WWE had failed to reach anything approaching an
agreement in principle in July 2019. Thus, plaintiff has
plausibly alleged that WWE's statement, even though cabined with
the phrase "I believe," did not "fairly align[] with the
information in the issuer's possession at the time" and was thus
misleading. Id. at 189.

Defendants' further argument that, evaluated in context,
this latter statement could not have been misleading because it
was cabined by cautionary language is unpersuasive. See id. at
190 (holding that statements must be read "in light of all its
surrounding text, including hedges, disclaimers, and apparently
conflicting information"). Indeed, some of the language that
defendants suggest is cautionary -- such as the statement that
"this understanding is nonbinding" and might "not occur on
expected terms," and even WWE's projection of the financial
downside of the agreement falling through -- only implies more
strongly that an agreement with specific terms had been reached.
CAC ¶ 256.

No more persuasive is defendants' reliance on some cases
where courts have held there was no misrepresentation where a
statement related to an ongoing negotiation. For example, in In

22

re Express Scripts Holdings Co. Sec. Litig., 773 F. App'x 9, 13
(2d Cir. 2019), the plaintiffs challenged statements that
company's relationship with its partner was "great . . . very,
very solid"; that it "really enjoys" its relationship, which is
"business as usual" and a "two-way street"; that it was "excited
to continue productive discussions" with the partner; and that
it was "actively engaged in good faith discussions with" the
partner. These statements are far vaguer, and thus much less
likely to mislead a reasonable investor than a concrete
statement that there was an "agreement in principle."

In short, without multiplying examples, it is clear that
plaintiff has alleged at least some misrepresentations that are
actionable, even if opinion statements in part.

5. PSLRA Safe Harbor

Defendants next argue that certain allegedly misleading
statements are inactionable because they fall within the PSLRA
safe harbor for certain "forward-looking statements." In re
Vivendi, 838 F.3d at 245 (citing 15 U.S.C. § 78u-5(c)). This
argument in unpersuasive because none of the alleged
misrepresentations -- WWE's risk disclosure, its statement that
it was "working on" the "rights renewal process outside the
U.S.," CAC ¶ 226, and its statement that it "believe[d] it ha[d]
agreements in principle" with Saudi Arabia, CAC ¶ 256 -- was
"forward-looking." Plaintiff does not allege that these

23

statements were misleading because they described a future that
did not come to pass, but instead because they misrepresented
present facts: that it was possible to renew the already-
terminated OSN Agreement and that WWE had already reached an
agreement in principle with Saudi Arabia. Thus, the PSLRA safe
harbor does not apply, and the CAC successfully alleges at least
some actionable misrepresentations.

B. Scienter

Defendants argue that even if the CAC has adequately
alleged some misrepresentations, the Court should still dismiss
the CAC because it fails to allege scienter. The PSLRA requires
that a complaint alleging securities fraud "state with
particularity facts giving rise to a strong inference that the
defendant[s] acted with the required state of mind." 15 U.S.C. §
78u-4(b)(2). A complaint meets this standard "if a reasonable
person would deem the inference of scienter cogent and at least
as compelling as any opposing inference one could draw from the
facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308, 324 (2007). The scienter requirement is met where
a complaint alleges facts showing either "1) a motive and
opportunity to commit the fraud; or 2) strong circumstantial
evidence of conscious misbehavior or recklessness." Employees'
Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d

297, 306 (2d Cir. 2015). Here, plaintiff has adequately alleged scienter as to the alleged misrepresentations.

### 1. OSN Agreement Statements

First, plaintiff points to both circumstantial and motive and opportunity evidence as to the purported misrepresentations about the renewal of the OSN Agreement. Circumstantial evidence of scienter includes, inter alia, evidence that defendants "knew facts or had access to information suggesting that their public statements were not accurate." Id. Plaintiff argues that defendants' own admission -- through the declaration of WWE's Vice President and General Manager, ECF No. 60-2 -- that WWE agreed to the early termination of the OSN Agreement in November 2018 constitutes evidence that defendants must have known or recklessly disregarded that their statements regarding the "renewal" of the MENA media rights agreement were false. CAC ¶¶ 305-08. This admission by itself is enough to indicate that WWE was aware of the termination of the OSN Agreement and its inability to be renewed, given that WWE was a party to the negotiations ending the OSN Agreement. Moreover, given the individual defendants' senior positions at WWE -- namely, CEO (McMahon) and Co-Presidents (Barrios and Wilson) -- plus the alleged importance of the MENA media rights agreements to their employers' revenue, CAC ¶¶ 149, 226, and the defendants' alleged comments to investors on the status of these agreements, the

individual defendants either knew or recklessly disregarded this information as well.

Defendants counter that such knowledge cannot be attributed to any defendant because the CAC does not include reference to "any internal reports or documents, any WWE insider accounts, any communications involving Defendants, or a description of any meeting at which any of these supposedly omitted 'adverse facts' allegedly was discussed with Defendants." Deft. Mem. at 31. But even though in some circumstances "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," Novak, 216 F.3d at 309, this has no applicability where, as here, a representative of WWE has admitted that WWE itself negotiated, and thus must have been aware of, the early termination of the OSN Agreement, id. (stating that this rule applies where "public statements are consistent with reasonably available" information). Moreover, this admission itself discusses documentary evidence, including a "Notice of Material Breach" letter sent by WWE to OSN, a settlement proposal provided WWE by OSN, and a settlement agreement entered into by the parties, indicating that a number of internal document referenced the termination of the OSN Agreement. ECF No. 60-2. And even if this were not the case, it is virtually inconceivable that the CEO and Co-Presidents of WWE would not

26

have been aware of the formal termination by WWE of this important contract -- or so a reasonable jury could infer from the facts pleaded in the complaint. Accordingly, defendants' involvement in, or knowledge of, the early termination of the OSN Agreement constitutes circumstantial evidence supporting an inference of scienter as to the alleged misrepresentations about the OSN Agreement.

