K7UHCITO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CITY OF WARREN, individually
    and on behalf of all others
4   similarly situated ,

5                Plaintiff,

6          v.                              20 Civ. 2031 (RK)

7   WORLD WRESTLING ENTERTAINMENT,
    et al.,
8                                          Oral Argument

9          Defendants.

10  ------------------------------x
                                           New York, N.Y.
11                                         July 30, 2020
                                           4:00 p.m.
12
    Before:
13
                        HON. JED S. RAKOFF,
14
                                           District Judge
15
                            APPEARANCES
16
    LABATON & SUCHAROW LLP
17       Attorneys for Plaintiff
    BY:  CAROL CECILIA VILLEGAS
18       CHRISTINE M. FOX

19  K&L GATES LLP
         Attorneys for Defendants
20  BY:  STEPHEN GREGORY TOPETZES

21

22

23

24

25

K7UHCITO

1            (The Court and all parties present telephonically)

2            THE COURT:  This is Judge Rakoff.  Would counsel

3    please identify themselves for the record.

4            MS. VILLEGAS:  Good afternoon, your Honor.  You have

5    Carol Villegas from Labaton Sucharow on behalf of the lead

6    plaintiffs and the class.

7            THE COURT:  Good afternoon.

8            MR. TOPETZES:  Good afternoon, your Honor.  Steve

9    Topetzes from K&L Gates on behalf of all of the defendants.

10            THE COURT:  Good afternoon.

11            We're here on oral argument on the motion to dismiss.

12    Let me hear first from moving counsel, then from responding

13    counsel.

14            MR. TOPETZES:  Thank you, your Honor.

15            We start by focusing on the PSLRA and its two pillars:

16    falsity and scienter.  The cornerstone of the story plaintiff

17    attempts to stitch together is the purported "deteriorating

18    relationship between WWE, World Wresting Entertainment, and the

19    Kingdom of Saudi Arabia."  I'd like to speak to that, as well

20    as the subject opinion statements and the use of confidential

21    witnesses in this particular case, all of which demonstrate

22    plaintiff has failed to make a particularized showing with

23    respect to falsity.  Then I would like to turn to scienter,

24    which we respectfully submit presents a discrete and

25    straightforward issue in this case because the complaint is

K7UHCITO

1    utterly devoid of specific allegations giving rise to a strong

2    inference that defendants acted with intent to deceive.

3         With respect to this central thesis of a deteriorating

4    relationship, plaintiff contends that the statements by

5    defendants were false and misleading because there was a

6    deteriorating relationship that included "growing tensions such

7    that things were 'boiling over' and the parties were 'embroiled

8    in conflict.'"  Based on those assertions, plaintiff says no

9    reasonable person could believe that a media rights deal for

10   the Middle East-North Africa region, the MENA region, could

11   occur.  Your Honor, all of that is pure speculation.  There is

12   no particularized allegation --

13        THE COURT:  I thought the gist of their complaint, so

14   far as falsity was concerned, was that, first, OSN had informed

15   WWE in November 2018 that it would not renew the agreement

16   between them which, according to plaintiffs, was an important

17   negative development that needed to be disclosed, but it wasn't

18   disclosed until months later.  And second, that when it was

19   disclosed, WWE tried to, in effect, blunt the negative impact

20   by simultaneously announcing that it had secured an agreement

21   in principle with the Saudi government for an agreement, a

22   media agreement, that would be completed very soon when, in

23   fact, according to plaintiffs, there was no such agreement in

24   principle, let alone something that would be completed very

25   soon.

K7UHCITO

1        So that's what I've understood to be the heart of the

2    allegations regarding falsity, the failure to disclose the

3    early termination of the first agreement and then in

4    conjunction with its disclosure months later, the

5    misrepresentation, alleged misrepresentation, of the status of

6    the negotiations with the Saudi government.

7            MR. TOPETZES:  Your Honor, if I could just address

8    both pieces of that?

9            THE COURT:  Yes.

10           MR. TOPETZES:  To put OSN in context and, again, with

11   reference to things of which the Court can take judicial notice

12   here at the initial pleading stage, in its Form 10-K for 2018

13   which was filed in early February 2019, the company stated that

14   it had a number of media rights deals that were "nearing the

15   end of their terms."  So in terms of the significance of OSN,

16   public disclosures reflect that of the company's more than half

17   a billion dollars in media rights deals, overwhelmingly it's

18   focused on U.S. distribution, only 79 million was up for

19   negotiation at that time.  And it's also clear that of that

20   79 million, the two largest pieces involved the UK and India.

21   Public disclosures did not reflect specifically where the MENA

22   region was ranked with respect to the distribution, but it's

23   important to note that OSN -- it's lower than the UK and India

24   which were taking up the largest parts of that 79 million, but

25   it's clear that OSN was just the pay TV distributor in the MENA

K7UHCITO

```
1   region.  NBC, which was a Saudi entity, was the partner with
2   respect to free TV.  We submit, with respect to that alleged
3   omission, that there are no particularized facts that provide
4   evidence that the omission was misleading, material, or
5   deceitful in any way.  As to the agreement in principle --
6           THE COURT:  Whoa, excuse me.  I think you're lumping
7   together two different things there.  Whether it was deceitful
8   is one issue; whether it is material is a separate issue.
9   Ultimately, plaintiffs, of course, would have to show both.
10  I'm not as clear that they have to show materiality at this
11  stage to the same heightened degree that they have to show
12  falsity.
13          MR. TOPETZES:  Yes, your Honor, and that's why we
14  focused on the falsity.  The statements by the company, the
15  alleged misstatements or misleading statements that contained
16  omission, talked in terms of markets, and the marketplace
17  understands that the company's media distribution arrangement,
18  or media rights deals, come and go.  Sometimes you renew or you
19  enter an agreement with an existing partner.  Sometimes you
20  find a current -- a new partner, and we've provided some
21  examples of that.  We don't think there was any falsity with
22  respect to the identified statements, and plaintiffs have not
23  identified or alleged anything that's particularized with
24  respect to why the statements made by the company were false.
25          As to the deteriorating relationship piece, which goes
```

