## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS, and MICHELLE D. WILSON,<br><br>Defendants. | Civil Action No. 1:20-cv-02031-JSR |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION, APPOINTMENT
## <u>AS CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

I.     INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF FACTS COMMON TO THE CLASS .............................. 4

    A.     WWE Expands Into a Key Market – the MENA Region,
        Partnering With the Kingdom of Saudi Arabia to Host Live Events ...................... 4

    B.     WWE Fails to Inform the Market That The OSN Agreement Had
        Been Terminated Early, Forcing the Company to Find a New
        Media Rights Partner in the MENA Region .......................................... 5

    C.     WWE Announces That the Media-Rights Deal With the Saudis
        Falls Through for 2019, While Reports Emerge That Problems
        Exist Between the Two Parties .......................................................... 6

III.   THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE
      CERTIFIED ............................................................................................... 7

    A.     The Proposed Class Satisfies The Requirements of Rule 23(a) ............................. 8

        1.     The Class Is So Numerous That Joinder Is Impractical ............................. 8

        2.     Questions of Law and Fact Are Common to the Class ............................... 9

        3.     Plaintiff's Claims Are Typical of the Class Claims .................................. 10

        4.     Plaintiff Will Fairly and Adequately Protect the Class'
            Interests ....................................................................................... 11

    B.     The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ....................... 13

        1.     Common Factual and Legal Issues Predominate ...................................... 13

            (a)     Plaintiff Is Entitled to the Fraud-On-The-Market
                Presumption of Reliance .......................................................... 14

                (i)     WWE's NYSE Listing Is Strong Evidence of
                      Market Efficiency ........................................................... 15

                (ii)     The *Cammer* and *Krogman* Factors Support a
                      Finding of Market Efficiency ............................................ 16

(iii)     Additional Factors Support a Finding of Market Efficiency ........................................................................ 21

(b)     Reliance Is Presumed Under *Affiliate Ute* ....................................22

(c)     Damages May Be Calculated On a Class-Wide Basis, Supporting a Finding of Predominance..............................22

2.     Superiority Is Established ..........................................................24

C.     The Court Should Appoint Labaton Sucharow As Class Counsel .......................25

IV.     CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972)........................................................................................3, 14, 22

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................21

*In re Am. Realty Capital Props., Inc. Litig.*,
No. 15-mc-40-AKH, 2017 WL 3835881 (S.D.N.Y. Aug. 31, 2017) ....................20

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...........................................................................................13

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)........................................................................7, 13, 14, 22

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)...........................................................................11, 12

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ..........................................................................11

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................3, 14

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................. *passim*

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ................................................................ *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................... *passim*

*Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007)..................................................................................8

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*,
No. 12-cv-0256-LAK-AJP, 2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017) ............9

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..............................................................................................22

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995).........................................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)...........................................................................................13, 14

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013)....................................................................22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).....................................................................................12

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ....................................................................10-11

*Fogarazzao v. Lehman Bros., Inc.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ...........................................................................22

*Gross v. GFI Grp., Inc.*,
    No. 14-cv-9438, 2017 WL 3668844 (S.D.N.Y. Aug. 23, 2017).......................11-12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)...............................................................................................14

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).......................................................................................8

*In re JPMorgan Chase & Co. Sec. Litig.*,
    No. 12-cv-3852, 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015) ....................8, 16, 17, 23-24

*Kaplan v. S.A.C. Capital Advisors, L.P*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ...........................................................................10

*Katz v. Image Innovations Holdings, Inc.*,
    No. 06-cv-3707-JGK, 2010 WL 2926196 (S.D.N.Y. July 22, 2010) ................2, 13

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ............................................................16, 19, 20, 21

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014)....................................................9, 10-11, 20, 21

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018) .........................................................................19-20

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    310 F.R.D. 203 (S.D.N.Y. 2015) ...........................................................................24

*Micholle v. Ophthotech Corp.*,
    No. 17-cv-210-VSB, 2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018).......................12

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ...................................................................... 9-10

*Pennsylvania Ave. Funds v. Inyx, Inc.*,
   No. 08-cv-6857-PKC, 2011 WL 2732544 (S.D.N.Y. July 5, 2011) ....................... 10

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017) ..................................................... 15, 16, 19, 25

*In re Pfizer Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ................................................................... 24

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) ............................................ 15-16, 17, 19

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015) ....................................................................... 22

*In re Sanofi-Aventis Sec. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013) ................................................................. 25

*In re SCOR Holding (Switz.) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008) ..................................................... 24-25

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 16-cv-6728-CM, 2019 WL 3001084 (S.D.N.Y. July 10, 2019) ............................... *passim*

*In re SLM Corp. Sec. Litig.*,
   No. 08-cv-1029-WHP, 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ........................... 1

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................... 11

*Stoneridge Inv. Partners, LLC v. Sci. Atlanta, Inc.*,
   552 U.S. 148 (2008) ................................................................................. 13

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd, Waggoner*, 875 F.3d ............................ 16, 20

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015) ................................................................... 22-23

*Vargas v. Howard*,
   324 F.R.D. 319 (S.D.N.Y. 2018) ..................................................................... 8

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   No. 15-cv-1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ..................... 1, 9, 10, 14

*In re Vivendi Universal, S.A.*,
   242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)................................................................................9

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).................................................13, 14-15, 18-19, 23

*In re Warner Chilcott Ltd. Sec. Litig.*,
   No. 06-cv-11515-WHP, 2008 WL 344715 (S.D.N.Y. Feb. 4, 2008) .....................24

*Wilson v. LSB Industries, Inc.*,
   No. 15-cv-7614-RA-GWG, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...............17, 18, 21

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ...............................................................16, 17, 18

