# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>   vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS, and MICHELLE D. WILSON,<br><br>      Defendants. | Civil Action No. 1:20-cv-02031-JSR |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL
OF PROPOSED CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 2

I.      Procedural History and Lead Plaintiff's Investigation........................................ 2

II.     Discovery and Class Certification ................................................. 4

III.    Negotiation of the Settlement and the Terms of the Proposed Settlement ........................ 6

ARGUMENT ................................................................................ 7

I.      PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED ................ 7

        A.      Standards for Preliminary Approval of a Proposed Class Action
                Settlement ........................................................................ 7

        B.      Rule 23(e)(2)(A): Zealous Representation............................................. 9

        C.      Rule 23(e)(2)(B): The Settlement Is the Product of Good Faith,
                Informed, and Arm's-Length Negotiations by Experienced Counsel ................... 9

        D.      Rule 23(e)(2)(C): The Settlement Provides Significant and Certain
                Benefits ......................................................................... 11

                1.      Despite Strong Claims, Many Risks to Recovery Remained ................... 11

                2.      The Effective Process for Distributing Relief to the Settlement
                        Class............................................................................ 17

                3.      The Settlement Does Not Excessively Compensate Lead Counsel .......... 18

        E.      Rule 23(e)(2)(D): Class Members Are Treated Equitably Relative to
                One Another....................................................................... 18

II.     PRELIMINARILY CERTIFICATION OF THE SETTLEMENT CLASS .................... 19

III.    THE PROPOSED NOTICE PROGRAM SHOULD BE APPROVED .......................... 21

IV.     PROPOSED SCHEDULE OF SETTLEMENT-RELATED EVENTS ........................... 23

CONCLUSION................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Battery Techs. Inc. Sec. Litig.*,
298 F.R.D. 171 (S.D.N.Y. 2014) ...................................................................................10, 11

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) .........................................................................................................20

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
293 F.R.D. 459 (S.D.N.Y. 2013) ......................................................................................7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .........................................................................................................20

*In re Citigroup Inc. Bond Litig.*,
296 F.R.D. 147 (S.D.N.Y. 2013) ......................................................................................7

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
No. 12-cv-01203-VEC, 2015 U.S. Dist. LEXIS 181932
(S.D.N.Y. Oct. 15, 2015) .................................................................................................18

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ..............................................................................................8

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) .....................................................................................21

*In re Indep. Energy Holdings PLC*,
No. 00 Civ. 6689 (SAS), 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ............................10

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) .....................................................................................18

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) .....................................................................................16

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) .....................................................................................19

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) .........................................................................................................21

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ......................................................................................10

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................10

*Olkey* v. *Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996)...............................................................12

*In re Patriot Nat'l, Inc. Sec. Litig.*,
    828 F. App'x. 760 (2d Cir. 2020) ..................................................16

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019)..................................................8, 9

*Vaccaro v. New Source Energy Partners L.P.*,
    No. 15 CV 8954 (KMW), 2017 WL 6398636 (S.D.N.Y. Dec. 14, 2017) ..............16

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05-MDL-01695(CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)..............11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)........................................................7, 21

*Yang v. Focus Media Holding Ltd.*,
    No. 11-9051, 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ....................7

**Statutes**

15 U.S.C. § 78u-4(a)(4) ........................................................................19

15 U.S.C. §78u-4(a)(7)(A)-(F)...............................................................22

**Rules**

Fed. R. Civ. P. 23 ..................................................................................8

Fed. R. Civ. P. 23(a) .......................................................................19, 20

Fed. R. Civ. P. 23(b)(3).....................................................................19, 20

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................21

Fed. R. Civ. P. 23(e) .........................................................................1, 7

Fed. R. Civ. P. 23(e)(1)(B) ...................................................................8

Fed. R. Civ. P. 23(e)(2).......................................................................7, 8

Fed. R. Civ. P. 23(e)(2)(A) ...................................................................9

Fed. R. Civ. P. 23(e)(2)(B) ...................................................................9

Fed. R. Civ. P. 23(e)(2)(C) ...................................................................................................11

Fed. R. Civ. P. 23(e)(2)(C)(iv) ............................................................................................19

Fed. R. Civ. P. 23(e)(2)(D) ..................................................................................................18

Fed. R. Civ. P. 23(e)(3)...........................................................................................................8

**OTHER AUTHORITIES**

Francis, Samuel Meet Two-Face: The Dualistic Rule 10b-5 and the Quandary of
   Offsetting Losses by Gains, 77 FORDHAM L. REV. 3045, 3047 (2009) ...................................14

Rubenstein, William B.  Newberg on Class Actions (5th Ed. 2015)............................................7

iv

## PRELIMINARY STATEMENT

Lead Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust ("Lead Plaintiff" or "Kansas City FPS"), on behalf of itself and all other members of the proposed Settlement Class,[1] submits this memorandum of law in support of its unopposed motion for preliminary approval of the proposed settlement reached in the above-captioned class action (the "Action"). The Settlement would provide a recovery of $39,000,000 in cash to resolve this securities class action brought against World Wrestling Entertainment, Inc. ("WWE" or the "Company"), Vincent K. McMahon, George A. Barrios, and Michelle D. Wilson (collectively, "Defendants"). The terms of the proposed settlement are set forth in the Stipulation, which was entered into by all Parties to the litigation.

