# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS, and MICHELLE D. WILSON, <br><br> Defendants. | Civil Action No. 1:20-cv-02031-JSR |

**MEMORANDUM OF LAW IN IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND <u>APPROVAL OF PLAN OF ALLOCATION</u>**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..............................................................................................................................3

I.      THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL....................................................3

      A.      The Law Favors and Encourages Settlement of Class Action Litigation ...............3

      B.      The Standards for Final Approval...........................................................................4

      C.      Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class.....................................................................................................5

      D.      The Settlement Was Reached after Robust Arm's-Length Negotiations ...............7

      E.      The Relief Provided by the Settlement Is Adequate...................................................8

            1.      The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement ..........................................................9

            2.      The Risks of Establishing Liability and Damages Support Approval of the Settlement ......................................................................................10

                  (a)      Risks to Proving Liability .............................................................11

                  (b)      Risks Related to Proving Loss Causation and Damages ...............12

             3.      The Risks of Maintaining Class Certification...........................................16

      F.      The Effective Process for Distributing Relief to the Settlement Class.................17

      G.      The Anticipated Attorneys' Fees and Expenses are Reasonable..........................18

      H.      The Relief Provided in the Settlement Is Adequate Taking Into Account all Agreements Related to the Settlement...................................................................18

      I.      Application of the Remaining *Grinnell* Factors Support Approval of the Settlement ............................................................................................................19

            1.      The Ability of Defendants to Withstand a Greater Judgment....................19

            2.      The Reaction of the Settlement Class to the Settlement ...........................19

3. The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement........................20

4. The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and all the Attendant Risks of Litigation Support Approval of the Settlement ...........................................................21

II. THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED.................................22

III. NOTICE TO THE CLASS SATISFIED THE  REQUIREMENTS OF RULE 23 AND DUE PROCESS ....................................................................................24

CONCLUSION...........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anixter v. Home-Stake Prod. Co.*,
    77 F.3d 1215 (10th Cir. 1996) ...........................................................................................10

*In re AOL Time Warner, Inc.*, *Sec. and ERISA Litig.*,
    No. 02 cv 5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)............................................10, 11

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) ..........................................................................................6

*In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012)............................................................................. *passim*

*In re Canadian Superior Sec. Litig.*,
    No. 09 Civ. 10087(SAS), 2011 WL 5830110 (S.D.N.Y. Nov. 16, 2011) ...............................22

*In re Citigroup Inc. Sec. Litig.*,
    No. 09 MD 2070 (SHS), 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ..................................4

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)......................................................................................5, 10, 19

*City of Providence v. Aeropostale Inc. et al.*,
    No. 11 civ. 7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd*,
    *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015)...........................................................8

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014)..............................................................................................13

*Dura Pharms.*, *Inc. v. Broudo*,
    544 U.S. 336 (2005).........................................................................................................12

*Ebbert v. Nassau Cnty.*,
    No. CV 05-5445 AKT, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) ..................................17

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    No. MDL 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F.
    App'x. 37 (2d Cir. 2016) .................................................................................................7, 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02–CV–3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ...........................................23

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) .........................................................................24

*In re Gilat Satellite Networks*, *Ltd.*,
  No. CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .............................9

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .........................................................................19

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)...................................................................................5

*In re GSE Bonds Antitrust Litig.*,
  No. 19-CV-1704 (JSR), 2019 WL 6842332 (S.D.N.Y. Dec. 16, 2019) ...................8

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) ...........................................................4, 15, 22, 23

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................................................9, 23

*In re Marsh & McLennan Cos. Sec. Litig.*,
  No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)................25

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  246 F.R.D. 156 (S.D.N.Y. 2007) .........................................................................22

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  No. 02 MDL 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)...................22

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972).................................................................................21

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).............21, 23

*In re Patriot Nat'l, Inc. Sec. Litig.*,
  828 F. App'x. 760 (2d Cir. 2020).........................................................................22

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) .........................................................................5, 8

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ...........................................................................6

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ...........................................................................10

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
 258 F. Supp. 2d 254 (S.D.N.Y. 2003) ...................................................................10

*Teachers' Ret. Sys. of La., v. A.C.L.N. Ltd*,
 No. 01-cv-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ......................................19, 21

*In re Telik, Inc. Sec. Litig.*,
 576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...........................................................9, 11, 15

*In re Veeco Instruments Inc. Sec. Litig.*,
 No. 05 MDL 01695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007). ..........................................8

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
 396 F.3d 96 (2d Cir. 2005) ..................................................................... *passim*

*In re Warner Chilcott Ltd. Sec. Litig.*,
 No. 06 Civ. 11515, 2009 WL 2025160 (S.D.N.Y. July 10, 2009) ........................................20

**Statutes**

15 U.S.C. § 78u-4(a)(7) ................................................................................25

15 U.S.C. § 78u-4(e) ..................................................................................23

**Rules**

Fed. R. Civ. P. 23(a) .................................................................................17

Fed. R. Civ. P. 23(b)(3) ..............................................................................17

