**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>WORLD WRESTLING ENTERTAINMENT, INC., VINCENT K. McMAHON, GEORGE A. BARRIOS, and MICHELLE D. WILSON,<br><br>        Defendants. | Case No. 1:20-cv-02031-JSR |

**DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND LEAD COUNSEL'S MOTION FOR AN AWARD OF <u>ATTORNEYS' FEES AND PAYMENT OF EXPENSES</u>**

I, CAROL C. VILLEGAS, declare as follows, pursuant to 28 U.S.C. §1746:

1.      I am a partner of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), which serves as court-appointed Lead Counsel for Lead Plaintiff Firefighters' Pension System of the City of Kansas City, Missouri Trust ("Lead Plaintiff" or "Kansas City FPS").[1]  I have been actively involved throughout the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth below based upon my close supervision of the material aspects of the Action.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation, as well as Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses.  Both motions have the full support of Lead Plaintiff.  *See* Declaration of Barbara Davis on Behalf of Kansas City FPS, attached as Exhibit 1.[2]  To date, there have been no objections to any aspect of the Settlement.

## I.      PRELIMINARY STATEMENT

3.      Lead Plaintiff has succeeded in obtaining a very favorable recovery for the Settlement Class in the amount of $39,000,000 in cash.  As set forth in the Stipulation, in exchange for this payment, the proposed Settlement resolves all claims asserted by Lead Plaintiff and the Settlement Class, which the Court certified for purposes of the Settlement, and all Released Claims against the Released Defendant Parties.  ECF No. 104-1.

---

[1] All capitalized terms not otherwise defined below have the same meaning as that set forth in the Stipulation and Agreement of Settlement, dated as of December 22, 2020 (the "Stipulation", ECF No. 104-1).

[2] Citations to "Exhibit" or "Ex.___" refer to exhibits to this Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference is to the designation of the entire exhibit and the second alphabetical reference is to the exhibit designation within the exhibit itself.

4.      This case was vigorously litigated and settled in under a year, after an expediated briefing and discovery schedule was set by the Court.  The Settlement was achieved only after Lead Counsel, *inter alia* and as detailed below:  (i) conducted a wide-ranging, international investigation concerning the allegedly fraudulent misrepresentations and omissions; (ii) prepared and filed a detailed amended class action complaint; (iii) researched and drafted an opposition to Defendants' comprehensive motion to dismiss the amended complaint, after which the Court entered an Order denying Defendants' motion in its entirety; (iv) moved for class certification, and was in the process of finalizing Lead Plaintiff's reply in further support of class certification at the time the Parties agreed to settle; (v) defended the depositions of Lead Plaintiff and Lead Plaintiff's expert, Chad Coffman, CFA, as well as participated in the deposition of a representative from Lead Plaintiff's investment manager William Blair & Company; (vi) engaged in extensive and thorough fact discovery, including taking three remote depositions of WWE current employees, and preparing for the depositions of additional deponents, including the Individual Defendants, and analyzing more than 1,080,000 pages of documents produced by Defendants and six third-parties; (vii) engaged in extensive expert discovery, including retaining professionals with expertise in (a) materiality, loss causation, and damages, (b) insider trading, and (c) the media rights industry and agreements therein; and (viii) engaged in trial preparation, including retaining and consulting with jury consultants and preparing for remote jury focus groups.  At the time the Settlement was reached, Lead Counsel had a thorough understanding of the strengths and weaknesses of the Action.

5.      As discussed in more detail below, according to Lead Plaintiff's damages expert, maximum aggregate damages in the Action were approximately $559.1 million, if gains on pre-class period purchases were excluded or "netted" and Lead Plaintiff prevailed on each of its

claims and was able to prove that all four of the corrective disclosures were actionable and caused damages. However, after factoring in Lead Plaintiff's expert's analysis "disaggregating" the impact of non-fraud related information on WWE's share prices on each of the four alleged disclosure dates, which would likely need to be done, a more realistic estimate of aggregate damages was approximately $215 million for the full Class Period. The $39 million Settlement, therefore, represents a recovery of more than 18% of Lead Plaintiff's expert's estimate of likely recoverable damages—a favorable recovery that is well within the range of reasonableness, particularly in light of the countervailing legal and factual arguments tenaciously pursued by Defendants and the attendant litigation risks. *See* Section V, below, and the accompanying Memorandum of Law in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Settlement Brief").

6.       In deciding to settle, Lead Plaintiff and Lead Counsel took into consideration the significant risks associated with advancing the claims alleged in the operative complaint, the risks of certifying a class for the full alleged Class Period, and the complexity of the then-upcoming proceedings, including *Daubert* motions directed at experts, summary judgment motions, and trial. The Settlement was achieved in the face of staunch opposition by Defendants who would have, had the Settlement not been reached, continued to raise serious challenges to each of the elements of Lead Plaintiff's claims -- materiality, falsity, scienter, loss causation, reliance, and damages. The Settlement eliminates these risks while providing a guaranteed recovery to the Settlement Class in a timely manner.

7.       In addition to seeking approval of the Settlement, Lead Plaintiff also seeks approval of the proposed Plan of Allocation for distributing the proceeds of the Settlement. As discussed in further detail below and in the Settlement Brief, the proposed Plan of Allocation

was developed by Lead Plaintiff's damages expert and reflects the theory of the case and the alleged disclosures, and would provide for the fair and equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment.

8.      With respect to the Fee and Expense Application, as discussed in Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses ("Fee Brief"), the requested fee of 18% of the Settlement Fund would be eminently fair to the Settlement Class, and warrants the Court's approval.  This fee request is well within the range of fee percentages frequently awarded in this type of action and would provide a reasonable multiplier of approximately 1.5 on Lead Counsel's lodestar to date.  Lead Counsel also seeks litigation expenses totaling $468,375.08, including reimbursement to Lead Plaintiff, pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4), in the amount of $6,286.40— which, when combined, are less than the cap on litigation expenses of $550,000 provided for in the Notice.

## II.      SUMMARY OF LEAD PLAINTIFF'S CLAIMS

9.      World Wrestling Entertainment, Inc., d/b/a WWE ("WWE") is a global sports entertainment company, primarily known for its brand of professional wrestling.  Complaint ¶¶41-42.  In recent years, the Company has become more of a media company, generating, as of 2018, over 70% of its revenue from media, as opposed to tickets or products.  *Id.* ¶43.  As WWE expanded internationally, a key market was the Middle East and North Africa ("MENA") region, and a key element to growth and revenue within the region was (and is) the viability of a media rights agreement in the MENA region.  *Id.* ¶70.

10.      The operative complaint in the Action, the Consolidated Amended Class Action Complaint ("the Complaint") (ECF No. 57), asserts violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder

by WWE, CEO Vincent K. McMahon and former Co-Presidents George A. Barrios and Michelle D. Wilson (collectively, the "Individual Defendants," and, together with WWE, the "Defendants").  Lead Plaintiff alleges that WWE and the Individual Defendants violated Section 10(b) and 20(a) of the Exchange Act by making materially false and misleading statements concerning the Company's former media rights agreement in the MENA region, as well as the prospects for a new media rights agreement in the region.  Lead Plaintiff further alleges that when news of the lack of a media rights agreement in the MENA region was released to the public, the price of WWE common stock declined precipitously, and class members suffered damages as a result.

11.    More specifically, the Complaint alleges that during the Class Period, Defendants misled the market concerning: (i) WWE's "renewal" of a media rights agreement in the MENA region with Orbit Showtime Network ("OSN"); and (ii) WWE's ability to obtain a new replacement media rights agreement with the Saudi government, with whom WWE said it had an "agreement in principle" on July 25, 2019.  In reality, as alleged in the Complaint, Defendants had cancelled the agreement with OSN, which was exiting the sports broadcasting business, with no new agreement in place at the time Defendants discussed a "renewal" with the market. Prior to information being revealed to the market, and immediately prior to the effective date of the termination of the OSN agreement, Defendant McMahon sold $261 million worth of his WWE stock.  In addition, contrary to there being any "agreement in principle" with the Saudi government, WWE was "worlds apart" in its negotiations with the Saudis for a replacement media rights agreement, which did not close at any point during the Class Period.

12.    Corrective information was allegedly released to the market on April 25, 2019 (before the market opened), October 31, 2019 (before the market opened), January 30, 2020

(after the market closed), and February 6, 2020 (before the market opened), impacting the market price of WWE common stock and allegedly removing artificial inflation from the price of the Company's common stock.

## III.   RELEVANT PROCEDURAL HISTORY

### A.   Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

13.     The Action was commenced on March 6, 2020, when two related proposed securities class actions were filed in the Court, on behalf of investors in WWE, alleging violations of the Exchange Act.  On May 12, 2020, the Court consolidated the related actions into this Action.  ECF No. 44.  On May 22, 2020, after oral argument and pursuant to the PSLRA, the Court issued an order appointing Kansas City FPS as Lead Plaintiff and appointing Labaton Sucharow LLP as Lead Counsel to represent the proposed class.  ECF No. 50.

### B.   The Amended Complaint

14.     On June 8, 2020, Lead Plaintiff filed the operative Complaint asserting claims against Defendants WWE, McMahon, Wilson, and Barrios under: (i) Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and (ii) Section 20(a) as against the Individual Defendants.  ECF No. 57.  *Id.*

15.     Prior to and after its appointment, Lead Plaintiff engaged in a thorough investigation for the purpose of drafting a comprehensive amended complaint that would survive the strictures of the PSLRA.  The Complaint was the result of a significant effort by Lead Counsel that included, among other things, the review and analysis of: (i) press releases, news articles, transcripts, and other public statements issued by or concerning the Company and the Individual Defendants; (ii) research reports issued by financial analysts concerning WWE's business; (iii) reports filed publicly by WWE with the U.S. Securities and Exchange Commission

(the "SEC"); (iv) news articles, media reports and other publications concerning the Company's media rights agreements, its growth in the MENA region, and relational difficulties with Saudi Arabian authorities; (v) certain pleadings filed in other pending litigation naming WWE as a defendant; (vi) other publicly available information and data concerning WWE, its securities, and the markets therefor; (vii) sworn declarations of WWE employees provided by Defendants to Lead Counsel; and (viii) information provided by economic experts regarding loss causation and damages.  Through its own internal investigation and the assistance of the international investigative firm Gryphon Strategies, Lead Counsel identified approximately 293 former WWE employees and other persons with relevant knowledge, contacted 179, and interviewed 71 of them.  These individuals were not limited to those located within the United States and many were located abroad, including in the MENA region.