Additionally, as to defendant McMahon, the CAC provides evidence of "a motive and opportunity to commit the fraud," in the form, inter alia, of defendant McMahon's stock sales during the class period that supports a finding of scienter as to the OSN-related misrepresentations. Blanford, 794 F.3d at 306. "The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001). "Unusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." Id. (internal quotation marks and citation omitted). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." Id. at 74-75.

Plaintiff has successfully alleged that defendant McMahon's sales meet these standards. The CAC alleges that McMahon sold 3,204,427 shares of WWE stock during the class period for proceeds of more than $261 million, a very significant sum. CAC ¶ 337. Although this constituted only 10% of his shares, this sale was unusual in light of McMahon's past trading practices. Id. ¶ 343 (alleging that McMahon's sales in the class period were 10 times higher as compared to a control period). McMahon's March 27, 2019 sale was also suspiciously timed, as it occurred only few days before the OSN Agreement ended and a month before the issuance of lower-than-expected income projections for the second-quarter of 2019, which resulted in a drop in WWE's stock price. Id. ¶¶ 346, 371-72. Plaintiff alleges that it was the termination of the OSN Agreement that resulted in these lower projection, and thus that defendants' concealment of the termination of the OSN Agreement prior to the sale helped protect the value of the sale for McMahon. Id. ¶ 346. While defendants counter that McMahon only sold this stock to fund the creation of an additional sports league, Deft. Mem. at 36, this alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat this inference of scienter. In re EVCI Colleges Holding Corp. Sec. Litig., 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).

2. <u>Replacement Agreement Statements</u>

Second, plaintiff has alleged scienter as to the misrepresentations related to the replacement agreement with Saudi Arabia. As with the OSN related statements, there is circumstantial evidence that defendants "knew facts . . . suggesting that their public statements" about the replacement agreement "were not accurate." <u>Blanford</u>, 794 F.3d at 306. As detailed above, the testimony of CW-1 and CW-2 regarding the distance between WWE and Saudi Arabia on a media rights contract, and the tension between the parties, indicate that defendants' statements about the imminence of a media rights agreement with Saudi Arabia, including WWE's claim that "believe[d] it ha[d] an agreement[] in principle" in July of 2019, were false. While neither of the confidential witnesses is alleged to have direct knowledge of the defendants' state of mind, these allegations, particularly in light of the defendants' senior positions at WWE and the alleged importance of the MENA replacement agreement, support the proposition that not only WWE generally but also the individual defendants in particular knew or recklessly disregarded that their statement that there was in fact an agreement in principle was false.

Indeed, when taken in the context of the overarching scheme that plaintiff alleges, an inference of scienter as to the replacement deal statements is "at least as compelling as any

opposing inference one could draw from the facts alleged."

Tellabs, 551 U.S. at 324. Plaintiff does not allege merely that

defendants announced an agreement in principle without motive.

Rather, it alleges that this announcement came after WWE

suffered the unexpected early termination of its vital OSN

Agreement, which left WWE "scrambling to find a replacement

partner" in the MENA region. CAC ¶ 163. When defendants finally

revealed this troubling development after hiding it from

investors for months, plaintiff alleges that defendants

"shielded the impact of this news, and artificially maintained

the price of the stock, with their simultaneous" announcement of

an agreement in principle with Saudi Arabia. Id. ¶¶ 165-66. Such

allegations of motive, taken together with other circumstantial

evidence that defendants should have known the falsity of their

statements, perfectly plausibly supports an inference of

scienter embracing the entire alleged scheme. Accordingly, the

Court rejects defendants' arguments that the CAC fails to allege

scienter.

C. Loss Causation

Defendants also argue that plaintiff has failed to allege

loss causation. Loss causation requires that "the subject of the

fraudulent statement or omission [be] the cause of the actual

loss suffered." Suez Equity Inv., L.P. v. Toronto-Dominion Bank,

250 F.3d 87, 95 (2d Cir. 2001). A plaintiff may show loss

causation by alleging "(a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232-33 (2d Cir. 2014) (internal quotation marks and citation omitted). Here, the complaint plausibly alleges both kinds of loss causation. Plaintiff alleges, for example, that the lower-than-expected income projections WWE provided on April 25, 2019 reflected a partial materialization of the unknown risk that WWE would not receive revenues associated with the cancelled OSN Agreement, which had been terminated effective March 31, 2019. CAC ¶¶ 371-73. Plaintiff further alleges that revelations about the failed media rights deal for the MENA region on October 31, 2019, January 30, 2020, and February 6, 2020 caused the stock price to decline. See CAC ¶¶ 374-76, 377-79, 380-82. Accordingly, plaintiff has alleged loss causation.

IV.   Alleged Violation of Section 20(a)

Defendants lastly argue that plaintiff has failed to allege a Section 20(a) claim against the individual defendants. To survive dismissal under Section 20(a) of the Exchange Act a plaintiff must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the

31

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007). But defendants here argue only that plaintiff's Section 20(a) claim fails because there was no primary violation and none of the defendants acted with scienter. However, as indicated above, plaintiff has alleged both a primary violation and scienter as to all the individual defendants. Accordingly, plaintiff's Section 20(a) claim survives.

V.   Conclusion

While defendants have trotted out a virtual herd of objections to the CAC, on close inspection none is a winner. For the forgoing reasons, the CAC successfully states both a Rule 10b-5 and a Section 20(a) claim against all defendants, and, accordingly, defendants' motion to dismiss is denied in its entirety.

SO ORDERED.

Dated:   New York, NY

August 6, 2020

JED S. RAKOFF, U.S.D.J.