K7UHCITO

```
1    to the agreement in principle, I started to say the complaint

2    is devoid of particularized allegations that support any of it

3    relative to the falsity of the statements concerning the

4    agreement in principle.  There's no internal document.  There's

5    no reference to a meeting or discussion.  There's no

6    confidential witness who had any interaction with the

7    defendants or who was involved in discussions between WWE and

8    Saudi Arabia.  Instead, plaintiff offers two confidential

9    witnesses, neither of whom had direct interaction with

10   defendants.  Plaintiff cites selectively to portions of three

11   declarations, three of six declarations, provided to it when it

12   was served with a Rule 11 motion.  Plaintiff makes a conclusory

13   assertion regarding late payments without any specifics, and

14   plaintiff cites to "news reports" that appeared on Internet

15   wrestling websites that travel in gossip and multiple layers of

16   hearsay and unverified statements from Twitter accounts, social

17   media postings.

18            In contrast to that, Judge, we submit there are facts

19   of which the Court can take judicial notice at the initial

20   pleading stage that cut squarely against any inference of a

21   deteriorating relationship.  In fact -- and this goes to the

22   falsity with respect to the agreement in principle and this, we

23   submit, manufactured notion that the defendants were trying to

24   blunt the fallout from OSN, which, incidentally, the Court can

25   observe the context of analysts and Wall Street coverage of the
```

K7UHCITO

1   company, none of which was particularly focused or not focused

2   at all on OSN -- the relationship between WWE and Saudi Arabia

3   expanded during the relevant period.  It's important to note,

4   Judge -- and our concern might get lost in the smoke screen

5   plaintiffs are trying to create here -- the company in July of

6   2019 announced two agreements in principle with the Kingdom of

7   Saudi Arabia.  One -- and both of them in a nonbinding form on

8   broad terms.  One of the agreements in principle pertained to

9   live events.  That was the bigger piece revenue-wise, and

10  that's the piece on which analysts and the markets seized for

11  the most part.  The second was a media rights deal.  One of

12  those two agreements in principle happened.  It was finalized.

13  It was announced in September of 2019.  The company had another

14  live event in Saudi Arabia in 2019 and still another event

15  earlier this year, in February of this year, in a pre-COVID-19

16  environment.

17          Plaintiff focuses on the October 31, 2019, Crown Jewel

18  event at which plaintiff claims tensions were boiling over such

19  that there was a cut feed and a hostage situation relative to

20  the return trip for WWE wrestlers and others.  The public

21  record, Judge, reflects that two business days later, on the

22  following Monday, November 4, 2019, WWE announced an expansion

23  of the relationship with the Kingdom of Saudi Arabia to include

24  two live events annually through calendar year 2027.  So

25  focusing on the falsity of the statements with respect to the

K7UHCITO

1    agreement in principle, far from a relationship deteriorating,

2    boiling over, and embroiled in conflict, the facts give rise to

3    a stronger inference that the relationship was growing.  The

4    facts also cut against the suggestion by plaintiff that no

5    reasonable person could have believed that a deal would be

6    completed, something they repeat over and over in the

7    complaint.  The more plausible inference is that the

8    defendants, we submit, honestly believed their optimistic

9    opinions which were caveated and which were updated throughout

10   the period.

11        I'd like to talk a little bit about those opinions,

12   and I know the Court is deeply experienced regarding all of

13   these issues, and make two threshold observations.  The first

14   is this is a fraud by hindsight case squarely.

15   Plaintiff's theory is no deal happened, so it must have been

16   fraud when you expressed optimism or made your statements

17   concerning your efforts to obtain a deal.  The other thing is

18   that the statements on which plaintiff is focused largely are

19   opinion statements.  As the Court is well aware, under *Sanofi*

20   and *Omnicare* related cases, the statements are only actionable

21   if the belief was not sincerely held or if the speaker omits

22   information, which omission makes a statement misleading to a

23   reasonable investor.

24        With respect to this point, the character of the

25   statements, I direct the Court to the language used by the

K7UHCITO

1   company in its discussions and negotiations -- regarding its

2   discussions or negotiations with Saudi Arabia.  Defendants told

3   the marketplace that discussions are ongoing, and the potential

4   deal is termed something that the company is still working on.

5   WWE stated that it believed it had agreements in principle, in

6   principle on broad terms, while making clear that the

7   understanding is nonbinding and that ultimate agreement may not

8   occur.  The company then went further, Judge, and informed

9   investors that if a deal did not occur, a likely downside would

10  be an adjustment to its OIBDA, operating income before

11  depreciation and amortization.

12          THE COURT:  So I agree with you that there are aspects

13  of opinion in that, but there's also a factual assertion.  If,

14  for example -- let's take a hypothetical, not this case -- but

15  if, in fact, two parties to a negotiation had said to each

16  other:  "We're nowhere near an agreement.  We disagree on

17  fundamental terms, but let's continue talking," and then one

18  party thereafter said, "The parties have reached an agreement

19  in principle on broad terms," why wouldn't that be a false

20  factual statement?

21          MR. TOPETZES:  It might be, Judge, and it might be

22  actionable or enough to survive this stage if it was supported

23  by particularized allegations.  There are no specific

24  allegations of any type regarding -- from people with firsthand

25  knowledge regarding the character or the state of the

K7UHCITO

1  negotiations.