**Statutes**

Securities Exchange Act of 1934 Section 10(b), 15 U.S.C. §78j(b)...........................10, 13, 14, 23

Securities Exchange Act of 1934 Section 20(a), 15 U.S.C. §78t(a) ...................................1, 10, 11

17 C.F.R. §239.13 .................................................................................................................18

**Other Authorities**

Fed. R. Civ. P. Rule 23(a)........................................................................................ *passim*

Fed. R. Civ. P. Rule 23(b)........................................................................................ *passim*

Fed. R. Civ. P. Rule 23(g)..............................................................................................3, 25

H.R. Rep. No. 104-369 (1995)..........................................................................................12

SEC Rule 10b-5 ...............................................................................................................13

Lead Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust ("Plaintiff") respectfully submits this memorandum of law in support of its Motion for Class Certification, requesting that, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(3), and 23(g), the Court: (i) certify this case as a class action; (ii) appoint Plaintiff as Class Representative; and (iii) appoint Labaton Sucharow LLP as Class Counsel.

## I.    INTRODUCTION

This is a federal securities action against World Wrestling Entertainment, Inc., d/b/a WWE ("WWE" or the "Company"), CEO Vincent K. McMahon, and former Co-Presidents George A. Barrios, and Michelle D. Wilson (the "Defendants")[1] for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a).

As courts in this Circuit have recognized, "claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *In re SLM Corp. Sec. Litig.*, No. 08-cv-1029-WHP, 2012 WL 209095, at *3 (S.D.N.Y. Jan. 24, 2012); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15-cv-1249, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (securities fraud claims are "especially amenable to class certification").

This case is no exception—and it is well-suited for class treatment. Plaintiff therefore respectfully requests certification pursuant to Rule 23 on behalf of a class (the "Class") consisting of: all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of WWE during the period from February 7, 2019 through February 5, 2020, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of WWE during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) WWE's

---

[1] McMahon, Barrios, and Wilson are referred to herein collectively as the "Individual Defendants."

employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

For a class to be certified, "the Court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation." *Katz v. Image Innovations Holdings, Inc.*, No. 06-cv-3707-JGK, 2010 WL 2926196, at *1 (S.D.N.Y. July 22, 2010). The Court must also find that the party qualifies under one of the three sets of criteria set forth in Rule 23(b)(1), (2), or (3). *See id.* Rule 23(b)(3), in particular, permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Each of these requirements is met here.

*First*, with between 43.7 million and 47.5 million shares of WWE common stock outstanding throughout the Class Period, during which time an average of nearly 6.34 million shares traded weekly, there are likely thousands of Class members, satisfying numerosity.

*Second*, the commonality prerequisite is met because this action involves several class-wide issues of law and fact, including whether: (1) Defendants made material misrepresentations and omissions in the Company's Securities and Exchange Commission ("SEC") filings and other public disclosures; (2) Defendants acted with scienter; (3) the price of WWE's common stock was artificially inflated by Defendants' fraudulent conduct; (4) Class members suffered damages; and (5) the Individual Defendants were control persons of WWE.

*Third*, the typicality prerequisite is met where Plaintiff's injuries and those of Class members arise from the same alleged fraudulent conduct. Plaintiff and Class members purchased WWE securities at prices that had been artificially inflated by Defendants' material

2

misrepresentations and omissions. When the information Defendants concealed from investors during the Class Period was finally revealed, the price of WWE's common stock dropped, injuring Plaintiff and the Class.

**Fourth**, the adequacy requirement is met here because Plaintiff has demonstrated that it will vigorously prosecute this case and protect the Class' interests, and because no antagonism exists between Plaintiff and the Class. Additionally, Plaintiff's choice of counsel, Labaton Sucharow LLP ("Labaton Sucharow"), is highly experienced in securities class actions and is well-suited for appointment as Class Counsel under Rule 23(g).

**Fifth**, this action satisfies the predominance requirement of Rule 23(b)(3). Several issues of fact and law—including falsity, materiality, scienter, loss causation, and damages—are subject to common proof and predominate over any individual issues. The same is true with the issue of reliance, which may be presumed using the "fraud-on-the-market" presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), or the presumption of reliance for omissions under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). Indeed, *Basic* permits the presumption in this case because, as established in the accompanying Expert Report of Chad Coffman, CFA, the market for WWE common stock, which traded on the New York Stock Exchange ("NYSE"), was efficient throughout the Class Period. *See* Declaration of Carol C. Villegas ("Villegas Decl."), Ex. A  ("Coffman Report" or "Coffman Rpt."), ¶¶25-26. And *Affiliated Ute* permits a presumption of reliance, since Plaintiff's claims are based, in part, on Defendants' material omissions.

**Sixth**, the superiority requirement of Rule 23(b)(3) is satisfied because: (1) thousands of geographically dispersed investors were harmed by Defendants' misconduct; (2) due to litigation costs, it is highly unlikely that investors who lost relatively small amounts of money would file

individual actions; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

For the reasons detailed herein, Plaintiff's motion should be granted.

## II.   STATEMENT OF FACTS COMMON TO THE CLASS

### A.   WWE Expands Into a Key Market – the MENA Region, Partnering With the Kingdom of Saudi Arabia to Host Live Events

WWE is a sports-entertainment company, primarily known for its brand of professional wrestling. ¶¶41-42.[2] The Company has in recent years transitioned into more of a media company, with its Media segment accounting for the vast majority of its overall revenue— specifically reflecting 67%, 73%, and 77% of total net revenues in 2017, 2018, and 2019, respectively. ¶¶43-45. The Company's growth and transformation into a media company has been fueled by WWE's expansion internationally over the past number of years (¶¶61-69), including through increasing the revenues earned on licensing deals the Company enters into with international television providers, who buy the exclusive right to air original WWE content.