Lead Plaintiff respectfully submits that the Settlement warrants preliminary approval by the Court given that it is the result of vigorous arm's-length negotiations by experienced counsel overseen by a well-respected mediator, represents a favorable recovery that falls well within the range of possible approval, and is likely to meet all of the approval factors required by Fed. R. Civ. P. 23(e) and Second Circuit precedent. Through the Court's grant of preliminary approval, Lead Plaintiff will be able to provide notice of the Settlement's terms and conditions to potential members of the Settlement Class. A final approval hearing (the "Settlement Hearing") will then be conducted so that the Parties and Settlement Class Members may present arguments and evidence for and against the Settlement, and the Court will then make a final determination as to whether the Settlement is fair, reasonable, and adequate. The Court will also be asked to

---

[1] All capitalized terms used in this memorandum that are not defined have the same meanings as in the Stipulation and Agreement of Settlement, dated December 22, 2020 (the "Stipulation"). The Stipulation is annexed as Exhibit 1 to the Declaration of Carol C. Villegas ("Villegas Decl."), filed herewith.

approve the proposed Plan of Allocation for distributing the proceeds of the Settlement and to consider Lead Counsel's Fee and Expense Application.

The proposed Preliminary Approval Order has been negotiated by the Parties and will, among other things: (i) preliminarily approve the Settlement on the terms set forth in the Stipulation; (ii) preliminarily certify the Settlement Class and appoint Lead Plaintiff as class representative and Lead Counsel as class counsel, for purposes of the Settlement only; (iii) approve the form and content of the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses ("Notice"), Proof of Claim and Release ("Claim Form"), and Summary Notice, attached as Exhibits 1, 2 and 3 to the Preliminary Approval Order; (iv) find that the procedures for distribution of the Notice and Claim Form and publication of the Summary Notice constitute the best notice practicable under the circumstances and comply with due process, Rule 23, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"); (v) set a date and time for the Settlement Hearing, at which the Court will consider final approval of the Settlement, the Plan of Allocation, and Lead Counsel's application for attorneys' fees and expenses, including reimbursement of costs and expenses to Lead Plaintiff pursuant to the PSLRA; and (vi) appoint Epiq Class Action and Claims Solutions, Inc. ("Epiq"), which was selected after a competitive bidding process, to administer the Settlement process.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Procedural History and Lead Plaintiff's Investigation

Starting on March 6, 2020, two related proposed securities class actions were filed in the Court, on behalf of investors in WWE, alleging violations of the Securities Exchange Act of 1934 ("Exchange Act").  On May 12, 2020, the Court consolidated the related actions into this Action.  ECF No. 44.  On May 22, 2020, after oral argument and pursuant to the PSLRA, the

Court issued an order appointing Kansas City FPS as Lead Plaintiff and appointing Labaton Sucharow LLP as Lead Counsel to represent the proposed class.  ECF No. 50.

Prior to and after its appointment, Lead Plaintiff engaged in a thorough investigation for the purpose of drafting a comprehensive amended complaint that would survive the strictures of the PSLRA, which included, the review and analysis of: (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (ii) publicly available information, including press releases, WWE earnings call transcripts, news articles, and other public statements issued by or concerning the Company and the Defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) other publicly available information and data concerning the Company; (v) declarations provided by WWE to Lead Counsel; and (vi) the applicable law governing the claims and potential defenses.  Through its own internal investigation and the assistance of the investigative firm Gryphon Strategies, Lead Counsel identified approximately 293 former WWE employees and other persons with relevant knowledge, contacted 179, and interviewed 71 of them.  Lead Counsel also consulted with an expert on damages and loss causation issues.

On June 8, 2020, Lead Plaintiff filed the Consolidated Amended Class Action Complaint (the "Complaint") asserting claims against Defendants WWE, McMahon, Wilson, and Barrios under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act.  ECF No. 57.  The Complaint asserts claims against WWE and the Individual Defendants arising from Defendants' allegedly materially false and misleading statements and omissions with respect to WWE's (1) "renewal" of a media rights agreement in the Middle East and North Africa ("MENA") region with Orbit Showtime Network ("OSN"), and (2) ability to obtain a replacement media rights

agreement with the Saudi government, with whom WWE stated it had an "agreement in principle" on July 25, 2019.  According to the Complaint, such statements were false and misleading because (1) senior WWE officials had admitted that the agreement with OSN had been terminated early and that renewal of that agreement with OSN was not possible as OSN was exiting its sports broadcasting business; and (2) WWE and the Middle East Broadcasting Company ("MBC")—owned and controlled by the Saudi government and negotiating on the Saudi government's behalf—were worlds apart in negotiations on a MENA media rights deal, even months after WWE's "agreement in principle" statements were issued on July 25, 2019.  In addition, the Complaint alleges that Defendants had motive and opportunity to engage in the fraud, as Defendant McMahon sold $261 million in WWE stock on March 27, 2019, just a few days prior to the effective date of the termination of the OSN agreement and the close of WWE's fiscal quarter ended March 31, 2019.  The Complaint further alleges that the price of WWE common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements and omissions, and that WWE's stock price declined when the truth was revealed through a series of partial disclosures on April 25, 2019, October 31, 2019, January 30, 2020, and February 6, 2020.

On June 26, 2020, Defendants filed their motion to dismiss, ECF No. 58 & 66, which Lead Plaintiff opposed, ECF No. 61.  After oral argument, on August 6, 2020 the Court denied Defendants' motion, upholding Lead Plaintiff's claims relating to both the OSN "renewal" and "agreement in principle" portions of the case.  ECF No. 68.  On August 19, 2020, the Court entered the Case Management Plan, with a trial ready date of February 22, 2021.  ECF No. 79.