Fed. R. Civ. P. 23(c)(1)(C) ...........................................................................16

Fed. R. Civ. P. 23(c)(2)(B) ...........................................................................25

Fed. R. Civ. P. 23(e) ........................................................................1, 4, 5, 24

Fed. R. Civ. P. 23(e)(2) .............................................................................4, 5

Fed. R. Civ. P. 23(e)(2)(A) .............................................................................6

Fed. R. Civ. P. 23(e)(2)(B) .............................................................................7

Fed. R. Civ. P. 23(e)(2)(C) ..........................................................................8, 17

Fed. R. Civ. P. 23(e)(2)(C)(i) ..........................................................................8

Fed. R. Civ. P. 23(e)(2)(C)(iv) ........................................................................18

Fed. R. Civ. P. 23(e)(3) ...............................................................................4

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Court-appointed Lead Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust ("Lead Plaintiff" or "Kansas City FPS"), on behalf of itself and all other members of the proposed Settlement Class,[1] respectfully submits this memorandum of law in support of its motion for final approval of the proposed Settlement of the above-captioned class action (the "Action"), approval of the proposed plan of allocation for the proceeds of the Settlement (the "Plan of Allocation"), and final certification of the Settlement Class.

## PRELIMINARY STATEMENT

As detailed in the Stipulation, Lead Plaintiff and World Wrestling Entertainment, Inc. ("WWE" or the "Company"), Vincent K. McMahon, George A. Barrios, and Michelle D. Wilson (collectively, "Defendants") have agreed to a settlement of the claims in the Action, and the release of all Released Claims, in exchange for a payment of $39,000,000 in cash.  The terms of the Settlement are set forth in the Stipulation, which was previously filed with the Court.  ECF No. 104-1.

As detailed in the accompanying Declaration of Carol C. Villegas in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses (the "Villegas Declaration" or "Villegas Decl."), filed herewith,[2] Lead Counsel has: (i) conducted a robust

---

[1] All capitalized terms not otherwise defined below have the same meanings given to them in the Stipulation and Agreement of Settlement, dated December 22, 2020 (the "Stipulation"), previously filed with the Court (ECF No. 104-1).

[2] The Villegas Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation; among other things.  Citations to "¶" in this memorandum refer to paragraphs in the Villegas Declaration.  All exhibits referenced below are attached to the Villegas Declaration.  For clarity, citations to exhibits that themselves

international investigation concerning the allegedly fraudulent misrepresentations and omissions; (ii) prepared and filed a detailed amended class action complaint; (iii) researched and drafted an opposition to Defendants' comprehensive motion to dismiss the amended complaint, after which the Court entered an Order denying Defendants' motion in its entirety; (iv) moved for class certification, and was in the process of finalizing Lead Plaintiff's reply in further support of class certification at the time the Parties agreed to settle; (v) took or defended six depositions and was preparing for the depositions of additional deponents, including the Individual Defendants; (vi) analyzed more than 1,080,000 pages of documents produced by Defendants and third parties; (vii) engaged in extensive expert discovery, including retaining professionals with expertise in loss causation and damages, insider trading, and the media rights industry; and (viii) engaged in trial preparation, including retaining and consulting with jury focus consultants and preparing for remote jury focus groups.  At the time the Settlement was reached, Lead Counsel had a thorough understanding of the strengths and weaknesses of the Action.

The Settlement is also the product of extensive arm's-length negotiations between the Parties, which included two full-day in-person mediation sessions under the auspices of a respected and experienced mediator, Robert Meyer Esq. of JAMS.  After two-days of mediation, the Parties agreed, in principle, to a settlement based on the Mediator's recommendation, subject to the negotiation of a mutually acceptable long form stipulation of settlement.  ¶¶100-04.

The Settlement is a very favorable result in light of the risks of continued litigation.  While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants are strong, they recognize that the Action presented a number of substantial risks, including certifying a class

---

have attached exhibits will be referenced as "Ex. ___ - ___."  The first numerical reference is to the designation of the entire exhibit attached to the Villegas Declaration and the second reference is to the exhibit designation within the exhibit itself.

for the full alleged Class Period and rebutting Defendants' loss causation arguments, among other risks. While Lead Plaintiff would advance credible counter arguments to Defendants' liability defenses, it nonetheless recognizes a substantial risk that Defendants' anticipated summary judgment and *Daubert* motions might be granted. These risks are in addition to the genuine risk of a much smaller recovery, or no recovery at all.

In light of the recovery for the Settlement Class and the risks to continued litigation, as discussed further below and in the Villegas Declaration, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate, and warrants final approval by the Court. *See* Declaration of Barbara Davis on Behalf of Kansas City FPS, Ex. 1.

Additionally, Lead Plaintiff requests that the Court approve the proposed Plan of Allocation, which was set forth in the Notice sent to Settlement Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, Chad Coffman, CFA, of Global Economics Group LLC, provides a reasonable and equitable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims. The Plan of Allocation is fair and reasonable and should likewise be approved.