16.     Lead Counsel's preparation of the thorough Complaint required many meetings to discuss strategy and a high degree of partner and senior associate-level hours, given the complexities of the case—such as that the claims turned on facts concerning WWE's contractual relationships with foreign entities—and as a result of the Complaint being due only 17 days after Kansas City FPS was appointed Lead Plaintiff.

17.     Lead Plaintiff's claims centered on allegations that WWE and the Individual Defendants misled the market with respect to WWE's: (i) "renewal" of a media rights agreement in the MENA region with OSN; and (ii) ability to obtain a replacement media rights agreement with the Saudi government, with whom WWE stated it had an "agreement in principle" on July 25, 2019.  According to the Complaint, such statements were false and misleading because: (i) senior WWE officials knew that the agreement with OSN had been terminated early and that renewal of the agreement with OSN was not possible, as OSN was exiting its sports broadcasting

business altogether; and (ii) WWE and the Middle East Broadcasting Company ("MBC")—owned and controlled by the Saudi government and negotiating on the Saudi government's behalf—were worlds apart in negotiations, even months after WWE's "agreement in principle" statements were issued on July 25, 2019.  Both theories of fraud are inextricably linked because when Defendants finally revealed that the OSN agreement had been terminated, they allegedly attempted to blunt the effect of this negative news by announcing that WWE had an "agreement in principle" with the Saudis.  In addition, the Complaint alleges that Defendants had motive and opportunity to engage in the fraud, as Defendant McMahon sold $261 million in WWE stock on March 27, 2019, just a few days prior to the effective date of the termination of the OSN agreement and the close of WWE's fiscal quarter ended on March 31, 2019, and more than three months before disclosing to the public that the OSN deal had ended.  The Complaint further alleges that the price of WWE common stock was artificially inflated and/or artificially maintained as a result of Defendants' allegedly false and misleading statements and omissions, and that WWE's stock price declined when the truth was revealed through a series of partial disclosures on April 25, 2019, October 31, 2019, January 30, 2020, and February 6, 2020.

### C.    Defendants' Motion to Dismiss the Complaint

18.    The Parties engaged in an expedited motion to dismiss briefing schedule, with briefing completed and argument heard in less than two months from when the Complaint was filed.

19.    On June 26, 2020, Defendants filed their motion to dismiss.  ECF Nos. 58, 59. Defendants argued, among other things, that Lead Plaintiff failed to: (i) allege with the required specificity why any of the alleged misstatements were false, or why Defendants' purported omissions were actionable; and (ii) plead the highly particularized allegations of scienter required by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.  Regarding the

falsity of statements, Defendants argued that the statements about the Company's MENA media rights "renewal" and ongoing negotiations for a new deal were not actionable, as they were "accurate" and protected as opinion statements and further protected by the safe harbor for forward-looking statements.  Regarding scienter, Defendants argued that Lead Plaintiff's allegations failed because Lead Plaintiff did not sufficiently demonstrate Defendants' knowledge of their purported falsity, or severe recklessness, as to each alleged misrepresentation or omission, and that the statements of the two confidential witnesses cited in the Complaint were not reliable because neither witness interacted with any of the Individual Defendants. Defendants also argued that the allegations regarding Defendants' stock sales did not support a finding of scienter as a matter of law.  In addition, Defendants contended that Lead Plaintiff did not sufficiently plead loss causation.

20.     Lead Plaintiff filed an opposition to Defendants' motion to dismiss the Complaint on July 14, 2020.  ECF No 61.  Lead Plaintiff argued that it had sufficiently alleged that Defendants made materially false and misleading statements and omissions, and that Defendants concealed the truth from investors concerning the true status of the Company's media rights agreement in the MENA region and profited from that concealment.  More specifically, Lead Plaintiff argued that Defendants misled investors when they informed the market that they were working on a "renewal" for a media rights agreement in the MENA region, when in reality and unbeknownst to investors, the agreement with OSN had been terminated early, leaving Defendants unable to "renew" the agreement and searching for a new media rights partner in the region.  Lead Plaintiff argued that the meaning of "renewal" was misleading in this context. Lead Plaintiff further argued that Defendants' later statement that WWE had an "agreement in principle" with the Saudis was untrue because, according to a confidential witness, months later

the parties (*i.e.*, WWE and the Saudi-owned entity, MBC) still were "worlds apart" in their negotiations.  Regarding Defendants' opinion arguments, Lead Plaintiff contended that the false statements were not opinion statements, and Defendants either: (i) did not genuinely hold the expressed opinions, or (ii) omitted material facts about the basis for the opinions.  Concerning Defendants' forward-looking statement arguments, Lead Plaintiff contended that the false statements were not forward-looking, omitted material information that made the statements misleading, or did not contain adequate cautionary language.

21.     With respect to Defendants' scienter arguments, Lead Plaintiff argued that the sworn declarations of WWE employees included in Defendants' motion to dismiss briefing acknowledged Defendants' scienter with respect to the "renewal" statements.  Lead Plaintiff also argued that while the termination of the OSN agreement was unknown to the market, Defendant McMahon sold WWE stock for proceeds of more than $261 million, which was strongly supportive of scienter.  Lead Plaintiff further argued that the confidential witnesses cited in the Complaint sufficiently supported allegations that Defendants could not have believed they had an "agreement in principle" with the Saudis, and that they were, at any rate, engaged in a turbulent and deteriorating relationship with the Saudis.

22.     On July 21, 2020, Defendants filed a reply brief in further support of their motion to dismiss the Complaint.  ECF No. 66.

23.     On July 30, 2020, the Parties participated in telephonic oral argument on Defendants' motion to dismiss before Judge Rakoff.

**D.     The Court's Order on the Motion to Dismiss**

24.     On August 6, 2020, the Court issued an Order denying Defendants' Motion to Dismiss, in its entirety.  *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123 (S.D.N.Y. 2020).  The Court found that Lead Plaintiff sufficiently alleged

the material and misleading nature of statements concerning both the: (i) renewal statements, *Id.* at 129-31, and (ii) the "agreement in principle" statements, *Id*. at 131-34. Specifically, the Court found, among other things, that the Complaint "does provide the requisite particularity as to both groups of alleged misrepresentation." *Id.* at 129.

25.     The Court also found that Lead Plaintiff sufficiently pled a strong inference of scienter. *Id*. at 138. With regard to the renewal statements, the Court credited both the circumstantial evidence of the signed declarations and the motive and opportunity resulting from Defendant McMahon's trades. *Id.* at 136-37. With regards to the "agreement in principle" statements, the Court credited the circumstantial evidence of the confidential witness testimony and that Defendants were motivated to shield the impact of the news that there was no media rights agreement in the MENA region by announcing an agreement in principle with the Saudis. *Id.* at 137-38. The Court further held that loss causation was adequately alleged for each alleged disclosure. *Id.* at 138.

26.     On August 19, 2020, the Court entered the Civil Case Management Plan, with a trial ready date of February 22, 2021. ECF No. 79.

27.     On August 28, 2020, Defendants filed their Answer to the Complaint, denying the Complaint's substantive allegations and raising 20 affirmative defenses. ECF No. 80.

**E.     Discovery**

28.     As described in more detail in Section IV, below, the discovery in this case, while expediated, was extremely fulsome. For example, in under three months, the Parties exchanged numerous document requests and interrogatories and met and conferred via telephone and videoconference on over 20 occasions, and sent numerous emails conferring weekly, and sometimes daily, on various discovery issues. Lead Counsel prepared and served over 20 subpoenas on non-parties and negotiated production pursuant to many of those subpoenas.

Defendants and third-parties produced over one million pages of documents, six depositions were taken, and numerous experts were consulted in preparation for summary judgment and trial.

### F.   Lead Plaintiff's Motion for Class Certification

29.   On October 6, 2020, Lead Plaintiff moved for certification of the class, appointment as class representative pursuant to Rules 23(a) and 23(b)(3), and appointment of Labaton Sucharow LLP as Lead Counsel.  ECF Nos. 85-87.  In connection with this motion, Lead Plaintiff filed an expert report on market efficiency by Mr. Coffman, CFA (ECF No. 87-1). Mr. Coffman conducted a detailed event study concerning: (i) the average weekly trading volume of WWE's stock, (ii) the number of securities analysts following and reporting on WWE, (iii) the extent to which market makers traded in WWE's stock, (iv) WWE's eligibility to file an SEC registration Form S–3, and (v) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in WWE stock's price.  Mr. Coffman concluded that the market for WWE's stock was efficient throughout the Class Period.

30.   In connection with class certification, Lead Plaintiff requested specific admissions by Defendants and sought and reviewed specific documents from Defendants.  *See* Section IV.A.

31.   Defendants deposed Mr. Coffman concerning his expert report and deposed a representative of Lead Plaintiff's investment manager, William Blair & Company.  Lead Counsel defended the deposition of Mr. Coffman and cross-examined the William Blair deponent.  *See* Section IV.C.

32.   On November 3, 2020, Defendants opposed Lead Plaintiff's motion for class certification, ECF No. 94, on the basis that, among other things, Lead Plaintiff lacked standing to represent purchasers of WWE common stock prior to July 25, 2019, because Lead Plaintiff did not purchase WWE stock until the following month (August 2019).  Defendants claimed that, as a result, Lead Plaintiff could not pursue claims with respect to the "renewal" misstatements

during the first half of the Class Period.  Defendants also asserted that Lead Plaintiff was not

adequate or typical based on deposition testimony from Lead Plaintiff's investment manager at

William Blair who stated that she knew the OSN agreement was terminated prior to purchasing

any WWE stock and believed that the agreement in principle with the Saudis was tentative.  As a

result, Defendants argued that William Blair did not rely upon the information Lead Plaintiff

alleges the Company misrepresented – and because of this, Lead Plaintiff was an atypical and

inadequate representative given that it faced unique defenses.  Alternatively, Defendants argued

that even if the Court certified a class, it should shorten the Class Period to start on July 25, 2019

– eliminating the claims concerning the "renewal" statements.

33.     Lead Plaintiff researched and prepared a reply in further support of class

certification which was due to be filed on November 24, 2020, but the Parties agreed to resolve

the Action approximately one week prior to filing the reply.