2         THE COURT:  OK.

3         MR. TOPETZES:  The complaint --

4         THE COURT:  I'm sorry.  Go ahead.

5         MR. TOPETZES:  No, I apologize, your Honor.

6         THE COURT:  No, no.

7         MR. TOPETZES:  The complaint is devoid of factual

8  allegations, let alone particularized ones, that indicate

9  defendants did not believe the opinions contained in the

10  alleged statement.

11         THE COURT:  My point was -- is the statement "we've

12  reached agreement in principle" is partly a statement of an

13  opinion but partly a statement of fact.  You're saying that the

14  falsity of that, of the portion that is a statement of fact, is

15  in this complaint, according to you, not alleged with factual

16  particularity sufficient to meet the requirements of the PSLRA

17  and Rule 9(b).  So I understand that argument.

18         Now, you wanted to also talk about scienter?

19         MR. TOPETZES:  I do, Judge.  I also -- I did want to

20  talk about the confidential witnesses, but I'm happy to jump to

21  scienter.

22         THE COURT:  No, go ahead.  No, go talk about the

23  confidential witnesses.

24         MR. TOPETZES:  As the Court is aware, well aware,

25  confidential witnesses are a fact of life and an element of

K7UHCITO

this type of litigation which is lawyer-driven, and I know your

Honor is deeply experienced on all of these issues.

Respectfully, your Honor, we submit the confidential witness

presentation is especially thin and inadequate in this case.

Neither confidential witness alleges any connection to or

interaction with any defendant.  There are no specific

allegations forced by a confidential witness regarding any

communication with a defendant, any internal document,

communication or meeting or any purported disclosure statement,

events or matter or other matter or thing that creates a strong

inference that defendant did not believe any of the subject

statements.

Confidential witness No. 1 was not directly involved

in negotiations or discussions between World Wresting

Entertainment and Saudi Arabia and offers nothing as to what

the defendants knew.  He arrived later in the fall of 2019, so

he is in no position to comment on veracity or state of mind

questions connected to the company's July 25, 2019, statement.

Rather than present the confidential witness with relevant

firsthand knowledge, plaintiff makes sweeping and, we believe,

unpersuasive assertions in its opposition.  Among other things,

plaintiff says at page 18:  CW-1's allegations made clear that

there could not have been an agreement in principle in

July 2019.  Why?  How does that conclusory assertion reflect a

particularized allegation of fraud?

K7UHCITO

1          Your Honor, we submit courts historically and

2     consistently have required much more.  CW-1 was not at NBC.

3     And I note, and we highlight this in our reply, the company

4     announced an agreement in principle with the GSA, which is

5     another Saudi -- General Sports Authority, and was negotiating

6     and working with the General Entertainment Authority.  There's

7     no mention of NBC.  CW-1 worked at NBC, but he was, in any

8     event, not at NBC during the time that the announcement was

9     made with respect to the agreement in principle.

10          Plaintiff then makes the following assertion, and this

11    is truly sweeping:  Based on the way negotiations work at

12    NBC -- again, not the party with which WWE announced an

13    agreement in principle -- and WWE were far apart in the fall,

14    there's no way WWE could have believed it was close to a deal

15    in the summer with GSA.  Again, why, your Honor?  And how does

16    that sweeping unsupported assertion reflect a particularized

17    allegation of fraud?  It is incumbent on the plaintiff to plead

18    fraud with particularity.

19          The same is true regarding CW-2, purportedly a former

20    wrestler.  He offers, for the most part, a personalized

21    perspective regarding a scene at the airport in Saudi Arabia

22    following the Crown Jewel event on October 31, 2019, a

23    circumstance that allegedly involved a hostage situation.

24    Again, CW-2 offers nothing regarding what any defendant knew,

25    understood, said, or was told regarding any relevant matter or

K7UHCITO

1    thing connected to the relationship between WWE and the Kingdom

2    of Saudi Arabia.  Your Honor, respectfully, this is not *City of*

3    *Pontiac Retirement System v. Lockheed* or any number of other

4    cases where confidential witnesses provide a plausible basis to

5    permit a case to go forward.  In *Lockheed*, your Honor was

6    presented with six confidential witnesses who provided detailed

7    allegations with respect to personal conversations, direct

8    interactions with defendants, and --

9          THE COURT:  I take it with respect to CW-1, what I

10   took away from the papers was that CW-1 was involved in a later

11   stage of the negotiations and concluded that the parties at

12   that later stage were, I think the term was, "worlds apart."

13   And then the argument from plaintiff's counsel is that if they

14   were worlds apart months later, it stands to reason that they

15   could not have reached an agreement in principle months

16   earlier.

17          So what about that?

18          MR. TOPETZES:  There's nothing about the opinion or

19   the assessment of CW-1 that ascribes -- that can be ascribed to

20   any of the defendants.  CW-1 doesn't offer insight with respect

21   to the negotiations, had no communications with any of the

22   defendants, is not reporting with respect to communications

23   with the defendants.  CW-1 speaks in terms of an internal to

24   NBC -- again, not the party with which the corporate defendant

25   announced an agreement in principle -- but an internal to NBC

K7UHCITO

1    study regarding subscriber levels.  None of that is

2    particularized with respect to the state of mind of any of the

3    defendants and whether they believe their statement.