An important part of the Company's international expansion involved extending WWE's reach into countries within the MENA region. ¶70. The Company took a significant step towards boosting WWE's popularity in the region in 2014, when it entered into a five-year exclusive media-rights agreement with OSN, pursuant to which OSN agreed to pay fees for the right to air WWE's original content on OSN, including *Raw* and *Smackdown Live*. ¶¶72, 130-31. A few years later, in March 2018, the Company made further headway in the MENA region when it announced that it had signed a 10-year exclusive partnership with the Saudi General Sports Authority to hold large wrestling events in the Kingdom of Saudi Arabia. ¶¶73-74.

---

[2] The Consolidated Amended Class Action Complaint (ECF No. 57) is referred to herein as the "Complaint," (cited as "¶__").

**B.     WWE Fails to Inform the Market That The OSN Agreement Had Been Terminated Early, Forcing the Company to Find a New Media Rights Partner in the MENA Region**

Heading into the start of the Class Period, investor attention was focused on the Saudi partnership, but also on a number of international media-rights agreements that were nearing expiration and which the Company had been assuring investors, in months prior, would be renewed on even more favorable terms. ¶¶149-50. One such agreement was the OSN deal, which was set to expire at the end of 2019. At the start of the Class Period, on February 7, 2019, WWE told investors that it was targeting Adjusted OIBDA[3] of at least $200 million. ¶149. These results were dependent on WWE's ability to renew a number of its media-rights agreements in key markets, including the OSN/MENA region agreement, *id.*, and Defendants had been telling investors for months that it was working on renewing those agreements. ¶¶150-52.

But, in reality, as Defendants have now admitted, through statements of current WWE employees, OSN actually informed WWE in November 2018 that it would not renew the media rights agreement, and WWE and OSN entered instead into an agreement terminating the media rights agreement on December 18, 2018, formally ending the contract ***early***, effective March 31, 2019. ¶¶154-56. Defendants did not inform the market of this significant development for more than six months—instead telling investors that the WWE was working on ***renewing*** the MENA region agreement (which the market still understood to be the OSN agreement) and that they would not otherwise comment on the status of the "renewal" negotiations. ¶158. When the WWE finally announced its 1Q19 results on April 25, 2019, WWE issued lower-than-expected second-quarter 2019 guidance, reflecting the still-unknown news that the Company would no longer be receiving revenues associated with the OSN agreement that expired on March 31, 2019. ¶371.

---

[3] "OIBDA" means Operating Income Before Depreciation and Amortization.

It was not until July 25, 2019 that WWE finally informed the market that the OSN deal had been terminated (though no specifics were given)—but Defendants shielded the impact of this material news by simultaneously (but falsely) announcing that that WWE had an agreement "in principle" with the Saudi government for a media-rights agreement for the MENA region that would be complete "very soon." ¶¶165-68. But an employee of the Middle East Broadcasting Company ("MBC")—which is controlled by the Saudi government—explained that, by Fall 2019, at least several months later, WWE and the Saudi government still were worlds apart in their negotiations of a new media-rights deal and could not agree on key terms, such as the size of the potential market of WWE subscribers in the MENA region. ¶¶188-95.

## C. WWE Announces That the Media-Rights Deal With the Saudis Falls Through for 2019, While Reports Emerge That Problems Exist Between the Two Parties

Even though Defendants informed the market in July 2019 that a new media-rights agreement for MENA would be completed "very soon" as an "agreement[] in principle" had been reached, Defendants shocked investors just months later, on October 31, 2019, when they announced, in connection with WWE's third-quarter 2019 results, a "delay in completing a previously contemplated agreement in the MENA region." ¶174. On this basis, WWE lowered its full-year 2019 guidance to an Adjusted OIBDA range of $180 million to $190 million. *Id.*

Just hours after the October 31, 2019 earnings call, WWE held its fourth live event pursuant to the Saudi partnership, billed the *Crown Jewel* 2019. ¶207. Following the event, reports emerged revealing that the relationship between WWE and the Saudi government was in trouble. Specifically, it was reported that numerous WWE wrestlers and representatives were being detained in Saudi Arabia—their flight not allowed to take off from the airport. ¶¶208-11. It was also reported that Defendant McMahon cut the live feed to the October 31, 2019 *Crown Jewel* event in response to delayed payments by the Saudi government in connection with prior

6

events—and that the Crown Prince retaliated by refusing to let WWE representatives leave the country, holding them for as long as six hours. *Id.*

These reports are corroborated by a former wrestler for WWE, who participated in the October 31, 2019 *Crown Jewel* event and who was held in Saudi Arabia afterwards. ¶216. WWE's Chief Accounting Officer also confirms that the Saudi government was delayed in making a $60 million payment to WWE in connection with the June 7, 2019 *Super ShowDown* event—a payment that was received ***after*** the close of the third-quarter 2019 (on September 30, 2019), even though Defendants had told investors in July 2019 that this payment would be received ***during*** the third-quarter. ¶214.

Additional details of Defendants' fraud were revealed on January 30, 2020, when WWE issued a press release stating that it expected its full year 2019 Adjusted OIBDA to be approximately $180 million, and also announced that two of its most senior and longest-serving executives, Defendants Barrios and Wilson, had abruptly left WWE. ¶181. But Defendants did not reveal the full truth until February 6, 2020, when WWE confirmed that it had achieved just $180 million in adjusted OIBDA for 2019 due to the failure to complete the MENA distribution agreement with the Saudis. ¶182. WWE also announced that its guidance for 2020 did not include any revenues related to a MENA media-rights deal—meaning Defendants acknowledged that a deal with the Saudi government would not even be completed in 2020—if at all. *Id.*

## III.   THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED

Certification is appropriate where a putative class meets all four requirements of Rule 23(a) and one requirement of Rule 23(b). *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 73 (S.D.N.Y. 2015). Though "a court's class-certification analysis must be 'rigorous' . . . Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66

(2013). For this reason, "[a] motion for class certification should not become a mini-trial on the merits; the question before the Court is whether Plaintiff meets Rule 23's requirements, not whether Plaintiff will prevail on the merits." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728-CM, 2019 WL 3001084, at *7 (S.D.N.Y. July 10, 2019); *Vargas v. Howard*, 324 F.R.D. 319, 324 (S.D.N.Y. 2018) ("The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction.").