## II.    Discovery and Class Certification

In connection with formal discovery, which commenced in late August 2020 when the

PSLRA discovery stay was lifted, Lead Plaintiff and Defendants exchanged extensive written discovery of the Parties and relevant third-parties.  Lead Plaintiff spent dozens of hours conferring with Defendants and third parties over the scope of fact discovery.

Defendants produced documents to Lead Plaintiff totaling over 822,000 pages, and Lead Plaintiff produced documents totaling 2,950 pages to Defendants.  Lead Plaintiff's investment manager, who purchased and/or sold WWE common stock on Lead Plaintiff's behalf during the Class Period, produced 26,365 pages of documents, and Lead Plaintiff's custodian produced 26 pages of documents.  Lead Plaintiff's investment consultant also produced an additional 632 pages to Defendants.  Lead Plaintiff also obtained more than 258,000 pages of documents from six different third-parties.  In total, approximately 1.1 million pages of documents were produced by the Parties and third parties in connection with formal discovery.

Here, as part of fact discovery, Lead Counsel negotiated with Defendants concerning the production of electronically stored information, took three remote depositions of WWE employees, and was preparing for the depositions of additional WWE witnesses, including the Individual Defendants, at the time the Parties settled.  Lead Plaintiff retained an industry expert in media rights and an insider trading expert, who were in the process of preparing expert reports.  Lead Plaintiff also retained a jury consultant experienced in securities class actions.

On October 6, 2020, Lead Plaintiff filed its motion for class certification and appointment of class counsel, which was accompanied by a report from Lead Plaintiff's expert Chad Coffman, on market efficiency and common damages methodologies.  ECF Nos. 85-87.  On November 3, 2020, Defendants filed their opposition to Lead Plaintiff's motion for class certification and appointment of class counsel.  ECF No. 94.  In connection with Lead Plaintiff's October 6, 2020 class certification motion, Defendants deposed, and Lead Plaintiff defended the

depositions of, a representative from Lead Plaintiff, as well as Lead Plaintiff's expert, Chad Coffman. Defendants also deposed, and Lead Plaintiff cross-examined, a representative from Lead Plaintiff's investment manager William Blair. Lead Plaintiff was in the process of finalizing its reply in support of class certification at the time the Parties agreed to settle.

## III.    Negotiation of the Settlement and the Terms of the Proposed Settlement

In October 2020, counsel for the Parties met and conferred on the possibility of a pre-trial resolution of the Action. Specifically, the Parties agreed to engage in a mediation and subsequently retained JAMS mediator Robert A. Meyer, Esq. to act as mediator in the Action. Mr. Meyer is a well-respected mediator with substantial experience in securities class actions.

On November 17, 2020, Lead Counsel, a representative from Kansas City FPS, and Defendants' Counsel, among others, participated in a full-day, ten hour mediation session before the Mediator. Unable to reach a resolution on that day, the mediation continued on November 18, 2020. In advance of the mediation, the Parties submitted detailed mediation statements to the Mediator, together with more than 100 exhibits, which highlighted each of the Party's best facts and arguments, and addressed both liability and damages issues. At the conclusion of the mediation on November 18, 2020, the Parties reached an agreement to settle the Action based on the Mediator's proposed recommendation, which was memorialized in a binding term sheet executed and finalized on that day (the "Term Sheet"), subject to the execution of a "customary long form" stipulation and agreement of settlement and related papers. The next day, November 19, 2020, the Parties notified the court of the Settlement and requested a stay of the Action, which was ordered on November 23, 2020. ECF No. 100.

The Parties subsequently negotiated the Stipulation, which sets forth the final terms and conditions of the Settlement, including, among other things, a release of all claims asserted

against Defendants in the Action and related claims ("Released Plaintiff's Claims"), in return for a cash payment on behalf of Defendants of $39,000,000 for the benefit of the Settlement Class.

## ARGUMENT

I.   **PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED**

A.   **Standards for Preliminary Approval of a Proposed Class Action Settlement**

Public policy favors settlement of litigation. *See Yang v. Focus Media Holding Ltd.,* No. 11-9051, 2014 WL 4401280, at *3 (S.D.N.Y. Sept. 4, 2014) ("[W]hen exercising discretion to approve a settlement, courts are mindful of the strong judicial policy in favor of settlements[.]"[2] This is especially so in securities class actions.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116-17 (2d Cir. 2005) ("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy.").

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the court for approval, and the settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see In re Citigroup Inc. Bond Litig.,* 296 F.R.D. 147, 154 (S.D.N.Y. 2013); *In re Am. Int'l Grp., Inc. Sec. Litig.,* 293 F.R.D. 459, 464 (S.D.N.Y. 2013). District court review of a class action settlement proposal is a two-step process. William B. Rubenstein, Newberg on Class Actions §13:12 (5th Ed. 2015). The first step is a preliminary, pre-notification determination of whether notice of the proposed settlement should be sent to the class. *Id*. at §13:13.