## ARGUMENT

## I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

### A.    The Law Favors and Encourages Settlement of Class Action Litigation

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the

class action context.'").[3]  This policy would be well-served by approval of the Settlement of this complex securities class action, that absent resolution, would consume years of additional time of this Court.

## B.     The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval.  The Settlement should be approved if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In ruling on final approval of a class settlement, courts in the Second Circuit have held that a court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms.  *See Visa*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014); *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 188 (S.D.N.Y. 2012).

Pursuant to the amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors:

(A)     whether the class representatives and class counsel have adequately represented the class;

(B)     whether the proposal was negotiated at arm's length;

(C)     whether the relief provided for the class is adequate, taking into account:

   i.     the costs, risks, and delay of trial and appeal;

   ii.    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

   iii.   the terms of any proposed ward of attorneys' fees, including timing of payment; and

   iv.    any agreement required to be identified under Rule 23(e)(3); and

---

[3] All internal quotations and citations are omitted unless otherwise stated.

(D)      whether the proposal treats class members equitably relative to each other.

In *City of Detroit v. Grinnell Corp.*, the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Visa*, 396 F.3d at 117; *In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265-66 (S.D.N.Y. 2012).

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23 (e)(2) Advisory Committee Notes to 2018 Amendments. Indeed, "[t]he Court understands the new Rule 23(e) factors to add to, rather than displace, the Grinnell factors." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019). Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four factors set forth in Rule 23(e)(2), and will also discuss the application of relevant, non-duplicative factors traditionally considered by the Second Circuit.

### C.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, the court should consider

whether the "class representatives and class counsel have adequately represented the class."  Rule 23(e)(2)(A).  *See also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (noting that "the adequacy requirement 'entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation'").

There can be little doubt that Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class.  As set forth in Lead Plaintiff's motion for class certification, Lead Plaintiff, like all other members of the Settlement Class, acquired shares of WWE during the Class Period, when its value was allegedly artificially inflated by false and misleading statements and omissions. Thus, the claims of the Settlement Class and Lead Plaintiff would prevail or fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiff and all members of the Settlement Class.  *See, e.g., In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Further, Lead Plaintiff was an active and informed participant in the litigation and, among other things, testified during the hearing on lead plaintiff appointment as to its ability to supervise counsel and oversee the litigation.  Lead Plaintiff (i) regularly communicated with Lead Counsel regarding the posture and progress of the Action; (ii) reviewed and/or discussed all significant pleadings and motions filed in the Action; (iii) reviewed and/or discussed significant decisions in the Action; (iv) coordinated and reviewed Kansas City FPS's production of documents and written discovery responses to Defendants; (v) contacted Kansas City FPS's investment managers and others responsible for Kansas City FPS's investments in WWE's securities; (vi) virtually attended

two court hearings – during one of which Kansas City FPS was questioned by the Court; (vii) virtually participated in a full day deposition; (viii) virtually participated in two full day mediations sessions; and (ix) evaluated and approved the proposed Settlement. *See* ¶160; Ex. 1 at ¶6.

Additionally, throughout the Action, Lead Plaintiff had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases. During the course of the litigation, Labaton Sucharow developed a deep understanding of the facts of the case and the merits of the claims. *See* generally Villegas Decl. at §§III-VI. Moreover, Lead Counsel is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 4-C) and was able to successfully conduct the litigation against skilled opposing counsel.[4] Accordingly, the Settlement Class has been, and remains, well represented.

### D.     The Settlement Was Reached after Robust Arm's-Length Negotiations

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). A settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *Visa*, 396 F.3d at 116; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. MDL 12-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016).

The Settlement here merits such a presumption of fairness because it was achieved after thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced Mediator, and after an extensive investigation into the claims. As noted above and in the Villegas Declaration, the Parties and their counsel were well informed

---

[4] Defendants were represented by three well-regarded law firms: Paul, Weiss, Rifkind, Wharton & Garrison LLP, K&L Gates LLP, and Day Pitney LLP.

about the strengths and weakness of the case before agreeing to settle.  The judgment of Lead Counsel—a law firm that is highly experienced in securities class action litigation—that the Settlement is in the best interests of the Settlement Class is entitled to "great weight."  *City of Providence v. Aeropostale Inc. et al.*, No. 11 civ. 7132, 2014 WL 1883494, at \*5 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015).  Moreover, Lead Plaintiff took an active role in supervising the litigation, as envisioned by the PSLRA, and endorses the Settlement.  *See* Ex. 1.  A settlement reached "with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'"  *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at \*5 (S.D.N.Y. Nov. 7, 2007).

### E.      The Relief Provided by the Settlement Is Adequate

In determining whether a class-action settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors.  Fed. R. Civ. P. 23(e)(2)(C).  "This inquiry overlaps significantly with a number of Grinnell factors, which help guide the Court's application of Rule 23(e)(2)(C)(i)."  *In re GSE Bonds Antitrust Litig.*, No. 19-CV-1704 (JSR), 2019 WL 6842332, at \*2 (S.D.N.Y. Dec. 16, 2019) (Rakoff, J.).  Indeed, "[t]his assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 36.