### G.     Mediation

34.     On November 17 and November 18, 2020, the Parties, including Lead Counsel, a

representative from Kansas City FPS, Defendants' Counsel, and representatives of certain of

WWE's insurance carriers, took part in a virtual mediation before JAMS mediator Robert A.

Meyer, Esq.  In advance of the mediation, and as discussed in Section VI, Lead Counsel put

extensive time and effort into preparing for the mediation and submitting a detailed mediation

statement and related material.

35.     At the end of the two-day mediation, the Parties reached an agreement to settle

the Action based on the Mediator's recommendation of $39,000,000, for the benefit of the

Settlement Class, which was memorialized in a binding term sheet executed and finalized on

November 18, 2020 (the "Term Sheet"), subject to the execution of a "customary long form"

stipulation and agreement of settlement and related papers.  The next day, November 19, 2020,

the Parties notified the Court of the Settlement and requested a stay of the Action, which was ordered on November 23, 2020.  ECF No. 100.

## IV.   DISCOVERY

36.   As set forth in more detail below, Lead Plaintiff: (i) prepared and served detailed discovery requests on Defendants, including Requests for Production of Documents, Interrogatories, and Requests for Admission; (ii) met and conferred with Defense Counsel via video-conference on numerous occasions concerning the discovery served by both sides and the search terms and protocols to be used to collect documents and data responsive to those discovery requests; (iii) prepared and served 21 subpoenas on non-parties and negotiated the production of information pursuant to many of those subpoenas; (iv) received and reviewed approximately 1,080,000 pages of production documents; (v) took, defended, or otherwise participated in six remote depositions, including taking the deposition of three fact witnesses (and preparing for many more), defending the depositions of Lead Plaintiff and Lead Plaintiff's market efficiency expert, Chad Coffman, and cross-examining a representative from Lead Plaintiff's investment manager William Blair; (vi) negotiated and resolved myriad discovery disputes; and (vii) engaged and consulted frequently with several experts, who were preparing expert reports, before the Parties reached a settlement.

37.   Prior to document production by the Parties, Lead Counsel and Defendants' Counsel negotiated a comprehensive confidentiality agreement, detailing two levels of confidentiality.  The protective order was So Ordered by the Court on September 18, 2020.  ECF No. 83.

38.   During discovery, Lead Counsel operated efficiently and flexibly, altering the size of the litigation team to fit the needs of the case and designating sub-teams to handle the many different aspects of discovery, such as Lead Plaintiff's document production, Defendants'

production, non-party productions, and deposition preparation, as well as a specific team

dedicated to class certification briefing.

**A.   Discovery Propounded on Defendants**

39.     Lead Plaintiff served its first set of document requests on Defendants on August

26, 2020.  Thereafter, Lead Plaintiff served its second set of document requests on Defendants on

October 27, 2020.

40.     Lead Plaintiff served its first set of interrogatories on Defendants on August 28,

2020 and a second set of interrogatories on November 4, 2020.

41.     Lead Plaintiff served its first set of requests for admission on Defendants on

August 26, 2020, and a second set of requests for admission on November 4, 2020.

42.     In total, this discovery included two sets of document requests containing 94

individual requests, two sets of interrogatories containing a total of ten individual interrogatories

for Defendants, and two requests for admission containing 106 individual requests.

43.     Lead Plaintiff also served a notice of deposition on WWE pursuant to Rule

30(b)(6), which included 12 topics for examination.

44.     Over the span of just three months, the Parties engaged in numerous meet-and-

confer conferences (typically, via video conference) and exchanged multiple meet and confer

letters and emails, as to the scope and manner of the requested document productions,

interrogatories, and requests for admission, including issues pertaining to search terms and

custodians for electronically stored information ("ESI"), production of documents in related

actions, and other disputes related to the requests.  More specifically, the Parties met and

conferred via telephone and videoconference on more than 20 occasions and emailed each other

weekly, sometimes multiple times a day.  Through this comprehensive effort, the Parties were

able to reach an understanding as to the scope of Defendants' discovery, and reached many compromises without having to request the Court's assistance.

45.     Lead Plaintiff conducted an efficient review of the documents produced in discovery.  Defendants began a rolling production of documents on October 5, 2020.  To facilitate an economical and time-efficient document review process, all of the documents were placed in an electronic database, using a platform called Disco to organize the data.

46.     A team of experienced Labaton Sucharow attorneys reviewed and analyzed the production.  These document review attorneys have all worked on multiple securities cases while at Labaton, specialize in securities and/or corporate governance litigation, and are experienced in utilizing the latest technology with respect to document review, including "Technology Assisted Review" and AI in order to maximize document review efficiencies.  Each were W-2 employees of Labaton, which means that the firm paid FICA and Medicare taxes on their behalf, along with state and federal unemployment taxes.  Once certain eligibility requirements were met, these attorneys had access to the firm's 401(k) program and were eligible to receive year-end bonuses.  Each attorney had access to secretarial and paralegal support, and the firm assigned a firm email address to each of them.  A summary of these attorney qualifications, as well as their resumes, is attached as Exhibit 2.

47.     As the production of documents by Defendants and third-parties ramped up, so too did the size of the review team—an effort to maximize effectiveness, especially given the case's expedited schedule.  The review began in late September 2020; a team leader and additional reviewers were added by October 2, 2020.  The review team grew to approximately ten reviewers, plus the team leader, just prior to settlement.  These attorneys were integral to the litigation team and focused on reviewing Defendants' and third-parties' document productions

for the purpose of preparing for class certification, fact depositions, expert reports and

depositions, the upcoming Defendants' summary judgment motion, and trial preparation, as well

as, eventually, preparing for mediation.

48.     To efficiently focus on the most relevant documents, these attorneys used the

document platform's software tools to analyze and search the data.  Due to the fast pace of

discovery, a linear review was not optimal.  Instead, the team used a variety of methods to

conduct targeted searches.  The attorneys culled documents based on legal issues, custodians,

and relevant time periods, in order to narrow the scope of the review universe.  Once this initial

set of documents was identified, the attorneys conducted targeted searching through text, file

names, document type (*e.g.,* emails, memoranda, SEC filings, and correspondence), dates, bates

numbers, etc. to identify relevant, irrelevant, and hot documents for additional review, and to

create collections of documents sorted by issue.  Documents also were allocated to be reviewed

by specific experts retained by Lead Counsel.  Through experience and their increasing

familiarity with the documents, the review team identified additional swaths of important

documents, which were also run through the analytics and search functions to derive the most

significant documents for use in connection with depositions, summary judgment, trial

preparation, expert discovery, and Lead Plaintiff's mediation statement.

49.     The document review attorneys did not only review documents.  They also

participated in frequent meetings with more senior attorneys to discuss important documents,

deposition preparation efforts, and case strategy.  These meetings occurred at least once per week

and were often twice-weekly.  The document review attorneys also: (i) assisted in selecting

relevant documents for expert review; and (ii) assisted in the preparation of deposition binders.

**B.      Fact Depositions of WWE Personnel**

50.      Lead Counsel conducted three fact witness depositions.  The fact depositions took place via electronic methods due to COVID restrictions.  The fact depositions Lead Counsel conducted were of:

(a)      Carlo Nohra (Vice President and General Manager, Middle East, at WWE) on November 11, 2020;

(b)      John Brody (Executive Vice President and Global Head of Sales and Partnerships at WWE) on November 13, 2020; and

(c)      Brad Blum (Executive Vice President, Operations, at WWE) on November 16, 2020.

51.      Collectively, the depositions provided substantial evidence and insight into events during the Class Period, including WWE's negotiations regarding the early termination of the OSN agreement and negotiations with the Saudis regarding a new media rights deal in the Middle East. However, they also provided a preview of the difficulties of proving Lead Plaintiff's case through adverse witnesses aligned with the Defendants.

52.      The Parties had scheduled and prepared for seven additional fact depositions, including the depositions of the three Individual Defendants, to occur between November 20 and December 4, 2020—a 14 day period during which Lead Plaintiff's reply in support of class certification was due and the hearing on the class certification motion was scheduled to occur. Lead Counsel was heavily engaged in preparing for these depositions, motion submission, and argument at the time the Parties agreed to settle the Action on November 18, 2020.

**C.      Discovery Propounded on Lead Plaintiff**

53.      Defendants also aggressively sought discovery from Lead Plaintiff.  Defendants' discovery requests led to: (i) the production of approximately 2,950 pages of documents; (ii) a

deposition of Lead Plaintiff's executive officer; (iii) multiple meet-and-confer sessions to discuss the scope of Lead Plaintiff's production, and (iv) a contentious letter writing campaign.  Lead Plaintiff objected to many of the discovery requests on the basis that they were exceedingly broad and sought information that was protected by various privileges and protections.

54.     As a result of the breadth of Defendants' document requests, the Parties engaged in extended meet-and-confer conferences to negotiate the scope of Lead Plaintiff's production. The Parties were able to reach a compromise on Lead Plaintiff's production without having to request the Court's assistance.

55.     Defendants also served interrogatories on Lead Plaintiff, which led to additional meet and confer conferences and email exchanges concerning the identity and availability of, and Lead Counsel's communications with, one of the confidential witnesses cited in the Complaint, who was located abroad and whose safety was at risk as a result of information he provided in the Complaint.  Although Lead Counsel prepared for argument before the Court on the issue, it was resolved without having to request the Court's assistance.

56.     Defendants deposed Barbara Davis, Executive Officer for the Firefighters' Pension System of the City of Kansas City, Missouri Trust, who testified as a Rule 30(b)(6) witness for Kansas City FPS, on October 23, 2020, via electronic means.  Lead Counsel traveled from New York to Missouri several days prior to prepare Ms. Davis for the deposition.

57.     Defendants also deposed Chad Coffman, CFA, Founder & President of Global Economics Group, LLC and Lead Plaintiff's market efficiency expert, on October 20, 2020, via electronic means.  The deposition was limited to Mr. Coffman's expertise on market efficiency as it related to Lead Plaintiff's motion for class certification and did not relate to Mr. Coffman's

additional expertise as Lead Plaintiff's expert in materiality, loss causation, and damages, which would have been the subject of a separate expert deposition.

58.     In addition, Lead Plaintiff's investment manager, William Blair, which purchased and/or sold WWE common stock on Lead Plaintiff's behalf during the Class Period, was subpoenaed by Defendants and produced 26,365 pages of documents, Lead Plaintiff's investment custodian Northern Trust produced 26 pages of documents, and Lead Plaintiff's investment consultant Asset Consulting Group produced 632 pages of documents.  Defendants deposed Lauren Thompson of William Blair on October 27, 2020, via electronic means.  Lead Plaintiff cross-examined Ms. Thompson.