4           Unlike other cases, and the plaintiff cited *Lockheed*,

5    there's no texture here, Judge.  It's missing from the

6    allegations in the consolidated amended complaint, or as the

7    Second Circuit termed it recently in a case *Jackson v.*

8    *Abernathy*, which was decided about two months ago in late May,

9    there was connective tissue in *Lockheed*, for example, between a

10   witness statement and the alleged misstatement by the

11   defendant.  There is no connective tissue here, your Honor, not

12   in this very lengthy consolidated amended complaint.  There's

13   nothing that charges any of this to defendants in terms of

14   their knowledge, their having received contrary facts.  The

15   defendant Wilson, there's nary a mention of her with respect to

16   all of the pages of the complaint that talk about the alleged

17   deception and the statements.  She's listed as a participant on

18   earnings calls or conference calls with analysts or media

19   representatives, but none of the statements is attributed to

20   her that are allegedly misleading.

21          With respect to scienter, the Court again is very

22   familiar the PSLRA requires the plaintiff state with

23   particularity facts giving rise to a strong inference that

24   defendants acted with the requisite state of mind.  Here,

25   plaintiff's allegations lack any ties to defendants and what

K7UHCITO

1    they actually knew.  There are no specific allegations

2    regarding instances where defendants received contrary

3    information.  Again, Judge, the complaint is devoid of

4    references to internal reports or documents, insider accounts,

5    communications involving any of the defendants or a description

6    of any meeting or discussion during which adverse facts were

7    provided, communicated, or established.  Under Dyn- --

8         THE COURT:  Well, in the first group of allegations

9    relating to the undisclosed early termination of the agreement,

10   assuming for the purpose of assessing scienter that that ought

11   to have been disclosed and that the failure to disclose it was

12   misleading, how could it not be that the defendant knew and

13   chose not to disclose it by the nature of the allegations

14   there?  Moreover, there's the allegation that because the

15   purpose was to keep the price of the securities high, then at

16   least one of the defendants sold a substantial amount of stock

17   during that period.  So I'm not clear as to the first set what

18   more you think is necessary.

19        MR. TOPETZES:  Your Honor, speaking in terms of

20   scienter, with respect to the OSN early termination, there's

21   nothing that ties the facts surrounding that to the defendant.

22   Yes, it involved the corporation.  And I do want to get to

23   these collective scienter, corporate scienter, core operations

24   doctrine theories in which plaintiff seeks refuge in its

25   opposition, but there's nothing with respect to the alleged

K7UHCITO

1    omission regarding OSN that is tied to the defendants.  There's

2    no statement from an insider.  There's no document that

3    reflects that the defendant made a false statement with respect

4    to that because they had contrary information.  Again, neither

5    confidential witness is alleged to have interacted with any

6    defendant.

7          Again, your Honor, we submit the more plausible

8    inference is that plaintiff honestly believed the subject

9    statement and that nothing supports a strong inference of

10   recklessness, something that the Second Circuit in *Novak*

11   described as a state of mind approximating actual intent.

12   Other cases, Judge, where contrary findings have been made at

13   the motion to dismiss stage have consistently and

14   overwhelmingly involved more in the way of particular

15   allegations, particularized allegations, even as to the alleged

16   omission.  OSN and its profile in this litigation has morphed

17   and evolved some from the complaints that were originally filed

18   and assigned to your Honor, and now they're inflating it and

19   saying that this was a material omission without providing

20   specific facts related to materiality but without tying that

21   omission to the defendant.  Courts have consistently required

22   more that undermine the good faith -- in terms of

23   particularized allegations that undermine the good faith of

24   defendants.

25          I want to speak briefly regarding these other theories

K7UHCITO

that they've injected with respect to scienter because in

apparent recognition of the gap, the absence of particularized

allegations with respect to the defendants, in its opposition

plaintiff is seeking, as I said earlier, refuge in notions of

collective scienter or corporate scienter and the core

operations doctrine.  The core operations doctrine, Judge,

while not altogether rejected or entirely discounted in the

Second Circuit, it is largely disfavored.  It's not something

on which courts place great weight.  As the Second Circuit

again said recently in *Jackson v. Abernathy* in refusing the

embrace the core operations doctrine, in exceedingly rare

circumstances, a statement may be "so dramatic that collective

corporate scienter may be inferred," relying on *Dynex*.

        Judge, there's nothing about the omission here or the

statements with respect to the agreement in principle that rise

to that level.  Again, the court in *Jackson* said we require

connective tissue between the facts alleged or evidence,

witness statements, and the alleged misleading statements by

defendants.  Those elements are absent from the complaint here.

        Your Honor, the stakes are always high at this early

stage in these cases, as the Court is well aware.  So we

understandably approach this matters with spirit and with

energy because the impact on public companies and their

shareholders is so substantial, but we also come to you with

principle.  This is a strained effort by plaintiff.  It is

K7UHCITO

1   grounded in innuendo and unsupported surmise and this effort to

2   distort and amplify the OSN arrangement.  The company had media

3   distribution deals coming and going routinely over a period of

4   years.  It lacks particularity or connective tissue that would

5   support an indicia of fraud.  We respectfully submit the claim

6   should be dismissed in their entirety with prejudice.

7            THE COURT:  All right.  That was very helpful.  Let me

8   hear now from plaintiff's counsel.

9            MS. VILLEGAS:  Thank you, your Honor.  Carol Villegas

10  on behalf of plaintiff.

11            So this case is a little bit unusual in that some of

12  the information we do rely upon are declarations from some of

13  the WWE executives that defendants' counsel provided us with.

14  And I'd like to start with the OSN contract agreements because

15  I think they're very helpful for that part of the case.

16            There are a lot of facts that aren't in dispute, I

17  think, because we have these declarations from defendants.