"If the Court finds that the requirements of Rule 23 have been met, the Court may, in its discretion, certify the [C]lass." *Signet,* 2019 WL 3001084, at *7. "The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification." *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12-cv-3852, 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015); *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) (instructing courts to "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met," but cautioning against "assess[ing] any aspect of the merits unrelated to a Rule 23 requirement").

A.      **The Proposed Class Satisfies The Requirements of Rule 23(a)**

1.      **The Class Is So Numerous That Joinder Is Impractical**

Rule 23's numerosity prong requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). The Second Circuit has recognized that "numerosity is presumed at a level of 40 members." *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). In the securities class action context "relating to publicly owned and nationally listed corporations, the numerosity

requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Signet*, 2019 WL 3001084, at *8.

Here, the Class is so numerous that joinder would be impracticable. During the Class Period, there were between 43.7 million and 47.5 million shares of WWE stock outstanding, and the average weekly trading volume of WWE stock on the NYSE was 6.34 million shares, representing 13.54% of all outstanding shares. Coffman Rpt. ¶¶26, 67. In addition, 559 institutional investors owned WWE common stock during the Class Period. *Id*. at ¶73. The numerosity requirement is therefore easily satisfied. *See Signet*, 2019 WL 3001084, at * 8 (finding numerosity satisfied where defendant corporation had between 60.5 and 80.5 million shares outstanding and an average of 1.34 million shares traded daily); *Virtus*, 2017 WL 2062985, at *2  (numerosity established where the daily trading volume averaged approximately 65,000 shares); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153, 156 (S.D.N.Y. 2012) (demonstrating numerosity where defendant corporation had 23 million ADRs outstanding and between 71 and 82 institutional investors).

## 2.  Questions of Law and Fact Are Common to the Class

Rule 23(a)(2)'s requirement that "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), is a "low hurdle," *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014), requiring only that plaintiff "identify some unifying thread among the members' claims that warrants class treatment." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016); *see also City of Westland Police and Fire Ret. Sys. v. MetLife, Inc*., No. 12-cv-0256-LAK-AJP, 2017 WL 3608298, at *5 (S.D.N.Y. Aug. 22, 2017) (commonality requirement "met if plaintiffs' grievances share a common question of law or of fact."). Courts have explained that "[e]ven a single common legal or factual question will suffice." *In re NYSE Specialists Sec. Litig*., 260

F.R.D. 55, 70 (S.D.N.Y. 2009). In Section 10(b) cases, "[c]ommon questions of law and fact include whether certain statements were false and misleading, whether those statements violated the federal securities laws, whether those statements were knowingly and recklessly issued, and ensuing causation issues." *Pennsylvania Ave. Funds v. Inyx, Inc.*, No. 08-cv-6857-PKC, 2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011).

Here, there are numerous questions of law and fact that are common to all Class members, whose claims for redress all arise from Defendants' failure to disclose (1) the premature termination of WWE's 2014 media-rights agreement with OSN, (2) that the new media-rights agreement the WWE began negotiating with the Saudi government would not be completed in 2019, notwithstanding Defendants' assurance in July 2019 that an "agreement[] in principle" had been reached, and (3) that the Company's relationship with the Saudi government was under stress because, among other things, the Saudi government had failed to make timely payments to the Company owed in connection with those events. These common issues create related common questions of law and fact, including whether (1) the alleged misrepresentations and/or omissions were material; (2) Defendants acted knowingly or recklessly; (3) Defendants violated Section 10(b) and Section 20(a); and (4) investors suffered resulting damages. The commonality prong is therefore satisfied. *See Virtus*, 2017 WL 2062985, at *2 ("[C]ommonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages.").

### 3.    Plaintiff's Claims Are Typical of the Class Claims

Rule 23(a)(3)'s typicality requirement is "not demanding," *Kaplan v. S.A.C. Capital Advisors, L.P*, 311 F.R.D. 373, 379 (S.D.N.Y. 2015), and is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *See McIntire*, 38 F. Supp. 3d at 424. When

assessing typicality, courts focus on "the defendant's actions." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014). Thus, when "the same unlawful conduct was directed at or affected both" the class and its representative, typicality "is usually met irrespective of minor variations in the fact patterns underlying individual claims." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45-46 (S.D.N.Y. 2013). For this reason, "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar" to the proposed class representative." *Id.* at 46.

Here, typicality is easily met. Plaintiff's claims arise out of the same alleged facts and legal theories as the claims of all other Class members—*i.e.*, Plaintiff alleges that Defendants made materially false and misleading public statements and omissions, in violation of Sections 10(b) and 20(a) of the Exchange Act. Moreover, the injury Plaintiff suffered is alleged to be the same as the injury suffered by the proposed Class as a whole—*i.e.*, Plaintiff purchased WWE shares at artificially inflated prices during the Class Period, suffering losses when the truth about Defendants' common course of conduct was revealed to the market, just like all other Class members. Thus, its claims are typical of—if not identical to—those of other members of the Class. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016) ("[T]ypicality is established because all class members' claims arise from the same course of events and involve similar arguments on liability").