Rule 23(e) was recently amended to, among other things, specify that the crux of a court's preliminary approval evaluation is whether notice should be provided to the class given

---

[2] All internal quotations and citations are omitted, unless otherwise noted.

the likelihood that the court will be able to finally approve the settlement, after considering the required factors enumerated in Rule 23(e)(2), and be able to certify the class. Rule 23(e)(1)(B). Rule 23(e)(2) provides that a court may approve a proposed settlement that would bind class members "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:"

    (A)    class representatives and counsel have adequately represented the class;

    (B)    the proposal was negotiated at arm's length;

    (C)    the relief provided for the class is adequate, taking into account:

        (i)    the costs, risks, and delay of trial and appeal;

        (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

        (iv)    any agreement required to be identified under Rule 23(e)(3); and

    (D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[3]  The Rule 23 amendment, which became effective in December 2018, has not changed the overall standard for approving a settlement, *i.e.* whether or not the settlement is fundamentally fair, adequate, and reasonable. The proposed Settlement here readily satisfies all these factors and should be preliminarily approved. *See, e.g., In re Payment Card Interchange*

---

[3] In assessing these core factors at the final approval stage, the Court may also consider the Second Circuit's long-standing approval factors, many of which overlap with the Rule 23 factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability and damages; (5) the risks of maintaining the class action through the trial; (6) the ability of the defendants to withstand a greater judgment; and (7) the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation. *See Detroit v. Grinnell Corp*., 495 F.2d 448, 463 (2d Cir. 1974).

*Fee & Merch. Disc. Antitrust Litig.,* 330 F.R.D. 11, 60 (E.D.N.Y. 2019).

B.      **Rule 23(e)(2)(A): Zealous Representation**

Lead Plaintiff and Lead Counsel have zealously prosecuted this Action on behalf of the class since its inception and will continue to do so throughout the administration of the Settlement to secure and deliver its benefits.   Lead Plaintiff was an active and informed participant in the litigation which, among other things, testified before this Court as to its ability to supervise counsel and oversee the litigation during the Lead Plaintiff hearing, and was deposed by Defendants.   Faithfully executing this duty, Lead Plaintiff oversaw the drafting of a robust Complaint containing over 130 pages of detailed allegations, discovery, and Lead Plaintiff's motion for class certification.   Lead Plaintiff attended the two-day mediation, was aware of both the Settlement Class's and Defendants' best arguments concerning liability and damages, and was consulted on and approved the  terms of the Settlement.

Likewise, Lead Counsel developed a deep understanding of the facts of the case and merits of the claims through (i) a comprehensive investigation that involved, among other things, a review of publicly available information regarding the Company and interviews of former employees; (ii) briefing on Defendants' motion to dismiss; (iii) engaging in extensive discovery efforts; and (iv) working with experts in media rights, insider trading, jury consulting, and damages and loss causation issues.   In consultation with its damages expert, Lead Counsel evaluated the potential damages in the case and negotiated vigorously to secure the $39 million recovery.   Accordingly, the Settlement Class has been, and remains, well represented.

C.      **Rule 23(e)(2)(B): The Settlement Is the Product of Good Faith,
          Informed, and Arm's-Length Negotiations by Experienced Counsel**

"Where the proposed settlement appears to be the product of serious, informed, non–collusive negotiations, has no obvious deficiencies, does not improperly grant preferential

treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *In re NASDAQ Mkt.-Makers Antitrust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y. 1997). A strong presumption of fairness attaches where a settlement is "reached by experienced counsel after arm's length negotiations." *In re Advanced Battery Techs. Inc. Sec. Litig.*, 298 F.R.D. 171, 179 (S.D.N.Y. 2014). The Settlement is entitled to this presumption because it was achieved after thorough arm's-length negotiations over two days of mediation by well-informed and experienced counsel—on both sides.[4] *See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (Courts give "great weight … to the recommendations of counsel[.]").

Here, Lead Plaintiff is represented by an experienced and skilled firm in securities class litigation. *See* Villegas Decl., Ex. 2. Lead Counsel believes that the achieved Settlement is an excellent result for the Settlement Class given the attendant risks to ongoing litigation and recommends that the Settlement be preliminarily approved.

Second, Lead Plaintiff and Lead Counsel only agreed to settle the claims after a rigorous factual investigation and consultation with experts, and after testing the Parties' claims and defenses through a mediation process overseen by a highly experienced third-party neutral, Mr. Robert A. Meyer of JAMS. In fact, the accepted Settlement was the product two full-days of mediation and was the result of Mr. Meyer's own recommendation to the Parties. "[T]hat the Settlement was reached . . . with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable." *In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003).

---

[4] Defendants were represented by two well-regarded law firms: Paul, Weiss, Rifkind, Wharton & Garrison LLP and K&L Gates LLP.

Finally, the Settlement was negotiated with the oversight of Lead Plaintiff, a sophisticated institutional investor, which recommends that the Settlement be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05-MDL-01695(CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("[U]nder the PSLRA, a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'").   Thus, the procedurally fair manner in which this Settlement was reached weighs strongly in favor of granting approval.

### D.      Rule 23(e)(2)(C): The Settlement Provides Significant and Certain Benefits

#### 1.      Despite Strong Claims, Many Risks to Recovery Remained

To determine whether the proposed Settlement is fair, reasonable, and adequate, courts balance the continuing risks of litigation against the benefits afforded to class members through settlement.   Although Lead Plaintiff and Lead Counsel believe the claims to be strong, they acknowledge that Defendants advance several substantial arguments concerning liability and damages.   It is well known that "[s]ecurities class actions present hurdles to proving liability that are particularly difficult for plaintiffs to meet." *In re Advanced Battery*, 298 F.R.D. at 177.