####     1.      The Complexity, Expense, and Likely Duration
         of the Litigation Support Approval of the Settlement

Securities class actions like this one are by their nature complicated, and district courts in this Circuit have long recognized that "[a]s a general rule, securities class actions are 'notably difficult and notoriously uncertain' to litigate." *In re Facebook,* 2015 WL 6971424, at *3; *Bear Stearns,* 909 F. Supp. 2d at 266; *In re Gilat Satellite Networks*, *Ltd*., No. CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute.").

This case was no exception.  As discussed in the Villegas Declaration, the case involved complicated and intricate issues related to loss causation, falsity, scienter, and materiality within the sphere of international media rights in general, and WWE's agreements within the MENA region and with the Saudi Arabian government in particular.  Additionally, prevailing on summary judgment and then achieving a litigated verdict at trial (and sustaining any such verdict in the appeals that would inevitably ensue) would have been a very complex and risky undertaking that would have required substantial additional time and expense.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

Indeed, the trial of the Action here would have required extensive expert testimony on numerous contested issues, including falsity, materiality, scienter, causation and damages.  Courts routinely observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate.  *See, e.g., In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited…").

Of course, even if Lead Plaintiff had prevailed at trial, it is virtually certain that appeals would be taken, which would have, at best, substantially delayed any recovery for the Settlement Class. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery."). At worst, there is always a risk that the verdict could be reversed by the trial court or on appeal. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).

### 2. The Risks of Establishing Liability and Damages Support Approval of the Settlement

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463. In most cases, this will be the most important factor for the Court to consider in its analysis of the proposed settlement. *See Id.* at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."). While Lead Plaintiff and Lead Counsel believe the claims asserted against Defendants are meritorious, they recognize that the Action presented several substantial risks to establishing both liability and damages. Securities class actions present hurdles to proving liability that are difficult for plaintiffs to meet. *See In re AOL Time Warner, Inc., Sec. and ERISA Litig.*, No. 02 cv 5575, 2006 WL 903236, at *11 (S.D.N.Y. Apr. 6, 2006) (noting that "[t]he difficulty of establishing liability is a

common risk of securities litigation").  Here, in particular, Defendants would have vigorously challenged Lead Plaintiff on falsity, scienter and loss causation.

### (a)  Risks to Proving Liability

**Falsity.**  At summary judgment and trial, Defendants would strenuously maintain that Lead Plaintiff failed to establish that Defendants' statements were false and misleading.  For example, Lead Plaintiff would have to establish that the "renewal" statements were false and that, contrary to Defendants' likely counter arguments and evidence, "renew" in the context of Defendants' statements meant renewal of the agreement ***with OSN***, not entering into any agreement with a counterparty within the region.  Defendants would also argue that the cancellation of the OSN agreement was already known to the market, so the renewal statements were not understood by the market to refer to the OSN agreement.  ¶75.

Lead Plaintiff would also have to establish that Defendants did not in fact have an agreement in principle with the Saudis.  In addition, Defendants would likely argue that the inability to ultimately close on the agreement with the Saudis was a risk that was sufficiently warned of by Defendants, particularly by their stressing publicly that the agreement in principle was "nonbinding."  ¶76.  While the Court credited Lead Plaintiff's falsity theory in connection with the motion to dismiss, discovery to date was mixed, and Defendants could have succeeded in these arguments at subsequent stages of the litigation.

**Scienter.**  Lead Plaintiff also faced a significant challenge in proving that Defendants acted with scienter as "[p]roving a defendant's state of mind is hard in any circumstances." *Telik,* 576 F. Supp. 2d at 579.  While McMahon's $261 million in stock trades were deemed suspicious enough to infer a finding of scienter at the motion to dismiss stage, Defendants would likely introduce evidence at summary judgment and at trial about legitimate reasons for the stock trades to rebut this inference and counter Lead Plaintiff's expert's testimony on the issue.  ¶79.  As

discussed below, Lead Plaintiff could also lose the ability to present evidence of McMahon's stock sale if Defendants were to succeed in their arguments for shortening the Class Period.

Furthermore, Lead Plaintiff must establish that Defendants knew (or believed) or were reckless in not knowing (or reckless in not believing) that their renewal statements were false and that they did not have an agreement in principle with the Saudis. With respect to the later, Lead Plaintiff obtained evidence which Lead Plaintiff contends supports Lead Plaintiff's claim that Defendants did not believe (or *should not* have believed) an agreement in principle had been reached, however it was unclear how a jury would view the lengthy negotiations and the longstanding relationship between WWE and the Saudi government. Moreover, Defendants would likely have strong arguments that the agreement in principle statement, even if not believed by Defendants, was not made with the requisite intent to deceive.  ¶80.

In short, it was far from certain that Lead Plaintiff would be able to prove the falsity of Defendants' statements and Defendants' scienter through summary judgment and at trial.