59.     While these depositions provided support for Lead Plaintiff's claims and support for class certification and beyond, they also provided a preview of the difficulties of proving Lead Plaintiff's case, particularly with respect to falsity, materiality, and reliance.

**D.     Non-Party Discovery**

60.     In addition to the documents collected from Defendants, Lead Counsel also served 21 subpoenas for the production of documents on third-parties that Lead Counsel believed had documentary evidence relevant to the claims in the Action.  For example, Lead Plaintiff sought documents from consultants, which were involved in meetings between WWE and Saudi Arabian representatives concerning WWE's growth in Saudi Arabia.  Lead Plaintiff also sought documents from: (i) numerous analysts that covered WWE, (ii) non-party WWE board members, and (iii) the airline involved in the flight delay situation in Saudi Arabia.  While it did not ultimately come to fruition, Lead Plaintiff prepared a motion to compel the production of documents by an additional third party.  However, just prior to filing the motion to compel, the third party produced documents.  In total, and by the time the Parties had entered into the

Settlement, more than 258,000 pages of documents were produced from six different third-parties.

**E.    Discovery Disputes**

61.    As described above, discovery in this matter was both intense and voluminous. The Parties held more than 20 meet-and-confer sessions throughout discovery.  The Parties also engaged in several letter writing campaigns and contentious email correspondence, concerning: (i) Defendants' responses and objections to Lead Plaintiff's requests for documents; (ii) Lead Plaintiff's responses and objections to Defendants' requests for documents; (iii) Defendants' document custodians; (iv) the timing and content of Defendants' privilege logs accompanying their productions; (v) the scope and number of depositions; (vi) the scope and timing of a noticed 30(b)(6) deposition of WWE; (vii) Defendant McMahon's use of proceeds generated from his Class Period stock sales; and (viii) information concerning one of the confidential witnesses cited in the Complaint.

62.    Lead Plaintiff prepared for argument before the Court on several of these above enumerated discovery disputes.  However, through productive meet and confers on these issues, the Parties were able to reach compromises on all of these issues.

**F.    Expert Discovery**

63.    In preparation for expert discovery, Lead Plaintiff engaged four experts: (i) an expert on the MENA region, (ii) a media rights expert, (iii) an insider trading expert, and (iv) Mr. Coffman, to opine on materiality, loss causation and damages.  At the time the Parties agreed to settle the Action, Lead Plaintiff's experts were preparing expert reports for use at summary judgment and trial.

64.    More specifically, Lead Plaintiff's media rights expert was preparing a report articulating the importance of the Company's media rights agreements to its growth, specifically

that the MENA region was pivotal to WWE's growth.  Lead Plaintiff's insider trading expert was preparing a report concerning the Individual Defendants' stock trades—highlighted by Defendant McMahon's stock trades—and whether they were indicative of motive and opportunity to commit the alleged fraud and, thus, supportive of scienter.  Mr. Coffman  was preparing a report concerning, *inter alia*, whether:  (i) the alleged misstatements and omissions were material; (ii) the disclosures revealed the allegedly concealed information that WWE lacked a media rights agreement in the MENA region or impacted the Company's financial guidance or results; (iii) there was an economic link between the alleged misrepresentations and omissions and the foreseeable investor losses that occurred in connection with the alleged corrective disclosures; and (iv) the allegedly corrective information caused the price of WWE common stock to decline.  Mr. Coffman would have also expressed an opinion on appropriate damages figures.

## V.   RISKS FACED BY LEAD PLAINTIFF IN THE ACTION

65.     Based on publicly available information and documents obtained through counsel's investigation and the extensive fact and expert discovery conducted in the Action, Lead Counsel believes that it had adduced substantial evidence to support Lead Plaintiff's and the Settlement Class's claims and was prepared to proceed to trial.  However, Lead Counsel also realized that Lead Plaintiff and the Settlement Class faced significant risks and defenses in continuing to litigate, and if any of the risks materialized, Lead Plaintiff and the Settlement Class's potential recovery could be seriously jeopardized.  These risks were made apparent through document discovery, depositions, and class certification briefing.  Lead Plaintiff and Lead Counsel carefully considered these risks during the months and weeks leading up to the Settlement and throughout the settlement discussions with Defendants.

66.     With respect to estimated damages, using a rigorous event study and a well-recognized trading model, Mr. Coffman estimated maximum aggregate damages for the class to be approximately $559.1 million, assuming that gains on pre-class period purchases were netted and that Lead Plaintiff was able to prevail on *all* of its claims, including proving damages in connection with *all four* alleged disclosure dates.  However, this damages estimate does not account for disaggregation, *i.e.,* the removal of the portion of a stock price decline caused by confounding non-fraud related information, as detailed further below.  Once accounted for, maximum disaggregated damages estimated by Lead Plaintiff are approximately $215 million. In addition, Mr. Coffman analyzed several other damages scenarios advocated by Defendants or anticipated by Lead Plaintiff, based on the evidence adduced to date.  If any of Defendants' damages arguments prevailed at summary judgment or trial (including Defendants' loss causation contentions for any or all of the four alleged disclosures), the Settlement Class's damages would be severely or completely diminished.

67.     In agreeing to settle, Lead Plaintiff and Lead Counsel weighed, among other things, the substantial certain cash benefit to Settlement Class Members against: (i) the uncertainty of certifying a class covering the full alleged Class Period; (ii) the uncertainties in surviving Defendants' upcoming summary judgment motion, which could result in the termination of the Action, no recovery for the Settlement Class, and a lengthy appellate process; (iii) the difficulties and challenges involved in proving falsity, scienter, loss causation, reliance, materiality, and damages at trial; (iv) the fact that, even if Lead Plaintiff prevailed at summary judgment and trial, any monetary recovery could have been less than the Settlement Amount; and (v) the delays that would follow even a favorable jury finding, including a contested claims process and appeals to the Second Circuit and beyond.

A.      **Risks at Class Certification**

68.     Defendants tenaciously contested Lead Plaintiff's efforts to certify the class, by arguing that: (i) Lead Plaintiff lacked standing to pursue claims related to the renewal statements; (ii) Lead Plaintiff is atypical of the class and subject to unique defenses; (iii) Lead Plaintiff is an inadequate class representative; and (iv) alternatively, the class definition should be narrowed.

69.     Specifically, as noted above, Defendants argued in their opposition to Lead Plaintiff's motion for class certification that Lead Plaintiff "lacks standing to pursue claims relating to the 'renewal' statements because Plaintiff concedes that the Company fully disclosed the termination of the OSN agreement before Plaintiff purchased WWE stock." ECF No. 94 at 8. In anticipation of this argument, Lead Counsel actively considered the benefits and drawbacks to adding an additional named plaintiff (or class representative), but ultimately concluded that Lead Plaintiff could demonstrate adequate standing to represent a class for the renewal statements. Notwithstanding Lead Plaintiff's contention that it did in fact have standing to pursue this part of the case, Lead Counsel recognized the severity of the risk of a negative ruling on the issue, which would have resulted in a shortened class period, decreased damages, and the loss of favorable scienter inferences associated with McMahon's stock sale.

70.     Defendants also argued that Lead Plaintiff was atypical of class members because it was subject to several unique defenses. First, Defendants claimed that because Lead Plaintiff did not purchase WWE stock until after the "renewal" statements were corrected, Lead Plaintiff "cannot invoke the *Basic* presumption of reliance," and therefore must prove reliance on an individual basis, defeating typicality. ECF No. 94 at 13. Second, Defendants argued that Lead Plaintiff did not rely on the "renewal" statements because it purchased after the statements were corrected, and that William Blair—to whom Lead Plaintiff delegated investment authority—was aware of the truth concerning the "renewal" statements prior to Lead Plaintiff's purchases.

24

Third, Defendants argued that because William Blair obtained third-party analysis, which did not come from WWE, Lead Plaintiff was atypical for relying on non-public information. Fourth, Defendants argued that Lead Plaintiff did not rely on the "agreement in principle" statements because William Blair knew of the risks that an agreement with the Saudis would not be completed in the near-term and that negotiations with the Saudi authorities involved greater uncertainty. Fifth, Defendants argued that the unique issues presented by Lead Plaintiff would be detrimental to absent class members.

71.   Defendants also argued that Lead Plaintiff was an inadequate class representative because, in part, Lead Plaintiff did not have claims related to the "renewal" statements and would not collect damages if these claims succeeded, and thus, was not financially incentivized to vigorously pursue the "renewal" claims or maximize recovery for them.

72.   At the time of the Settlement, Lead Plaintiff was in the process of responding to each of Defendants' arguments in its reply in support of class certification. Although Lead Plaintiff would have contended that each of these arguments should be rejected, it recognized the significant downsides of the Court: (i) not appointing it as class representative, which would result in the case requiring an absent class member to step in as class representative; (ii) not certifying the class, which would result in a lengthy appeal and risk dismissal of the case outright; or (iii) shortening the Class Period, which, as discussed below, would result in decreased damages and losing scienter inferences tied to McMahon's stock sales.

**B.   Risks in Proving Liability and Damages**

73.   Beyond class certification challenges, there were significant risks that: (i) the Court would find that Lead Plaintiff failed to establish falsity, scienter, loss causation, reliance, materiality, or damages as a matter of law at summary judgment; (ii) Defendants would ultimately succeed in their *Daubert* challenges to Lead Plaintiff's experts' analyses; or (iii)—if

the Court were to permit the claims to proceed to trial—that a jury (or appeals court) would rule against Lead Plaintiff on liability and/or damages grounds.  While Lead Plaintiff and Lead Counsel believe they would have advanced strong arguments and evidence on the merits, they nonetheless acknowledge that Defendants' arguments and counter evidence posed very credible threats to Lead Plaintiff's ability to ultimately succeed.  Furthermore, if the Court or a jury were to find that any of the alleged corrective disclosures identified in the Complaint were not actionable, the potential recovery for the class would be significantly diminished.

74.    Even beyond these substantial challenges, Defendants would hold Lead Plaintiff to its burden of proof on each of the elements of securities fraud, and establishing the class's claims would require the jury to make complicated assessments of credibility in several complex and hotly contested factual disputes.