18  This is an agreement that was entered into in 2014, and it was

19  supposed to go through the end of 2019.  There's some

20  specificity in their declarations about documents that they

21  received from OSN, a settlement agreement, and it was

22  ultimately terminated on December of 2018 with the last

23  effective date of the payments ending on March 2019.  So

24  there's no dispute that this agreement ended three quarters

25  early.

K7UHCITO

1          I think it's important when we go into the class

2     period to talk about the context of where WWE is.  They're in

3     the process of trying to renew and renegotiate a number of

4     international media rights agreements, and part of the reason

5     why the early termination was a material omission was because

6     of how significant these media rights deals are for the

7     company, and they specifically talked about that in the context

8     of the MENA region agreement.  If I could just point the Court

9     to a couple of statements that support the fact that this

10    agreement was important, it was something that defendants were

11    focused on, it was something analysts were focused on, and it

12    would have mattered to the market to know that an agreement in

13    a very important region for the market had been canceled three

14    quarters early and that there wasn't going to be an agreement

15    in place.

16         One of those paragraphs is paragraph 237 of the

17    complaint where defendant Barrios talks about the MENA

18    distribution rights agreement and he says:  "Locking those

19    agreements down is obviously important for us strategically

20    because our distributor -- distribution partners for the core

21    content is a key part of value creation for the business,

22    important for us financially."

23         So based on what he's saying, having these deals in

24    place is important, and if one of these deals is canceled

25    early, that's also important.

K7UHCITO

1       Just another statement made by the senior vice

2    president of investor relations also underscores this.  At

3    paragraph 253, the senior vice president is specifically

4    talking about the Middle East agreement in particular and says:

5    "So those are coming and important deal for us."  He's also

6    referring to the other international deals, but calls out the

7    Middle East specifically and says:  "We're not going to talk

8    terms, but there's really interesting elements of those that

9    become really important, the ability to expand reach through

10   elements like free to air, the ability to offer, to commit our

11   partners to localized content, really important.  That helps

12   build engagement."

13       And what they're referring to there is the reach of

14   these agreements in terms of the countries that they affect,

15   and the OSN agreement covered more than 20 countries in the

16   Middle East and in North Africa.  So if there's a canceled

17   agreement with no media rights in place for these 20 countries,

18   you're missing out on that engagement and the reach to all of

19   those countries.  And that's why we think it's important,

20   that's why the market was focused on it, that's why defendants

21   were talking about it, and that's why it would have mattered to

22   investors to know that this agreement was canceled three

23   quarters early.

24       One of the other things I'll say is that there are

25   other places in our complaint where we talk about how important

K7UHCITO

1    these agreements are in terms of how they affect the live

2    events and the merchandising.  I know in defendants' reply they

3    make statements about how the agreement itself wasn't material

4    in terms of revenue, but it really does go beyond just the

5    revenue, your Honor.  It goes to this engagement, this reach.

6    It sort of works together and in concert so that when you have

7    these media agreements in place, it encourages people to go to

8    live events and also to buy the merchandise.  So the media

9    rights deals matter and an early cancellation would also

10   matter.

11        The other point I would like to make about the OSN

12   deal is the April 25, 2019, disclosure where the stock price

13   goes down, and we talk about this because this is really a

14   materialization of the undisclosed risk that this agreement was

15   canceled early.  And what happened on this date is that

16   defendants missed consensus estimates.  Analysts had a

17   consensus estimate of $40 million, and analysts had no idea

18   that this agreement had been canceled.  So in their minds, it's

19   the status quo.  They're just baking in what we think is

20   happening, this agreement's going to go on until the end of

21   2019.  So at least part of that miss, we allege, is a

22   materialization of the undisclosed risk that this agreement had

23   been canceled early.

24        Again, Your Honor, I'm happy to go through some of the

25   false statements just to show how they were specifically

K7UHCITO

referring to the MENA region and why it would have mattered to

investors to know that the deal had been -- the agreement had

been canceled early, but the point is that this was really

giving the market a sense of facts that didn't exist.  They

were operating under the impression that this agreement was

still in place, and that's what makes it false and misleading.

As to the OSN deal, your Honor is correct, we don't

really rely upon confidential witnesses for the earlier part of

the case.  The scienter aspect of the OSN deal being canceled

early is pretty simple.  We have declarations from high-level

employees of the WWE describing for us in great detail that the

deal was canceled early, that OSN sent a letter to WWE, that

WWE sent them a letter of material breach, that there was a

settlement agreement that was negotiated.  And so our position

on the OSN agreement is that defendants certainly had access to

this information to know that the OSN deal was canceled, that

coupled with the fact that everybody was focused on the region

at the time.

And as your Honor mentioned, another important point

about what was happening in this first part of the year, the

first part of the class period, are the stock sales by

defendant McMahon.  And when you look at these sales, these

sales are very large.  He sells an incredible amount of stock,

$261 million.  And the timing is particularly interesting

because it's four days before the close of the first quarter,

K7UHCITO

| 1 | and the first quarter actually underperforms.  But you also
| 2 | have this canceled agreement and no other agreement in place
| 3 | for the rest of the year at that point.
| 4 |         Now, I know defendants want you to look at this Form
| 5 | 8-K that says he sold shares so that he could enter into a
| 6 | venture called the XFL football league, but the case law says a
| 7 | proposed innocent explanation for stock sales are facts that
| 8 | are in dispute and not appropriate for a determination on a
| 9 | motion to dismiss.  At the time he made this trade, he knew
| 10 | there was nothing in place to fill the revenue gap or he was at
| 11 | least reckless in not knowing, but our allegations are that he
| 12 | knew.  So we think this provides a very strong inference of
| 13 | scienter as to defendant McMahon.  And there are, of course,
| 14 | other indicia of scienter for McMahon and the other defendants,
| 15 | and I can get to that later, but at least for defendant McMahon
| 16 | around this time we think the insider trade made with knowledge
| 17 | of material nonpublic information is suspicious and supports
| 18 | scienter.
| 19 |         So just moving on to the agreement in principle
| 20 | statements, we get to July 2019, and defendants tell the market
| 21 | a few things.  They do finally admit that the OSN deal is
| 22 | canceled, but as your Honor recognized, they blunt the news by
| 23 | telling the market that they have what they believe to be an
| 24 | agreement in principle with Saudi Arabia to replace this deal,
| 25 | and they tell the market that they expect that it will close