### 4.    Plaintiff Will Fairly and Adequately Protect the Class' Interests

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement seeks to ensure that Plaintiff's interests are not antagonistic to those of the Class and that Plaintiff's attorneys are qualified, experienced, and able to conduct the litigation. *See Signet*, 2019 WL 3001084, at *9; *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "The purpose

of this inquiry is to uncover conflicts of interest between the named parties and the class they seek to represent." *Gross v. GFI Grp., Inc.*, No. 14-cv-9438, 2017 WL 3668844, at *2 (S.D.N.Y. Aug. 23, 2017). "[H]ypothetical conflict[s] of interest, without more," are not enough to warrant denial of class certification on "adequacy grounds." *Id.* at *3; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (noting that conflict "must be fundamental" to defeat class certification).

The adequacy requirement is satisfied here. ***First***, none of Plaintiff's interests are antagonistic to those of the proposed Class. Plaintiff, like all Class members, purchased WWE common stock at market prices during the Class Period and was injured by the same material misrepresentations and omissions, and subsequent stock price decline. Plaintiff's interests in establishing Defendants' liability and maximizing recovery are aligned with those of absent Class members. *Billhofer*, 281 F.R.D. at 157 (stating "the interests of the other members of the proposed class will be adequately protected by [p]laintiff" in securities case where all claims arose from the same conduct). ***Second***, Plaintiff has already proven its willingness and ability to serve as Class Representative by, among other things, actively supervising and monitoring this litigation; participating in discussions with counsel concerning case developments; reviewing Court filings; participated in hearings before the Court; and receiving regular status reports—and Plaintiff intends to continue to perform similar activities, including participating in ongoing discovery and trial preparation. Plaintiff also understands its duty to the Class and is committed to vigorously prosecuting this Action to maximize the recovery of all Class members.[4] ***Finally***, Plaintiff has engaged competent Lead Counsel that is "qualified, experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60. Labaton Sucharow has extensive experience litigating

---

[4] Further, as an institutional investor, Plaintiff is particularly well-qualified to serve as Class Representative. The PSLRA was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs." *See* H.R. Rep. No. 104-369, at 34 (1995) (Conf. Rep.); *see also Michelle v. Ophthotech Corp.*, No. 17-cv-210-VSB, 2018 WL 1307285, at *6 (S.D.N.Y. Mar. 13, 2018) (recognizing such intent).

securities class actions in courts throughout the country and has successfully prosecuted hundreds of securities class actions on behalf of injured investors. *See* Villegas Decl. Ex. B (Labaton Sucharow Firm Resume). The Class's interests are therefore protected.

**B.     The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

The proposed Class also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate and that a class action be the superior method to adjudicate this dispute. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

**1.     Common Factual and Legal Issues Predominate**

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017). "Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Image Innovations*, 2010 WL 2926196, at *5.

The analysis of whether common questions predominate "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-810 (2011) ("*Halliburton I*"). The elements of Plaintiff's claims under Section 10(b) and Rule 10b-5 of the Exchange Act are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Sci. Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The Supreme Court has held that falsity, materiality, and loss causation are common issues to a class, *Amgen*, 568 U.S. at 474-75, which means that whether common questions of law or fact predominate in a securities fraud action "often turns on the element of reliance."

13

*Halliburton I*, 563 U.S. at 810. Here, Plaintiff and the Class are entitled to a presumption of

Class-wide reliance under the fraud-on-the-market theory set forth in *Basic Inc. v. Levinson*, 485

U.S. 224 (1998), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258,

276 (2014) ("*Halliburton II*"), or set forth in *Affiliated Ute Citizens v. United States*, 406 U.S.

128, 153-54 (1972). As set forth below, damages will also be determined on a class-wide basis

using the same formula and measure of artificial inflation attributable to Defendants' conduct.

Accordingly, the predominance requirement is satisfied.

<strong>(a)      Plaintiff Is Entitled to the Fraud-On-The-Market Presumption<br>of Reliance</strong>

In *Basic Inc. v. Levinson*, the Supreme Court held that investors could satisfy the reliance

element of Section 10(b) by invoking a rebuttable presumption of reliance. 485 U.S. at 245-49.

The *Basic* presumption of reliance is premised on the fact that "the price of a security traded in

an efficient market will reflect all publicly available information about a company; accordingly,

a buyer of the security may be presumed to have relied on that information in purchasing the

security." *Amgen*, 568 U.S. at 458; *Basic*, 485 U.S. at 229-30 (concluding that anyone who buys

or sells stock at the market price may be considered to have relied on material misstatements).

Plaintiff may invoke the presumption by establishing that "the alleged misrepresentations

were public, that [WWE's] stock traded on an efficient market, and that the relevant transaction

took place between the time the misrepresentations were made and the time the truth was

revealed." *Virtus*, 2017 WL 2062985, at *4. Once the *Basic* presumption of reliance is

successfully invoked (as is the case here), "the burden then shifts to the [D]efendants, who 'bear

the burden of persuasion [under *Halliburton II*] to rebut the Basic presumption by a

preponderance of the evidence.'" *Signet*, 2019 WL 3001084, at *11. To meet their burden,

[D]efendants must 'do more than merely produce evidence that *might* result in a favorable

14

outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the evidence.'" *Id.* (citing *Waggoner*, 875 F.3d at 101).

Plaintiff has successfully invoked the *Basic* presumption. First, Plaintiff alleges that Defendants made material misrepresentations and omissions in their public statements to investors through WWE's SEC filings and press releases, as well as during earnings conference calls and investor conferences, that artificially inflated or maintained the market price of WWE stock. ¶¶224-32, 237-38, 243-47, 251, 253, 255-61, 267, 271-73, 279, 283, 285. Second, with respect to market timing, Plaintiff alleges that it, like other members of the proposed Class, bought stock during the Class Period at artificially inflated prices and suffered losses when that inflation was removed upon the disclosure of the truth. ¶¶368-82. Third, as detailed below and in the Coffman Report, the market for WWE's common stock was efficient at all relevant times.