With respect to liability, Lead Plaintiff would have faced significant hurdles in connection with ultimately proving materiality, falsity, and reliance given the nature of the claims.   For instance, with respect to the "renewal" statements, Defendants were expected to advance evidence supporting the arguments that: (i) the term "renewal" is widely used to refer to agreements respecting rights in the same market—not to just refer to an extension or continuation of an existing agreement with a particular counterparty, as alleged in the Complaint, potentially rendering Defendants' "renewal" misstatements not actionable; (ii) the OSN agreement contributed only a trivial amount of revenue to WWE's overall earnings; (iii) some market participants, including Lead Plaintiff's investment manager, were aware that OSN was in

financial difficulty and had closed its sports channels in March 2019, prior to Defendants' announcement of the cancellation of the OSN agreement on July 26, 2019; (iv) Lead Plaintiff's investment manager did not purchase WWE stock until after WWE's disclosure of the OSN cancellation, undermining Lead Plaintiff's reliance on the "renewal" statements; and (v) both analysts and the market price of WWE did not react to the disclosure of the OSN cancellation. Given the evidence advanced or likely to be advanced by Defendants at class certification, summary judgment and trial, Lead Plaintiff faced significant challenges in establishing reliance, materiality, and falsity for the renewal statements.  The loss of such statements would have led, at minimum, to a significantly shortened Class Period, materially reducing recoverable damages.

Similarly, Lead Plaintiff would have faced significant challenges in connection with ultimately proving falsity, scienter, and reliance for the "agreement in principle" statements. Defendants were expected to advance evidence supporting the arguments that attendant risk warnings and statements by Defendants concerning the agreement in principle with the Saudis, of which Lead Plaintiff's investment manager (and the market) was aware, fully, fairly, and accurately conveyed the risk that the potential agreement was both non-binding and might not occur.  Defendants also would have likely argued that they explicitly quantified for investors the most likely downside scenario should an agreement not be reached, thus "warn[ing] investors of exactly the risk the plaintiffs claim was not disclosed." *Olkey* v. *Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, at *5 (2d Cir. 1996).  Further, Defendants would have likely argued that their actions were fully consistent with and supportive of the genuine belief that an agreement with the Saudis was expected to be executed shortly.  The Company relied on the existence of what Defendants believed to be an agreement in principle when WWE issued its financial guidance, elected not to pursue deals with other potential counterparties in the region, terminated a pre-existing contract

with another commercial partner, and sought to secure office space in Saudi Arabia. These arguments would have provided Defendants with a persuasive foundation to argue that the Class Period should end no later than October 31, 2019, because the market could not have been misled after that point about the status of the Saudi deal or its impact on the Company's financials given Defendants' increasingly negative disclosures on the topic.

Additionally, Lead Plaintiff would have faced obstacles to pleading and proving that Defendants acted with the required intent to defraud or severe recklessness necessary to establish Defendants' scienter. Specifically, Defendants likely would have argued, among other things, that: (i) they facilitated the early termination of OSN agreement to make WWE's MENA media rights available to the Saudis; (ii) they reasonably believed, after independent inquiry, that they had an agreement in principle with the Saudis at that time; (iii) the evidence advanced by Lead Plaintiff in the Complaint in support of scienter concerning the interruption of the live feed from the Crown Jewel event and related flight delay were not caused by Defendants' allegedly deteriorating relationship with the Saudis; and (iv) Defendants were in advanced negotiations for a media rights deal with key players in the Saudi government capable of securing such an agreement.

Furthermore, even if the hurdles to establishing liability were overcome, Lead Plaintiff would have confronted significant challenges in proving loss causation and damages. Defendants would have likely argued that certain of the allegedly corrective disclosures repackaged already available public information or failed to provide any correction of the alleged misstatements given the robust risk warnings and cautionary statements by Defendants throughout the Class Period. If such arguments were accepted by the Court or a jury, in whole or part, they would have dramatically limited any potential recovery.

Lead Plaintiff consulted with an expert in damages and loss causation who has worked on numerous securities class action matters, and who analyzed class wide damages in light of the facts and circumstances presented in the case and developed through the discovery process. The Complaint alleged four disclosure dates where information concerning Defendants' alleged fraud was releveled to the market.

Lead Plaintiff's expert has estimated that maximum damages attributable to the four alleged fraud-related disclosure dates are approximately $559.1 million.[5]   However, this "best case" scenario is impossible to achieve as it does not disaggregate the non-fraud related causes of downward stock movement on the four alleged corrective disclosure dates.  Lead Plaintiff's expert determined that the stock price declines on each of these dates would need to be disaggregated to remove the portion of the declines related to confounding non-fraud related information.[6]   Using discovery produced in the case, Lead Plaintiff's expert performed a disaggregation analysis on each of the four disclosure dates and determined that a reasonable estimate of class wide damages would be approximately $215 million for the full Class Period.  The Settlement represents approximately 18.2% of this estimate of achievable damages.

Lead Plaintiff's expert also considered other scenarios based on the factual record,

[5] These damage estimates assume that gains on pre-class period purchases accrued during the class period are removed or "netted."  *See* Samuel Francis, *Meet Two-Face: The Dualistic Rule 10b-5 and the Quandary of Offsetting Losses by Gains,* 77 Fordham L. Rev. 3045, 3047 (2009) ("Courts emphasizing the compensation objective have taken a netting approach to damages that offsets gains and losses stemming from different transactions.").