### (b)      Risks Related to Proving Loss Causation and Damages

Another principal challenge in continuing the litigation is the difficulty of proving loss causation and damages, which would have been hotly contested by Defendants, particularly in the context of class certification and summary judgment, and would continue to be challenged in *Daubert* motions, at trial, in post-trial proceedings and appeals.  To succeed at trial "a plaintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms*., *Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

Though Lead Plaintiff's damages expert estimated maximum aggregate damages of approximately $559.1 million if Lead Plaintiff prevailed on all of its claims and pre-class period gains were netted, and a more realistic estimate of $215 million after disaggregation of non-fraud related information, Defendants and their experts would have made several credible arguments

that would have reduced damages, potentially significantly.  *See generally* Villegas Decl. §§V.B.5. and V.B.6.

Lead Counsel expects that Defendants would have vigorously persisted in arguing, at summary judgment, trial, and on appeal, that much of the declines in WWE's stock price were not attributable to Defendants' allegedly false and misleading statements and omissions.  Defendants would likely have argued that the first alleged disclosure, on April 25, 2019, did not reveal any information related to the alleged fraud, and that the last two alleged disclosures, on January 30, 2020 and February 6, 2020, revealed information that was already known to the market.  ¶85; *see Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014) (affirming grant of summary judgement where "the district court concluded that those two disclosures did not add any new information to the market, and as a result, Plaintiffs had not established a genuine dispute of material fact as to loss causation.").  If Defendants succeeded with these arguments, the Class Period would be shortened and damages would be reduced substantially.  ¶¶95-96.

Specifically, with regard to the April 25, 2019 disclosure, Defendants would likely have marshalled evidence to support their argument that the lowered guidance for 2Q19 was unrelated to the early termination of the OSN agreement and therefore this disclosure did not actually correct any of the allegedly false statements.  ¶86.  With regard to the January 30, 2020 disclosure, Defendants likely would have continued to argue that the Adjusted OIBDA announcement of $180 million for 2019 on that date did not reveal anything new to the market, because the possibility of a lower range of results was made publicly available on October 31, 2019 when Defendants lowered Adjusted 2019 OIBDA guidance by $10 to 20 million.  ¶87.  With regard to the February 6, 2020 disclosure, Defendants likely would have continued to argue that this disclosure did not reveal anything new to the market because WWE had already disclosed the full truth concerning

13

the purported fraud when it pre-announced the Adjusted OIBDA for 2019 on October 31, 2019 and January 30, 2020.  ¶88.

While Lead Plaintiff would advance a number of arguments in response, including that each disclosure in fact revealed new, previously concealed information about the alleged fraud, there is no certainty as to how the Court or a jury would decide these issues.  If Defendants' loss causation arguments were sustained, and these corrective disclosures were eliminated, the surviving class period would have been substantially shortened to run only from July 25, 2019 through October 31, 2019, and estimated damages would have fallen, as detailed below.

Additionally, the impact of non-fraud related information on the alleged stock price declines would also likely need to be identified and quantified in order to determine damages. While Lead Plaintiff concedes that some amount of disaggregation would be appropriate, Defendants would argue that a significant amount of the alleged stock price declines on April 25, 2019 and October 31, 2019 were caused by confounding non-fraud related information.  Using discovery produced in the case, Mr. Coffman performed a disaggregation analysis on each of the four disclosure dates and determined that a reasonable estimate of class-wide damages, after disaggregation, was approximately $215 million for the full Class Period.  ¶¶93-94.  However, Defendants would have vigorously countered this analysis with their own contrary expert testimony supporting much lower damages, leaving the issue to a jury to determine.

Furthermore, as noted above, Defendants would continue to maintain that, for several reasons, the Class Period should begin on July 25, 2019 rather than February 7, 2019.  If the Court or jury agreed, Lead Plaintiff and the class would lose any damages associated with the April 25, 2019 disclosure, as well as the scienter allegations concerning McMahon's $261 million stock sale.  Mr. Coffman's estimate of disaggregated damages for this shorter class period was

approximately $187.5 million.  ¶95.

Lead Plaintiff also ran the risk of further reduced damages.  For instance, Defendants have argued that the negative language and risk warnings used by WWE to describe the status of the agreement in principle as the Class Period progressed eliminated or mitigated liability after the January 30, 2020 disclosure.  Lead Plaintiff's expert has estimated that if the Class Period were shortened to July 25, 2019 through January 30, 2020, then the disaggregated damages would be approximately $159.5 million.   Furthermore, if Defendants' loss causation arguments were sustained and both the January 30, 2020 and February 6, 2020 corrective disclosures were removed, the surviving class period would have been substantially shortened and estimated non-disaggregated damages would have fallen to $101 million, with disaggregated damages of just $30.3 million.  ¶96.

While Lead Counsel would work extensively with Lead Plaintiff's damages expert with a view towards presenting compelling arguments to the jury and prevailing on these matters at trial, Defendants would have put forth well-qualified experts of their own who were likely to opine at trial that the Settlement Class suffered little or no damages.  As Courts have long recognized, the substantial uncertainty as to which side's experts' view might be credited by the jury presents a serious litigation risk.  *See IMAX*, 283 F.R.D. at 193 ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts."); *Telik,* 576 F. Supp. 2d at 579-80 (in this "'battle of experts', it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found…").