### 1.    Risks in Proving Falsity

75.    At summary judgment and trial, Defendants would likely argue that Lead Plaintiff simply failed to establish that Defendants' statements were false and misleading.  For example, Lead Plaintiff would have to establish that the "renewal" statements were false and that, contrary to Defendants' likely counter arguments and evidence, "renew" in the context of Defendants' statements specifically meant renewal of the agreement *with OSN*, and not simply that WWE would enter into an agreement with a counterparty within the region.  As described below, Defendants would also argue that the cancellation of the OSN agreement was already known to the market so the renewal statements were not understood by the market to refer to the OSN agreement.

76.    Lead Plaintiff would also have to establish that Defendants did not in fact have an agreement in principle with the Saudis.  More specifically, Lead Plaintiff would have to counter evidence demonstrating that Saudi representatives and WWE were in negotiations before the

July 2019 agreement in principle statement, and that they had an ongoing relationship dating back several years.  In addition, Defendants would likely argue that the inability to ultimately close on the agreement with the Saudis was a risk that was sufficiently warned of by Defendants, particularly by their stressing publicly that the agreement in principle was "nonbinding."

77.     While the Court credited Lead Plaintiff's falsity theory in connection with the motion to dismiss, discovery to date was mixed, yielding evidence that was supportive of each sides' arguments—resulting in the possibility that Lead Plaintiff's claims would be unable to survive summary judgment or presentation to a jury.

### 2.     Risks in Proving Scienter

78.     Lead Plaintiff also faced difficulties in establishing that Defendants had an intent to deceive or otherwise acted with recklessness nearing such intent.

79.     First, while McMahon's $261 million in stock trades were deemed suspicious enough to infer a finding of scienter at the motion to dismiss stage, Defendants would likely introduce evidence at summary judgment and at trial about legitimate reasons for the stock trades to rebut this inference and counter Lead Plaintiff's expert's testimony on the issue.  As discussed above, Lead Plaintiff could also lose the ability to present evidence of McMahon's stock sale if Defendants were to succeed in their arguments for shortening the Class Period.  In addition, Defendants explanation for McMahon's stock sale——to primarily fund the XFL, a professional football league—would be a question of fact posed to the jury.

80.     Second, Lead Plaintiff must establish that Defendants knew (or believed) or were reckless in not knowing (or reckless in not believing) that their renewal statements were false and that they did not have an agreement in principle with the Saudis.  With respect to the later, Lead Plaintiff obtained evidence which Lead Plaintiff contends supports Lead Plaintiff's claim that Defendants did not believe (or *should not* have believed) an agreement in principle had been

reached, however it was unclear how a jury would view the lengthy negotiations and the longstanding relationship between WWE and the Saudi government. Moreover, Defendants would likely have strong arguments that the agreement in principle statement, even if not believed by Defendants, was not made with the requisite intent to deceive. The Individual Defendants' depositions were crucial to proving these facts – which all would have come from hostile adverse witnesses.

81.     While Lead Plaintiff would put forth evidence and expert opinion to support its claims, there is no certainty about which side a jury would credit.

### 3.     Risks in Proving Reliance

82.     As discussed above, in opposing class certification, Defendants made strong arguments that Lead Plaintiff did not rely on either the renewal statements or the agreement in principle statements. Even if Lead Plaintiff was appointed as the class representative and the class was certified for the full Class Period, Defendants likely would have reasserted these same arguments at summary judgment and at trial—this time, arguing that Lead Plaintiff had not met its burden to establish an actionable claim, including the element of reliance.

83.     As with class certification, Lead Plaintiff believes it would succeed in establishing that it relied on Defendants' allegedly false statements, but recognizes the significant risk associated with this defense.

### 4.     Risks in Proving Materiality

84.     Defendants also would have likely argued strenuously that the renewal statements were immaterial since the OSN agreement generated a small percentage of WWE's total revenue. Lead Plaintiff was planning to establish, through an expert, that the OSN agreement had significant value for the Company and its growth plans even beyond the direct revenues from the deal, and that OIBDA mattered far more than revenue for WWE. However, Defendants

likely would have marshalled significant fact and expert evidence to oppose those arguments. How a jury would have weighed the competing evidence and experts was far from known.

### 5. Risks in Proving Loss Causation

85. Lead Counsel expects that Defendants would have vigorously persisted in arguing, at summary judgment, trial, and on appeal, that much (if not all) of the declines in WWE's stock price were not attributable to Defendants' allegedly false and misleading statements and omissions. In order to prove damages from those statements, Lead Plaintiff bears the burden of establishing "loss causation"—that Defendants' false and misleading statements caused their alleged loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'" (quoting 15 U.S.C. § 78u-4(b)(4))). Generally, Defendants would likely have argued that the first alleged disclosure, on April 25, 2019, did not reveal any information related to the alleged fraud, and that the last two alleged disclosures, on January 30, 2020 and February 6, 2020, revealed information that was already known to the market. If Defendants succeeded with these arguments, the Class Period would be shortened, and damages would be reduced substantially. *See* Paragraphs 94-96 below.

86. More specifically, with regard to the April 25, 2019 disclosure, Defendants would likely have marshalled evidence to support their argument that the lowered guidance for 2Q19 was unrelated to the early termination of the OSN agreement and therefore this disclosure did not actually correct any of the allegedly false statements.

87. With regard to the January 30, 2020 disclosure, Defendants likely would have continued to argue that the Adjusted OIBDA announcement of $180 million for 2019 on that date did not reveal anything new to the market, because the possibility of a lower range of results

was made publicly available on October 31, 2019 when Defendants lowered Adjusted 2019 OIBDA guidance by $10 to 20 million.

88.     With regard to the February 6, 2020 disclosure, Defendants likely would have continued to argue that this disclosure did not reveal anything new to the market because WWE had already disclosed the full truth concerning the purported fraud when it pre-announced the Adjusted OIBDA for 2019 on October 31, 2019 and January 30, 2020.

89.     Additionally, Defendants likely would have continued to argue a "truth on the market defense" because the market purportedly knew: (i) that the OSN agreement had been terminated before the alleged disclosure based, in part, on media reports that OSN was exiting the sports broadcasting business in Q1 2019; and (ii) that WWE might not finalize a media rights deal with the Saudis.

90.     While Lead Plaintiff would advance a number of arguments in response, including that each disclosure in fact revealed new, previously concealed information about the alleged fraud, there is no certainty as to how the Court or a jury would decide these issues.  If Defendants' loss causation arguments were sustained, and these corrective disclosures were eliminated, the surviving class period would have been substantially shortened to run only from July 25, 2019 through October 31, 2019, and estimated damages would have fallen, as detailed below.

### 6.     Risks in Proving Damages

91.     In addition to Defendants' loss causation and reliance arguments that threatened a significant reduction of damages, Defendants would also undoubtedly continue to dispute Mr. Coffman's methodologies, arguing, among other things, that he failed to conduct an adequate analysis to determine that: (i) WWE's common stock was efficient during the Class Period; (ii)

damages in the Action can be calculated on a class-wide basis using a common methodology;
and (iii) WWE's stock price declines were related to the alleged fraud.

92.    As mentioned, Mr. Coffman estimated maximum aggregate damages to be
approximately $559.1 million, if Lead Plaintiff were to prevail on all of its claims and pre-class
period gains were netted.  Of course, Defendants would have argued strenuously and presented
complex expert evidence purportedly showing that damages in the Action were much smaller, or
none at all, and Lead Plaintiff would need to disaggregate these damages to account for
information revealed to the market that was unrelated to the fraud.

93.    While Lead Plaintiff concedes that some amount of disaggregation would be
appropriate, Defendants would argue that a ***significant*** amount of the alleged stock price declines
was caused by confounding non-fraud related information.  For example, on April 25, 2019,
WWE issued lower-than-expected guidance for its second quarter of 2019. Lead Plaintiff alleged
the decline was caused, in substantial part, by the unknown risk that WWE would not receive, in
2Q19, the revenues associated with the OSN agreement, which had expired on March 31, 2019.
Complaint ¶371.  However, on that day, WWE also disclosed 1Q19 financial results, revealing
that revenues had fallen year over year on declines in the live events and consumer products
segments, which was concededly unrelated to the alleged fraud.  *Id*. ¶372.  Additionally, on
October 31, 2019, WWE disclosed its inability to complete a media rights deal in the MENA
region and that it was reducing its OIBDA guidance for the year; however, it also disclosed that
the reduction was, in part, caused by the "impact of accelerated investment to support content
creation."  *Id*. ¶267.  The impact of this non-fraud related information on the stock price declines
on April 25, 2019 and October 31, 2019 would need to be identified and quantified in order to
determine damages.

94.     Using discovery produced in the case, Mr. Coffman performed a disaggregation analysis on each of the four disclosure dates and determined that a reasonable estimate of likely class-wide damages, after disaggregation, was approximately $215 million for the full Class Period.  The Settlement represents approximately 18.1% of this estimate of achievable damages. However, Defendants would have vigorously countered this analysis with their own contrary expert testimony supporting much lower damages, leaving the issue to a jury to determine.

95.     Furthermore, as noted above, Defendants would continue to maintain that, for several reasons, the Class Period should begin on July 25, 2019 rather than February 7, 2019.  If the Court or jury agreed, Lead Plaintiff and the class would lose any damages associated with the April 25, 2019 disclosure, as well as the scienter allegations concerning McMahon's $261 million stock sale.  Mr. Coffman's estimate of disaggregated damages for this shorter class period was approximately $187.5 million.  The Settlement represents approximately 20.8% of this damages figure.

96.     Lead Plaintiff also ran the risk of further reduced damages.   For instance, Defendants have argued that the negative language and risk warnings used by them to describe the status of the agreement in principle as the Class Period progressed eliminate or mitigate liability after the January 30, 2020 disclosure.  Lead Plaintiff's expert has estimated that if the Class Period were shortened to July 25, 2019 through January 30, 2020, then the disaggregated damages would be approximately $159.5 million.  The Settlement would then represent 24% of this damages figure.  Furthermore, if Defendants' loss causation arguments were sustained and both the January 30, 2020 and February 6, 2020 corrective disclosures were removed, the surviving class period would have been substantially shortened and estimated non-disaggregated damages would have fallen to $101 million, with disaggregated damages of just $30.3 million.