K7UHCITO

1    very soon.  They also say that meeting their OIBDA, which is an

2    important financial metric for the year, was dependent on the

3    MENA media rights deal closing as well as having a second live

4    event in Saudi Arabia.  Again, this just goes to show you how

5    important it is to have a deal in place and that a canceled

6    deal would matter.

7            But just getting to the falsity of the statements,

8    they say "we believe we have an agreement in principle," and

9    I'll get to whether this is an opinion statement in a minute.

10   But in the first instance, I agree with your Honor that this is

11   a present sense fact statement.  So this present fact statement

12   doesn't get any safe harbor protection.  We have an agreement

13   in principle actually means something.  The case law says it

14   means we have a deal on structure and price, and defendants

15   don't dispute this in their reply.

16           So why is this false?  Well, we talked a little bit

17   about the confidential witness who worked at NBC on this

18   feasibility study, and I think if you look at the allegations

19   that this CW provides us, they're very specific.  The CW gives

20   us numbers.  He tells us just how far apart they were in terms

21   of the licensing fee.  He says that the WWE was first at

22   80 million and then they went down to 50 million, but that NBC

23   was not going to go above 14.5 million.  So they were still far

24   apart in the fall.  And WWE had their subscriber numbers at

25   100 million, while NBC was at 6.5 million, and they only raised

K7UHCITO

1    it to 15 million to be cooperative.

2           So you have a witness who is working on a feasibility

3    study to determine the feasibility of its media rights

4    agreement between the WWE and NBC providing us with very

5    specific details about the work that he did.  Now, it's true

6    that this witness did not have any direct contact with any of

7    the defendants, but it's not the standard in this circuit, your

8    Honor, that the witness has to have a direct communication with

9    the defendant for his information to be probative of scienter

10   or falsity.  In this case, as you mentioned, this CW was

11   involved in the later stages of the negotiation.  That's what

12   we allege.  And what we're asking the Court to do is to give us

13   an inference that if later in the negotiations they were still

14   far apart, that earlier in the negotiations they weren't any

15   closer, and we believe we're entitled to this inference and

16   that it's a logical inference based on the information that we

17   have provided.

18          So we also believe that the information that this

19   witness provides goes to the falsity of the agreement in

20   principle.  And if you don't have an agreement on the number of

21   subscribers or the licensing fees, then you don't have an

22   agreement in principle because you don't have an agreement on

23   the deal structure and the price.

24          Now, I want to turn to talk a little bit about whether

25   this is an opinion statement or not, "we believe we have an

K7UHCITO

agreement in principle."  There's obviously case law that says

just because you put the words "I think" or "I believe" in

front of a statement, that doesn't make it an opinion

statement, and that's certainly our position here, especially

since whether there was an agreement in principle is an

objectively verifiable fact.

   Defendants claim that they actually believed the

statement.  Well, *Omnicare* itself is actually helpful for us

here in this situation.  It says:  "That defendants may have

believed their statements to be accurate is irrelevant even

when read as an opinion statement.  So core inquiry when

determining whether an omission renders a misleading is whether

the omitted facts conflict with what a reasonable investor

would take from the statement itself."

   So here we have the omitted fact, which is just how

far apart they were in terms of price and structure months

later juxtaposed with the statement "we believe we have an

agreement in principle," making it false, so this statement

would still be actionable.  And we also allege that even the

guidance they gave that was dependent on the media rights

agreement being completed is also actionable.  They claim that

their OIBDA guidance of 200 million was dependent in part on

the MENA media rights deal that they had an agreement in

principle for.  And we look to the *Aéropostale* case where Judge

McMahon said plaintiff does not need to rely on the falsity of

K7UHCITO

defendant's financial projection in order to show that they

failed to disclose facts that impacted the reliability of those

statements, and the safe harbor and bespeaks-caution doctrine

do not apply to these omissions.

I'd just like to address the risk language that

defense counsel talked about when they said we have an

agreement in principle, but you know we're not sure what's

going to happen.  So, to be clear, we're not alleging that this

particular risk language in July is false.  We're saying it

doesn't matter because "we have an agreement in principle"

isn't a forward-looking statement, so the risk language can't

protect them.  And as I mentioned before, the case law actually

defines an "agreement in principle" as having an agreement on

the price and structure.  So we're also not talking about a

puffery statement either.

Of course things happen.  Of course you could have an

agreement with someone or think you have an agreement.  It

might be breached in the future.  But, again, that's not what

we're talking about here.  I like your hypothetical, your

Honor, because it's a hypothetical I was also thinking about

when preparing for this argument, which is defendants don't say

something like, "We believe we will have an agreement in

principle next quarter."  They say, "We believe we have an

agreement in principle," meaning now.  That was a statement of

present fact, an agreement on price and structure, when there

K7UHCITO

 1    was no agreement on the price and structure, and so we contend

 2    that this is actionable even despite the risk language.