The Second Circuit has held that the burden to show market efficiency at class certification "is not an onerous one." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 278 (2d Cir. 2017); *see also Waggoner*, 875 F.3d at 97. Instead, it is a flexible inquiry for which the Second Circuit has declined to adopt any particular test, instead directing "a holistic analysis based on the totality of the evidence presented." *Id.* at 94, 96-97. As detailed herein and in the accompanying Coffman Report, Plaintiff has established that the market for WWE stock was efficient at all relevant times, triggering the presumption of reliance.

### (i)    WWE's NYSE Listing Is Strong Evidence of Market Efficiency

As an initial matter, WWE's listing on the NYSE alone supports a presumption of market efficiency. *See Billhofer*, 281 F.R.D. at 159 (stating that a security listed on NASDAQ, the American Stock Exchange, or NYSE is presumed efficient at class certification stage); *Carpenters*, 310 F.R.D. at 81 (collecting cases noting that some courts presume securities traded on national markets to be efficient); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 44

(S.D.N.Y. 2018) (referring to the NYSE as a "paradigmatic efficient market"). At a minimum, WWE's trading on a national exchange provides "a strong indication" of efficiency. *JPMorgan*, 2015 WL 10433433, at *7; *accord Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) ("most courts in this Circuit agree that such listing is a good indicator of efficiency"), *aff'd, Waggoner*, 875 F.3d at 79. *See also* Coffman Rpt. ¶40.

### (ii)    The *Cammer* and *Krogman* Factors Support a Finding of Market Efficiency

The "prevailing tests for market efficiency," *Signet*, 2019 WL 3001084, at *11, are the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)—known as the *Cammer* and *Krogman* factors.

The five *Cammer* factors are (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S–3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *Signet*, 2019 WL 3001084, at *11. The three *Krogman* factors are: (1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders.

Courts are clear that these factors should be used "as an analytical tool rather than as a checklist," *Billhofer*, 281 F.R.D. at 160, and should be analyzed holistically "based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 275, 277. A holistic consideration of the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for WWE common stock was efficient during the Class Period.

***Cammer* One: Weekly Trading Volume**. "Average weekly trading volume of 2% or more of outstanding securities justifies a strong presumption of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013). High

trading volume suggests efficiency "because it implies significant investor interest in the company" which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Carpenters*, 310 F.R.D. at 79 (certifying securities class). Here, WWE's average weekly trading volume of 13.54% of shares outstanding easily exceeds the 2% threshold set forth in *Cammer*. Coffman Rpt. ¶29; *JPMorgan*, 2015 WL 10433433, at *5 (finding that average weekly trading volume of 6.5% of shares outstanding weighed in favor of market efficiency); *Pirnik*, 327 F.R.D. at 44 (finding that average weekly trading volume of 2% justified "a strong presumption of efficiency").

*Cammer* **Two: Number of Analysts**. Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446. Here, analysts from 23 separate firms (including major financial firms like JP Morgan, Morgan Stanley, and MKM Partners) issued at least 167 reports on WWE during the Class Period. Coffman Rpt. ¶34. The extensive analyst coverage of WWE easily satisfies *Cammer* Two and supports a finding of market efficiency. *Winstar*, 290 F.R.D. at 446 (finding market efficient with three analysts); *Wilson v. LSB Industries, Inc.*, No. 15-cv-7614-RA-GWG, 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (finding 45 reports by 5 analysts supportive of efficiency and noting that it well surpassed the 15 research reports in *Cammer*); *Pirnik*, 327 F.R.D. at 44 (finding of efficiency supported where at least 25 analysts covered the defendant company during the class period).

Courts also recognize that widespread media coverage supports a finding of efficiency. *See Carpenters*, 310 F.R.D. at 92 ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency); *Billhofer*, 281 F.R.D. at 153-54 (noting the publication of over two dozen press releases and articles supported finding of efficiency). Here, hundreds of

unique news articles concerning WWE were published during the Class Period, further supporting the efficiency of the market for WWE common stock. Coffman Rpt. ¶36.

*Cammer* **Three: Market Makers**. The number of market makers and arbitrageurs supports a finding of market efficiency because they "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *LSB Industries*, 2018 WL 3913115, at *10; *Winstar*, 290 F.R.D. at 446 ("Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level.").[5] Courts in this Circuit "have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at 92 (citing cases). Here, according to Bloomberg, there were 91 market makers for WWE common stock, which satisfies a finding of efficiency. Coffman Rpt. ¶42; *see Winstar*, 290 F.R.D. at 449 (six market markers evidenced market efficiency); *Carpenters*, 310 F.R.D. at 92 (holding 51 market makers sufficient).

*Cammer* **Four: SEC Registration Form S-3**. "The ability to file [a Form S-3 registration statement] indicates that the company is easily able to issue new securities," and is evidence of market efficiency. *Winstar*, 290 F.R.D. at 447. A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for 12 consecutive months and possesses a market capitalization of at least $75 million. *See* 17 C.F.R. §239.13. Based on his analysis, Mr. Coffman found no evidence that WWE was not S-3 eligible during the Class Period. Coffman Rpt. ¶45. This factor therefore supports a finding of market efficiency.