[6] For example, on April 25, 2019, WWE issued lower-than-expected guidance for its second quarter of 2019, which Lead Plaintiff alleged was caused *in part* by the unknown risk that the WWE would not receive in 2Q19 the revenues associated with the OSN agreement, which had expired on March 31, 2019.  Complaint ¶ 371.  On that day, WWE also disclosed 1Q19 financial results, revealing that revenues had fallen year over year on declines in the live events and consumer products segments, which was unrelated to the alleged fraud. ¶ 372.  These non-fraud related disclosures and their impact on the stock price decline on April 25, 2019 would need to be identified in order to determine a reasonable estimate of damages.

Defendants' arguments, and risks related thereto.  If Defendants were successful at convincing the Court at class certification or summary judgment, or a jury at trial, that there was no liability for certain statements or no loss causation for certain alleged corrective disclosures, then the Class Period would effectively be shortened, significantly reducing recoverable damages.

*First,* Defendants have argued (among other things) that Lead Plaintiff could not prove falsity, materiality, or reliance in connection with the "renewal" statements related to the OSN agreement.  If Defendants were successful in convincing a Court or a jury that there was no liability for these statements, then the Class Period would effectively be shortened – and instead of beginning on February 7, 2019, the Class Period would begin on July 25, 2019, and run through February 5, 2020.  Lead Plaintiff's expert has estimated that a reasonable estimate of disaggregated damages for this period would be approximately $187.5 million. The Settlement represents approximately 20.8% of this disaggregated maximum.[7]

*Second,* Defendants have argued that the negative language and risk warnings used by Defendants to describe the status of the agreement in principle as the Class Period progressed eliminate or mitigate liability after the January 30, 2020 disclosure.  Lead Plaintiff's expert has estimated that if the Class Period were shortened to July 25, 2019 through January 30, 2020, then the disaggregated damages would be approximately $159.5 million.  The Settlement represents approximately 24.4% of this disaggregated maximum.  In short, there are many moving elements and risks in this case – elements and risks that would only be resolved up through and including trial (assuming the case survived summary judgment).

---

[7] If Defendants were successful in having the Class Period begin in July 2019, then one of Lead Plaintiffs most compelling facts to support scienter – McMahon's $261 million trade in March 2019, would no longer be relevant.

The below table provides a range of possible outcomes and percentages of recovery, assuming various permutations of liability over various potential Class Periods:

| Class Period | Disaggregated Damages | Percentage of Recovery ($39 million settlement) |
|---|---|---|
| 2.7.19 – 2.5.20 | $214.7 | 18.2% |
| 2.7.19 – 1.30.20[8] | $179.9 | 21.7% |
| 7.25.19 – 2.5.20 | $187.5 | 20.8% |
| 7.25.19 – 1.30.20 | $159.5 | 24.4% |

These percentages of recovery are well above the range of settlements that have received approval within this District. *See, e.g.*, *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (affirming district court's approval of settlement representing 6.1% of the class's maximum potentially recoverable damages); *Vaccaro v. New Source Energy Partners L.P.*, No. 15 CV 8954 (KMW), 2017 WL 6398636, at *6 (S.D.N.Y. Dec. 14, 2017) (approving settlement representing 6.5% of the maximum recoverable damages and noting that the settlement amount is "in line with other settlements in securities class actions"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages").

Moreover, the $39 million recovery is well-above the median settlement amount of $8.8 million for securities class actions between 1996 and 2018, is higher than the median recovery in 2019 of $11.5 million, and is higher than the average recovery in 2019 of $27.4 million. *See*, Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2019 Review and*

---

[8] This scenario assumes that Lead Plaintiff would be successful in preserving the renewal statements and the current Class Period start date, but that Defendants would be successful in excluding purchasers after January 30, 2020, as described above.

*Analysis*, at 1, 13 (Cornerstone Research 2020), Villegas Decl., Ex. 3. Thus, compared to other similarly situated cases in 2019, and during the span of the PSLRA, the Settlement is a very favorable outcome for the Settlement Class.

<h2 style="text-align:center">2.    The Effective Process for Distributing Relief to the Settlement Class</h2>

The Settlement, like most securities class action settlements, will be effectuated with the assistance of an established and experienced claims administrator.  The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Namely, a potential class member will submit, either by mail or online using the Settlement website, the Court-approved Claim Form.  Based on the trade information provided by claimants, the Claims Administrator will determine each claimant's eligibility to participate by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determine each eligible claimant's *pro rata* portion of the Net Settlement Fund.  *See* Stipulation at ¶ 24.  Lead Plaintiff's claim will be reviewed in the same manner.  Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims.  *Id*. at ¶ 30(d)-(e).  Any claim disputes that cannot be resolved will be presented to the Court for a determination.  *Id*.

After the Settlement reaches its Effective Date (*id*. at ¶ 39) and the claims process is completed, Authorized Claimants will be issued payments.  If there are un-claimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions.  At this point, if there are unclaimed funds, Lead

Plaintiff will request Court approval of a *cy pres* beneficiary, after conferring with counsel for WWE. *Id*. at ¶ 27.