Given all of these risks with respect to liability, loss causation, and damages, Lead Plaintiff and Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the certain and substantial benefit conferred by the Settlement.

### 3.      The Risks of Maintaining Class Certification

At the time the Parties agreed to settle the Action, Lead Plaintiff had moved for class certification, Defendants had opposed the motion, and Lead Plaintiff was in the midst of preparing its reply in further support of class certification.  Substantial risks and challenges remained in connection with certifying the class.  Defendants' vigorous challenges to class certification "could well devolve into yet another battle of the experts." *Bear Stearns*, 909 F. Supp. 2d at 268.  As set forth in detail in the Villegas Declaration, Defendants argued that: (i) Lead Plaintiff lacked standing to pursue claims related to the renewal statements due to the timing of its purchases of WWE stock; (ii) Lead Plaintiff was atypical of the class and subject to unique defenses; (iii) Lead Plaintiff was an inadequate class representative; and (iv) alternatively, the class definition should be narrowed.  ¶¶32, 68-71.  Although Lead Plaintiff would have contended that each of these arguments should be rejected, there is no way to know how the Court would ultimately rule.  For example, regarding Defendants' arguments on standing, notwithstanding Lead Plaintiff's contention that it did in fact have standing to represent a class for the renewal statements, Lead Counsel recognized the severity of the risk of a negative ruling on the issue, which could have resulted in a shortened class period, decreased damages, and the loss of favorable scienter inferences associated with McMahon's stock sale.  ¶72.

Additionally, class certification can be reviewed and modified at any time by the Court before final judgment.  *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").  Although Lead Plaintiff believes there are strong grounds for certifying a litigation class, discussed in Lead Plaintiff's motion for preliminary approval of the Settlement (ECF No. 102) as well as Lead Plaintiff's motion for class certification (ECF Nos. 85-87), the Settlement avoids any uncertainty with respect to class certification and the risks of maintaining certification of the Settlement Class through trial and on

appeal. *See Ebbert v. Nassau Cnty.*, No. CV 05-5445 AKT, 2011 WL 6826121, at *12 (E.D.N.Y.

Dec. 22, 2011) (risk of de-certification of the certified class supported approval of Settlement).[5]

### F.     The Effective Process for Distributing Relief to the Settlement Class

Rule 23(e)(2)(C) instructs courts to consider whether the relief provided to the class is

adequate in light of the "effectiveness of any proposed method of distributing relief to the class,

including the method of processing class-member claims."  The proceeds of the Settlement will be

distributed with the assistance of an experienced claims administrator.  The Claims Administrator

will employ a well-tested protocol for the processing of claims in a securities class action.  Namely,

a potential class member will submit, either by mail or online using the Settlement website, the

Court-approved Claim Form.  Based on the trade information provided by claimants, the Claims

Administrator will determine each claimant's eligibility to participate by, among other things,

calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation,

and ultimately determine each eligible claimant's *pro rata* portion of the Net Settlement Fund.  *See*

Stipulation at ¶24.  Lead Plaintiff's claim will be reviewed in the same manner.  Claimants will be

notified of any defects or conditions of ineligibility and be given the chance to contest the rejection

of their claims.  *Id.* at ¶30(d)-(e).  Any claim disputes that cannot be resolved will be presented to

the Court for a determination.  *Id.*

---

[5] In the Preliminary Approval Order (ECF No. 107), the Court preliminarily certified the Settlement Class for settlement purposes.  There have been no developments in the case that would undermine that determination and, for all the reasons stated in the Memorandum of Law in Support of Lead Plaintiff's Unopposed to Motion for Preliminary Approval of Proposed Class Action Settlement (ECF No. 102), incorporated herein by reference, Lead Plaintiff now requests that the Court reiterate its prior certification of the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes, and the appointment of Lead Plaintiff as Class Representative and Labaton Sucharow as Class Counsel.

After the Settlement reaches its Effective Date (*id*. at ¶39) and the claims process is completed, Authorized Claimants will be issued payments.  If there are un-claimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions.  At this point, if there are unclaimed funds, Lead Plaintiff will request Court approval of a *cy pres* beneficiary, after conferring with counsel for WWE.  *Id*. at ¶27.

### G.     The Anticipated Attorneys' Fees and Expenses are Reasonable

As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 18% of the Settlement Fund, to be paid when ordered by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation.  Most importantly with respect to the Court's consideration the fairness of the Settlement, is the fact that approval of attorneys' fees are entirely separate from approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.

### H.     The Relief Provided in the Settlement Is Adequate Taking Into Account all Agreements Related to the Settlement

Rule 23(e)(2)(C)(iv) also requires the disclosure of any agreement between the Parties in connection with the proposed Settlement.  On November 18, 2020 the Parties entered into a settlement term sheet and on December 22, 2020, they entered into a confidential Supplemental Agreement Regarding Requests for Exclusion, (the "Supplemental Agreement").  Stipulation at ¶41.  The Supplemental Agreement sets forth the conditions under which Defendants have the option to terminate the Settlement in the event that requests for exclusion from the Settlement

Class exceed a certain agreed-upon threshold. As is standard in securities class actions, the Supplemental Agreement is kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual settlement, to the detriment of the Settlement Class. Pursuant to its terms, the Supplemental Agreement may be submitted to the Court *in camera* or under seal. The Supplemental Agreement, Stipulation, and term sheet are the only agreements concerning the Settlement entered into by the Parties.