C.      **Risks Attendant at Trial**

97.     In addition to the specific liability risks discussed above and the typical uncertainties attendant to placing complex securities fraud issues before a jury, a trial of this case presented its own unique hurdles.  Given the focus of evidence on the negotiation of the MENA media rights agreement over a long period of time between parties with an established relationship, it is certainly possible that a jury could view the situation as just that – a negotiation, and one that Defendants sufficiently warned of not being completed as of the "agreement in principle" statement in July 2019.  More broadly, in presenting the claims and the documentary and deposition evidence supporting the falsity of the statements, Defendants' scienter, and materiality of the allegedly withheld information, Lead Plaintiff intended to rely heavily on its media rights expert, who would certainly be countered by an expert presented by Defendants.  The Parties would likely present additional dueling experts on insider trading, loss causation, and damages.

98.     Further, at the time the Settlement was reached, the Parties had not yet filed *Daubert* motions, where Defendants would undoubtedly seek to exclude all or most of the testimony that Lead Plaintiff intended to offer through its experts.  Had Defendants prevailed in excluding any of this testimony, the presentation of many aspects of Lead Plaintiff's case would have been severely hampered.

99.     Lastly, even if Lead Plaintiff were successful in obtaining a jury verdict on all or part of its claims, it was a foregone certainty that a jury verdict would have been just the beginning of a long and arduous post-trial and appellate process.  Given the novelty of the issues concerning falsity, scienter, materiality, reliance, and the duties attendant under Section 10(b), an appellate process, with the possibility of reversal, presented a very real hurdle to obtaining a recovery for the class.

## VI.   SETTLEMENT NEGOTIATIONS

100.   Beginning in October of 2020, the Parties began initial discussions concerning the possibility of mediating the case.  Given the Parties' familiarity with the claims and defenses, the fast-approaching trial date, and well-informed views on the value of the case from their close knowledge of the documents produced, the Parties believed they were in a strong position to discuss settlement.  Moreover, Lead Counsel and Lead Plaintiff believed a mediation would be timely given the impending reply in support of class certification, the hearing on class certification, and the depositions of the Individual Defendants—all of which were scheduled to occur by December 4, 2020.  Lead Counsel and Lead Plaintiff believed they were particularly well situated to leverage a valuable settlement, given that mediation would likely occur on the eve of the Individual Defendants' depositions.

101.   Mediation was scheduled for November 17, 2020 before JAMS mediator Robert A. Meyer.  The Parties selected Mr. Meyer based on his significant experience as a mediator of securities class actions, as well as his wealth of experience in navigating insurance issues.

102.   Prior to the mediation, the Parties submitted thorough mediation statements.  Collectively, the two mediation statements attached dozens of exhibits.   Lead Plaintiff's mediation statement provided a detailed timeline of its views of Defendants' knowledge, as reflected in contemporaneous messages and other documentary evidence.

103.   The mediation on November 17, 2020 lasted for ten hours.  While negotiations were not ultimately successful, they were productive—enough so that the Parties and Mr. Meyer agreed to extend mediation talks to the following day, November 18, 2020, which lasted an additional six hours.  Both sessions were attended by Lead Counsel, Defendants' Counsel, certain insurers, and Lead Plaintiff, who actively participated in the Meditation.

104.    As a result of these arm's-length discussions, the Parties reached an agreement in principle to the settle the Action on November 18, 2020, which was memorialized in a term sheet that night.

105.    On November 23, 2020, the Court stayed the case until December 23, 2020, by which time the Parties were to file a formal settlement agreement and motion for preliminary approval of the settlement.  ECF No. 100.

106.    The Parties spent significant time drafting and conferring on, and ultimately memorializing the terms of the Settlement in the Stipulation, and its associated exhibits, which was executed by the Parties on December 22, 2020 and filed with the Court the next day, on December 23, 2020 (ECF No. 104-1), along with Lead Plaintiff's unopposed motion and supporting memorandum of law seeking preliminary approval of the proposed Settlement (ECF Nos. 102-03).[3]

107.    As documented in the Stipulation, in exchange for payment of the Settlement Amount ($39,000,000), upon the Effective Date of the Settlement, Lead Plaintiff and each and every other Settlement Class Member, will forever release all Released Plaintiff's Claims against the Released Defendant Parties and the Action will be dismissed with prejudice.  Released Plaintiff's Claims are essentially all claims that were brought or that could have been brought in the Action, or any forum, arising out of the allegations in the Action and the purchase of WWE

_____

[3] Contemporaneously with executing the Stipulation, as referenced in ¶41(a), the Parties also executed a Confidential Supplemental Agreement Regarding Requests for Exclusion ("Supplemental Agreement"),which governs the circumstances under which Defendants can terminate the Settlement if a certain threshold of exclusion requests is received.  It is typical to keep such agreements confidential so that potential opt outs do not use them to leverage additional recoveries for themselves, at the expense of the class.  If the termination threshold is ultimately reached, notice will be filed with the Court before the Settlement Hearing.  The term sheet, Stipulation, and Supplemental Agreement are the only agreements between the Parties in connection with the Settlement.

common stock during the Class Period. *See* Stipulation ¶1(ee). The release language was carefully tailored and is very typical of that used in numerous other securities class action settlements. It provides Defendants with "complete peace" from collateral re-litigation of the claims in the Action. Also, upon the Effective Date of the Settlement, the Defendants will forever release all Released Defendants' Claims against the Released Plaintiff Parties. Released Defendants' Claims are essentially all claims related to the institution, prosecution, or settlement of the claims. *See id.* ¶1(cc).

## VII. LEAD PLAINTIFF'S COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS

108. On March 7, 2021, the Court granted Lead Plaintiff's unopposed motion for preliminary approval of the Settlement (the "Preliminary Approval Order"). ECF No. 107. Pursuant to the Preliminary Approval Order, the Court: (i) preliminarily certified, for Settlement only, the Settlement Class; (ii) preliminarily certified Lead Plaintiff as Class Representative for the Settlement Class; and (iii) preliminarily appointed Labaton Sucharow LLP as Class Counsel for the Settlement Class. *Id.*

109. Pursuant to the Preliminary Approval Order, the Court appointed Epiq Class Action and Claims Solutions, Inc. ("Epiq") as the Claims Administrator and instructed Epiq to disseminate copies of the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses and Proof of Claim (collectively the "Notice Packet") by mail and to publish the Summary Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses. Prior to selecting Epiq, Lead Counsel received bids from three highly regarded and experienced claims administration firms and ultimately selected Epiq based on its fee proposal and Lead Counsel's successful track record in cases in which Epiq was used.

110.    The Notice, attached as Exhibit A to the Declaration of Melissa M. Mejia Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion (the "Mailing Declaration", Ex. 3), provides potential Settlement Class Members with information about the terms of the Settlement and, among other things:  their right to opt-out of the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Claim Form to be eligible for a payment from the net proceeds of the Settlement. The Notice also informs Settlement Class Members of Lead Counsel's intention to apply for an award of attorneys' fees of no more than 18% of the Settlement Fund and for payment of litigation expenses in an amount not to exceed $550,000.

111.    As detailed in the Mailing Declaration, on March 22, 2021, Epiq began mailing Notice Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees whose clients may be Settlement Class Members.  Ex. 3 at ¶¶2-8.  In total, to date, Epiq has mailed 46,925 Notice Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid.  *Id.* at ¶8.[4]

112.    On April 5, 2021, Epiq caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire* for dissemination across the internet. *Id*. at ¶9 and Exhibit B attached thereto.

113.    Epiq also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.WWESecuritiesSettlement.com, to provide Settlement Class Members with information, including downloadable copies of the Notice Packet and the Stipulation.  *Id*. at ¶13.

---

[4] As is standard in securities class actions, personal email addresses of potential class members were not requested (or provided) from the Company's transfer agent or nominees.

114.     Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to request exclusion from the Settlement Class is May 25, 2021. To date, no objections to the Settlement have been received and the Claims Administrator has received one request for exclusion in connection with the Notice.  *Id*. at ¶14.

115.     Lead Counsel will respond to any future objections and exclusion requests in its reply papers, which are due on June 8, 2021.

**VIII.   PLAN OF ALLOCATION**

116.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in a future distribution of the Settlement proceeds must submit a valid Claim Form, including all required information, no later than June 10, 2021.  As provided in the Notice, after the deduction of Court-awarded attorneys' fees and litigation expenses, Notice and Administration Expenses, Taxes, and any other fees or expenses approved by the Court, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

117.     The proposed Plan of Allocation, which was set forth in full in the Notice (Ex. 3-A), is designed to achieve an equitable and rational distribution of the Net Settlement Fund.  Mr. Coffman developed the Plan of Allocation after careful consideration of the Settlement Class's theories of liability and damages, including disaggregation, and Lead Counsel believes that the plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

118.     The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Claims," calculated according to the Plan's formulas, which are consistent with Lead Plaintiff's theories of liability

and damages under the Exchange Act.  These formulas consider the amount of alleged artificial inflation in the prices of WWE's publicly traded common stock, as estimated by Mr. Coffman. Mr. Coffman analyzed the movement in the prices of WWE's common stock and took into account the portion of the price drops allegedly attributable to the alleged fraud.

119.    Claimants will be eligible for a payment based on when they purchased, held, or sold their WWE stock.  The Court-approved Claims Administrator, under Lead Counsel's direction, will calculate claimants' Recognized Loss Amounts using the transactional information provided in their Claim Forms.  Claims may be submitted to the Claims Administrator through the mail, online using the case website or, for large investors with thousands of transactions, through email to Epiq's electronic filing team.  (Neither the Parties nor the Claims Administrator independently have claimants' transactional information.)  Lead Plaintiff's losses will be calculated in the same manner.

120.    After the Effective Date of the Settlement, in accordance with the terms of the Stipulation, the Plan of Allocation, or such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund will be distributed to Authorized Claimants.  After the distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of the distribution, the Claims Administrator will, if feasible and economical after payment of any outstanding Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, redistribute the balance among Authorized Claimants who have cashed their checks in an equitable and economic fashion.  Once it is no longer economical to make further distributions, any balance that still remains in the Net Settlement Fund after re-distribution(s) and after payment of any outstanding Notice and Administration Expenses, Taxes,

and attorneys' fees and expenses, if any, will be contributed to a private, non-profit, non-sectarian 501(c)(3) organization approved by the Court upon motion by Lead Plaintiff.  Before Lead Plaintiff moves to distribute any unclaimed funds, Lead Counsel will confer with Paul, Weiss, Rifkind, Wharton & Garrison LLP and will recommend to the Court an organization that is acceptable to Lead Plaintiff and WWE.