 3           If I could just turn to scienter on the agreement in

 4    principle point, I've already talked a little bit about the

 5    confidential witness No. 1 who provided us information about

 6    the feasibility study that he prepared and specifics on the

 7    numbers.  And again, your Honor, it's in the papers.  I'll

 8    admit he didn't have any direct contact with defendant McMahon,

 9    but he really doesn't need to because when you look at all the

10    other allegations in the complaint, we detail how important

11    this new media rights agreement was for the company.  They tied

12    their full-year guidance to completion of the deal.  They

13    touted the importance of WWE's relationship with the Saudi

14    government.  When you look at these facts collectively and

15    holistically, this supports defendants' knowledge of the

16    negotiation or that they were extremely reckless in making

17    statements that they had an agreement in principle if they

18    didn't know that they were so far apart in terms of the deal.

19           Now, we also allege -- have allegations based on

20    confidential witness No. 2.  He's a former wrestler who

21    corroborates some reports that the conflict between defendant

22    McMahon and the Saudi Crown Prince was caused by these delayed

23    Saudi payments.  Now, I just want to make sort of a broader

24    point that I think defendants are looking at our allegations a

25    bit too narrowly by saying that all of our allegations are

K7UHCITO

```
1    based on a deteriorating relationship.  This is a part of the
2    complaint, but it's certainly not the main thrust of the
3    complaint.  But at least as to this wrestler, he does provide
4    very specific facts based on his present sense impressions of
5    being on the plane, in the room, and having a conversation with
6    WWE's senior director of talent, Mark Carrano, and that person
7    told him that the Crown Prince and McMahon had gotten into an
8    argument over these late payments, that McMahon had cut the
9    live feed, and that that had made the Crown Prince very mad.  I
10   mean, this allegation also supports that McMahon was directly
11   involved in the Saudi relationship and that he knew about the
12   late payments.
13        Now, I know defendants say this is all based on
14   hearsay, but part of his allegations are based on a person he
15   names, Mark Carrano.  So we know where it came from, and he
16   gives us very specific details about what mark Carrano told
17   him.  And the Court is allowed to rely on hearsay.  In
18   preparing for this argument, it also occurred to me that this
19   might not even be hearsay.  This could potentially be a
20   statement made by a party's agent pursuant to Rule 801, and of
21   course, we would probably need discovery to find out if he was
22   making it in the scope of his employment.  But at least at the
23   pleading stage, he is the senior director of talent; it was his
24   job to deal with talent.  So I would submit, your Honor, that
25   these two confidential witnesses have provided information that
```

K7UHCITO

```
1    can be relied upon because they -- the information is based on

2    their positions and the fact that they would be in a position

3    to possess the information that they provided us with.

4            Some of the other allegations that we have as to

5    scienter, as I mentioned before, are based on defendants' own

6    declarations.  And we also provide information about stock

7    sales as to defendant McMahon, which I discussed.  And as to

8    the other defendants, we believe their stock sales were

9    suspiciously timed, and even though the amounts were not so

10   different from the control period for Barrios and Wilson, the

11   percentages were.  So we think the Court should consider these

12   trades holistically along with other scienter allegations

13   against those defendants.  We think it provides just another

14   data point.

15           So in addition to the declarations, the confidential

16   witnesses, the trading, we do ask the Court to rely on the core

17   operations doctrine.  In this case we think it makes sense for

18   several reasons.  Defendants touted growth from the media

19   rights agreements, including the MENA region.  They talked

20   about how important these were strategically and financially

21   for the company.  They spoke about finalizing the agreements.

22   They spoke about negotiating the agreements.  They said the

23   MENA region was important and that it had become the company's

24   second largest market by monetization.  Their full-year

25   guidance was dependent on finalizing this MENA agreement.
```

K7UHCITO

That's how important it was.  And the live event partnership

with the Saudi government generated a lot of money for the

company, meaning that defendants paid close attention to WWE's

relationship with the Saudi government.  So we do think it

would be absurd to suggest that defendants did not have this

knowledge given the importance of the MENA region media rights

agreement and the WWE's relationship with the Saudis.

Also, defendants made very specific statements about

the supposed agreement with the Saudis, including that the

parties had an agreement in principle that would be announced

very soon.  This provides strong circumstantial evidence that

they were receiving some form of specific information in order

to make those statements.

So we believe the more plausible inference here, your

Honor, is that defendants knew about the OSN agreement and they

didn't tell the market until they told the market that they had

an agreement to replace it, maybe, to keep the stock price up

and that this case should be sustained.

THE COURT:  All right.  Well, that is all very

helpful.  I will hear briefly from defendants' counsel in

rebuttal.

MR. TOPETZES:  Thank you, your Honor.

First of all, your Honor, I want to focus on the

statement made by the company in July, on July 25, 2019.  The

company said it believes it has agreements in principle with

K7UHCITO

1   the Saudi General Sports Authority on the broad terms for the

2   latter two items, live events and media rights.  However, this

3   understanding is nonbinding.  It is possible that either or

4   both of these business developments do not occur on expected

5   terms and/or that engagement does not improve as assumed.  The

6   company has evaluated these potential outcomes and currently

7   believes that the most likely downside to its adjusted OIBDA

8   would be approximately 10 million to 20 million below its

9   current outlook.