*Cammer* **Five: Price Reaction**. The fifth (and final) *Cammer* factor allows, but does not require, plaintiffs to submit "direct evidence" demonstrating a "cause and effect relationship

---

[5] The NYSE does not have market makers as the term was used in *Cammer*, and instead relies on "a computerized system to match orders and provide quotes" and minimum requirements for listing that "virtually guarantee a liquid market for the security." Coffman Rpt. ¶41.

between unexpected corporate events or financial releases and an immediate response in the stock price." *Waggoner*, 875 F.3d at 94. In this Circuit, "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies," particularly where the "indirect" *Cammer* and *Krogman* factors provide compelling evidence of market efficiency. *Waggoner*, 875 F.3d at 96-98. Here, the first four *Cammer* factors, and all of the *Krogman* factors, support market efficiency, obviating the Court's need to analyze the fifth *Cammer* factor. *Pirnik*, 327 F.R.D. at 45 n.3 ("As Plaintiffs easily satisfy the first four Cammer factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact."); *Carpenters*, 310 F.R.D. at 86 ("In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it."); *Signet*, 2019 WL 3001084, at *13 (finding market efficiency on basis of first four *Cammer* factors and three *Krogman* factors).

However, Plaintiff has also established the fifth *Cammer* factor. Mr. Coffman "performed an event study to determine whether WWE Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no meaningful WWE-related news."[6] Coffman Rpt. ¶49. After controlling for market and industry factors, Mr. Coffman's event study found "a clear cause-and-effect relationship between new public information about WWE and the market price of WWE Common Stock." *Id.* As the report details, Mr. Coffman has shown through empirical analyses based on the results of his event study that WWE's stock price reacted in an efficient manner to new information about the Company. *Id.* at ¶¶46-65; *see Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 98 (S.D.N.Y. 2018) (finding efficiency even where defendants were able to "poke[] some holes" in

---

[6] "'[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.'" *Petrobras*, 862 F.3d at 278 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)).

plaintiffs' expert's conclusions, as "the event study goes to the basic premise of *Cammer* 5"). Thus, Mr. Coffman's analysis further establishes market efficiency.

*Krogman* **One: Market Capitalization**.[7] During the Class Period, WWE had an average market capitalization of $3.39 billion, based on between 43.7 million and 47.5 million shares of WWE common stock outstanding. Coffman Rpt. ¶¶67-68. This supports a finding of market efficiency. *See, e.g.*, *Carpenters*, 310 F.R.D at 92 (quarterly market capitalization ranging from $0.5 to $3.2 billion indicated market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (market capitalization of $292 to $585 million supported market efficiency); *Billhofer*, 281 F.R.D. at 154 ($288 million to $717 million market capitalization supported efficiency).

*Krogman* **Two: Bid/Ask Spread**. The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares. *See Krogman*, 202 F.R.D. at 478. "[A] small bid-ask spread indicate[s] that trading in the stock [is] inexpensive, suggesting efficiency." *Strougo*, 312 F.R.D. at 316. During the Class Period, the time-weighted average percentage bid-ask spread for WWE Common Stock in each month was between 0.023% and 0.037%. Coffman Rpt. ¶71. This is well within what courts have found indicative of market efficiency. *See Signet*, 2019 WL 3001084, at *12 (noting that "the average bid-ask spread for all stocks trading on the NYSE and NASDAQ was .68%"); *In re Am. Realty Capital Props., Inc. Litig.*, No. 15-mc-40-AKH, 2017 WL 3835881, at *1 (S.D.N.Y. Aug. 31, 2017) (bid-ask spread averaging 0.18% supported efficiency).

*Krogman* **Three: Public Float**. A stock's public float is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities. A higher public float indicates greater market efficiency. *Krogman*, 202 F.R.D. at 478. Here, WWE's public float

---

[7] Market capitalization is an indicator of market efficiency because investors have a greater incentive to invest in more highly-capitalized corporations, and such companies tend to be more well-known, and closely followed. *See Krogman*, 202 F.R.D. at 478.

was more than 98% of shares outstanding. Coffman Rpt. ¶72. The large size and high percentage of WWE's float supports a finding of market efficiency. *See Signet*, 2019 WL 3001084, at *12 (finding public float ranging from 99.4 and 99.8% to "weigh heavily in favor of a finding of market efficiency"); *McIntire*, 38 F. Supp. 3d at 433 (finding that float between 57% and 69% of shares outstanding supported efficiency).

### (iii) Additional Factors Support a Finding of Market Efficiency

The Coffman Report also addresses three additional factors that demonstrate market efficiency: institutional ownership (Coffman Rpt. ¶73); autocorrelation (*id.* at ¶¶74-76); and the presence of option trading (*id.* at ¶78). High institutional ownership has been considered indicative of market efficiency. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). Here, 559 major institutions owned WWE stock during the Class Period, further supporting a finding of market efficiency. Coffman Rpt. ¶73; *see LSB Industries*, 2018 WL 3913115, at *12 (finding ownership of company stock by 251 major institutions supported efficiency). Mr. Coffman also ran accepted autocorrelation analyses, which "test[] for the presence of a statistical relationship between price changes (also known as returns) on successive trading dates," *Billhofer*, 281 F.R.D at 160, finding "no evidence of autocorrelation," further indicating an efficient market. Coffman Rpt. ¶77. Finally, Mr. Coffman also analyzed the option trading activity related to WWE – activity that academics have cited as "improv[ing] efficiency by permitting an expansion of the contingencies that are covered by the market." *Id.* at ¶78. According to Mr. Coffman, there was "considerable option trading in WWE Common Stock during the Class Period," supporting a finding of market efficiency. ¶78.

Because all of the *Cammer* and *Krogman* factors, as well as additional market analyses, demonstrate here that the market for WWE's common stock was efficient during the Class Period, Plaintiff is entitled to rely on the fraud-on-the-market presumption of reliance.