### 3. The Settlement Does Not Excessively Compensate Lead Counsel

As an initial matter, the reasonableness of attorneys' fees will be decided by the Court after Lead Counsel files a motion for attorneys' fees and Litigation Expenses. The Settlement does not contemplate any specific award. Lead Counsel will be compensated out of the Settlement Fund, under the common fund doctrine, and will not be compensated by Defendants. In connection with Lead Counsel's Fee and Expense Application, Lead Counsel will seek no more than 18% of the Settlement Fund, an amount that is well-below the percentages that courts in the Second Circuit have approved in class actions with comparable recoveries. *See, e.g., In re Monster Inc. Sec.. Litig.*, 07-cv-2237-JSR (awarding 25% of $47.5 million settlement); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 149 (S.D.N.Y. 2010) (awarding 33.3% of $35 million ERISA class action settlement); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, No. 12-cv-01203-VEC, 2015 U.S. Dist. LEXIS 181932, at *12 (S.D.N.Y. Oct. 15, 2015) (awarding 30% of $33 million settlement). Counsel will also seek payment of Litigation Expenses incurred during the prosecution of the Action, in an amount not to exceed $550,000. Lead Counsel is aware of the Court's practice of awarding Litigation Expenses and 50% of awarded fees upon approval and the remaining 50% of fees when the Net Settlement Fund is distributed to eligible claimants.

### E. Rule 23(e)(2)(D): Class Members Are Treated Equitably Relative to One Another

The Settlement does not improperly grant preferential treatment to either Lead Plaintiff or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Lead Plaintiff, will receive a distribution from the Net Settlement Fund pursuant to the Plan of

Allocation approved by the Court.[9]  The proposed plan was created by Lead Plaintiff's damages expert and is consistent with Lead Plaintiff's theories of damages under the Exchange Act.  All Class Members that were allegedly harmed as a result of the alleged fraud, and that have an eligible claim pursuant to the Plan of Allocation, will receive their *pro rata* share of the Net Settlement Fund based on their "Recognized Claim" under the plan. Notice at ¶¶ 52-69.  *See, e.g.*, *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008) ("A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is presumptively reasonable.").[10]

## II.   PRELIMINARILY CERTIFICATION OF THE SETTLEMENT CLASS

For the reasons set forth in its previously filed motion for class certification (ECF Nos. 85-87), Lead Plaintiff respectfully requests that the Court preliminarily certify the Settlement Class for purposes of the Settlement only, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.  The proposed Settlement Class, which has been stipulated to by the Parties, is "all persons and entities who or which purchased or otherwise acquired the publicly traded

---

[9]   Lead Plaintiff will seek reimbursement of its reasonable costs and expenses (including lost wages) directly related to its participation in the Action, pursuant to the PSLRA.  This would not constitute preferential treatment. *See* 15 U.S.C. § 78u-4(a)(4) (reimbursement of a plaintiff's costs and expenses is explicitly contemplated, in addition to receiving a *pro rata* portion of the recovery).

[10]  Rule 23(e)(2)(C)(iv) also requires the disclosure of any agreement between the Parties in connection with the proposed Settlement.  Here, on November 18, 2020 the Parties entered into a settlement term sheet and on December 22, 2020, they entered into a confidential Supplemental Agreement Regarding Requests for Exclusion, (the "Supplemental Agreement"). Stipulation at ¶ 41. The Supplemental Agreement sets forth the conditions under which Defendants have the option to terminate the Settlement in the event that requests for exclusion from the Settlement Class exceed a certain agreed-upon threshold.  As is standard in securities class actions, the Supplemental Agreement is kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual settlement. Pursuant to its terms, the Supplemental Agreement may be submitted to the Court *in camera* or under seal.  The Supplemental Agreement, Stipulation, and term sheet are the only agreements concerning the Settlement entered into by the Parties.

common stock of WWE during the period from February 7, 2019 through February 5, 2020, inclusive, and were damaged thereby."[11] *See* Stipulation at ¶ 1(ii).

Pursuant to Rule 23(a): (1) the Settlement Class is so numerous that joinder of all members is impracticable (ECF No. 86 at 8-9); (2) there are questions of law or fact common to the Settlement Class (*id.* at 9-10); (3) the claims or defenses of Lead Plaintiff are typical of the claims or defenses of the Settlement Class (*id.* at 11-12); and (4) Lead Plaintiff and Lead Counsel will fairly and adequately protect the interests of the Settlement Class (*id.*).

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The proposed Settlement Class meets this standard: (i) common questions of both fact and law predominate, given the presumptions of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) (ECF No. 86 at 14-23); and (ii) a class action would be superior to other methods for the fair and efficient adjudication of the claims (*id.* at 24).

Courts within the Second Circuit have long acknowledged the propriety of certifying settlement classes. "Certification of a settlement class has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of

---

[11] Excluded from the Settlement Class are: (i) Defendants; (ii) members of the Immediate Family of any Individual Defendant; (iii) any person who was an officer or director of WWE during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) WWE's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Also excluded from the Settlement Class are any persons or entities who or which exclude themselves by submitting a valid request for exclusion that is accepted by the Court.

claims by relatively small claimants." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 186 (S.D.N.Y. 2012). For the foregoing reasons, Lead Plaintiff respectfully requests that the Court preliminarily certify the Settlement Class for purposes of implementing the proposed Settlement.

## III.   THE PROPOSED NOTICE PROGRAM SHOULD BE APPROVED

The proposed Notice and Summary Notice, attached as Exhibits 1 and 3 to the proposed Preliminary Approval Order, would satisfy due process, the federal rules, and the PSLRA. Rule 23(c)(2)(B) requires notice of the pendency of the class action to be "the best notice that is practicable under the circumstances." It must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Due process is satisfied if the notice "fairly apprise[s] the [prospective] members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc.* 396 F.3d at 114.