### I.    Application of the Remaining *Grinnell* Factors Support Approval of the Settlement

#### 1.    The Ability of Defendants to Withstand a Greater Judgment

The ability of a defendant to pay a judgment greater than the amount offered in settlement is relevant to whether the settlement is fair. *Grinnell*, 495 F.2d at 463. While it is Lead Plaintiff's understanding that Defendants have the ability to fund a settlement given available insurance, continued litigation would put that insurance at risk of dwindling. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) (ability to withstand a greater judgment supports final approval where the "main settlement funds available to the individuals are the insurance proceeds" which "would be largely consumed by defense costs if this litigation were to continue"); *Teachers' Ret. Sys. of La., v. A.C.L.N. Ltd*, No. 01-cv-11814, 2004 WL 1087261, at *4 (S.D.N.Y. May 14, 2004) (likely depletion of insurance supports settlement approval).

#### 2.    The Reaction of the Settlement Class to the Settlement

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy. *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67. Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"), mailed copies of the Notice Packet (consisting of the Notice and Claim Form) to record holders identified in the Company's transfer records and potential

Settlement Class Members and their nominees.  *See* Declaration of Melissa M. Mejia, Ex. 3 at ¶¶2-8.  As of May 5, 2021, Epiq has mailed 46,925 copies of the Notice Packet to potential Settlement Class Members.  *Id*. at ¶8.  In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over the internet using *PR Newswire* on April 5, 2021.  *Id*. at ¶9.

While the deadline set by the Court for Settlement Class Members to object or request exclusion (May 25, 2021) has not yet passed, to date, no objections and only one request for exclusion has been received.  *See In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 Civ. 11515, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval).  As provided in the Preliminary Approval Order, Lead Plaintiff will file reply papers no later than June 8, 2021 addressing any objections and any other requests for exclusion.

### 3.   The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

Here, as detailed in the Villegas Declaration, Lead Counsel conducted a robust international investigation; prepared a comprehensive Complaint; thoroughly opposed Defendants' motion to dismiss the Complaint; moved for certification of the class and substantively prepared Lead Plaintiff's reply; engaged in extremely thorough discovery efforts that led to obtaining more than approximately 1,080,000 pages of documents from Defendants and third-parties; engaged in over 20 phone and videoconference meet and confers with Defendants' Counsel in addition to exchanging correspondence on discovery issues; took, defended, or participated in six depositions, and prepared for at least seven others; retained and had numerous meetings with several experts; prepared for Lead Plaintiff's opposition to summary judgment and trial, including consulting with jury trial experts; and prepared for the mediation.  *See generally* Villegas Decl. at §§III, IV and VI.

Armed with this substantial base of knowledge, Lead Plaintiff was in a position to balance the proposed settlement with a well-educated assessment of the likelihood of overcoming the risks of litigation.  Accordingly, Lead Plaintiff and Lead Counsel respectfully submit that they had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible outcomes at trial.  *Teachers Ret. Sys. of La.*, 2004 WL 1087261, at *3.  The Court thus should find that this factor also supports approval.

### 4. The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and all the Attendant Risks of Litigation Support Approval of the Settlement

Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum."  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  Instead, "in any case there is a range of reasonableness with respect to a settlement…."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).  Lead Plaintiff's damages expert has estimated maximum aggregate damages of approximately $559.1 million if Lead Plaintiff prevailed on all claims, disaggregation of non-fraud related information was not required, and pre-class period gains were netted.  However, and as discussed in detail above, disaggregation was likely and would have had an impact on damages. According to analyses prepared by Lead Plaintiff's damages expert, the more realistic estimate (from Lead Plaintiff's perspective) of class-wide damages, after disaggregation, is $215 million, for the full Class Period, and the Settlement represents approximately 18% of this more realistic assessment of damages.  ¶¶5, 66, 94.  However, if Defendants succeeded on some or all of their arguments that the Class Period should be shorter, then Lead Plaintiff's view of disaggregated damages for a shorter class period would be approximately $187.5 million (with a class period beginning on July 25, 2019) or $159.5 million (if the class period runs from July 25, 2019 through January 30, 2020).  Accordingly, the Settlement represents approximately 7% to 24% of

potentially recoverable damages—and more if the January 30 or February 6 disclosures were lost. ¶¶95-96.