121.    To date, there have been no objections to the proposed Plan of Allocation.

122.    In sum, the proposed Plan of Allocation, developed by Lead Plaintiff's damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants.  Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## IX.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

123.    For its significant efforts on behalf of Lead Plaintiff and the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  As explained in Lead Counsel's Fee Brief, courts within the Second Circuit recognize that the percentage method is the appropriate method of fee recovery and the prevailing method of determining attorneys' fees in the Second Circuit.

124.    Consistent with the Notice, Lead Counsel seeks a fee award of 18% of the Settlement Fund, *i.e.,* $7,020,000, plus accrued interest, if any.  Lead Counsel also requests payment of its expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $468,375.08, plus Lead Plaintiff's request for $6,286.40, pursuant to the PSLRA.  Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

### A.      Lead Plaintiff Supports the Fee and Expense Application

125.    Kansas City FPS, a sophisticated institutional investor, played a central role in monitoring and participating in the Action by, among other things, (i) regularly communicating with Lead Counsel regarding the posture and progress of the Action; (ii) reviewing and/or discussing all significant pleadings, motions, and briefs filed in the Action; (iii) reviewing and/or discussing significant decisions in the Action; (iv) coordinating and reviewing Kansas City FPS's production of documents and written discovery responses to Defendants; (v) contacting Kansas City FPS's investment managers and others responsible for Kansas City FPS's investments in WWE's securities; (vi) virtually attending two court hearings – during one of which Kansas City FPS was questioned by the Court; (vii) virtually participating in a full day deposition; (viii) participating in two full day mediations sessions; and (ix) evaluating and approving the proposed Settlement.  *See* Ex. 1 at ¶6.

126.    Lead Plaintiff evaluated and fully supports the Fee and Expense Application.  *See* Ex. 1.  In coming to this conclusion, Lead Plaintiff considered the recovery obtained, as well as Lead Counsel's substantial effort in obtaining the recovery.  Particularly in light of the considerable risks of the litigation, which Lead Plaintiff was well aware of, Lead Plaintiff agreed to allow Lead Counsel to apply for 18% of the Settlement Fund.  *See id.*

127.    The 18% request is a highly-competitive cap on Lead Counsel's fees, based on a negotiations between Lead Counsel and Kansas City FPS at the start of the case, which were memorialized in the Lead Plaintiff's retention agreement with Labaton and which incorporate the stage of the litigation at which the case is settled.

### B.      The Favorable Settlement Achieved

128.    Here, as described above, the $39,000,000 Settlement is a very favorable result, particularly when considered in view of the substantial risks and obstacles to recovery if the

Action were to continue through decisions on class certification and summary judgment, to trial, and through likely post-trial motions and appeals.

129.    As set forth in detail above, the recovery obtained for the Settlement Class was the result of thorough and diligent prosecutorial and investigative efforts, complicated motion practice, and extensive discovery efforts—all under an expedited schedule.  As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or significantly less recovery) in the absence of a settlement.

### C.    The Risks and Unique Complexities of Contingent Class Action Litigation

130.    This Action presented substantial challenges from the outset of the case.  The specific complexities and risks Lead Plaintiff faced in proving Defendants' liability and damages are detailed in paragraphs 65 to 96, above.  These case-specific risks, which were made evident to Lead Counsel and Lead Plaintiff as the case advanced in discovery and through class certification briefing, are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent basis. Here, there was no restatement, no Company admissions, and no parallel governmental or criminal proceedings, which would have aided Lead Plaintiff or Lead Counsel in proving elements of the case, like materiality and scienter.

131.    From the outset, Lead Counsel understood that it was embarking on a complex and expensive litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and cover the considerable costs that a

case such as this requires.  These obligations were of specific focus given the expedited nature

of the Action.  With no promise of recovery, the financial burden on contingent-fee counsel is far

greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no

compensation during the course of the Action but has dedicated 8,437.7 hours of time with a

lodestar value of $4,624,292.50 and has incurred $468,375.08 in expenses in prosecuting the

Action for the benefit of the Settlement Class.  *See* Declaration of Carol C. Villegas, Ex. 4.

132.     Even with the most vigorous and competent of efforts, success in contingent-fee

litigation, such as this, is never assured.  Lead Counsel knows from experience that the

commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard

work and diligence by skilled counsel to develop the facts and theories that are needed to sustain

a complaint, win at trial, or convince sophisticated defendants to engage in serious settlement

negotiations at meaningful levels.  Lead Counsel is aware of many hard-fought lawsuits in

which, because of the discovery of facts unknown when the case was commenced—like that

existed in the Action—or changes in the law during the pendency of the case, or a decision of a

judge or jury following a trial on the merits, excellent professional efforts of members of the

plaintiffs' bar produced no fee for counsel.

133.     Federal appellate reports are filled with opinions affirming dismissals with

prejudice in securities cases.  The many appellate decisions affirming summary judgment and

directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of

recovery.  *See, e.g.*, *In re Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon

Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x.

339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir.

2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

134.    Successfully certifying the class for the full as-pled class period and successfully opposing a motion for summary judgment are also not guarantees that plaintiffs will prevail at trial.  Indeed, while only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), litigated by Labaton Sucharow, or partially lost, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

135.    Even plaintiffs who succeed at trial may find their verdict overturned.  *See, e.g.*, *In re BankAtlantic Bancorp, Inc.*, No. 07-cv-61542 (S.D. Fla. 2010) (in case tried by Labaton Sucharow, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd*, 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).  And, the path to maintaining a favorable jury verdict can be arduous and time consuming.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL

3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23,

2010) (trial court tossing unanimous verdict for plaintiffs, which was later reinstated by the

Ninth Circuit Court of Appeals) and judgment re-entered (*id*.) after denial by the Supreme Court

of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police

Annuity & Benefit Fund*, 131 S. Ct. 1602 (2011)).

136.    Losses such as those described above are exceedingly expensive for plaintiffs'

counsel to bear.  The fees that are awarded in successful cases are used to cover enormous

overhead expenses incurred during the course of litigations and are taxed by federal, state, and

local authorities.

137.    Courts have repeatedly held that it is in the public interest to have experienced

and able counsel enforce the securities laws and regulations pertaining to the duties of officers

and directors of public companies.  Vigorous private enforcement of the federal securities laws

and state corporation laws can only occur if private plaintiffs can obtain some parity in

representation with that available to large corporate defendants.  If this important public policy is

to be carried out, courts should award fees that will adequately compensate private plaintiffs'

counsel, taking into account the enormous risks undertaken with a clear view of the economics of

a securities class action.

138.    As discussed in detail above, this case was fraught with significant risk factors

concerning liability and damages.  Were this Settlement not achieved, and even if Lead Plaintiff

prevailed at trial, Lead Plaintiff and Lead Counsel faced potentially years of costly and risky

appellate litigation against Defendants, with ultimate success far from certain and the prospect of

no recovery significant.  Lead Counsel therefore respectfully submits that based upon the

considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### D.      The Time and Labor of Lead Counsel

139.     The work undertaken by Lead Counsel in investigating and prosecuting this case and arriving at the present Settlement in the face of serious hurdles, has been time-consuming and challenging.  As explained above, counsel conducted a robust investigation into the class's claims; researched and prepared a comprehensive amended complaint in less than a month from when Kansas City FPS was appointed Lead Plaintiff; briefed a thorough opposition to Defendants' motions to dismiss the Complaint; prepared for and participated in a motion to dismiss hearing; moved for certification of the class and substantively prepared Lead Plaintiff's reply—countering Defendants' numerous arguments—in further support of class certification; engaged in extremely thorough discovery efforts that led to obtaining more than approximately 1,080,000 pages of documents from Defendants and third-parties; conducted twice-weekly (or often more frequent) meetings during discovery to discuss the continued investigation, Defendants' document production, Lead Plaintiff's document production, third party subpoenas, depositions, interrogatories, requests for admissions, class certification, and numerous other issues;[5] engaged in over 20 phone and video meet and confers with Defendants' Counsel and exchanged numerous emails with counsel regarding discovery issues; took, defended, or participated in six depositions, and prepared for at least seven others; retained and had numerous meetings with several experts; prepared for Lead Plaintiff's opposition to summary judgment and trial; and prepared for the mediation, including formulating detailed mediation submissions.

---

[5] Lead Counsel had separate (but sometimes overlapping) teams dedicated to the different aspects of discovery, such as Lead Plaintiff's document production, Defendants' production and depositions, as well a specific team dedicated to class certification briefing.

140.    Lead Counsel was required to work many late hours—especially given the expedited schedule.  In part because of the demanding schedule, which culminated in November with seven depositions scheduled during a 14-day period, a significant degree of senior attorney attention was required to best advance the case and evaluate ongoing case theories and risks as the case rapidly developed.

141.    At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial, by the most efficient means possible.

142.    Attached as Exhibit 4 is a declaration detailing Lead Counsel's time and expenses.  Included with this declaration is a schedule that reports the amount of time spent by the attorneys and professional staff of Labaton Sucharow and the "lodestar" calculations, *i.e.,* their hours multiplied by their current hourly rates.  *See* Ex. 4-A.  As explained in the declaration, it was prepared from contemporaneous time records regularly prepared and maintained by Lead Counsel.  *See* Ex. 4.

143.    The hourly rates of Lead Counsel here range from $800 to $1,150 for partners, $565 to $800 for of counsels, $425 to $550 for associates, and $355 to $375 for paralegals.  *See* Ex. 4-A.  The rates for the staff attorneys, who focused on document review and deposition preparation, ranged from $315 to $435, *id.*, with an overall blended hourly rate of approximately $392.  It is respectfully submitted that the hourly rates for Lead Counsel included in this schedule are reasonable and customary for this type of complex commercial litigation.  A table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2020 is attached as Exhibit 5.  The

analysis shows that across all types of attorneys, Lead Counsel's rates are consistent with, or lower than, the firms surveyed.

144.    Lead Counsel has expended 8,437.7 hours in the prosecution and investigation of the Action through May 10, 2021.  *See* Ex. 4-A.  The resulting lodestar is $4,624,292.50, which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, and assisting Class Members. *Id*.  Pursuant to a lodestar "cross-check," applied within the Second Circuit, the requested fee of 18% of the Settlement Fund (or $7,020,000) results in a "multiplier" of 1.5 on the lodestar.