10          As the Court is aware, a central focus for your Honor

11  is what a reasonable investor would have understood.  We

12  submit, your Honor, that a reasonable investor would have

13  understood that there was uncertainty regarding the prospects

14  for a MENA distribution deal given the language used by the

15  company concerning its ongoing discussions with respect to a

16  nonbinding arrangement on broad terms.  I won't cover this at

17  length now.  It's covered in our papers.  The statements are

18  surrounded by meaningful cautionary language, not just

19  boilerplate or the type found to be wanting in some other

20  cases; language that talks about the risks of securing, or to

21  use the exact language of the company, entering, maintaining,

22  and renewing media rights deals as well as the risks associated

23  with transactions in international markets and the risks

24  associated with live events.  The marketplace, your Honor,

25  understood that delays and uncertainty and changing partners

K7UHCITO

1   with respect to distribution was not unusual for World

2   Wrestling Entertainment.

3        We provided the Court with information reflecting that

4   the company expressed optimism with respect to its media rights

5   deal in the UK and having a deal there before the end of

6   calendar year 2018.  That deal was not finalized until our

7   class period in 2019.  The company also expressed optimism

8   concerning a media rights deal for India early in 2019.  That

9   deal was not finalized until the early part of this year, in

10  late March 2020.  The marketplace understood the statements the

11  company was making.

12       With respect to questions about whether a risk had

13  materialized and plaintiff's assertion with respect to the

14  financial impact of the OSN early termination, there's no --

15  it's pure speculation, Judge.  There's no statement that ties

16  the company's financial reporting to the OSN termination.

17  There's nothing that plaintiff's counsel noted that the company

18  fell below analyst estimates with respect to the first quarter

19  of 2019 where the MENA -- where, excuse me, the pay TV piece,

20  the OSN arrangement, was still being paid throughout the close

21  of the quarter.  None of that is tied by definition to the OSN

22  termination.  And plaintiff's assertions with respect to the

23  going-forward financial impact are all speculation.  There's

24  nothing that says quantitatively there was an impact on the

25  company's business results.  Again, OSN pertained just to pay

K7UHCITO

1    TV in that region.  The larger piece is the free on air, and

2    that was reflected in the statement by defendant Barrios that

3    plaintiff's counsel read.

4            I want to address a couple other factual things and

5    then the stock sales, your Honor.

6            THE COURT:  Go ahead.

7            MR. TOPETZES:  First of all, these assertions with

8    respect to delayed payment, the one point I'll make -- and it's

9    indisputable and they've acknowledged it -- is that this

10   payment that supposedly led to the cut feed and maybe produced

11   this alleged hostage circumstance, all of these things that

12   plaintiff has manufactured, that payment was made before the

13   event on October 31, 2019.  That was something that was

14   publicly disclosed by the company prior to the event.  So these

15   statements that are attributed to Mr. Carrano by confidential

16   witness No. 1 don't follow as a matter of logic, in part

17   because that payment was made.  They are hearsay, multiple

18   layers of hearsay, and there's nothing regarding the statement

19   attributed to Mr. Carrano.  Even assuming he said it, with

20   presumptions running in favor of the plaintiff as nonmovant,

21   there's nothing about that statement that says anything about

22   defendants' state of mind in making the subject statement.

23   Plus we note, your Honor, that two business days later, the

24   company and the Kingdom of Saudi Arabia announced an expansion

25   of their relationship.

K7UHCITO

1          With respect to the stock sales, very quickly, and

2     we've addressed this in our papers, Mr. McMahon's stock sale

3     was a very public circumstance and involved a small percentage

4     of his overall shares available to sell.  Again, there's no

5     specific allegation in the complaint that charges him with

6     knowledge of omitted facts.  But in any case, with respect to

7     his stock sale, this was a well-known circumstance.  It

8     occasioned a Form 8-K filing by the issuer which stated what he

9     intended to do with the money and which also stated that he did

10    not intend to make additional sales.  The sale was, as

11    Ms. Villegas pointed out, connected to his public plan to

12    launch the XFL, a new sports league which was later launched

13    and which attracted a following in the days leading up to the

14    COVID-19 crisis.

15          All of these matters are public.  None of that is

16    suggestive of fraud, and none of it is supported by

17    particularized allegations that Mr. McMahon knew any of the

18    statements were false.  We cited the Court to cases where

19    larger stock sales in terms of percentage have been determined

20    not to be problematic, not to be a basis for a finding of

21    scienter, or when large sales by one defendant are deemed not

22    to be enough to carry the scienter burden of plaintiff with

23    respect to sales not only by that defendant but by the other

24    defendant.

25          As to the other two, Mr. Barrios' sales are pursuant

K7UHCITO

1   to a 10b5-1 plan.  That's something of which the Court, we

2   submit, can take judicial notice as reflected in Exhibit 30 to

3   the declaration that accompanied our opening brief.  The Form 4

4   filed with the SEC reflects the sales were pursuant to a

5   Rule 12b-1 plan.  And there's nothing unusual or

6   uncharacteristic regarding Ms. Wilson's sale which was in like

7   amount, it left proceeds, but like amounts to her sales in the

8   prior cycle.  We submit none of that is suggestive of a strong

9   inference of scienter, particularly in this circumstance,

10  Judge, where there's no connective tissue.  There's nothing

11  that ties these defendants to any of the alleged misstatements

12  or that creates intent to deceive.  This is core operations and

13  corporate scienter without any particularized allegations to

14  support it, and it's a distorted amplification of the OSN,

15  opportunistic amplification of the OSN arrangement.

16          THE COURT:  All right.

17          MR. TOPETZES:  I don't have anything further at this

18  time, Judge.  Thank you very much.

19          THE COURT:  I want to thank counsel for both sides.

20  This has been a very helpful and well-presented argument.  I am

21  still wrestling with some of the issues you've argued, but I

22  will get you at least a bottom line decision on this motion by

23  the end of August, hopefully a full opinion by then, but

24  certainly at least a bottom line ruling.  And of course, the

25  case will remain stayed until that ruling comes out.

K7UHCITO

1            So, again, my thanks to counsel, and the matter will

2    remain *sub judice*.  Thanks very much.

3            (Adjourned)