### (b)     Reliance Is Presumed Under *Affiliate Ute*

Where, as here, a claim "involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* at 153-54. The *Affiliated Ute* presumption reflects the reality that where no positive statements exist "'reliance as a practical matter is impossible to prove.'" *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013). Furthermore, because materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 466.

Plaintiff's Complaint includes numerous allegations regarding what Defendants' failed to disclose. *E.g.*, ¶¶160, 223, 234, 246, 249, 251, 253, 255-262, 267, 269, 271-273, 279, 283, 285. Under these circumstances, a showing of reliance on the omissions is unnecessary, even if Plaintiff also alleges that WWE disseminated affirmative misstatements. *See Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) ("[T]he theory behind the *Affiliated Ute* presumption . . . is not undermined simply because a defendant makes misstatements at the same time it omits material information.").

### (c)     Damages May Be Calculated On a Class-Wide Basis, Supporting a Finding of Predominance

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), "the Supreme Court held that, 'at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case[,]' and that 'courts must conduct a rigorous analysis to determine whether that is so.'" *Signet*, 2019 WL 3001084, at *19. As the Second Circuit acknowledged, *Comcast* does not require "a finding that damages are capable of measurement on a classwide basis." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015). "All that is required at

class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).

While not necessary for class certification, damages in this case can be calculated on a class-wide basis using a common methodology. *See Signet*, 2019 WL 3001084, at *20 ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate.").

Mr. Coffman concludes that "damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole." Coffman Rpt. ¶84. Specifically, Mr. Coffman explains that there "is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act" known as the "out-of-pocket" method, which measures damages as "the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale." *Id.* ¶79. To quantify artificial inflation, Mr. Coffman proposes the use of an "event study," which will "measure[] price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations." *Id.* ¶82. Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process. *Id.* ¶80. Courts frequently find that an event study is "the generally accepted method for measuring damages in a securities fraud class action." *Signet*, 2019 WL 3001084, at *20; *Waggoner*, 875 F.3d at 105-06 (common damages issues predominated where model measured harm due to defendants' fraud by examining share price decline after corrective disclosures); *JPMorgan*, 2015 WL 10433433, at *7 (common damages issues predominated where plaintiffs' expert proposed calculating class-

wide, per-share damages through an event study analysis of the inflation caused by the alleged misrepresentations). Accordingly, common issues concerning damages predominate.

### 2.    Superiority Is Established

Four factors are relevant when determining whether a class action is superior to other methods for fair and efficient adjudication: (1) the interests of members of the class in "individually controlling the prosecution of defense of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). It is widely recognized that "[s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3)." *In re MF Glob. Holdings Ltd. Inv. Litig.,*, 310 F.R.D. 203, 239 (S.D.N.Y. 2015). Indeed, each of the superiority factors is satisfied here.

First, the proposed Class consists of hundreds if not thousands of potential claimants "who are asserting claims based on predominantly common issues" and, as a result, "[a]djudicating individual claims would be a significant waste of judicial resources." *Billhofer*, 281 F.R.D. at 164; *see also In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-cv-11515-WHP, 2008 WL 344715, at *2 (S.D.N.Y. Feb. 4. 2008) (securities class action "superior to other methods for adjudication because separate actions would be inefficient and repetitive"). Second, Plaintiff is unaware of any other related securities litigation commenced by Class members. Third, "concentrating the litigation in this forum would promote judicial economy." *In re Pfizer Sec. Litig.*, 282 F.R.D. 38, 53 (S.D.N.Y. 2012). Finally, Plaintiff does not foresee any management difficulties that will preclude this action from being maintained as a class action. Indeed, "[l]itigating each case separately would be wasteful, and result in delay and in inefficient

expenditure of judicial resources." *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008). Thus, the superiority requirement of Rule 23(b)(3) is satisfied.[8]

### C.      The Court Should Appoint Labaton Sucharow As Class Counsel

Under Rule 23(g)(4), the Court must appoint counsel who will fairly and adequately represent the Class and, to that end, considers: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 (S.D.N.Y. 2013).

Here, Labaton Sucharow has investigated and vigorously pursued the Class' claims in the action and will continue to do so. In detailed briefing on Defendants' motion to dismiss, Labaton Sucharow demonstrated its knowledge of applicable law. Additionally, as discussed above, *see supra* at 12-13, and as supported by its firm résumé, *see* Villegas Decl., Ex. B, Labaton Sucharow has consistently demonstrated its ability to litigate securities cases, has extensive knowledge of the applicable securities laws, and has proven its willingness to commit substantial time and resources to representing the Class. Finally, Labaton Sucharow has no known conflicts that would prevent it from fairly and adequately representing the Class. Plaintiff respectfully requests that the Court appoint Labaton Sucharow as Class Counsel pursuant to Rule 23(g).

## IV.      CONCLUSION

Plaintiff respectfully requests that the Court certify the proposed Class and appoint Plaintiff as Class Representative and Labaton Sucharow as Class Counsel.

---

[8] The proposed Class meets the implied "ascertainability requirement" of Fed. R. Civ. P. 23 because it is defined using objective criteria that establish membership with definite boundaries. *Petrobras*, 862 F.3d at 257, 264-65 (2d Cir. 2017) (declining to adopt a heightened ascertainability requirement).

Dated:  October 6, 2020

LABATON SUCHAROW LLP

*/s/ Carol C. Villegas*
Carol C. Villegas
Christine M. Fox
Domenico Minerva
Ross M. Kamhi
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
Email: cvillegas@labaton.com
        cfox@labaton.com
        dminerva@labaton.com
        rkamhi@labaton.com

***Counsel for Lead Plaintiff Firefighters'
Pension System of the City of Kansas City,
Missouri Trust and the Proposed Class***