Collectively, the proposed forms of notice here describe, *inter alia*: (i) the terms of the Settlement and the recovery; (ii) the reasons for the Settlement; (iii) the maximum attorneys' fees and expenses that may be sought; (iv) the procedures for requesting exclusion from the Settlement Class and objecting; (v) the procedure for submitting a claim; (vi) the proposed Plan of Allocation for distributing the settlement proceeds to the Settlement Class; and (vii) the date, time and place of the Settlement Hearing (which can be held in-person or remotely, in the Court's discretion).  The Notice also satisfies the PSLRA's separate requirements by, *inter alia,* stating: (i) the amount of the Settlement determined in the aggregate and on an average per share basis; (ii) that the Parties do not agree on the average amount of damages per share that would be recoverable; (iii) that Lead Counsel intends to make an application for attorneys' fees and expenses (including the amount of such fees and expenses on an average per share basis); (iv) the

names, telephone numbers, and addresses of Lead Counsel; and (v) the reasons why the Parties

are proposing the Settlement. 15 U.S.C. §78u-4(a)(7)(A)-(F).

The proposed notice program uses the "gold standard" method in securities cases for

notifying class members: individual notice by mail, publication in *The Wall Street Journal*, a

national newspaper focusing on investors, and dissemination over the internet using a wire

service.  To the extent email addresses are provided to the Claims Administrator, the Notice will

also be emailed.  Upon entry of the Preliminary Approval Order, the Claims Administrator will

mail the Notice and Claim Form to all Class Members who can be identified and located, using

information provided by WWE's transfer agent, as well as information provided by banks,

brokers, and other nominees about their customers who may have eligible purchases.[12]  The

Notice and Claim Form will be available on the Settlement website and Lead Counsel's website.

Lead Plaintiff also requests that the Court appoint Epiq Class Action and Claims

Solutions, Inc. as the Claims Administrator to provide all notices approved by the Court, to

process Claim Forms, and to administer the Settlement. Epiq is a nationally recognized notice

and claims administration firm that has successfully and efficiently administered numerous

complex securities class action settlements, including the Petrobras settlement that was before

the Court.  *See* Villegas Decl. Ex. 4.  Epiq was chosen after a competitive bidding process.  Its

fees and expenses, payable from the Settlement Fund, will be based primarily on the number of

notices mailed and claims processed, but it has estimated that if 50,000 notices are mailed and

---

[12] Because of the availability of name and address data for potential class members from third-parties, and the Claims Administrator's ability to reach class members through individual mailed notice, Lead Counsel and the Claims Administrator have conferred and determined that using social media outreach would not be necessary here.

10,000 claims are received, Notice and Administration Expenses will total approximately $250,000.

## IV.     PROPOSED SCHEDULE OF SETTLEMENT-RELATED EVENTS

Lead Plaintiff respectfully proposes the following schedule for Settlement-related events. The proposed schedule revolves around the date that the Court enters the Preliminary Approval Order and the date on which the Court schedules the final Settlement Hearing—which Lead Plaintiff requests be approximately 100 days from entry of the Order in order to comply with the Class Action Fairness Act and to allow recipients of the Notice sufficient time to act, given the global COVID-19 pandemic:

| Event | Proposed Timing |
|---|---|
| Deadline for mailing the Notice and Claim Form to Settlement Class Members (the "Notice Date") | *No later than 10 business days after entry of Preliminary Approval Order.* |
| Deadline for publishing the Summary Notice | *Within 14 calendar days of the Notice Date.* |
| Deadline for filing motions in support of final approval of the Settlement, Plan of Allocation, and Lead Counsel's application for attorneys' fees and expenses | *No later than 35 calendar days before the Settlement Hearing.* |
| Deadline for receipt of requests for exclusion or objections | *Received no later than 21 calendar days before the Settlement Hearing.* |
| Deadline for filing reply papers | *No later than 7 calendar days before the Settlement Hearing.* |
| Deadline for submitting Claim Forms | *Seven (7) calendar days before the Settlement Hearing.* |
| Settlement Hearing | *At the Court's convenience, approximately 100 days from entry of the Preliminary Approval Order.  The hearing can be held either in-person or remotely, in the discretion of the Court.  Any scheduling updates will be posted on the Settlement website and Lead Counsel's website.* |

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully request that the Court enter the proposed Preliminary Approval Order, submitted herewith, which will: (i) preliminarily approve the Settlement; (ii) approve the proposed manner and forms of notice to the Settlement Class; (iii) appoint Epiq as Claims Administrator; (iv) set a date and time for the Settlement Hearing to consider final approval of the Settlement and related matters, and grant such other and further relief as may be required.

DATED: December 23, 2020                    **LABATON SUCHAROW LLP**

                                            */s/ Carol C. Villegas*
                                            Carol C. Villegas
                                            Christine M. Fox
                                            Domenico Minerva
                                            Ross M. Kamhi
                                            140 Broadway
                                            New York, New York 10005
                                            Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477
                                            Emails: cvillegas@labaton.com
                                                    cfox@labaton.com
                                                    dminerva@labaton.com
                                                    rkamhi@labaton.com

                                            *Counsel for Lead Plaintiff Firefighters'*
                                            *Pension System of the City of Kansas City,*
                                            *Missouri Trust and the Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 23, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

<u>/s/ <i>Carol C. Villegas</i></u>
CAROL C. VILLEGAS