This recovery falls well within the range of reasonableness that courts regularly approve under similar circumstances. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving $40.3 million settlement representing approximately 6.25% of estimated damages and noting was at the "higher end of the range of reasonableness of recovery in class actions securities litigation"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions"); *see also In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x. 760, 762 (2d Cir. 2020) (affirming district court's approval of $6.5 million settlement representing 6.1% of the class's maximum potentially recoverable damages); *In re Canadian Superior Sec. Litig.*, No. 09 Civ. 10087(SAS), 2011 WL 5830110, at *2 (S.D.N.Y. Nov. 16, 2011) (approving a $5.2 million settlement representing 8.5% of maximum damages which the court noted "exceed[s] the average recovery in shareholder litigation").

The Settlement also presents a favorable recovery when compared to industry trends as it is well above the median and average reported settlement amounts in securities class actions in 2020, $13 million and $30 million, respectively (excluding merger objection settlements, settlements for $0 to the class, and settlements of $1 billion or greater). Ex. 6.

## II.   THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d

at 270.  A plan of allocation with a "rational basis" satisfies this requirement.  *FLAG Telecom*, 2010 WL 4537550, at \*21; *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 497.  A plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable.  *See IMAX*, 283 F.R.D. at 192.  However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision."  *PaineWebber*, 171 F.R.D. at 133.

Here, the proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among class members who submit valid Claim Forms.  The Plan is set forth in full in the Notice.  *See* Ex. 3-A at pp. 11-15.  It provides for the distribution of the Net Settlement Fund based upon each Settlement Class Member's "Recognized Claim," as calculated by the formulas described in the Notice.  In developing the Plan, Lead Plaintiff's expert considered the amount of artificial inflation in the per share prices of WWE shares that allegedly was proximately caused by Defendants' alleged false and misleading statements and omissions. ¶¶117-18; Ex. 3-A at ¶¶52-59.  Lead Plaintiff's expert calculated the estimated artificial inflation by considering share price changes in reaction to public disclosures.

Epiq, as the Court-approved Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants, as calculated according to the Plan of Allocation.  A claimant's total Recognized Claim will depend on, among other things, when their shares were purchased and/or sold during the Class Period in relation to the disclosure dates alleged in the Action, whether the shares were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u-4(e) (providing methodology

for limiting damages in securities fraud actions), and the value of the shares when they were sold or held.  Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among the Settlement Class.

For these reasons, Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund.  *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel").  Moreover, as noted above, as of May 5, 2021, 46,925 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed plan, have been sent to potential Settlement Class Members and their nominees (*see* Ex. 3 at ¶8) and, to date, no objections to the proposed plan have been received.

## III.   NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

Lead Plaintiff has provided the Settlement Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Visa*, 396 F.3d at 114.  Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards.

The Notice provided all of the necessary information for Settlement Class Members to make an informed decision regarding the Settlement, the Fee and Expense Application, and the Plan of Allocation. The Notice informed Settlement Class Members of, among other things: (i) the amount of the Settlement; (ii) the reasons why the Parties are proposing the Settlement; (iii) the estimated average recovery per affected share of WWE; (iv) the maximum amount of attorneys'

fees and expenses that will be sought; (v) the identity and contact information for the representatives of Lead Counsel who are reasonably available to answer questions from Settlement Class Members concerning matters contained in the Notice; (vi) the right of Settlement Class Members to object to the Settlement; (vii) the binding effect of a judgment on Settlement Class Members; and (viii) the dates and deadlines for certain Settlement-related events. *See* 15 U.S.C. § 78u-4(a)(7). The Notice also contained the Plan of Allocation and provided Settlement Class Members with information about how to submit a Claim Form in order to be eligible to receive a distribution from the Net Settlement Fund.

In addition, Epiq caused the Summary Settlement Notice to be published in *The Wall Street Journal* and to be released over the internet using *PR Newswire.* Ex. 3 at 9. Epiq also created a webpage for this case, www.WWESecuritesSettlement.com, to provide members of the Settlement Class and other interested persons with information about the Settlement and the applicable deadlines, as well as access to copies of the Notice, the Claim Form, Stipulation, and the Preliminary Approval Order (*id*. at ¶13), and Lead Counsel posted copies of the Notice and Claim Form on its website, Villegas Decl. at ¶163.

This combination of individual first-class mail to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

## **CONCLUSION**

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement as fair, reasonable, and adequate and approve the Plan of Allocation as fair, reasonable, and adequate. Proposed orders will be submitted with Lead Plaintiff's reply papers,

after the deadlines for objections and seeking exclusion have passed.

DATED: May 11, 2021                      **LABATON SUCHAROW LLP**

                                         */s/ Carol C. Villegas*
                                         Carol C. Villegas
                                         Christine M. Fox
                                         Domenico Minerva
                                         Ross M. Kamhi
                                         140 Broadway
                                         New York, New York 10005
                                         Telephone: (212) 907-0700
                                         Facsimile: (212) 818-0477
                                         Emails: cvillegas@labaton.com
                                                 cfox@labaton.com
                                                 dminerva@labaton.com
                                                 rkamhi@labaton.com

                                         *Counsel for Lead Plaintiff Firefighters'*
                                         *Pension System of the City of Kansas City,*
                                         *Missouri Trust and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 11, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

/s/ <u>*Carol C. Villegas*</u>