**E.     The Skill Required and Quality of the Work**

145.    Lead Counsel Labaton Sucharow is among the most experienced and skilled securities litigation law firms in the field.  The expertise and experience of its attorneys are described in Exhibit 4-C.

146.    Since the passage of the PSLRA, Labaton Sucharow has been approved by courts to serve as lead counsel in numerous notable securities class actions throughout the United States, and has taken three of the approximately 21 post-PSLRA securities class actions to trial. Here, Labaton Sucharow attorneys have devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience.  For example, Labaton Sucharow has served as lead counsel in a number of high profile matters:  *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1501 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York

State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million). *See* Ex. 4-C.

> **F.      Standing and Caliber of Defendants' Counsel**

147.      The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by (1) K&L Gates LLP, (2) Paul, Weiss, Rifkind, Wharton & Garrison LLP, and (3) Day Pitney LLP.  After the motion to dismiss order, K&L Gates LLP was primarily replaced by Paul, Weiss, Rifkind, Wharton & Garrison LLP as lead defense counsel, but K&L Gates LLP remained in the case to further represent Defendants.  Paul Weiss is one of the country's most prestigious and experienced defense firms, which vigorously represents its clients.  In the face of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

## X.      LEAD COUNSEL'S REQUEST FOR LITIGATION EXPENSES

148.      Lead Counsel seeks payment from the Settlement Fund of $468,375.08 in litigation expenses reasonably and necessarily incurred in connection with prosecuting the claims against Defendants.  The Notice informs the Settlement Class that Lead Counsel will apply for payment of litigation expenses of no more than $550,000, which includes Lead Plaintiff's reimbursement of expenses directly related to its representation of the Settlement Class.  *See* Ex. 3-A at ¶¶4, 39.  The amount requested is below this cap.  To date, no objection to Lead Counsel's request for expenses has been raised.

149.      As set forth in its expense schedule, Lead Counsel has incurred a total of $468,375.08 in litigation expenses in connection with the prosecution of the Action.  *See* Ex. 4-

B.  As attested to, these expenses are reflected on the books and records maintained by Labaton Sucharow.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  Lead Counsel's declaration identifies the specific category of expense – *e.g.*, testifying and consulting expert fees, outside investigative firm fees, document management and storage system(s), electronic research, service of process fees, court reporting fees, duplicating, and overnight delivery expenses.

150.    A significant component of Lead Counsel's expenses is the cost of testifying and consulting experts, which totals $298,075.60 or approximately 64% of its total expenses.  Lead Counsel retained Mr. Coffman to evaluate damages and loss causation issues, as well as opine on market efficiency in connection with Lead Plaintiff's class certification motion.  Mr. Coffman submitted a report in connection with class certification.  Mr. Coffman was also retained to evaluate the issues of materiality, causation, and the amount of damages suffered by the class, as preparation for an expert report at summary judgment and to evaluate various damage scenarios in advance of mediation.  Mr. Coffman also developed, in consultation with Lead Counsel, a fair and reasonable Plan of Allocation.  Lead Counsel also retained: (i) an expert in insider trading, who had prepared a draft expert report on the Individual Defendants' trading of WWE stock and the extent to which the trading was supportive of their scienter; (ii) a media rights expert, who was in the process of preparing an expert report about WWE's MENA media rights agreement; (iii) a consulting expert who was crucial in assisting Lead Counsel's understanding of the media rights landscape in the MENA region, including identifying the major players; and (iv) jury consultants.  Except for the consulting experts, it is highly likely that each expert would have been deposed and would have assisted with crafting arguments countering the Defendants'

experts.  Lead Counsel spent numerous hours meeting, albeit virtually, with each of the retained experts.  These professionals were essential to the prosecution of the Action.

151.    Lead Counsel seeks $74,753.58 in expenses (approximately 16% of aggregate expenses) related to its use of investigative firm Gryphon Strategies, which assisted with the investigation—including providing valuable assistance with the identification and interviewing of witnesses located abroad, including in the MENA region.

152.    Because of the COVID-19 pandemic, travel expenses were significantly less than in a typical securities case involving events and potential witnesses outside the U.S. and that was in the midst of fact and expert discovery.  However, notwithstanding the pandemic, some travel was required—namely travel from New York to Missouri to prepare Lead Plaintiff for a deposition.  Travel costs in connection with the Action and incurred costs related to working meals, lodging, and transportation, total $3,834.09.  All airfare is at economy rates.

153.    Remote court reporting costs related to depositions totaled $24,964.25 or approximately 5% of aggregate expenses.

154.    Computerized electronic research totaled $14,991.15 or approximately 3% of aggregate expenses.  These are the charges for computerized factual and legal research services, including PACER, Thomson West (Westlaw) and Lexis/Nexis, Thomson T1 Research, and Bloomberg.  These services allowed counsel to perform media searches on WWE, obtain analysts' reports and financial data for WWE, and conduct legal research.

155.    In addition, expenses for document discovery management and storage totaled $24,474.05 or approximately 5% of aggregate expenses, which includes an estimate of $3,607.74 for approximately four months of ongoing baseline costs.  Although discovery has been paused in light of the Settlement, baseline monthly fees for these vendors will be incurred.  Given the

Settlement Hearing on June 15, 2021, and the lack of objections to date, we estimate that the Settlement may reach its Effective Date in July, at which point the electronic discovery can be shut down.

156.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients who pay by the hour.  These expenses include, among others, duplicating/printing costs, service and filing fees, and overnight delivery expenses.

157.    All of the litigation expenses incurred, which total $468,375.08, were necessary to the successful prosecution and resolution of the claims against Defendants.

158.    In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class.  Accordingly, it is respectfully submitted that the expenses incurred by Lead Counsel should be paid in full from the Settlement Fund.

## XI.    LEAD PLAINTIFF'S REIMBURSEMENT PURSUANT TO THE PSLRA

159.    Additionally, in accordance with 15 U.S.C. § 78u-4(a)(4), Lead Plaintiff Kansas City FPS seeks reimbursement of its reasonable costs and expenses (including lost wages) incurred in connection with its work representing the Settlement Class in the aggregate amount of $6,286.40, which, when included with Lead Counsel's expenses, is below the $550,000 that the Notice informed the Settlement Class would be the cap on litigation expenses.  The amount of time and effort devoted to this Action by Lead Plaintiff is detailed in the accompanying Declaration of Barbara Davis, Executive Officer of Kansas City FPS, attached as Exhibit 1. Kansas City FPS seeks $4,753.00 in connection with the time it dedicated to the litigation, and $1,533.40 in expenses.  *Id*.  Lead Counsel respectfully submits that the amounts requested by Lead Plaintiff are consistent with Congress's intent, as expressed in the PSLRA, of encouraging

institutional investors to take an active role in commencing and supervising private securities litigation.

160.     As discussed in the Fee Brief and in Lead Plaintiff's supporting declaration, Lead Plaintiff has been committed to pursuing the class's claims since it became involved in the litigation.  As a large institutional investor, Lead Plaintiff actively and effectively fulfilled its obligations as a representative of the class, complying with all of the many demands placed upon it during the litigation and settlement of the Action, and providing valuable assistance to Lead Counsel.  For instance, Lead Plaintiff (i) regularly communicated with Lead Counsel regarding the posture and progress of the Action; (ii) reviewed and/or discussed all significant pleadings, motions, and briefs filed in the Action; (iii) reviewed and/or discussed significant decisions in the Action; (iv) coordinated and reviewed Kansas City FPS's production of documents and written discovery responses to Defendants; (v) contacted Kansas City FPS's investment managers and others responsible for Kansas City FPS's investments in WWE's securities; (vi) virtually attended two court hearings – during one of which Kansas City FPS was questioned by the Court; (vii) prepared for and virtually participated in a full day deposition; (viii) participated in two full day mediations sessions; and (ix) evaluated and approved the proposed Settlement. Ex. 1 at ¶6.  These efforts required employees of Lead Plaintiff to dedicate time and resources to the Action that it would have otherwise devoted to its regular duties.

161.     Barbara Davis, Executive Officer of Kansas City FPS, dedicated at least 65.25 hours to litigation efforts.  *Id.* at ¶12.  Her standard rate as Executive Officer increased from $71.61 per hour to $73.04 per hour during the course of the Action, resulting in a cost to Lead Plaintiff of $4,753.00.  *Id*. at ¶13.  Kansas City FPS also seeks reimbursement for the $1,533.40 in fees it paid to its outside fund counsel, Arnold, Newbold, Sollars & Hollins, P.C., in

connection with participating in the Action and ensuring that its efforts were consistent with Kansas City FPS's fiduciary and other obligations.  *Id.* at ¶14.

162.    The efforts expended by Lead Plaintiff during the course of the Action are precisely the types of activities courts have found support reimbursement to class representatives, and support Lead Plaintiff's request for reimbursement.

## XII.   THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

163.    As mentioned above, consistent with the Preliminary Approval Order, a total of 46,925 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 18% of the Settlement Fund, and payment of expenses in an amount not greater than $550,000, which includes Lead Plaintiff's reimbursement of expenses directly related to its representation of the Settlement Class.  *See* Ex. 3 at ¶8.  Additionally, the Summary Notice was published in *The Wall Street Journal* and be transmitted over *PR Newswire*.  *Id*. at ¶9.  The Notice has also been available on the case website maintained by the Claims Administrator (*id.* at ¶13) and on Labaton Sucharow's website.[6]

164.    While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no one has objected to the fee or expense request.  Lead Counsel will respond to any objections that may be received in its reply papers, if such papers are necessary.

---

[6] Lead Plaintiff's motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the case website and Labaton Sucharow's website.

## XIII.   MISCELLANEOUS EXHIBITS

165.    Attached as Exhibit 6 is a true and correct copy of Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA 2021).

166.    Attached as Exhibit 7 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee Brief.

## XIV.   CONCLUSION

167.    In view of the significant recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate, and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the significant recovery in the face of substantial risks; the quality, efficiency, and amount of work performed under a tight schedule; the contingent nature of the fee; and the standing and experience of Lead Counsel, as described above and in the accompanying memorandum of law, Lead Counsel respectfully submits that a fee in the amount of 18% of the Settlement Fund be awarded, that its litigation expenses in the amount of $468,375.08 be paid, and that Lead Plaintiff be reimbursed $6,286.40, pursuant to the PSLRA.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 11, 2021.

_____ */s/ Carol C. Villegas*
CAROL C. VILLEGAS